UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS


KEVIN RICHARD CARMODY,

                          Docket No. 12-2249

          Plaintiff,

   vs.                    Urbana, Illinois
                          January 12, 2016
BOARD OF TRUSTEES OF THE      9:15 a.m.
UNIVERSITY OF ILLINOIS, et al.,

          Defendants.


JURY TRIAL -- Day 1 of 3

BEFORE THE HONORABLE COLIN STIRLING BRUCE
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S :

For the Plaintiff:      MICHAEL J. TAGUE, ESQUIRE
                       Flynn, Palmer & Tague
                       402 West Church Street
                       P.O. Box 1517
                       Champaign, Illinois 61824-1517
                       217-352-5181

For the Defendants:     WILLIAM J. BRINKMANN, ESQUIRE
                       Thomas, Mamer & Haughey, LLP
                       30 East Main Street, Suite 500
                       Champaign, Illinois 61820
                       217-351-1500

Court Reporter:        LISA KNIGHT COSIMINI, RMR-CRR
                       U.S. District Court
                       201 South Vine, Suite 344
                       Urbana, Illinois 61802

Proceedings recorded by mechanical stenography; transcript
produced by computer.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

2

I  N  D  E  X

Page

PRELIMINARY MATTERS ...............................   3


COURT'S PRELIMINARY INSTRUCTIONS
     By Judge Bruce .................................  21


OPENING STATEMENTS
     By Mr. Tague ...................................  37
     By Mr. Brinkmann ..............................  48


DEBORAH STONE
     Direct Examination by Mr. Tague ...............  63
     Cross-Examination by Mr. Brinkmann ............  83
     Redirect Examination by Mr. Tague .............  85


JOSEPH BOHM
     Direct Examination by Mr. Tague ...............  88


SHARON REYNOLDS
     Direct Examination by Mr. Tague ............... 127

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1              (In open court, 9:15 a.m.)
 2          COURTROOM DEPUTY:  This is in Case Number
 3   12-2249, Carmody versus the Board of Trustees of the
 4   University of Illinois, et al.
 5          THE COURT:  The plaintiff, Kevin Carmody, is
 6   present.  He is accompanied by his attorney, Michael
 7   Tague.
 8          The defendants are present.  You're obviously
 9   Joseph Bohn.  I think I overheard you identify yourself
10   as Sharon Reynolds.  And that leaves you to be Deborah
11   Stone.
12          DEFENDANT STONE:  Yes.
13          THE COURT:  And all three defendants are
14   present, and they are represented by their attorney,
15   William Brinkmann.
16          We've got some time on our hands.  Just so the
17   record is clear, there's a winter storm warning right now
18   from the National Weather Service for a large part of our
19   area.  We have some jurors coming down from around the
20   Kankakee area on I-57; coming up from the
21   Mattoon-Charleston area on I-57.  I'm told that those
22   driving on I-72 from Decatur or I-74 from Danville, the
23   east-west routes are not being heavily impacted by the
24   bad weather; but the north-south routes, at some points
25   there's white-out conditions.
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249                    4

1          So this morning I have excused three additional

2     jurors through the clerk -- obviously, I didn't speak to

3     them directly -- who are, two of them were elderly and

4     afraid to drive down here from Kankakee because of the

5     weather.  One of them was going to drive up from the

6     Mattoon-Charleston area; but they're farther out in the

7     country, and one of the roads they were going to go on

8     was essentially impassable.

9          So we're waiting for the rest of the jurors,

10    potential jurors to arrive; and they're also in the

11    process of moving some cars around.  We had some parking

12    difficulty also because it -- you know, the weather

13    doesn't just impact us.  It impacts the county courthouse

14    across the street.  In fact, six of our jurors mistakenly

15    went to the county courthouse, which doesn't happen very

16    often.

17         All right.  But there are some housekeeping

18    matters I'd like to take up in the interim.  So, first

19    off, these are -- most of these are sort of standard.

20    Does -- Mr. Tague or Mr. Brinkmann, do either one of you

21    make a motion under Rule 615 to exclude witnesses at this

22    time?

23         MR. BRINKMANN:  No, Your Honor.

24         MR. TAGUE:  Plaintiff would.

25         THE COURT:  All right.  I will grant that

1    motion.

2           MR. BRINKMANN:  If I may speak to that, Laura

3    Clower is the university's legal counsel who, as part of

4    her job duties, is responsible for managing the

5    litigation of the university.

6           THE COURT:  Okay.

7           MR. BRINKMANN:  The defendants are university

8    employees.  And she is a witness in the case, but we were

9    hoping -- she was hoping to be able to sit in court

10   during the trial because of her job duties.

11          THE COURT:  She would be normally supervis-- I

12   understand.  That's not a normal witness type position;

13   so, Mr. Tague, you don't have a problem with that

14   exception, do you?  It would be more of the nature of an

15   expert witness sitting in the courtroom.

16          MR. TAGUE:  Well, the university isn't a party

17   anymore, based upon your orders.  These people, or the

18   defendants have Mr. Brinkmann as their attorney.

19          THE COURT:  But they are U of I employees.

20          MR. TAGUE:  Pardon?

21          THE COURT:  They are U of I employees.

22          MR. TAGUE:  That's correct.  And, of course,

23   that's the basis of the federal jurisdiction of the color

24   of law.  So I don't -- I understand that it is a

25   different situation, but this witness will testify.  Once

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    the witness testifies, I don't have a problem.  But I

2    think we would object to her being present until she

3    testifies.

4              THE COURT:  When do you anticipate her

5    testifying?

6              MR. TAGUE:  Tomorrow morning.

7              And I don't have a problem with her being

8    present during all of the proceedings until the witnesses

9    start testifying.

10             THE COURT:  I'm thinking.

11             (Brief pause in proceedings.)

12             THE COURT:  Well, I think Mr. Tague has a

13   point.  She's not actually going to be an expert witness

14   who would need to hear the testimony of the witnesses

15   before testifying.  She will testify, and Rule 615 is

16   designed to make sure that -- one of its rules, to make

17   sure the witnesses are not contaminated or don't

18   structure their testimony.

19             I have no indication that she would in any way

20   alter her testimony, but Rule 615 is there for a reason.

21   So I'm sorry, Mr. Brinkmann; she'll have to stay out of

22   the courtroom until she's called to testify.  Then after

23   that, she can stay in the courtroom.

24             MR. BRINKMANN:  Thank you, Your Honor.

25             THE COURT:  I'd rather be safe than sorry.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1              All right.  Speaking of conduct, I am now
 2   telling all counsel and all parties -- so, Mr. Carmody,
 3   Ms. Reynolds, Mr. Bohn, Ms. Stone -- when the jurors,
 4   when the venire comes in and then after the jury is
 5   selected, I am specifically instructing you to be rude to
 6   them.  I don't want to see anybody holding doors open.  I
 7   don't want to see anybody greeting the jurors or
 8   potential jurors.  Do not exchange any pleasantries with
 9   them.
10              I do this because in the past we've had
11   instances where people try to show politeness to the
12   jurors, and then I have to stop what I'm doing and then
13   hold a hearing to find out what was said, what was not
14   said, potentially excuse jurors, et cetera.  So just so
15   we're all clear, everybody be rude.  Any questions about
16   that?  All right.
17              MR. TAGUE:  May I ask one question, Your Honor?
18   I take it, in your jury orientation, you've told the
19   jurors that if we appear to be rude it's because we don't
20   want to have any appearance of impropriety?
21              THE COURT:  I have a whole standard spiel --
22              MR. TAGUE:  Okay.
23              THE COURT:  -- I give them about being rude;
24   and usually, when I get to the part about attorneys being
25   rude, they laugh.  So I've done this -- this isn't my
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    first rodeo.  So I've told them that.  They know.

2            All right.  I've completed the potential voir

3    dire questions that I intend to ask.  I've incorporated

4    the questions that Mr. Brinkmann tendered at the final

5    pretrial to which there were no objections.

6            I'll remind both counsel that if there's any

7    follow-up, make sure it's actual follow-up, not a new

8    question.  This is not Cook County.  Do not try to try

9    your case through your questions, or I'll cut you off at

10   the knees.

11           We may actually have the jury pool ready.  Let

12   me cover a couple more quick things.

13           COURTROOM DEPUTY:  They're still moving cars.

14           THE COURT:  Oh, I'm advised they're still

15   moving cars around, so we have some more time.

16           Let me verify the witness list, by the way.

17   Mr. Tague, you indicated some of these people would not

18   be called, so let me just verify this.  This is in no

19   particular order.

20           Rhonda Perry, will she be called?

21           MR. TAGUE:  Yes.

22           THE COURT:  Joseph Bohn?

23           MR. TAGUE:  Yes.

24           THE COURT:  Ilesanmi Adesida?

25           MR. TAGUE:  That's a deposition.  Yes.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
1              THE COURT:  Sharon Reynolds is obviously here.
2    Laura Clower we already talked about.
3              Deborah Thurston.
4              MR. TAGUE:  Yes.
5              THE COURT:  Laura Willoughby?
6              MR. TAGUE:  Possibly.
7              THE COURT:  I'm only asking because these are
8    the names I'm going to read to the jury as potential
9    witnesses.
10             MR. TAGUE:  Right.
11             THE COURT:  Just because I read the name does
12   not mean I'm going to allow that person to testify.
13             Deborah Stone?
14             MR. TAGUE:  Yes.
15             THE COURT:  Charles Thompson?
16             MR. TAGUE:  Yes.
17             THE COURT:  Elyne Cole?
18             MR. TAGUE:  Possibly.
19             THE COURT:  I'd rather have you err on the side
20   of "yes," and then not call them, than "no."
21             MR. TAGUE:  Yes.
22             THE COURT:  Jong-Shi Pang.
23             MR. TAGUE:  Deposition.
24             THE COURT:  Shig -- oh, Shig Yasunaga?
25             MR. TAGUE:  No.
```

1          THE COURT:  Take him off.

2          Michael Essig?

3          MR. TAGUE:  No.

4          THE COURT:  Randy Elkins?

5          MR. TAGUE:  No.

6          THE COURT:  Debra Hilligoss?

7          MR. TAGUE:  No.

8          THE COURT:  James Kearns?

9          MR. TAGUE:  That's --

10          MR. BRINKMANN:  I plan to call him.  Yes, Your

11 Honor.

12          THE COURT:  All right.  Is there anybody whose

13 name I have not called out who either side intends to

14 call?

15          MR. BRINKMANN:  I don't believe so, Your Honor.

16          MR. TAGUE:  No.

17          THE COURT:  Mr. Tague?  All right.

18          A couple more matters.  When we talked before

19 at the final pretrial, I advised you that prior to

20 opening statements I would read the stipulations that

21 usually accompany these cases.  Frankly, gentlemen, I had

22 not perused your stipulation before I made that

23 statement.

24          It is still your intent, Mr. Tague, to have me

25 read the stipulation to the jury prior to opening

1    statement?  It's some -- it's -- I didn't realize how

2    lengthy it was.  I'm more than willing to do so.

3            MR. TAGUE:  Yes.

4            THE COURT:  Likewise, Mr. Brinkmann, that's

5    your intent?

6            MR. BRINKMANN:  Yes, Your Honor.

7            THE COURT:  All right.  I will do so.  You can

8    test my reading ability.

9            How long do you think your opening statement

10   will take, Mr. Tague?

11           MR. TAGUE:  30 minutes.

12           THE COURT:  30 minutes?

13           MR. TAGUE:  Uh-huh.

14           THE COURT:  All right.

15           MR. TAGUE:  At most.

16           THE COURT:  All right.  Mr. Brinkmann?

17           MR. BRINKMANN:  15 minutes, Your Honor.

18           THE COURT:  All right.  Just for planning

19   purposes, I usually give time limits on openings and

20   closings.  I won't do it for the openings.  I will for

21   the closings.

22           Finally, last thing, there are going to be some

23   U of I College of Law students that are showing up.  I

24   periodically do things with the U of I Law School.  Take

25   no mind of them.  They'll be here.  They actually come

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  back and take a look at my chambers.  They talk about

2  possible projects they could work on for me in the

3  future.  So I advise you that, both sides, if you see

4  some students show up, or some younger people show up --

5  and by the way, I've learned; I tell them to dress in

6  business casual, so you shouldn't see inappropriate

7  attire in here.  But if you see some people coming back

8  to talk to me in chambers during the breaks, that's who

9  they are.  There's nothing sinister afoot.

10          Mr. Tague, before we start jury selection,

11  anything further you wish to bring up at this time?

12          MR. TAGUE:  I do have a complete set of the

13  pretrial exhibits for the Court.

14          THE COURT:  You want to just hand those to my

15  courtroom deputy.  She'll keep track of those for me.

16          MR. TAGUE:  I erred on the side of being

17  over-inclusive.  Those are all of them.  Obviously given

18  some of your pretrial rulings, --

19          THE COURT:  Sure.

20          MR. TAGUE:  -- we won't be presenting all of

21  them.

22          THE COURT:  I'd rather have them than not have

23  them.

24          Anything else besides that, Mr. Tague?

25          MR. TAGUE:  No.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1          THE COURT:  Mr. Brinkmann, anything you want to

2     bring up before the --

3          MR. BRINKMANN:  Yes, Your Honor.

4          I had asked Mr. Tague what order he would be

5     calling witnesses, and he was unable to tell me last

6     week.  Ms. Willoughby and Ms. Cole are subpoenaed to be

7     here tomorrow.  They have scheduling issues, and I told

8     them that I would try to let them know when they would be

9     called, and Mr. Tague has not been able to tell me that.

10    I was wondering if Mr. Tague might be able to tell me

11    that at this point so I could coordinate.

12          MR. TAGUE:  Here's what my general plan would

13    be, subject to timing and weather, all the other things.

14    I figured, obviously, we'll pick the jury first.  We'll

15    have our opening statements.  The witnesses that I wanted

16    to call today would be all three of the defendants as

17    adverse witnesses.  I think they'll all be about,

18    approximately, an hour.  I think that gets us to the 4:00

19    time that you told us you like to let the jury go.  So

20    that's my goal today.

21          Tomorrow, one of the university witnesses who

22    is under subpoena, Deborah Thurston, the -- she has

23    commitments, too, and I've spoken with her attorney.  We

24    want to call her first thing in the afternoon if the

25    schedule permits.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1           And then I would like to call the other

2    university witnesses that are under subpoena tomorrow

3    morning.  And I think we can hammer most of them out in

4    the morning.

5           I'll get together with Bill.  I don't think

6    there's anything magical about some of the witnesses and

7    the order.  So whatever works into their schedule, we can

8    fine-tune that.  But the other witnesses that are under

9    subpoena, we would plan to complete tomorrow.

10          We have Mr. Chuck Thompson's video, and we

11   would like to have that played sometime during the course

12   of our presentation.

13          THE COURT:  So presumably tomorrow?

14          MR. TAGUE:  Pardon?

15          THE COURT:  Presumably tomorrow?

16          MR. TAGUE:  Tomorrow or first thing on Friday,

17   or wherever we have a gap to put that in if we have time.

18          THE COURT:  You mean first thing on Thursday?

19          MR. TAGUE:  Thursday, the 14th, correct.

20          THE COURT:  Okay.

21          MR. TAGUE:  And then the -- any depositions to

22   be read would be on Thursday, and then Mr. Carmody would

23   testify on Thursday; and then I think we'll be done on

24   Thursday.  I'm optimistic that we'll be done Thursday

25   morning, and then we turn it over to whatever Bill's

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    going to present for the defense.

2              THE COURT:  Any thoughts, Mr. Brinkmann?

3              MR. BRINKMANN:  Your Honor, Charles Thompson's

4    deposition was taken as a defense witness, and I did the

5    direct examination during that deposition.  I don't have

6    an objection if it helps the scheduling of, flow of

7    witnesses to taking that out of order.  But I did want

8    the jury to be instructed that this would be a witness

9    that would be testifying as a defense witness because

10   that's the way it was presented in the deposition that

11   will be played.

12             THE COURT:  That's, that's fine.  I have no

13   problem with taking witnesses out of order for either

14   side.  Mr. Brinkmann, if you remind me, I will so

15   instruct the jury --

16             MR. BRINKMANN:  Thank you.

17             THE COURT:  -- before we play that.  That's the

18   video?

19             MR. BRINKMANN:  It is.

20             THE COURT:  Just remind me, and I'll instruct

21   the jury about that before we play the video.

22             Mr. Tague, how do you intend to present the

23   depositions?  Do you yourself plan on reading them, or

24   are you going to put an associate on the stand and go

25   back and forth, or how do you --

1          MR. TAGUE:  My plan is -- I was working on the

2     logistics of that -- to have an associate or a reader.

3     If logistically that doesn't work out or we have a break

4     and the scheduling doesn't come in, we would have to go

5     to another plan.

6          THE COURT:  I just ask because when an attorney

7     starts reading a deposition, oftentimes -- to quote

8     Senior Judge Baker -- you get the jurors having MEGO, "my

9     eyes glaze over," as you stand there and read page after

10    page of a deposition.  So I'm just asking how you intend

11    to do it just so --

12         MR. TAGUE:  Yeah.  I don't think any of them

13    are lengthy, and you have pared down, based upon your

14    ruling, and I did logistically -- Mr. Brinkmann filed a,

15    a, certain objections to the depositions that would be

16    read.

17         THE COURT:  Right.

18         MR. TAGUE:  You ruled and my responses came in

19    after your ruling, and the -- I did that.  There's a

20    couple, maybe, at the appropriate time, --

21         THE COURT:  Right.

22         MR. TAGUE:  -- that I would like you to maybe

23    entertain hearing more on.  Many of them, I certainly --

24    as you saw from my response, I understood; and it wasn't

25    disrespectful of your ruling.  But, obviously, I needed

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    to make an appellate record, too, so --

2              THE COURT:  You know what.  Let me flesh that

3    out, too.  After I -- that order was entered, it was very

4    short -- I mean, minutes later I saw the notice that

5    you'd filed a response.  It could not have been that

6    long.  I read both of your responses.  I don't think,

7    after reading your responses, I don't think there was

8    much in dispute.  I did note that there was -- in one of

9    them there was an argument that you raised that I thought

10   I would like to reconsider; so when you get to the -- if

11   you think there's something that I made a mistake on in

12   one of those, just -- I will reconsider it because I

13   thought there was one area where I thought you brought up

14   something about attorney-client privilege that actually

15   made sense to me.

16             MR. TAGUE:  Yeah.  The big one was the

17   evaluations that I thought did relate to nature and

18   extent of injuries; and there was only, only a handful

19   that the -- at some point in time, I think since their

20   depositions, they're of record.  If the Appellate Court

21   needs to see them, I don't need to make necessarily an

22   offer of proof on them.

23             THE COURT:  They're there.

24             MR. TAGUE:  Other than in the ebb and flow of

25   trial if I think we would like you to reconsider, we'll

1   be efficient in our request for reconsideration and

2   selective in what we would ask you to look at.

3          THE COURT:  Just tell me during a break what

4   you want me to reconsider.

5          And just so the record is clear, I read both of

6   your responses in their entirety.  I will maintain the

7   same order that I entered.  I thought it was appropriate.

8   I thought it was correct, even after reading your

9   responses.

10          However, in the ebb and flow of trial, any

11   experienced trial practitioner knows things can change;

12   and if it appears to me that something I thought was not

13   admissible becomes admissible, you can ask me to

14   entertain an argument to reconsider, and I will do so.

15          I cannot, of course, reconsider things

16   involving the Seventh Circuit's decision.  You know, I'm

17   sorry, but that's the law of the case.  So to the extent

18   that the Seventh Circuit has ruled, I obviously cannot

19   circumvent what they've said.

20          But trials are fluid.  Things change.  And only

21   a fool would stick rigidly to an evolving situation.

22          MR. TAGUE:  And --

23          THE COURT:  I would hope that people didn't

24   think I was a fool.

25          MR. TAGUE:  Obviously, I didn't respond to the

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1    objections on Thurston at this time because she's under

 2    subpoena, and I understand she'll be here tomorrow

 3    afternoon, so --

 4              THE COURT:  Right.

 5              MR. TAGUE:  -- her deposition would only be

 6    used for --

 7              THE COURT:  Cross-examination or impeachment.

 8              MR. TAGUE:  -- on impeachment.  But if that

 9    would change, obviously, the -- there may be a couple

10    things that, again, I would bring to your attention.

11              THE COURT:  All right.  Teresa, how we doing?

12              COURTROOM DEPUTY:  I'll check with her.

13                   (Brief pause in proceedings.)

14              THE COURT:  They are watching the movie, five

15    to ten more minutes.

16              All right.  Mr. Tague, you're standing again.

17              MR. TAGUE:  Yes.  If I may make one more

18    inquiry, and I think you might have -- I think the clerk

19    told me about this.  But if -- speaking with my client,

20    the mic will pick it up unless I push this.

21              THE COURT:  You have to push the touch pad that

22    will turn it off.

23              MR. TAGUE:  Okay.  On both of them?

24              THE COURT:  On both of them, separately.

25              MR. TAGUE:  And do I need to ask your
```

1    permission or the clerk's permission to do that?

2            THE COURT:  You can turn the microphones on and

3    off.

4            I will caution both attorneys:  If you have the

5    microphones off, that will last a very brief period of

6    time before my exceedingly good court reporter will, the

7    first time, politely tell you to turn them back on and

8    then the second time will not be so polite -- even though

9    she is a very lovely person.

10           Likewise, make every effort -- everybody, make

11   every effort not to brush the microphones because it is

12   really disconcerting to everybody in the courtroom.

13           We have at least 10, 15 minutes before

14   everybody gets, moves around and organized in the jury

15   pool.  They're now watching the orientation video.

16           So why don't we just -- it's 9:37.  Let's just

17   take a break until about 9:50.  So if you need to use the

18   restroom, whatever else, just come back in here at 9:50.

19   All right.  We'll be in recess.

20                   (Recess, 9:37 a.m. to 9:54 a.m.)

21                   (Voir dire proceedings, 9:54 a.m. to

22                   11:07 a.m., were reported but are not now

23                   transcribed.)

24                   (Jury impaneled and sworn, 11:07 a.m.)

25           THE COURT:  All right.  Let me give you some

1   preliminary instructions.

2           But, first, I sometimes get the question:  Why

3   were we moved?  It's easier if I just tell you all at

4   once.  You're moved because two of the seats in the back

5   row are against those pillars.  Those seats don't move.

6   Inevitably during the day, somebody in one of those seats

7   is going to lean back, thonk their head against the -- it

8   makes a huge sound because it's hollow -- not their head;

9   the pillars are hollow.  It's very disruptive, so we've

10  got in the habit now that we've moved people away so you

11  can lean back and forth and be more comfortable.

12          All right.  Let me read you now some

13  preliminary instructions.

14          You are now the jury in this case.  I want to

15  take a few minutes to tell you something about your

16  duties as jurors and to give you some instructions.  At

17  the end of the trial, I will give you more detailed

18  instructions.  Those instructions, the one I give you at

19  the end of the trial, those control all of your

20  deliberations.

21          One of my duties is to decide all questions of

22  law and procedure.  From time to time during the trial,

23  and at the end of the trial, I will instruct you on the

24  rules of law that you must follow in making your

25  decision.  You should not take anything I may say or do

1   during the trial as indicating what I think of the

2   evidence or what your verdict should be.

3          It is your duty to determine the facts and to

4   determine them from the evidence produced in open court.

5   You are to consider only the evidence received in this

6   case.  The evidence consists of the testimony of the

7   witnesses, the exhibits received in evidence, and any

8   facts that I may instruct you to find or to which the

9   parties agree or stipulate.

10          You will have to decide whether the testimony

11   of each of the witnesses is truthful and accurate in

12   part, in whole, or not at all.  You also have to decide

13   what weight, if any, you give to the testimony of each

14   witness.

15          The trial will proceed in the following manner.

16   First, Plaintiff's attorney may make an opening

17   statement.  Next, Defendants' attorney may make an

18   opening statement.  An opening statement is not evidence.

19   It is simply a summary of what the attorney expects the

20   evidence to be.

21          After the opening statements, Plaintiff will

22   call witnesses and present evidence.  Then the defendants

23   will have an opportunity to call witnesses and present

24   evidence.  After the evidence has been presented, I will

25   instruct you on the law that applies to the case; and the

1  attorneys will make closing arguments.  After that, you

2  will go to the jury room to deliberate on your verdict.

3         You as jurors must decide this case based

4  solely on the evidence presented here within the four

5  walls of this courtroom.  This means that during the

6  trial you must not conduct any independent research about

7  this case, the matters in this case, or the individuals

8  involved in the case.

9         In other words, you should not consult

10  dictionaries or reference materials; search the Internet,

11  websites, or blogs; or use any other electronic tools to

12  obtain information about this case or to help you decide

13  the case.  Please do not try to find out information from

14  any source outside the confines of this courtroom.

15         Until you retire to deliberate, you may not

16  discuss this case with anyone, even your fellow jurors.

17  You may not permit others to discuss the case with you.

18  If anyone approaches you and tries to talk to you about

19  the case, please let me know about it immediately.

20         In order to avoid any potential problems, I

21  have instructed the attorneys not to greet you or

22  interact with you in any way.  I've actually instructed

23  them to be rude to you.  And now here's the best part.

24  I'm officially telling you as a federal judge:  Be rude

25  to the attorneys.  So you can be rude to them.  They're

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    going to be rude to you.  You be rude to them.  Don't

2    exchange pleasantries with them.  Don't open doors for

3    each other.  Pretend that they don't exist, the attorneys

4    or the parties.  They're going to do the same to you.

5           Do not take any offense if an attorney in this

6    case or a party in this case does not acknowledge you or

7    otherwise extend you a common courtesy.  As I said, they

8    are simply following my directions, and you can do

9    likewise.

10          I know that many of you use cell phones,

11   smartphones, the Internet, other tools of technology.

12   The security officers were required to ensure that you

13   did not bring any electronic devices into the courthouse,

14   including cell phones.  If you have a cell phone or any

15   other electronic device in your possession, let me know

16   immediately; and it will be held in safekeeping for you.

17          After you retire to deliberate, you may begin

18   discussing the case with your fellow jurors.  But you

19   cannot discuss the case with anyone else until you have

20   returned a verdict and the case is at an end.

21          Other than talking with your fellow jurors

22   during deliberations, you must not talk to anyone at any

23   time about this case until the case is at an end,

24   including communicating with anyone electronically about

25   this case.  This is a big one for some people.  This

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  includes your family and friends.  So you cannot tell

2  your family and friends anything about this case.  Just

3  say, "I'm in a trial in Federal Court."  When it's all

4  done, you can give them whatever details you want.  But

5  while the case is going on, you cannot talk to your

6  family, your friends -- anyone -- about what's going on.

7         Also -- and this is another big one -- you may

8  not communicate with anyone about the case on your cell

9  phone, through email, smartphone, text messaging,

10  Twitter, Facebook, LinkedIn, YouTube, et cetera.  This is

11  a real hardship for some people.  Don't Facebook about

12  this case.  Some people actually have -- like, I can

13  almost see it when I give them this instruction -- they

14  have Facebook withdrawal.  If you're used to Facebooking,

15  you're not going to do it now.  You don't talk about this

16  case until it's done.  If you want to post on Facebook,

17  "I'm in a federal jury trial," that even goes too far

18  sometimes because you'll get responses.  So don't

19  Facebook about this case.  Everybody understand me?

20         Okay.  You may not use any similar technology

21  of social media, even if I have not specifically

22  mentioned them here.

23         I expect you will inform me as soon as you

24  become aware of another juror's violations of these

25  instructions.  A juror who violates these instructions

1  jeopardizes the fairness of these proceedings.  Frankly,

2  if I find out you're Facebooking, not only are you going

3  to get in trouble with me; but, really, there's a good

4  chance I'll have to declare a mistrial, which means

5  everybody has to start all over again simply because you

6  couldn't hold off on Facebooking or Tweeting or

7  otherwise.  Just don't do it.  A juror who violates these

8  restrictions jeopardizes the fairness of these

9  proceedings, and a mistrial could result which would

10 require the entire trial process to start over.

11         Finally, do not form any opinion until all the

12 evidence is in.  Keep an open mind until you start your

13 deliberations at the end of the case.  I hope that for

14 all of you this case is interesting and enjoyable.

15         If you want to take notes during the course of

16 the trial, you may do so.  However, it is difficult to

17 take detailed notes and pay attention to what the

18 witnesses are saying at the same time.  If you do take

19 notes, be sure that your note-taking does not interfere

20 with your listening and considering all of the evidence.

21         Also, if you do take notes, do not discuss them

22 with anyone before you begin your deliberations.  Do not

23 take your notes with you at the end of the day.  Just

24 leave them in the jury room.  The jury room is locked.

25 Nobody will see your notes.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1          For that matter, do we have the thing set up to

2    show?

3          COURTROOM DEPUTY:  Yes.

4              (Brief pause in proceedings.)

5          THE COURT:  You also cannot ask me for a copy

6    of a transcript.  One of the best things about my court

7    reporter's job is she's the only person who can read what

8    she's taking down.

9          If you can -- you want to dim the lights so we

10   can see that.

11         Up on the screen, that's an example of the

12   shorthand that she's taking down.  There's only one

13   person who can read that.  She's right here.

14         We don't do transcripts for you.  So if you're

15   too busy taking notes or otherwise not paying attention,

16   you can't think to yourself, "Well, when it's done I'll

17   just ask the judge for a transcript of that witness."

18   Not going to happen.  So pay attention to what's going on

19   when the witnesses are testifying.  All right?

20         Thanks, Teresa.

21             (Brief pause in proceedings.)

22         THE COURT:  The positions of the parties can be

23   summarized as follows.  Plaintiff claims that Defendants

24   violated his due process rights under the Fourteenth

25   Amendment to the Constitution of the United States, and

1  he was thereby injured and sustained damage.

2          Plaintiff claims that Defendants Sharon

3  Reynolds, Joseph Bohn, and Deborah Stone violated his

4  constitutional right to procedural due process prior to

5  the termination of his employment.  Specifically,

6  Plaintiff claims that, while employed by the University

7  of Illinois, he was discharged without first having been

8  given a reasonable notice of the charges against him and

9  a reasonable opportunity to respond.

10          Defendants deny that Plaintiff was discharged

11  without first having been given notice of the charges and

12  an opportunity to respond.  Defendants further deny that

13  Plaintiff was injured or sustained damages.

14          To succeed on Plaintiff's claim that Defendants

15  violated his constitutional rights to procedural due

16  process prior to termination of his employment, Plaintiff

17  must prove each of the following things by a

18  preponderance of the evidence -- each of these things by

19  a preponderance of the evidence.

20          One:  Plaintiff was an employee of the

21  University of Illinois with a reasonable expectation of

22  continued employment.

23          Two:  Plaintiff was discharged from that

24  employment.

25          Three:  Before Plaintiff's discharge, Plaintiff

1    was not given an adequate pretermination hearing.

2    Specifically, he was not given reasonable notice of the

3    charges and/or given a reasonable opportunity to contest

4    the reasons for his discharge.

5            And four:  As a result of Defendants' failure

6    to give him an adequate pretermination hearing, Plaintiff

7    suffered damage.

8            Plaintiff has the burden of proving each and

9    every element of his claim by a preponderance of the

10   evidence.  If you find Plaintiff has proven each of these

11   things required of him, then you must return a verdict

12   for the plaintiff.

13           However, if you find that Plaintiff has not

14   proved any one of these elements by a preponderance of

15   the evidence, you must return a verdict for the

16   defendants.

17           When I say Plaintiff must prove something by a

18   "preponderance of the evidence," this is what I mean:

19   When you have considered all the evidence in the case,

20   you must be persuaded that it is more probably true than

21   not true.

22           At the end of the trial, I will give you a

23   final instruction on these matters.  If there is any

24   difference between what I just told you and what I tell

25   you in these instructions I give you at the end of the

1  trial, the instructions at the end of the trial govern.

2           All right.  Now let me find -- there we go.

3  All right.  The parties have stipulated or agreed to the

4  following facts.  You must treat the following facts as

5  having been proved for purposes of this case.

6           1) Plaintiff worked for the University of

7  Illinois for 25 years.  For the last 22 years of his

8  employment, he was manager of Systems Services in the

9  Department of Industrial and Enterprise Systems

10 Engineering, IESE.

11          2) In 2009, Plaintiff filed a complaint against

12 the University of Illinois Professor David Goldberg in

13 the Circuit Court of Champaign County, bearing Case

14 Number 09-L-133, called the "Goldberg litigation."

15 Plaintiff claimed that Goldberg was liable for assault

16 based upon conduct which occurred in 2005.  On or about

17 June 8, 2010, during the pendency of the Goldberg

18 litigation, Plaintiff came into possession of email

19 documents, hereinafter referred to as "Exhibit A," he

20 believed to have relevance to the State Court litigation.

21          3) Exhibit A contained about 40 pages of emails

22 from or to university employee Deborah Thurston from 2005

23 to 2007.  Some of the emails discussed Goldberg.

24 Plaintiff was not listed as a recipient or author of any

25 of the email messages in Exhibit A.  Exhibit A included

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   emails marked "confidential" and "attorney-client

2   privileged communication."

3          4) Plaintiff gave the documents comprising

4   Exhibit A to the attorneys representing him in the

5   Goldberg litigation, Ruth Wyman and Robert Kirchner.

6          5) On June 23, 2010, Plaintiff's attorneys

7   attached these documents, as Group Exhibit A, to

8   Plaintiff's Response to Defendants' Motion in Limine

9   filed in the Goldberg litigation.

10          6) On June 25, 2010, an emergency hearing was

11   held before Judge Chase Leonhard, the judge assigned to

12   the Goldberg litigation, regarding the documents in

13   Exhibit A.

14          7) Judge Leonhard entered an order that stated,

15   "The Court is going to enter an order here precluding any

16   party from making an immediate or mediate use of any

17   documents that are in Group Exhibit A attached to the

18   Plaintiff's Response to Defendants' Motion in Limine

19   which haven't previously been disclosed.  Moreover, the

20   Court is going to order that Group Exhibit A be placed

21   under seal pending litigation of any further claims of

22   privilege or relevance, and the Court is further going to

23   enter a protective order on the parties that there is to

24   be no secondary dissemination of any of the contents of

25   Group Exhibit A as this Court has described them, beyond

1    the respective litigation files of the three lawyers

2    here."

3              8) James Kearns gave the Group Exhibit A

4    documents to Laura Clower, associate university counsel.

5              9) Defendant Deborah Stone, director of

6    Academic Human Resources for the university, assigned

7    Joseph Bohn, a labor and employment relations specialist

8    with Academic Human Resources, and Defendant Sharon

9    Reynolds, assistant director of Academic Human Resources,

10   to investigate the matter.  As part of the investigation,

11   Bohn spoke with Mike Corn, the University's city privacy

12   and security officer, and Charles Thompson, Plaintiff's

13   supervisor as of July 1, 2010.

14             10) Bohn and Reynolds conducted interviews with

15   Deborah Thurston and Jong-Shi Pang, Plaintiff's

16   supervisors prior to July 1, 2010.

17             11) on July 19, 2010, Plaintiff was given a

18   letter setting out charges against him, signed by

19   Ilesanmi Adesida, the dean of the College of Engineering.

20   The letter stated in pertinent part, "The College of

21   Engineering has been alerted to serious concerns related

22   to the improper use of and/or access to electronic

23   communications.  This letter is to notify you that you

24   are a subject of an investigation into those concerns and

25   that Academic Human Resources, in conjunction with the

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    College of Engineering, will be conducting that

2    investigation.

3            "More specifically, these misconduct

4    allegations are based on the following.

5            "1. It is alleged that on June 23, 2010, your

6    attorney filed documents called 'Exhibit A.'  The

7    exhibit contains some emails from or to university

8    employee Deborah Thurston from 2005 and 2007.  The

9    materials included attorney-client privileged

10   communications, job-related communications, and personal

11   correspondence.  You are not listed as a recipient or

12   author of any of the email messages.  It is alleged that

13   you attempted to use the substance of the email messages

14   for non-university related purposes and without

15   permission.  Furthermore, there are open questions

16   regarding how you came into possession of these

17   documents, specifically whether you obtained them through

18   improper access.

19           "If substantiated, such acts of misconduct are

20   a violation of university policy, including, but not

21   limited to, the University Code of Conduct, and the

22   Policy on Appropriate Use of Computers and Network

23   Systems at the University of Illinois at

24   Urbana-Champaign."

25           12) The letter informed Plaintiff that these

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    were very serious allegations that may result in

2    disciplinary action, up to and including immediate

3    dismissal.  The letter stated that a meeting would be

4    held on July 21, 2010, where Plaintiff would have --

5    would "have an opportunity to respond to all charges."

6    The letter also stated that Plaintiff was placed on

7    administrative leave with pay pending the outcome of the

8    investigation.

9            13) The date of the meeting was changed to

10   July 28, 2010.  At the meeting, Bohn and Reynolds

11   attempted to question Plaintiff Kevin Carmody about the

12   Exhibit A emails.

13           14) Plaintiff's attorney, Robert Kirchner,

14   informed Bohn and Reynolds that Plaintiff would not

15   answer any questions about Exhibit A because of Judge

16   Leonhard's order.

17           15) Counsel for the university contacted

18   Plaintiff's attorney by letter, August 11, 2010, giving

19   notice that the university would continue its

20   investigation, that the university did not interpret

21   Judge Leonhard's ruling as preventing the university from

22   using its own documents as necessary to determine if a

23   breach of security occurred, and offering to join with

24   Plaintiff's attorney to clarify the judge's order.

25           16) On September 7, 2010, Defendants Bohn and

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  Reynolds submitted a report to Charles Thompson and

2  Defendant Deborah Stone regarding their investigation.

3       17) On September 10, 2010, university attorney

4  Laura Clower wrote to Carmody's attorney offering an

5  opportunity to respond to the recommendations and

6  findings.  The response by Carmody's attorney and further

7  response by University's attorney in correspondence dated

8  September 15, 2010, and September 17, 2010, contained

9  Plaintiff Kevin Carmody's and the university's responses

10 to the September 7, 2010, report and recommendation.

11      18) Plaintiff was informed through his attorney

12 that a decision relating to the investigation would be

13 made on September 23, 2010.  On September 23, 2010,

14 Plaintiff's attorney, Robert Kirchner, filed a motion

15 relating to the State Court's protective order; and a

16 hearing was had that day with Attorneys Kirchner, Wyman,

17 Kearns, and Lietz in attendance.  At the hearing, Judge

18 Leonhard vacated the protective order.

19      19) On September 23rd, a letter was sent to

20 Plaintiff by Deborah Stone and Charles Thurston -- excuse

21 me, Charles Thompson terminating Plaintiff's employment

22 effective that day.

23      The letter stated, "The university finds that

24 you did, in fact, engage in the alleged misconduct,

25 violating the University Code of Conduct and the Policy

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    on Appropriate Use of Computers and Network Systems at

2    the University of Illinois at Urbana-Champaign.  In

3    particular, we find that you attempted to use the

4    substance of the email messages in Group Exhibit A for

5    non-university related purposes and without permission.

6    It is more probable than not that the documents contained

7    in Group Exhibit A were obtained from Deborah Thurston's

8    computer.  Furthermore, it is more probable than not that

9    you obtained the documents in Group Exhibit A through

10   improper access.  As an information technology

11   professional, you did not immediately report the breach

12   of security to your supervisor when you came into

13   possession of the documents consisting -- excuse me,

14   constituting Group Exhibit A.

15          "As you know, the protection and security of

16   our information technology equipment and data are of

17   utmost concern for the university.  Given your position's

18   responsibilities to ensure that security and because of

19   your actions, we can no longer trust you to carry out the

20   responsibilities of your position."

21          That is the stipulation by the parties.

22          All right.  It is 11:30.  Ladies and gentlemen,

23   I'm going to have us forge ahead, and I will give you a

24   longer lunch because I want -- with the weather outside,

25   I want to try to end earlier today, so we're going to

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    plow ahead right now.

2          First, we'll rotate the podium.

3                (Brief pause in proceedings.)

4          THE COURT:  At this time, we'll have the

5    opening statements by the plaintiff, Mr. Tague.

6          MR. TAGUE:  Ladies and gentlemen of the jury,

7    the judge has told you what the nature of this case is

8    about; and during the course of the trial, we're going to

9    present witness testimony and exhibits relevant to the

10   issues explained by the judge.

11         This case involves a question of whether or not

12   Kevin Carmody was apprised of charges against him that

13   could result in termination of his long-term employment

14   with the University of Illinois, and whether that

15   notification and his opportunity to respond were

16   meaningful or reasonable before they actually fired him.

17         Kevin Carmody found -- or Kevin Carmody was

18   engaged in litigation with a university professor.  That

19   litigation had gone on for quite some time.  There had

20   been pretrial activity in the nature of depositions,

21   discovery, exchange of documents; and depositions had

22   been taken of various people.  James Kearns was the

23   attorney for Dr. Goldberg.  James Kearns was assigned by

24   the university to defend Dr. Goldberg.

25         There were also other attorneys assigned by the

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   university to deal with matters involving the Goldberg

2   and Carmody litigation.  An attorney by the name of Gary

3   Lietz was assigned to assist university witnesses as they

4   would participate in the process of producing documents

5   and providing their depositions.

6           During the course of the pretrial discovery and

7   the depositions in early June of 2010, the plaintiff

8   received documents in paper form, consisting of about

9   40 pages of printouts, in his News-Gazette mailbox.  They

10  were delivered by a party unknown to the plaintiff.  No

11  one has been able to determine who actually delivered

12  those documents to his News-Gazette mailbox.  But they --

13  you'll see them; they're one of the exhibits that you'll

14  see.  And as the judge described, some of them involved

15  Dr. Goldberg and what Deborah Thurston had to say about

16  Dr. Goldberg.

17          The plaintiff, having been involved in the

18  litigation, will testify that when he receives documents

19  in this litigation, he believed the correct thing to do

20  was to give them to his attorneys, which he will testify

21  that he did.  Once those documents were given to his

22  attorneys, his attorneys ultimately filed them in the

23  State Court in conjunction with pretrial discovery and

24  investigation matters.

25          Once those documents were filed, the

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    university's attorneys asked Judge Leonhard to have a

2    hearing relative to whether or not the documents could be

3    used within the course of those proceedings.  And Judge

4    Leonhard, on June 25, 2010, entered the order that the

5    judge told you a little bit about; and you'll see the

6    transcript of the proceedings as to what the judge did.

7            The judge believed that the documents should

8    not be used in that case and told the attorneys, "I'm

9    going to enter a protective order.  Put it in your

10   litigation file, and don't give it to anybody."

11           Nevertheless, James Kearns got the document to

12   university attorney Laura Clower, and Laura Clower had

13   that document that then ultimately -- although, the exact

14   details, I think, are, are sketchy -- but that document

15   ended up in the university system, starting an

16   investigation of Mr. Carmody as to the source of the

17   documents and what he did with the documents once he'd

18   received them.

19           And, ultimately, there was people in Academic

20   Human Resources, the three defendants that are here,

21   others in the university process, that met, apparently

22   gathered information you're going to hear about, and

23   ultimately prepared some drafts that they talked about

24   and presumably edited prior to July 19, 2010.

25           And then the judge told you a little bit

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    about -- and you'll see -- the charging letter, which is

2    Plaintiff's Exhibit Number 1 that the dean signed and

3    delivered to Kevin Carmody.  Now, the dean was provided

4    this information by the university group consisting of

5    the defendants and some others you'll hear about.  But he

6    didn't actually do the investigation himself, and he's

7    going to testify that he relied upon the work of others

8    in creating this charge.

9          You'll see the charge.  You'll see it --

10   ultimately, as testimony is had, you'll see it.  I

11   believe it will be admitted, and you'll be able to see it

12   in the jury room.

13         But as the judge read it and as you see it,

14   ultimately -- may I? -- as the judge was reading it, he

15   did a fine job in reading it from the verbal standpoint.

16   But you'll see it says, "You're charged with the

17   following:  1.," and there's one charge.  It isn't simply

18   typed as a subparagraph, but there's one charge; and

19   there are no bullet point numbers or paragraphs that are

20   actually after that.

21         Almost immediately after the plaintiff received

22   the, the charge, he asked for more information because

23   the charge says that he was -- in the second paragraph,

24   it says there's a University Code of Conduct and a Policy

25   on Appropriate Use of Computers that were implicated in

1     the charge.

2           But as you see this document and as you are

3     able to carefully peruse it, it doesn't say what

4     paragraphs or actual language in those policies are

5     applicable and breaches of duties associated, or

6     allegedly associated with Kevin's receipt of these paper

7     documents.

8           So Mr. Carmody wanted more information before

9     the meeting that was scheduled.  And, ultimately, he

10    asked Defendant Reynolds:  Okay, you're saying I violated

11    these policies.  What sections of these policies need I

12    read so that when we meet I can respond to those?

13          And you'll see this document in further detail.

14    You'll hear testimony from the witnesses.  Before he was

15    terminated on June 23, 2010, he wasn't provided with any

16    details of what he supposedly violated, or what laws or

17    policies governed.  And you'll see here that, where I

18    have my finger, it says, "With regard to the sections of

19    the policy that relate to the alleged misconduct, I refer

20    you to the meeting notice."  The meeting notice, which

21    was the July 19th document, didn't identify any specific

22    policy provisions, nor did that document.

23          Mr. Carmody ultimately appeared with his

24    attorney, Robert Kirchner, at a meeting that was

25    rescheduled, as the judge told you, on July 28th.  You

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    will see exhibits that Defendants Joseph Bohn and Sharon

2    Reynolds had prepared a list of questions that they

3    wanted to ask Mr. Carmody about, but that list was

4    presented to Mr. Carmody -- well, was not presented to

5    Mr. Carmody or Mr. Kirchner before the meeting, and

6    wasn't presented to them, really, after the meeting -- or

7    during the meeting.  And at no time prior to his

8    termination were those list of questions actually

9    specifically presented to Mr. Carmody or his attorney.

10          So they wanted to ask him questions about the

11   Group Exhibit A documents, and Mr. Kirchner's attorney --

12   or Mr. Carmody's attorney, Mr. Kirchner, interjected and

13   said, "We can't -- I can't let him answer questions about

14   the Group Exhibit A documents because of Judge Leonhard's

15   protective order saying there's not supposed to be

16   further dissemination of those documents and records."

17          During the course of that meeting, questions

18   were asked, but Mr. Carmody wasn't permitted by his

19   attorney to get in hot water with Judge Leonhard and

20   violate that order.

21          One of the university attorneys, Rhonda Perry,

22   was called over to attempt to get the meeting, I guess,

23   back on course.  But there was no resolution at that time

24   because the attorneys for the university did not believe

25   that the protective order would prevent dissemination of

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    information within the context of those proceedings.

2            So Mr. Carmody and his attorney were -- and

3    you'll see exhibits where they actually -- there's

4    exchange of letters between university attorneys and Mr.

5    Carmody's attorney concerning some aspects of the

6    investigation and facts that did not relate specifically

7    to the orders subject to the protective order, but the

8    protective order was still in place until June [sic] 23

9    of 2010.

10            During that time, the investigation continued.

11   The report was ultimately prepared and put together on

12   September 7th of 2010 by Defendants Reynolds and Bohn.

13   And those had findings and recommendations relating to

14   discipline of Mr. Carmody; and as of that time, still, he

15   had not had an opportunity from our perspective -- but at

16   least he had not actually answered questions or appeared

17   before the investigators or any decision makers to give

18   his side of the story about the Group Exhibit A documents

19   themselves because the State Court protective order was

20   still in place.

21            A communication ultimately was made by a

22   university attorney to Robert Kirchner and said:  We have

23   this report and findings that we did, even though Mr.

24   Carmody hasn't given his version of the story yet.  We're

25   going to make a decision on -- we expect a decision to be

1  made on September 23, 2010.

2          And at that time, the -- Robert Kirchner was

3  able to get a hearing before Judge Leonhard to have the

4  protective order either vacated or modified so that

5  Mr. Kirch-- or so that Mr. Carmody could discuss the

6  Group Exhibit A documents.

7          A hearing actually took place on

8  September 23rd, and you'll see the transcript of that

9  hearing, or at least a portion of it, that shows that

10  that happened in the afternoon.  Sometime prior to the

11  Court's hearing, a termination letter, which you'll see

12  as Plaintiff's Exhibit Number 5, was already crafted by

13  Defendants Sharon -- I'm sorry, Deborah Stone and the

14  fellow by the name of Charles Thompson.  That was already

15  in existence because they're -- you're going to see a

16  document that shows there was a signed letter that was

17  emailed in the university hierarchy the morning of

18  September 23rd, even though the hearing was taking place

19  in the afternoon.

20          So the letter was ready to go but not sent

21  until the judge lifted the order the afternoon of the

22  23rd; and at that point in time, it was delivered to

23  Kevin Carmody, and that letter is the letter that found

24  him guilty of unspecified violations and ultimately

25  terminated his employment, effective immediately, with

1   the university.

2          And, ultimately, there was no consideration by

3   the university to allow Kevin Carmody on September 23rd,

4   within a couple days, or any period of time after that,

5   to actually finally be able to come in and give his side

6   of the actual story.

7          As you look at the documents, the other thing

8   that you will need to consider on the question of whether

9   Kevin Carmody had a reasonable opportunity to respond to

10  charges, I started out by telling you that the original

11  charging letter and the meeting set up for him to discuss

12  that had one bullet point of a charge.

13         The questionnaires had questions relating to

14  what we believe to be a second charge, the first charge

15  being, I guess to paraphrase it, "you stole the documents

16  from the university computers," the second charge being

17  that, "once you received the documents, be they innocent

18  or whatever, you didn't notify your supervisor or

19  properly notify people in the university hierarchy of a

20  breach of security and that you actually possessed the

21  documents."

22         That -- as you compare the actual termination

23  letter, which is Number 5, to Number 1, the question is:

24  Are those charges the same?  Was Mr. Carmody charged with

25  something but then found guilty of something else that

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    was a compound determination of guilt and, accordingly,

2    never had an opportunity to respond to the charge of the

3    reporting if it was never proffered in something that

4    says, "Oh, by the way, we're amending the charge," or,

5    "Make sure you respond to this second element that's

6    actually out there."

7            We're going to, through testimony and exhibits,

8    show that an academic professional, in which Mr. Carmody

9    was -- that was his type of job that he had -- worked on

10   a year-to-year basis, but that those contracts are

11   renewed every year; and if they're not going to be

12   renewed, there's a process that you're given a

13   notification a year in advance that your contract is not

14   going to be renewed for the next year period.  That never

15   happened in this case, obviously, because they fired him

16   for cause.

17           And the evidence, we believe, will show that

18   given his performance and his longevity that had he not

19   been terminated because of this pretermination faulty

20   procedure, from our perspective, he would have continued

21   to have these renewal contracts into the future from 2010

22   to today as we sit here and then from points now until

23   you, as the triers of fact, would determine when would he

24   have retired in the future.

25           You're going to see a document that, I believe,

1    is a joint exhibit -- if not, I don't think there's any

2    dispute of it -- that he was making approximately $73,000

3    a year that he has not earned since the termination and

4    will not earn for the period now until he would have

5    otherwise left the university system.  And you will see

6    those documents and decide whether or not he lost wages

7    based upon a bad pretermination hearing process.

8            The other element of damages that you're going

9    to hear testimony from Mr. Carmody on and ultimately

10   instructions from the judge is that if you find that Mr.

11   Carmody suffered emotional distress and, from the, being

12   subjected to this procedure and fired without being able

13   to tell his story, you can award him compensatory damages

14   for an amount that you think would fairly and reasonably

15   compensate him for that emotional distress.

16           He will testify that from the time that he

17   received this notice it was, regrettably, in a difficult

18   time of his life that he had to care for some age-- for

19   some ill relatives, was dealing with things that a lot of

20   people have to deal with -- putting kids through school,

21   financial matters involving the day-to-day living

22   expenses that people would have -- and that, accordingly,

23   that was devastating to his emotional well-being during

24   that period of time.

25           The final thing that, as you look at all these

1    exhibits in evidence -- and we believe that you have to

2    look at all of them very carefully for the culminating

3    aspects of things -- if you find that the plaintiff is

4    entitled to compensatory damages, you can also award

5    punitive damages which would be an amount that you could

6    award to punish the defendants who were involved in this

7    process and, if you find that they violated his rights to

8    an actual fair hearing.

9           Thank you.

10          THE COURT:  Thank you, Mr. Tague.

11          Mr. Brinkmann.

12          MR. BRINKMANN:  Thank you, Your Honor.  May it

13   please the Court, --

14          THE COURT:  It does.

15          MR. BRINKMANN:  -- counsel, ladies and

16   gentlemen of the jury.

17          On September 23rd of 2010, the plaintiff, Kevin

18   Carmody, was terminated from his position as an

19   information technology officer at the College of

20   Engineering.  As an information technology officer, he

21   had access to the servers there, to the stations there,

22   and to the university databases.

23          The termination was the result of an

24   investigation that found that Mr. Carmody was guilty of

25   violations of the University Code of Conduct and the

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   University Policy on Appropriate Use of Computers.

2           The people involved in discovering Mr.

3   Carmody's use of this information, his filing of it in

4   court, included Mr. Jim Kearns, who was the attorney for

5   David Goldberg in the civil litigation that Mr. Carmody

6   had filed.  It included university attorneys Rhonda

7   Perry, who was the attorney who advises the Academic

8   Human Resources Office at the university.  And it

9   included Laura Clower, who manages litigation at the

10  University of Illinois.  All of these lawyers will be

11  testifying at the trial of this case.

12          It also involved Mr. Carmody's supervisor at

13  the time, who was Mr. Charles Thompson.  He will testify

14  in this case through a video evidence deposition.

15          And then, lastly, it involved members of the

16  Academic Human Resources Office at the University of

17  Illinois.  Those are my clients in this case.  Deborah

18  Stone was the director of Academic Human Resources at the

19  University of Illinois in 2010.  Her involvement in this

20  case was that she received the information from the

21  university legal counsel office about Mr. Carmody's

22  possession and use of the documents, the emails, the

23  private emails of Deb Thurston.

24          She, she passed that along to Deborah Stone --

25  Deborah Stone got it from legal counsel office.  She then

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  passed the information along to Sharon Reynolds and

2  Joseph Bohn.  Sharon Reynolds was the associate director

3  of Human Resources.  Joseph Bohn, as the judge has told

4  you, was the specialist in employee and relations --

5  labor relations at the Academic Human Resources Office.

6  Their mission was to investigate this matter, and that's

7  what they did in accordance with the standard practices

8  of their office and their training.

9       Now, this case involves two relevant issues,

10  and I think Judge Bruce has referred to those, and so has

11  Mr. Tague.  The two issues are, number one, did Mr.

12  Carmody have reasonable notice of the charges against

13  him?  And, number two, did he have a reasonable

14  opportunity to respond to those charges?

15       The judge has read to you the charge letter.

16  And the charge letter is an important piece of evidence

17  in the case because we have in black and white, that

18  you'll be able to see and look at, the charges that Mr.

19  Carmody received notice of in this case; and you'll be

20  able to form a judgment as the case develops and at the

21  end of the case whether or not these charges are

22  reasonable notice to Mr. Carmody.

23       This is the same document that Mr. Tague has

24  referred to.  And if you notice, in the very first

25  sentence, it says that, "The College of Engineering has

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  been alerted to serious concerns related to improper use

2  and/or access of electronic communications."  These,

3  again, were the private emails that we've been talking

4  about.

5         It doesn't refer to concerns about the contents

6  of those emails in the initial sentence, and that's going

7  to be important, and I'll refer to that in a minute

8  because it gets into the Court's order that Judge

9  Leonhard entered.

10        It informs Mr. Carmody that he is being

11 notified that he is the subject of an investigation into

12 these concerns.  In other words, the concern of his use

13 of these emails and the concern about his access to these

14 emails.

15        And then it says, more specifically -- it gives

16 him more information, and this is something that you can

17 consider as to whether or not the notice that he got was

18 reasonable.

19        It says, "More specifically, it is alleged that

20 on June 23, 2010, your attorney filed a document called

21 'Exhibit A.'  The exhibit contained some emails from or

22 to university employee Deb Thurston from 2005 and 2007."

23        So these were emails that had been sent three

24 to five years before they were filed with the Court in

25 the Carmody-Goldberg litigation.  The materials included

1    attorney-client communications.  It's clearly marked on

2    these emails "attorney-client communications."  They

3    included job-related communications and personal

4    correspondence.  This was the notice of charges being

5    given to Mr. Carmody.

6            It tells Mr. Carmody that he is not listed as a

7    recipient or author of any of the email messages.

8            It tells him that it is alleged that he

9    attempted to use the substance of the email messages for

10   non-university related purposes and without permission.

11   Again, this is the notice to Mr. Carmody of the charges.

12           Furthermore, there are open questions as to how

13   he came into possession of those documents; specifically,

14   whether he obtained them through improper access.

15           So this is the notice of charges that you are

16   going to have to decide whether or not it was reasonable

17   or not.

18           This letter then goes on to identify, "More

19   specifically," it says, "if substantiated, such acts of

20   misconduct are a violation of university policy,

21   including, but not limited to, the University Code of

22   Conduct and the Policy on Appropriate Use of Computers

23   and Network Systems at the University of Illinois in

24   Urbana-Champaign," talking about this section right here.

25           Now, the University Code of Conduct is a

1    one-page document.  It's something that is not difficult

2    to read.  It's something that Mr. Carmody had access to

3    and certainly after receiving this notice would have had

4    access to.

5              The Policy on Appropriate Use of Computers and

6    Network Systems is a five-page document.

7              Mr. Carmody is claiming that he didn't get

8    adequate notice because the university didn't point out

9    what paragraph in the Code of Conduct he was charged with

10   violating and what section, or part, of the Policy he was

11   being charged with violating.

12             The university's position is that the entire

13   Code of Conduct was applicable.  The entire Policy was

14   applicable.  And, certainly, at this stage before there

15   was any investigation conducted, there could be no focus

16   on any particular area that could be communicated to him.

17             But in any event, going on with this notice to

18   Mr. Carmody, he's told that he would have an opportunity

19   to respond.  And that's the second issue in this case.

20   Did Mr. Carmody have a reasonable opportunity to respond

21   to the charges that he just got notice of in this letter?

22             And the letter, after stating that these are

23   serious allegations that may result in disciplinary

24   action up to and including immediate dismissal, he's told

25   that there would be a meeting on July 21 of 2010.  And

1    he's specifically told that, "At this meeting, you will

2    have an opportunity to respond to all of the charges."

3    So this was going to be Mr. Carmody's opportunity, his

4    hearing, his chance to respond to these charges.

5           The date was changed to July 28th at Mr.

6    Carmody's request; and Mr. Carmody appeared at this

7    meeting with my clients, Joseph Bohn and Sharon Reynolds,

8    for discussion about these charges.  This was an

9    opportunity for Mr. Carmody to ask any questions that he

10   wanted to ask about the Code of Conduct, to ask any

11   questions that he wanted to ask about the Policy on Use

12   of Computers.  It was his opportunity to respond to the

13   charges, and it was his opportunity to answer questions.

14          At the meeting, Mr. Carmody did not respond in

15   written form to any of the charges.  He did not respond

16   verbally to any of the charges.  He did not ask any

17   questions about the Code of Conduct or the Policy on Use

18   of Computers.

19          And when Mr. Bohn and Ms. Reynolds attempted to

20   ask him questions, his attorney objected and started

21   talking about the court order and saying that Mr. Carmody

22   was not going to answer any questions about this Exhibit

23   A, the group of emails.  And his reason was that he said

24   that the Court order precluded Mr. Carmody from answering

25   any of the questions.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1           My clients are not attorneys.  They were not

2     involved in that litigation.  But the, the Court order

3     will be in evidence and something for you to consider

4     here.

5           And the key part of the Court order that I want

6     to direct your attention to begins at line 4 and then

7     goes to line 8; and it says that, "The Court is further

8     going to enter a protective order on the parties that

9     there be no secondary dissemination of any of the

10    contents of Group Exhibit A."

11          So the things that were stated in Group Exhibit

12    A, the Court was ordering the parties not to disclose.

13    It didn't say anything about Mr. Carmody being precluded

14    or ordered not to talk about how he got access.  It

15    didn't say anything about stopping Mr. Carmody from

16    talking about how he used them, these emails, who he

17    shared them with, who he talked about.  Did he get

18    permission to use them?  Did he disclose to Deborah

19    Thurston and the other people who were on these emails

20    that he had gotten ahold of them?

21          He was not precluded from talking about those

22    things, the things -- as I pointed out earlier, the very

23    first sentence of the charge letter, that the university

24    was concerned about how he had access to the emails and

25    how he used them.  He was only precluded from talking

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    about the contents of the emails, which was really not

2    the area of interest.  The university knew what the

3    contents of the emails were.

4           So Ms. Reynolds and Mr. Bohn called the

5    University Legal Counsel Office when the attorney started

6    to make his objections; and Rhonda Perry came to the

7    meeting, and she had a discussion with Mr. Kirchner.  She

8    told him that she did not agree with his interpretation

9    of the court order.  She told him that she would be

10   willing to work with him to clarify the judge's order.

11   And this is, again, on July 28th of 2010.  And she told

12   him that this investigation is going to go on; and if Mr.

13   Carmody wants to respond to the charges, he should do so.

14          After July 28, 2010, Joe Bohn and Sharon

15   Reynolds had no further contact with Mr. Carmody.  He did

16   not submit to them anything in writing to respond to the

17   charges.  He did not ask for another meeting to verbally

18   discuss the charges.

19          What did happen was that there were a couple of

20   letters in August between Rhonda Perry and Mr. Carmody's

21   attorney, which talked about what had gone on at the

22   meeting on the 28th of July.  Rhonda Perry reiterated her

23   offer to work with him to clarify the Court's order if he

24   felt that that was needed.  She advised him again that

25   this investigation was going to go forward.  And she

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    advised him that if Mr. Carmody wanted to participate,

2    wanted to respond, that he was welcome to do so.

3            In September of 2010, the investigation was

4    concluded.  And Mr. Bohn and Ms. Reynolds prepared a

5    report which summarized the information that they had

6    gathered and their findings; and they made a

7    recommendation in this letter, which is dated September

8    7th of 2010, that Mr. Carmody be terminated.

9            Mr. Carmody is claiming that the report

10   contained a new charge, a charge that wasn't in the

11   July 19th letter; and he points to portions of the

12   September 7 letter, which are identified under the

13   section that is described as "Summary of Investigation."

14           Under the Summary of Investigation, at

15   paragraph 14 and 15, it states that when Mr. Carmody

16   became aware of the documents constituting Group Exhibit

17   A, he did not immediately report the breach of security

18   to his supervisor; and as an information technology

19   professional, Mr. Carmody has a duty to report breaches

20   of security.

21           This was not a new charge.  This was a finding

22   from the investigation that informed Mr. Carmody about

23   improperly having access and use of the documents and the

24   Code of Conduct and the Policy on the Appropriate Use of

25   Computers.  So the university's position in this case is

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    that this was not a new charge and that Mr. Carmody did

2    have adequate notice of what the charges were against

3    him.

4            Now, up to that point in time, Mr. Carmody had

5    not ever responded to the charges.  His attorney has not

6    ever responded to the charges.  The letter of September 7

7    with the findings and the recommendation that he be

8    terminated was sent to Mr. Carmody's attorney, and he was

9    invited to respond to the findings and to respond to the

10   recommendations in that letter.  And there was a series

11   of additional letters that we'll talk about during the

12   trial of this case between the attorneys after

13   September 7th; and as Mr. Kirchner was invited to respond

14   and to reply, and he replied saying that these are

15   incorrect findings.  They're false.  They're not true.

16   But he never provided any substantive response.  He

17   didn't provide any evidence that related to the charges

18   that had been given to Mr. Carmody and the notice of

19   charge letter of the 19th of July.

20           On several occasions, Mr. Kirchner appeared in

21   court in September and had the opportunity of raising

22   with the judge clarification of this court order.

23   Beginning on September 17th, I believe there were four

24   more times that he appeared in court.  There was actually

25   a trial of the Goldberg case, beginning on, I believe,

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   September 21.  At no time until the day of the

2   termination did Mr. Kirschner attempt to get

3   clarification of the Court's order.

4           He had been given notice beforehand that this

5   letter of, the decision on this investigation was coming,

6   and it was coming on September 23rd.  That was the date

7   that he then, for the first time, tried to get

8   clarification of the court order.

9           By then, the decision had been made.  The

10  decision was made by the supervisor of Mr. Carmody, who

11  was Charles Thompson -- again, his testimony will be in

12  evidence, video evidence deposition during the trial --

13  and by Elyne Cole -- I'm sorry, by Sharon Stone [sic] who

14  is a defendant in this case.  So Sharon Stone's

15  involvement was to assign the investigation and to sign

16  the letter of termination.  She had no involvement in the

17  other parts of the case that we've discussed.

18          At the end of this case, we will suggest to you

19  that Mr. Carmody did have, number one, adequate notice,

20  reasonable notice of the charges and, number two, a

21  reasonable opportunity to respond to those charges.  And,

22  therefore, his due process rights were not violated, and

23  the verdict in this case should be for Defendants.

24          Thank you.

25          THE COURT:  Thank you, Mr. Brinkmann.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1          All right.  Ladies and gentlemen, we're going

2     to take our -- we're going to take our lunch break.  Let

3     me find for you -- here we go.

4          All right.  I have what's called a recess

5     instruction whenever we take a break.  It reads as

6     follows.  We are about to take our first break during the

7     trial, and I want to remind you of the instructions I

8     gave you earlier.

9          Until the trial is over, you are not to discuss

10    this case with anyone, including your fellow jurors,

11    members of your family, people involved in the trial, or

12    anyone else.  If anyone approaches you and tries to talk

13    to you about the case, do not tell your fellow jurors but

14    advise me about it immediately.

15         Do not read or listen to any news reports on

16    the trial -- excuse me, news reports of this trial.  Like

17    I said before, don't, don't Facebook, Twitter.  Don't do

18    any of that stuff.

19         Remember to keep an open mind until all the

20    evidence has been received and you have heard the views

21    of your fellow jurors.  I may not repeat these things to

22    you before every break we take, but keep them in mind

23    throughout the trial.

24         I will tell you honestly:  I don't repeat this

25    instruction because I assume all of you can remember it.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    I might say it once or twice more during the trial, maybe

2    tomorrow, maybe Thursday; but I'm presuming all of you

3    understand what I said, and you're going to follow my

4    instructions.  Don't talk about the case in any way with

5    anybody.  Keep an open mind, and wait for everything to

6    be done.

7              All right.  It is 12:12.  Why don't you try to

8    come back into the jury room -- Teresa, have they been

9    shown the jury room yet?

10             COURTROOM DEPUTY:  No.

11             THE COURT:  My courtroom deputy or CSOs will

12   make sure you know where the jury room is.  It's

13   basically right behind this wall.  Try to be back in

14   about 12:25 -- not 12:25 -- 1:25.  That gives you a

15   little more than an hour for lunch, and then we'll try to

16   start back up at 1:30.  All right?

17             Be careful out there.  I -- like I say, I

18   really try to take care of you.  I try to do two things:

19   Number one, make sure you're safe and, number two, not

20   waste your time.  It's now 14 degrees with a wind chill

21   of minus 6.  So be careful out there.  All right?

22             I'll see you back in the jury room at 1:25.

23             (Jury absent, 12:13 p.m.)

24             THE COURT:  Please be seated.  The jury has

25   left the courtroom.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1          Mr. Tague, who will your first witness be?

2          MR. TAGUE:  Deborah Stone.

3          THE COURT:  Deborah Stone, okay.

4          All right.  Anything further that you wish to

5     raise before you call your first witness?

6          MR. TAGUE:  No.

7          THE COURT:  Mr. Brinkmann, anything you wish to

8     raise before the first witness is called?

9          MR. BRINKMANN:  No, Your Honor.

10          THE COURT:  All right.  Gentlemen, why don't I

11    see you all back in here about 1:25, also.  In case

12    anything comes up, we'll try to take care of it as

13    quickly as possible, and then we'll have the first

14    witness ready.

15          That will be all for the record right now.

16    We'll be in recess.

17               (Recess, 12:14 p.m. to 1:27 p.m.)

18          THE COURT:  We're back on the record in Carmody

19    versus University of Illinois.  All counsel are present.

20    All parties are present.

21          Mr. Tague, you indicated your first witness is

22    Deborah Stone; is that correct?

23          MR. TAGUE:  [Nodding head up and down.]

24          THE COURT:  All right.  Any reason why we

25    should not bring the jury back in?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
1              MR. TAGUE:  No.

2              THE COURT:  Mr. Brinkmann?

3              MR. BRINKMANN:  No.

4              THE COURT:  All right.  By the way, in case I

5    didn't tell you, make sure everybody stands when the jury

6    comes in and out.  It's just showing them respect.

7              All right.  Let's bring the jury in.

8                   (Brief pause in proceedings.)

9                   (Jury present, 1:30 p.m.)

10             THE COURT:  All right.  Please be seated.

11             All the jury members are back.  Everybody's

12   now -- I see some coats on.  You figured out in here that

13   sometimes it gets colder, so bringing a coat or sweater

14   is always a good idea.  Everybody got lunch, it looks

15   like.  I'm seeing heads nod, so everybody got lunch.

16   Good.

17             All right, with that, to you, Mr. Tague.

18             MR. TAGUE:  I'd like to call Deborah Stone as

19   our first witness.

20             DEBORAH STONE, sworn, 1:30 p.m.

21         THE COURT:  Whenever you're ready, Mr. Tague.

22             DIRECT EXAMINATION BY MR. TAGUE:

23   Q    Would you please state your name?

24   A    Deborah Stone.

25   Q    And in the summer of 20-- summer and fall of
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   2010, were you employed at the University of Illinois?

2       A    Yes, I was.

3       Q    And what was your position?

4       A    Director of Academic Human Resources.

5       Q    And did Joseph Bohn and Sharon Reynolds work in

6   that same department?

7       A    Yes.

8       Q    What was their relationship to you in the work

9   hierarchy?

10      A    Sharon was a direct report to me as an

11  associate director.  Joe reported to Sharon.

12      Q    When did you learn that there was an

13  investigation relating to Kevin Carmody?

14      A    It would have been in the summer of 2010.  Five

15  years ago, I don't know the exact date that I would have

16  been informed that there was a need to explore whether

17  there had been any misconduct.

18           MR. TAGUE:  May I tender directly to the

19  witness?

20           THE COURT:  Yes, you may.

21  BY MR. TAGUE:

22      Q    Could you tell us what that document is?

23      A    This is a letter to Mr. Carmody, dated July 19,

24  2010.  It is from Dean Adesida, the dean of the College

25  of Engineering, informing him that the college had been

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1     alerted to concerns and that Academic Human Resources

2     would be conducting an investigation.

3          Q     When did you first receive a copy of that

4     letter?

5          A     I'm not copied on this letter specifically.

6          Q     Did you ever receive a copy of that letter?

7          A     I don't know that I can recall that

8     specifically.

9          Q     Were you involved in the investigation prior to

10    the creation of that letter?

11         A     Well, this letter is informing that an

12    investigation would occur, so there was no investigation

13    prior to this letter.  I'm not sure I understand your

14    question.

15         Q     Okay.  Do you know who actually developed the

16    charge that is in that letter with bullet point number 1?

17         A     Specifically, no, I do not recall that.

18         Q     Do you know whether or not there were any prior

19    drafts of that document that were created prior to that

20    version on July 19, 2010?

21         A     At this point, five years later, I don't know

22    for a fact.  I would imagine that there were drafts.

23    That's typical that there are drafts of communications

24    before final versions.

25         Q     How did it come about that Joseph Bohn and

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  Sharon Reynolds were assigned for this investigation?

2          THE COURT:  Mr. Tague, do you want to identify

3  that?  I've been waiting to see if you were going to

4  identify the exhibit.  Do you want to identify it as

5  Exhibit 1?

6          MR. TAGUE:  That's Exhibit 1.  I'm sorry.

7          THE COURT:  No problem.  Just an oversight.

8          MR. TAGUE:  Right.

9          THE COURT:  It's Exhibit 1.

10          MR. TAGUE:  Right.

11          And that -- is the document viewer on?  That

12  document --

13          COURT REPORTER:  I'm sorry.  I can't hear you.

14          MR. TAGUE:  That document, under the pretrial

15  order, was to be admitted without objection.  Could we

16  show the face of it on the screen?

17          THE COURT:  If you so wish.  Are you moving to

18  admit it at this time?

19          MR. TAGUE:  Yes.  I'd move to admit it into

20  evidence.

21          THE COURT:  Any objection, Mr. Brinkmann?

22          MR. BRINKMANN:  No, Your Honor.  It's also a

23  Joint Exhibit Number 4 that we agreed to admit.

24          THE COURT:  So you have -- the two of you have

25  double-marked exhibits to make it more complicated for

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    me?  All right.  So I have -- it's both Plaintiff's 1 and

2    Joint 4, and we'll inevitably make a mistake since you've

3    double-marked things.  But, all right.

4            So Joint 4/Exhibit 1 is admitted, and you may

5    publish it to the jury if that is your wish.

6            MR. TAGUE:  Yes.  I would like to do that.

7            THE COURT:  You're going to have to step up

8    here, and we'll turn the document camera on for you.

9            (Brief pause in proceedings.)

10   BY MR. TAGUE:

11       Q    That document refers to the University Computer

12   Use Policy; does it not?

13       A    Yes, it does.

14       Q    I've handed you Plaintiff's Exhibit Number 7.

15   That's the Computer Use Policy?

16       A    Yes.

17           MR. TAGUE:  I'd move that that be admitted

18   also, Your Honor.

19           THE COURT:  Any objection, Mr. Brinkmann?

20           MR. BRINKMANN:  No, Your Honor.  This is also

21   Number 6 on the joint exhibit list.

22           THE COURT:  All right.  Plaintiff's 7 is Joint

23   6.  It is admitted at this time.

24   BY MR. TAGUE:

25       Q    I've shown you Plaintiff's Exhibit Number 8.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1              And I think this is Joint Number 5 also; is it

 2   not, Mr. Brinkmann?

 3              MR. BRINKMANN:  Is this the Code of Conduct?

 4              MR. TAGUE:  Yeah, University Ethics Policy.

 5   BY MR. TAGUE:

 6        Q    What is that document?

 7        A    It is the University Code of Conduct.

 8        Q    And that document is also referred to on

 9   Exhibit Number 1 in the charging letter; is it not?

10        A    Yes, it is.

11              THE COURT:  So this is Plaintiff's 8?

12              MR. TAGUE:  Correct.

13              THE COURT:  And --

14              MR. TAGUE:  I would move to admit that into

15   evidence, also, Your Honor.

16              THE COURT:  Any objection to that, Mr.

17   Brinkmann?

18              MR. BRINKMANN:  No, Your Honor.

19              THE COURT:  Is it also a joint exhibit?

20              MR. TAGUE:  Number 5, yes.

21              THE COURT:  Plaintiff's 8/Joint 5 is admitted

22   without objection.

23   BY MR. TAGUE:

24        Q    After July 19, 2010, what did you do next in

25   the investigation relating to Kevin Carmody?
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
1        A    I was not active in the investigation because

2    that was work assigned to my staff, and so I was then the

3    recipient of recommendations at the close of the

4    investigation.

5        Q    What is Plaintiff's Exhibit Number 2 -- which I

6    believe is also Joint Number 7; is it not, Mr. Brinkmann?

7    That's the September 7, 2010 --

8             MR. BRINKMANN:  Yes, that's correct.

9    BY MR. TAGUE:

10       Q    What is that?

11       A    This is a letter dated September 7, 2010.  It's

12   a letter jointly addressed to me and to Charles Thompson.

13       Q    Why was it addressed to Charles Thompson?

14       A    Charles Thompson was the director of the

15   Information Technology Services in the College of

16   Engineering.  He would have been the supervisor.

17       Q    Why wasn't it directed to the dean who had sent

18   the initial charge letter out?

19       A    Mr. Thompson would have been the more direct

20   supervisor.  He was an assistant dean.

21       Q    How did the university become aware that Mr.

22   Carmody had Group Exhibit A documents in his possession?

23       A    How did the university become aware?

24       Q    Yes.

25       A    Legal counsel became aware.  I'm not exactly
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  sure of the particulars of how legal counsel became

2  aware.

3      Q    Were you ever aware that Judge Chase Leonhard,

4  a State Court judge in Champaign County, had entered a

5  protective order relating to the Group Exhibit A

6  documents?

7      A    At that time, I would have not been aware of

8  that.  No.

9      Q    Was there ever any investigation done by your

10  department, or anyone in the university, to your

11  knowledge, as to whether or not the reporting of the

12  Exhibit A documents to the university was in violation of

13  Judge Leonhard's order?

14          MR. BRINKMANN:  Your Honor, I'm going to object

15  on relevance grounds.  This is not pertinent to whether

16  reasonable notice was given or reasonable opportunity to

17  respond was given.  The manner that the investigation was

18  done is not part of this case.

19          THE COURT:  I would agree with that.  I'll

20  sustain the objection.

21  BY MR. TAGUE:

22      Q    Were you aware that Mr. Carmody and his

23  attorney maintained that Mr. Carmody could not discuss

24  the Group Exhibit A documents because of the judge's

25  protective order?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      A     Other than what I was informed in the letter

2   that Mr. Carmody did not respond, and I believe this

3   letter mentions on advice of his attorney.

4      Q     Did you ever make a determination that the

5   reasons articulated by Mr. Carmody and Mr. Kirchner were

6   valid?

7            MR. BRINKMANN:  Objection, relevance, Your

8   Honor.

9            THE COURT:  Ask that question a different way.

10  BY MR. TAGUE:

11     Q     Mr. Carmody and Mr. Kirchner's position was

12  that he could not talk about the Group Exhibit A

13  documents because of Judge Leonhard's protective order.

14  You became aware of that from that September 7, 2010,

15  report, correct?

16     A     Yes.

17     Q     Did you ever make a determination whether or

18  not that position was correct?

19            MR. BRINKMANN:  Objection, relevance.

20            THE COURT:  I'll sustain that.  That's not her

21  job.

22  BY MR. TAGUE:

23     Q     Did a meeting take place with members of your

24  staff or with you to discuss the findings and

25  recommendations prior to the creation of the September 7,

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    2010, report?

2        A    I do know that there was a meeting to discuss

3    the findings and the recommendations.  I believe that the

4    letter -- that there was a draft, and that's what we

5    would have discussed with the investigators to inform our

6    discussion of their findings.

7        Q    I'm going to give you back an exhibit.

8            I've handed you Plaintiff's Exhibit 7 and 8

9    because I'm going to ask you questions about both of

10   them.  With respect to Exhibit Number 8, that is the Code

11   of Conduct, correct?

12       A    Yes, it is.

13       Q    Was Mr. Carmody charged with a violation of

14   that?

15       A    Yes, he was.  I'm sorry.  The monitor here next

16   to me is not clear.

17           THE COURT:  Perhaps, Mr. Tague, you can zoom in

18   a little bit so it's more legible.  I think the jury

19   might appreciate that also.

20              (Brief pause in proceedings.)

21           MR. TAGUE:  Does that work?

22           THE WITNESS:  That's better.  Thank you.

23           Can you repeat your question, please?

24   BY MR. TAGUE:

25       Q    Yeah.  Was Mr. Carmody charged with a violation

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    of that Code of Conduct?

2        A    Yes.

3        Q    What provision of that Code of Conduct was he

4    charged with?

5        A    So the July 19th letter does not specify a

6    particular portion of the Code of Conduct.  All employees

7    are subject to the Code of Conduct in its entirety.

8        Q    No specific provision of that Code of Conduct

9    was ever identified in a charge, was it?

10       A    In this charge, it was not.  No.

11       Q    Well, was there some other charge that was

12   created against Mr. Carmody in which it was -- there was

13   a delineation of a specific provision of that document?

14       A    No.  This is the only charge letter.

15       Q    I've handed you Plaintiff's Exhibit Number 5.

16   What is that document?

17       A    It is a document to, a letter to Mr. Carmody,

18   dated September 23, 2010.

19       Q    And that's the letter discharging him

20   immediately from employment with the University of

21   Illinois?

22       A    Yes.

23       Q    Who authored that document?

24       A    It was -- it is signed by me and Charles

25   Thompson, jointly signed.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      Q      So you signed it?

2      A      Yes, I did.

3      Q      And Mr. Thompson signed it?

4      A      Yes.

5      Q      Who actually created it?

6      A      At, at this point, I honestly don't remember

7  whether I drafted the initial draft or whether I asked

8  one of my staff to draft the letter.  I don't remember.

9      Q      And by "one of your staff," you mean either Mr.

10  Bohn or Ms. Reynolds?

11      A      Yes.  That would have been who I would have

12  asked.

13      Q      And do you know whether or not there was a

14  draft prior to that final version that you and

15  Mr. Thompson signed?

16              MR. BRINKMANN:  Your Honor, I'm going to

17  object.  This is not relevant to reasonable notice or

18  reasonable opportunity to respond.

19              THE COURT:  I'll sustain that objection.

20  BY MR. TAGUE:

21      Q      Do you know when that document was actually

22  signed?

23      A      The date that I signed it?  I would imagine

24  that I signed it on the 23rd, but I -- at this point, I

25  don't know.  It's dated the 23rd.  That would be when I

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   would sign it.

2        Q    Do you know what time of the day you signed it?

3        A    No.

4             MR. BRINKMANN:  Objection, relevance.

5             THE COURT:  I'll overrule it.

6        A    No.  I do not.

7        Q    Were you aware that there was going to be a

8   hearing on September 23, 2010, relating to potentially

9   lifting the protective order?

10            MR. BRINKMANN:  Objection, relevance.

11            THE COURT:  Well, I'll overrule it.  But you're

12  getting -- you're getting farther and farther afield from

13  the issues, Mr. Tague.

14            You may answer the question.

15       A    No.  I would not have been aware of that.

16       Q    How was that document then sent to Mr. Carmody?

17       A    I would imagine since it has his address that

18  we delivered it via U.S. Mail.  Our practice would be to

19  send it -- we very often ask for confirmation of

20  delivery.  It's been five years.  I don't know that I

21  could exactly tell you how it was delivered.

22       Q    Were you aware that Judge Leonhard did vacate

23  the protective order on September 23, 2010?

24            MR. BRINKMANN:  Objection, relevance.

25            THE COURT:  Overruled.  Again, we're getting

1  far afield from the issues, Mr. Tague.

2           You may answer the question.

3     A    Was I aware on September 23rd that the order

4  had been lifted?

5     Q    Yes.

6     A    No.  I was not.

7     Q    Is there any reason that the decision that you

8  have in your hand, the September 23, 2010, letter to Mr.

9  Carmody, couldn't have waited a day or a few days after

10  the judge removed the protective order?

11          MR. BRINKMANN:  Object to the form of the

12  question and also on relevance.

13          THE COURT:  I'll sustain as to relevance.

14  BY MR. TAGUE:

15     Q    The September 23rd letter, which is Exhibit

16  Number 5, provides the basis of what Mr. Carmody was

17  found guilty of leading to his termination; does it not?

18     A    Can you re-ask your question, please?

19     Q    Sure.

20          Exhibit Number 5, which is the September 23rd

21  discharge letter, identifies the charges which Mr.

22  Carmody was found guilty of; did it not?

23     A    Yes.

24     Q    On Exhibit 5, on the first page, the last

25  sentence of the third paragraph states, "As an

1   information technology professional, you did not

2   immediately report the breach of security to your

3   supervisor when you came into possession of the documents

4   constituting Group Exhibit A."

5          That obviously appears in Exhibit 5; does it

6   not?

7      A    Yes, it does.

8      Q    That was not in the original charge of

9   Exhibit 1, was it?

10     A    That specific sentence, no, it was not.

11     Q    When in the process was that charge developed?

12          MR. BRINKMANN:  Objection, Your Honor.  The use

13  of the term "charge" assumes a fact not in evidence.

14          THE COURT:  Ask the question a different way,

15  Mr. Tague.

16  BY MR. TAGUE:

17     Q    When was that allegation developed?

18          MR. BRINKMANN:  Objection, Your Honor, to the

19  use of the term "allegation."  That's assuming a fact not

20  in evidence.

21          THE COURT:  No.  I'm -- overruled.

22          Go ahead and answer the question, please.

23          THE WITNESS:  Can I ask you to restate the

24  question, please?

25          MR. TAGUE:  Yes.

1    BY MR. TAGUE:

2         Q    When was that allegation developed?

3         A    This statement, which I would read as a

4    conclusion, would have been developed based on the

5    investigation.

6         Q    What document was provided to Kevin Carmody

7    alerting him that that was an allegation that would

8    support his termination?

9              MR. BRINKMANN:  Your Honor, I object.  This is

10   mischaracterizing the witness's answer.

11             THE COURT:  Yeah.  I'll sustain that.  That's

12   not -- ask another question, Mr. Tague.

13   BY MR. TAGUE:

14        Q    That specific sentence that we talked about in

15   Exhibit 5, that last sentence in the third paragraph, was

16   there ever a document that you're aware of that was

17   provided to Mr. Carmody or Mr. Kirchner in which that

18   sentence, or the gist of that sentence, appeared?

19        A    Not to my knowledge, that specific sentence,

20   no.

21        Q    I've shown you Plaintiff's Exhibit Number 13.

22             I believe that's Joint Exhibit Number 9, is it

23   not, Bill?  That's the Notification of Appointment,

24   8/16/2010 to 8/15/2011.

25             What is that document?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      A    It is a copy of Mr. Carmody's Notification of

2  Appointment, outlining his title, salary, FTE, and the

3  period of appointment and the source of funds.

4           MR. TAGUE:  I would move to admit that 13 into

5  evidence, Your Honor.

6           THE COURT:  Any objection, Mr. Brinkmann?

7           MR. BRINKMANN:  No objection, Your Honor.  This

8  is Number 9 on the joint list of exhibits.

9           THE COURT:  Right.  Just so far, since you --

10 since you've chosen to double-mark things, let me make

11 sure I've got this right.

12          We've admitted 1, which is also Joint 4.

13          7, which is also Joint 6.

14          8, which is also Joint 5.

15          2 -- you didn't move to admit it, but I presume

16 you would like to do so at this time, Mr. Tague?

17          MR. TAGUE:  Yes.  I would move to admit it.

18          THE COURT:  That's also Joint 7.

19          5, which is also Joint 8, do you move to admit

20 that?

21          MR. TAGUE:  Yes.

22          THE COURT:  And now 13, which is also Joint 9.

23 You're moving to admit that, correct?

24          MR. TAGUE:  I think those are the only ones

25 that I've moved to admit so far.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1            THE COURT:  All right.  Mr. Brinkmann, have I
 2    had all those -- did I miss any of them?
 3            MR. BRINKMANN:  No.  And I have no objection,
 4    Your Honor.
 5            THE COURT:  Fine.  13, which is also Joint 9,
 6    is admitted.
 7    BY MR. TAGUE:
 8        Q    That document set forth what Kevin Carmody's
 9    salary was going to be for that period; did it not?
10        A    Yes, it does.
11        Q    And what is that amount?
12        A    An annual salary of $73,695.
13        Q    Mr. Carmody was an academic professional; was
14    he not?
15        A    Yes, he was.
16        Q    And academic professionals at the U of I would
17    be given an annual contract like this?
18        A    They're giving -- they are given a contract.
19    Most of them are annual contracts.  There are occasions
20    in which employees are appointed for periods of time less
21    than an annual basis, --
22        Q    Okay.
23        A    -- and it's noted on their appointment.
24        Q    But this -- Mr. Carmody's appointment was on an
25    annual basis, correct?
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1        A    Yes, it was.

 2        Q    And he had been appointed on an annual basis

 3   for numerous years prior to that; had he not?

 4        A    Yes.

 5        Q    And --

 6        A    This document does not tell me that; but, yes,

 7   he had been.

 8        Q    And as an academic professional on an annual

 9   basis, there is a policy and procedure at the University

10   of Illinois -- is there not? -- relating to nonrenewal of

11   those?

12        A    Yes, there is.

13        Q    What is that policy?

14        A    It's, it is a policy -- it's actually in the

15   university governing documents -- that outlines, based on

16   the years of service and the source of funds, whether

17   they're hard, considered hard funds or soft funds, the

18   period of notice that a full-time academic professional

19   is given if the individual will not be reappointed.

20        Q    And in Kevin Carmody's case, that would be a

21   year?

22        A    Yes, based on his source of funds and his

23   length of employment.

24             THE COURT:  You said hard funds and soft funds?

25             THE WITNESS:  Yes.
```

 1           THE COURT:  What's the difference?

 2           THE WITNESS:  Hard funds are traditionally

 3    considered state funds, that there's not usually

 4    volatility in those.  When we get an appropriation, those

 5    funds are not subject to change over the year.

 6           Soft funds would be an example of grant funds

 7    that may not be renewed or may be pulled by the granting

 8    agency, so there's more volatility in the funding source.

 9           THE COURT:  Gotcha.  Thank you.

10    BY MR. TAGUE:

11       Q    Kevin Carmody's source of funds were hard

12    funds; were they not?

13       A    Yes, they were.

14       Q    And he had worked for the university for the

15    requisite number of years that he would have received a

16    year's notice of non-reappointment, correct?

17       A    Yes.

18       Q    A notice of non-reappointment was never created

19    and served upon Mr. Carmody, was it?

20       A    That is correct.

21           MR. TAGUE:  If I may have just a moment, Your

22    Honor.

23           THE COURT:  Take your time.

24           (Brief pause in proceedings.)

25           MR. TAGUE:  I have no further questions.  Thank

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   you, ma'am.

2            THE COURT:  Thank you.

3            Mr. Brinkmann, do you --

4            MR. BRINKMANN:  Your Honor, I just want to

5    clear up a few issues.

6             CROSS-EXAMINATION BY MR. BRINKMANN:

7        Q    Ms. Stone, with respect to the September 7,

8    2010, letter, which is Joint Exhibit 7, do you have that

9    before you?

10       A    I do not.

11       Q    This is also Plaintiff's Exhibit Number 5

12   [sic]; is that correct?

13       A    Yes, it is.

14       Q    Referring to the second page of that letter, is

15   there a section of that letter that is entitled "Summary

16   of Investigation"?

17       A    Oh, I'm sorry.  You gave -- you gave me the

18   September 23rd letter.

19            THE COURT:  If you look on the screen, it's

20   showing up on the screen next to you.

21            THE WITNESS:  Okay.  Thank you.

22            I'm sorry.  Can you ask your question again?

23            MR. BRINKMANN:  Yes, I apologize.

24   BY MR. BRINKMANN:

25       Q    Does Joint Exhibit 8 [sic] before you have a

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    section on the second page that refers to a summary of

2    the investigation?

3         A    Yes, it does.

4         Q    And the -- did that contain the conclusions

5    that the investigators made based on the information that

6    they developed?

7         A    Yes.  That is what that section is.

8         Q    On the next page of the summary of the

9    investigation, with reference to paragraph 14, is one of

10   the findings that Mr. Carmody -- when he "became aware of

11   the documents constituting Group Exhibit A, he did not

12   immediately report the breach of security to his

13   supervisor?

14        A    I -- yes.  That's what paragraph 14 says.

15        Q    All right.  That was one of the findings that

16   was not characterized as a charge?

17        A    That's correct.

18        Q    All right.  Going back, then, to Exhibit 5 that

19   you have, which is also Joint Exhibit 8, Mr. Tague asked

20   you questions about the last sentence -- the last

21   sentence in the third paragraph, and that last sentence

22   in the third paragraph was in a paragraph that describes

23   the findings that the university has made based on the

24   investigation?

25        A    Yes.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    Q    So Exhibit 5, or Joint Exhibit 8, which you

2  have before you is the letter that you and Mr. Thompson

3  wrote to Mr. Carmody; --

4    A    Yes.

5    Q    -- is that correct?

6    A    Yes.

7    Q    And you adopted the findings from the report

8  and recommendations that were given to you by Mr. Bohn

9  and Ms. Reynolds?

10    A    Yes.

11    Q    And those, again, were findings; they were not

12  charges.  Is that correct?

13    A    That's correct.

14        MR. BRINKMANN:  That's all, Your Honor.

15        THE COURT:  Mr. Tague.

16         REDIRECT EXAMINATION BY MR. TAGUE:

17    Q    Do you have Plaintiff's Exhibit 5 in front of

18  you?

19    A    Yes, I do.

20    Q    Plaintiff's Exhibit 5, Mr. Brinkmann was just

21  asking you, the third paragraph starts out, "The

22  university finds that you did, in fact, engage in the

23  alleged misconduct."  What misconduct are you referring

24  to?

25    A    As that sentence goes on, "violating the

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  University Code of Conduct and the Policy on Appropriate

2  Use of Computers and Network Systems at the University of

3  Illinois at Urbana-Champaign."

4      Q    And you did not in that letter identify a

5  specific portion of either policy, did you?

6      A    No.

7      Q    You go on to say, "In particular, we find that

8  you attempted to use the substance of the email messages

9  in Group Exhibit A for non-university related purposes."

10         How did you conclude that the, providing those

11  documents in respect to litigation of one university

12  employee against another were not university purposes?

13      A    The university was, did -- was not

14  particularly a -- either plaintiff or defendant; I'm not

15  exactly sure of the terms.  That was a lawsuit that, my

16  understanding, the university was not one of the parties,

17  principal parties.

18      Q    Kevin Carmody was an employee of the

19  university; was he not?

20      A    Yes, he was.

21      Q    David Goldberg was an employee of the

22  university; was he not?

23      A    Yes.

24      Q    And the incident happened on university

25  property; did it not?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1            MR. BRINKMANN:  Objection.  Lack of foundation
 2   and also relevance.
 3            THE COURT:  I'll sustain as to relevance.
 4   BY MR. TAGUE:
 5       Q    A university-provided attorney was provided for
 6   Mr. Goldberg; was he not?
 7            MR. BRINKMANN:  Objection, relevance.
 8            THE COURT:  Sustained.  We're not going to get
 9   into the Goldberg matter.
10   BY MR. TAGUE:
11       Q    You go on to say "without permission."  Whose
12   permission?
13       A    There was no permission from the university IT
14   organization or the permission from the individuals who
15   were either the senders or the receivers of the emails.
16       Q    Is it your position that there was no authority
17   in any of the Computer Network Use Policies that would
18   have allowed providing these documents in the State Court
19   action?
20            MR. BRINKMANN:  Objection, relevance.
21            THE COURT:  Sustained.  This -- we're not going
22   to go into the State Court lawsuit.  That's not at issue.
23   BY MR. TAGUE:
24       Q    And who was the plaintiff's supervisor to whom
25   you concluded he failed to report a breach of security?
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1       A      That would be Mr. Thompson.

 2              MR. TAGUE:  That's all the questions I have.

 3              MR. BRINKMANN:  Nothing further, Your Honor.

 4              THE COURT:  You may step down.

 5              THE WITNESS:  Thank you.

 6                 (Witness Stone excused, 2:12 p.m.)

 7              THE COURT:  Mr. Tague, you may call your next.

 8              MR. TAGUE:  I'd like to call Joseph Bohn.

 9                 JOSEPH BOHN, sworn, 2:12 p.m.,

10                 DIRECT EXAMINATION BY MR. TAGUE:

11       Q      Would you state your name?

12       A      Joseph Bohn.

13       Q      And back in July of 2010, you worked for the

14  University of Illinois; did you not?

15       A      I did.

16       Q      What was your position?

17       A      Labor and employee relations specialist.

18       Q      And what department did you work under?

19       A      Academic Human Resources.

20       Q      And who was your superiors?

21       A      Sharon Reynolds and Deb Stone.

22       Q      When did you have occasion to become involved

23  in an investigation relating to Kevin Carmody?

24       A      Sometime in the summer of 2010.

25       Q      Do you know specifically when?
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   A    I don't recall the exact date.

2   Q    And how were you called in -- what were you

3  told you were supposed to do with respect to that

4  investigation?

5   A    There were some concerns brought to our

6  attention related to documents that were produced, and we

7  were requested to take a look into the specifics behind

8  that circumstance.

9   Q    Okay.  Who brought you into the matter?

10   A    Deb Stone assigned the, the work to me.

11   Q    Did she assign it to you with Sharon Reynolds

12  to assist you, or did she assign it to Sharon Reynolds

13  with you to assist her?

14   A    I don't recall.  We were both asked to, to

15  participate in the investigation.

16   Q    And what were you provided prior to you

17  actually doing any investigating?

18   A    I don't -- I don't recall.

19   Q    What's the first thing you remember doing in

20  the Carmody matter?

21   A    I believe there was probably a discussion about

22  the initial concerns.

23   Q    With whom?

24   A    I don't -- I don't recall.  Our typical custom

25  and practice to, when situations like this arise, is to

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   get together with -- whether it's legal counsel, my

2   supervisor, or others that are involved with the

3   situation and try to get specifics on the concern at

4   hand.

5        Q    Did you have any discussions with Rhonda Perry?

6        A    Ever?

7        Q    Well, the -- initially in this investigation.

8        A    I don't recall when my first conversation was

9   with Rhonda Perry.

10       Q    When did you first learn what the allegations

11  against Mr. Carmody were?

12       A    That would have been -- once Academic Human

13  Resources was made aware of the concerns, I would have

14  then been informed and assigned the work.

15       Q    So Deb -- Deborah Stone told you about the, the

16  basis of the charges?

17       A    I don't, I don't recall specifically who told

18  me.

19       Q    I've shown you Plaintiff's Exhibit Number 1.

20  What is that document?

21       A    That, that is a letter dated July 19, 2010, to

22  Kevin Carmody, outlining the misconduct allegations and

23  letting him know how things were going to proceed.

24       Q    Who drafted that letter?

25       A    I don't recall who specifically drafted the

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   letter.

2       Q    Were you involved in drafting that letter?

3       A    It's possible that I would have been involved

4   with drafting the letter.

5       Q    Did you have the Group Exhibit A documents in

6   your possession on July 19, 2010?

7       A    I don't recall when I first received Group

8   Exhibit A documents.

9       Q    I've shown you Plaintiff's Exhibit Number 9.

10  What is that document?

11      A    It appears to be email messages to, you know,

12  to or from Deborah Thurston and other individuals.

13      Q    Is that the Group Exhibit A documents we've

14  been talking about all morning?

15      A    It appears to be.

16          MR. TAGUE:  I'd move to admit that into

17  evidence, Your Honor.

18          THE COURT:  Any objection, Mr. Brinkmann?

19          MR. BRINKMANN:  No, Your Honor.  It's also

20  Number 1 on the joint list.

21          THE COURT:  Thank you.  It's admitted.

22  BY MR. TAGUE:

23      Q    Do you recall having anything available to you

24  prior to July 19 -- prior to the creation of the July 19,

25  2010, letter?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
1        A     Anything -- I don't understand the question.

2        Q     Any documents or any investigation results --

3        A     Well, the investigation hadn't started at that

4   point yet, so I would not have had any investigation

5   results.

6        Q     Other than the dean signing that letter, do you

7   know if he had any involvement in the investigation?

8        A     I'm not aware of the dean having any

9   involvement in the investigation.

10       Q     Do you know how it came to pass that the dean

11   was going to sign that letter rather than somebody in

12   Academic Human Resources?

13       A     It's typical that a department official will

14   sign that letter versus somebody from Academic Human

15   Resources.

16       Q     Kevin Carmody's supervisor was Department Head

17   Jong-Shi Pang; was it not?

18       A     I think Mr. Carmody had a couple supervisors.

19   One was Jong-Shi Pang, and one was Charles Thompson.

20       Q     Do you know why one of those individuals was

21   not asked to sign the July 19th letter?

22       A     I don't know.

23       Q     In Plaintiff's Exhibit Number 1 -- you still

24   have that in front of you?

25       A     I do not, unless it's on the screen.
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1       Q       In the dean's letter, in the first paragraph,

2   the second sentence indicates that there would be "an

3   investigation into these concerns and that Academic Human

4   Resources, in conjunction with the College of

5   Engineering, will be conducting that investigation."

6               Who were the people in the College of

7   Engineering that were involved in the investigation?

8       A       Sharon and I were in charge of the

9   investigation.  There were, there were people that we, we

10  talked to in the College of Engineering as the

11  investigation began.

12      Q       After Mr. Carmody received that charging letter

13  from the dean, a meeting was scheduled; was it not?

14      A       Correct.

15      Q       And who was to attend that meeting?

16      A       I believe Sharon Reynolds and myself, Mr.

17  Carmody's attorney, and Mr. Carmody.

18      Q       And did you do anything in the investigation

19  before that meeting actually took place?

20      A       I don't recall doing anything regarding the

21  investigation before that meeting took place.

22      Q       That meeting ultimately was postponed from the

23  original time; was it not?

24      A       Correct.

25      Q       And it happened on or about July 28th?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1     A    I don't recall the exact date.

2     Q    What is Plaintiff's Exhibit Number 4?

3     A    This looks like interview notes for two

4  interviews that we -- that Sharon Reynolds and I

5  conducted with College of Engineering personnel.

6     Q    And in part of that document, there is a series

7  of questions with answers, correct?

8     A    Correct.

9     Q    Was the form of this letter created without the

10  answers before the interviews?

11         MR. BRINKMANN:  Your Honor, I'm going to

12  object.  This is not a letter.  I believe it is an

13  outline of talking points, and I object to the question.

14  It's assuming a fact that's not in evidence.

15         THE COURT:  Let me see the exhibit.

16         MR. TAGUE:  It's not a letter.

17         COURTROOM DEPUTY:  I have it.

18           (Brief pause in proceedings.)

19         THE COURT:  Yeah.  Mr. -- I'll sustain the

20  objection.  I think -- Mr. Tague, you want to rephrase

21  the question?

22         MR. TAGUE:  Yes, I do.

23         THE COURT:  It's not a letter.

24  BY MR. TAGUE:

25     Q    You created an outline prior to your meeting

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   with -- meetings with Jong-Shi Pang and Deborah Thurston;

2   did you not?

3        A    I would have been involved with creating an

4   outline.  Correct.

5        Q    When was that outline created?

6        A    I don't recall.

7             THE COURT:  That's Plaintiff's 4 and Joint 10,

8   Mr. Brinkmann; is that correct?

9             MR. BRINKMANN:  No, Your Honor.  This would be

10  Joint 11 and 12.  It's Pang and Thurston, is my

11  understanding.

12            THE COURT:  11 and 12, thank you.

13            You're moving to admit, Mr. Tague?

14            MR. TAGUE:  I might as well move to admit.  It

15  was on all the lists to be admitted without objection.

16            THE COURT:  Right, 4 and Joint 11 and 12, all

17  the same thing, they are admitted.

18            You wish to publish?

19  BY MR. TAGUE:

20       Q    Did I just give you Exhibit 3?

21       A    Yes.

22       Q    Do you recognize Exhibit 3?

23       A    No.

24       Q    Do you know whether or not Mr. Carmody asked

25  for clarification or identification of the policy

1  provisions that he was being charged with?

2      A      In this, in his email to Sharon Reynolds and

3  myself on July 20, 2010, he indicates, "Please provide me

4  in writing and in advance of any rescheduled meeting

5  precisely which portions of any and all policies which

6  are claimed in the alleged misconduct."

7      Q      So you're not familiar with that document in

8  its entirety?

9      A      I don't, I don't recall the document.

10      Q      On the first page of -- on the first page of

11  that document, it is an email from Sharon Reynolds to

12  Kevin Carmody; is it not?

13      A      Yes.

14      Q      You were copied; were you not?

15      A      Yes.

16      Q      And do you remember receiving a copy of this?

17      A      I don't recall receiving a copy, but my name is

18  on it.

19      Q      And it talks about -- it's a response to an

20  email from Mr. Carmody requesting additional information;

21  is it not?

22      A      It's in response to -- it appears to be in

23  response to Mr. Carmody's July 20, 2010, email message.

24      Q      The last two pages are an email from Mr.

25  Carmody to the, you and Sharon Reynolds; and then the

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   front page is Ms. Reynolds' response, correct?

2       A    Correct.

3            MR. TAGUE:  I'd move for admission of

4   Plaintiff's Exhibit Number 3.

5            THE COURT:  Mr. Brinkmann, any objection?

6            MR. BRINKMANN:  No objection, Your Honor.

7            THE COURT:  It's admitted.

8   BY MR. TAGUE:

9       Q    Ms. Reynolds did not identify any specific

10  excerpts or provisions from the policies, did she?

11      A    She points to the Policy on Appropriate Use of

12  Computer Network Systems and provides a link to that

13  policy, it appears; and the University Code of Conduct

14  and a link to that policy.

15      Q    And you're talking about the third paragraph

16  that starts out, "As you were notified in the meeting

17  notice of July 19, 2010, if the acts of misconduct

18  outlined in the notice are substantiated" -- is that

19  correct?

20      A    Correct.

21      Q    You did not make a separate response to Mr.

22  Carmody to his inquiry to identify the policy provisions?

23      A    I don't recall making a response to Mr.

24  Carmody.

25      Q    I've shown you Plaintiff's Exhibit Number 6.

1    What is that document?

2        A    This appears to be a document from Charles

3    Thompson, indicating that he has "reviewed the materials

4    from Exhibit A, primarily the email header information."

5    And he goes on to discuss -- he indicates, "I believe

6    that the most probable source of all information included

7    in this exhibit is Deborah Thurston's computer."  So it's

8    an analysis that he conducted.

9        Q    When did you receive this document in the

10   source of your investigation?

11           MR. BRINKMANN:  Your Honor, I'm going to object

12   on relevance grounds.  This gets into whether the

13   investiga-- or the way that the investigation was done

14   and is not probative of reasonable notice or opportunity

15   to respond.

16           THE COURT:  That's a close call, Mr. Tague.  If

17   you want to re-ask the question a different way, to see

18   where you're going -- I'm not sure where you're going

19   with this, so ask another question.  The objection for

20   now is overruled.

21   BY MR. TAGUE:

22       Q    You had this information at some point in your

23   investigation?

24       A    Correct.

25       Q    Prior to the meeting with Mr. Carmody?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    A    No.

2    Q    Or was anything in this memoranda incorporated

3  into charges against Mr. Carmody?

4    A    It's my understanding that this document

5  wouldn't have been available at the time the charges were

6  written.

7              (Brief pause in proceedings.)

8    Q    I showed you several -- I've handed you several

9  exhibits.  What's Exhibit Number 16?

10   A    It's an email dated July 13, 2010.  It's a

11  string of emails.  The last one was July 13, 2010, at

12  9:26 p.m. from Lori Rairden to myself, copying Charles

13  Thompson and Jeffrey Oberg.

14   Q    And what date is it?

15   A    July 13, 2010.

16   Q    And did this involve the Carmody matter?

17   A    I believe that it did.

18   Q    And do you know why this document was created?

19   A    I don't recall.

20        I don't -- are you asking why the email was

21  created?  I'm not aware of another document that's

22  attached to this.

23   Q    Why was -- yeah.  My question was:  Why was the

24  email created?

25   A    It just talks about --

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1     Q    Was it to schedule a meeting to discuss the

2   creation of charges and how to proceed once charges were

3   served?

4          MR. BRINKMANN:  Your Honor, I object.  Again,

5   we're getting into the investigative process and how that

6   was conducted, and that is not relevant to the issues

7   that are, this trial is about.

8          THE COURT:  I'm -- sustained.  We're not --

9   that's not at issue in this case.

10  BY MR. TAGUE:

11     Q    Ultimately, you had a meeting with Mr. Carmody

12  in July of 2010; did you not?

13     A    Correct.

14     Q    And who was present?

15     A    At the start of the meeting, Mr. Carmody was

16  present; Mr. Kirchner, his attorney, was present; Sharon

17  Reynolds; and myself.

18          And at another point in the meeting, Rhonda

19  Perry, our university legal counsel, was asked to attend.

20     Q    What is Exhibit Number 12?

21     A    Exhibit Number 12 indicates it's "Talking

22  Points for Kevin Carmody Charge Meeting."

23     Q    You had that in hand before the meeting?

24     A    I don't know if I would have had this

25  particular document in hand.  At some point I would have

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   had this document in my hand.  I'm not sure at what point

2   this draft was available to me.

3       Q    Okay.  Did you have any draft -- or did you

4   have any document that would be an outline of talking

5   points for the Kevin Carmody meeting at the meeting

6   itself?

7       A    Yes.

8       Q    You just can't say whether or not that is the

9   document?

10      A    I can't say that this is, this is my document.

11  I believe my document would have had some, some things

12  scribbled on it.

13      Q    Okay.  So what happened at the meeting?

14      A    Well, the -- what we typically do is we come

15  in, just as the talking points talk about, and we brought

16  an introduction; discuss that it's an informal process,

17  not a legal hearing; that this meeting is part of an

18  investigation to help us to better understand the

19  situation; notify Kevin that he'll be the only one

20  providing information to us; an attorney can advise; and

21  then we can take breaks at any time if needed.  And then,

22  generally, we would go in and discuss the specific

23  charges with Mr. Carmody.

24      Q    Did you have the charging letter with you, the

25  dean's letter of July 19, 2010, at that meeting?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1       A     I don't recall.

2       Q     What did you tell Mr. Carmody the charges were

3  or what he was supposed to respond to?

4       A     The charges would have been those charges that

5  were outlined in the dean's charge letter.

6       Q     Did you actually read him the charges again, or

7  did you begin attempting to ask questions?

8       A     I, I recall reading him the charges again.

9       Q     Okay.  So that means you would have had the

10 July 19th letter in front of you?

11      A     It's possible.

12      Q     After you read him the charges, did you attempt

13 to ask him questions?

14      A     Yes.

15      Q     Did only you ask him questions, or did Ms.

16 Reynolds also ask him questions?

17      A     I recall -- I recall asking questions as --

18 trying to ask questions off of this letter.  I don't

19 recall whether Sharon asked questions -- or Ms. Reynolds

20 asked questions off this document.

21      Q     Did you have a copy of the transcript of the

22 June 25, 2010, hearing in which Judge Leonhard imposed a

23 protective order relating to Group Exhibit A?

24      A     At the meeting?

25      Q     Yes.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1        A    I don't recall having that at the meeting.
 2        Q    Were you aware that such a protective order
 3   existed --
 4             MR. BRINKMANN:  Objection, Your Honor.
 5             THE COURT:  Finish asking the question.
 6   BY MR. TAGUE:
 7        Q    Were you aware that a protective order existed
 8   in some form at the time of your meeting with Mr. Carmody
 9   and Mr. Kirchner?
10             THE COURT:  What's the basis for your
11   objection, Mr. Brinkmann?
12             MR. BRINKMANN:  I'll withdraw, Your Honor.
13             THE COURT:  Please answer the question.
14             THE WITNESS:  Could you re-ask the question?
15             MR. TAGUE:  You want me to attempt it, or maybe
16   we should have her read it back, Your Honor?
17             THE COURT:  Were you aware that a protective
18   order existed in some form at the time of your meeting
19   with Mr. Carmody and Mr. Kirchner?
20             THE WITNESS:  I don't recall when I became
21   aware of that protective order.
22   BY MR. TAGUE:
23        Q    So you don't recall whether you actually knew
24   of its existence on that day or not.  Is that a --
25        A    I don't recall, going into that meeting, when I
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    would have been made aware of that protective order.  I

2    do recall that topic being brought up during the meeting.

3           Q     Okay.  And who brought that topic up?

4           A     The -- Mr. Carmody or his attorney.

5           Q     And what did you do then once they brought up

6    the existence of the protective order?

7           A     At some point, I recall asking Rhonda Perry to

8    join our meeting to help clarify the situation, and then

9    I do recall attempting to ask questions off of these

10   talking points.

11          Q     Okay.  So the, the talking points, the list

12   that you have in front of you, being Exhibit 12?

13          A     Correct.

14          Q     So you attempted to ask him those questions.

15   And what was his response, if any?

16          A     He would not respond to any of the questions.

17          Q     Did he give you a reason, or did he or

18   Mr. Kirchner give a reason why he didn't answer those

19   questions?

20          A     I believe they referred to the protective order

21   at that time.

22          Q     Did you attempt to ask every question on your

23   talking point list, or was there a point that you quit

24   asking questions?

25          A     I don't recall how many questions -- if I tried

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    to ask all the questions.  I do recall asking a number of

2    the questions.

3         Q    And the -- did you ever ask Mr. Carmody if he

4    had anything to say about the charges without tying it to

5    a specific question on your talking point?

6         A    In the, in the charge letter, he could have --

7    that was his -- he was put on notice that he would have

8    an ability to respond to those charges.  And so he could

9    have brought -- he could have responded to those charges

10   as I talked to them that day, or he could have brought

11   something in writing to respond to those charges.

12        Q    My question is:  Did you ever tell him in that

13   meeting, "Okay, I'm done asking questions.  Is there

14   anything you have to say"?

15        A    That would be my normal practice.

16        Q    And do you remember whether that happened in

17   that meeting?

18        A    I don't recall.  I do, I do have a -- in these

19   talking points it says, "Please provide any additional

20   information you feel would be valuable during this

21   investigation."  And so I would normally wrap up with

22   that type of response.

23        Q    That would be your normal practice, but this

24   wasn't a normal meeting, was it?

25        A    This is -- this is what I had outlined to

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   discuss.

2        Q    So you had an outline of what you wanted to ask

3   him and how you wanted it to progress, but it never

4   progressed the way you outlined it, did it, because of

5   Mr. Kirchner's objection based upon the protective order?

6        A    We weren't able to ask all the questions but

7   that wouldn't preclude me from hitting the key points off

8   of this, these particular talking points.

9        Q    But you don't remember whether you actually hit

10  that last wrap-up point or not?

11       A    It's been five and a half years.  It's on the

12  paper.  I follow my talking points.  I don't recall

13  specifically whether I answered [sic] it.

14       Q    Did you write down any answers to any of the

15  talking point questions?

16       A    There were no responses to the talking point

17  questions.

18       Q    So that last one, "Do you have anything to say

19  for yourself?", since you didn't write anything down,

20  there wasn't any answers?

21       A    I, I don't think I was the primary note taker.

22  I think I was scheduled to ask the questions.  So I, I

23  wasn't -- I believe the way that Ms. Reynolds and I set

24  this up is that I would ask the questions, and she would

25  try to take notes.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    Q    Ms. Reynolds did not prepare a talking point

2  outline with answers from Mr. Carmody, did she?

3    A    Can you restate that question?

4    Q    Sure.

5         Ms. Reynolds -- you indicated in, I think the

6  procedure would be that sometimes she would be the person

7  writing down the answers on the talking point outline.

8  She didn't do that with Kevin Carmody's interview, did

9  she?

10   A    I, I don't recall specifically what she did.

11 She would have had a copy of -- generally, she would have

12 had a copy of this, of these talking points.

13   Q    What happened -- well, was the meeting -- was

14 there a continuance or a break in the meeting and

15 somebody else joined the meeting?

16   A    Yes.  At some point, Rhonda Perry joined the

17 meeting.

18   Q    Who asked Rhonda Perry to join the meeting?

19   A    Ms. Reynolds or myself.

20   Q    Do you remember who?

21   A    I don't recall.

22   Q    And she came over?

23   A    She did.

24   Q    How long was it till she came over?

25   A    I don't recall.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    Q    What happened once Ms. Perry arrived?

2    A    I think we discussed some of the topics that

3  Mr. Carmody and his attorney brought up, and Ms. Perry

4  clarified the university's position.

5    Q    What was the university's position?

6    A    I'm not, you know -- from a legal basis, I

7  don't -- I'm not, haven't been involved with all the

8  protective order piece, so I would defer to her on that.

9    Q    Were any questions asked or attempted to be

10  asked after the discussion between Ms. Perry and

11  Mr. Kirchner?

12    A    It's possible.

13    Q    You just don't remember?

14    A    I don't recall.

15    Q    Do you know whether or not Mr. Carmody provided

16  any information relating to the charging letter after the

17  discussion between Ms. Perry and Mr. Kirchner?

18    A    I don't believe he provided any information.

19    Q    After that meeting, did you attempt to

20  reschedule another meeting with Mr. Carmody or

21  Mr. Kirchner?

22    A    I would, I would -- I know our attorneys were

23  in communication with Mr. Carmody and his attorney, and

24  I'm not familiar with all their communications that

25  occurred.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1              We did, we did indicate at the end of the

 2      meeting that, that should he want to respond, he would

 3      have an opportunity to respond, to -- to respond.  It was

 4      wide open for him to respond.

 5                   (Brief pause in proceedings.)

 6         Q    I put back up Exhibit Number 1.  That's the

 7      first -- and up on the screen is the first page of the

 8      July 19, 2010, charging letter.  The last sentence

 9      indicates, "Although you may bring someone to the

10      meeting, you will be the only one who is allowed to

11      participate in the meeting."

12              That sentence appears; does it not?

13         A    Correct.

14         Q    And the preceding sentence indicated that Mr.

15      Carmody could bring his attorney, correct?

16         A    Correct.

17         Q    But his attorney wasn't going to be allowed to

18      participate in the defense of the charges?

19         A    As it, as it was stated in the talking points,

20      we want to hear from the employee; and that they can seek

21      counsel from their, their representative, but we want to

22      hear from the employee when it comes to the questions

23      that we ask.

24         Q    So you wanted to ask the employee questions,

25      correct?
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1        A     Correct.

 2        Q     And you wanted the employee to answer the

 3   questions you directed to the employee, correct?

 4        A     Correct.

 5        Q     But didn't you also say that Mr. Carmody was

 6   going to be able to present information that he wanted in

 7   his defense?

 8        A     I'm not sure I understand --

 9        Q     Well, the last talking point that we talked

10   about, are you saying that Mr. Kirchner could not have

11   stated Mr. Carmody's position relative to the charges?

12        A     What, what talking point are you referring to

13   when you say "the last talking point"?

14              (Brief pause in proceedings.)

15        Q     On the second page, I'm talking about talking

16   point number 4.  I think you indicated that Mr. Carmody

17   could provide additional information that he would feel

18   valuable to the investigation.

19              The charging letter seems to indicate that his

20   attorney would not be able to do that for him?

21        A     I don't believe that's what it indicates.

22   During the actual meeting itself -- I can explain what

23   happened during the actual meeting itself.

24        Q     What is Plaintiff's Exhibit Number 2?

25        A     This is a September 7, 2010, communication to
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   Charles Thompson and Deborah Stone.

2        Q     Between July 28, 2010, and September 7, 2010,

3   was there any investigation on the Carmody matter done?

4        A     During that time frame, there would have been

5   investigation that occurred.  I would -- Ms. Reynolds and

6   I would have spoke with Jong-Shi Pang, Deborah Thurston,

7   Chuck Thompson, and Mike Corn.  Those were, you know,

8   four specific things I know that occurred.

9        Q     Anyone else?

10        A     I don't recall.

11        Q     Was an amendment to the charging letter, or a

12   supplement to the charging letter, created before

13   September 7, 2010?

14        A     I don't believe there was ever an amendment to

15   the charging letter.

16        Q     Did Mr. Carmody or his attorney provide

17   anything to the university between September 7 -- I'm

18   sorry, between July 28, 2010, and September 7, 2010?

19        A     I don't recall getting anything -- that Ms.

20   Reynolds or myself received anything.  Although, we did

21   open it up for him to provide that information at that,

22   at that meeting that we had scheduled.

23             I believe the only information that was

24   provided back and forth was between attorneys.

25        Q     Okay.  And any of that shared with you?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1        A     I don't recall.

 2        Q     You did not attempt to reschedule a meeting and

 3   ask Mr. Carmody and his attorney to come back in after

 4   you completed the other components of your investigation,

 5   did you?

 6        A     We, we left -- we left the options wide open.

 7   We said at any point if they would like to provide us

 8   information that they should contact us, or provide the

 9   information.

10        Q     But my question is:  You didn't, on your own

11   initiative, ask for a reconvened meeting or rescheduled

12   meeting to discuss matters with Mr. Carmody or

13   Mr. Kirchner, did you?

14        A     I believe that gesture would allow for that.

15        Q     This document, Number 2, was then provided

16   to --

17             THE COURT:  Mr. Tague, before you get too far

18   into it, do you have much more to go with this witness?

19   I'm thinking about taking a break.

20             MR. TAGUE:  I don't think I have very --

21             THE COURT:  All right.  Because we've been here

22   an hour and a half, and we just had lunch, and I don't

23   know if anybody needs to use the restroom or not.

24             MR. TAGUE:  I wouldn't mind doing that myself,

25   so that's --
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1              THE COURT:  Fine.

2              MR. TAGUE:  -- a good suggestion.

3              THE COURT:  All right.  All right.  Let's take

4      a ten-minute break.  Come back in here at 3:10.  Stretch

5      out; wake up; use the restroom.

6                      (Jury absent, 3:00 p.m.)

7              THE COURT:  We're in recess.

8                      (Recess, 3:01 p.m. to 3:09 p.m.)

9              THE COURT:  Mr. Tague and Mr. Brinkmann, for

10     planning purposes, I would like to try to wrap things up

11     sometime before 4:00 because of the, the weather.  It's

12     getting -- it's actually warmed up two degrees.  It's

13     16 degrees, but the wind chill has dropped to minus 9; so

14     I would like to get people out of here while it's still

15     light and while they can still drive home.

16             I looked at the -- over the break, I looked to

17     see where we have some of our jurors.  Some of them have

18     more than an hour drive home, so I tell that to both of

19     you gentlemen so you can then gauge how far into the next

20     witness after this one you wish to go.  If you don't --

21     well, we'll play it by ear.

22             All right.  Any reason not to bring the jury

23     back in, Mr. Tague?

24             MR. TAGUE:  No.

25             THE COURT:  Mr. Brinkmann?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
1              MR. BRINKMANN:  No, Your Honor.

2              THE COURT:  Bring them in.

3                   (Brief pause in proceedings.)

4                   (Jury present, 3:11 p.m.)

5              THE COURT:  Please be seated.

6              Mr. Tague -- where's our witness?  We need our

7    witness back on the witness stand.

8              Thank you, Mr. Bohn.

9              All counsel, parties are present.  The jury is

10   back.

11             Mr. Tague, you may continue.

12   BY MR. TAGUE:

13        Q    I've shown you what's been marked as

14   Plaintiff's Exhibit Number 11.  Do you know what that

15   document is?

16        A    I'm not familiar with the document.

17        Q    Okay.  Did you ever have that in your

18   possession at any time during the investigation?

19        A    I don't, I don't recall having this document.

20        Q    Did you ever have any excerpts or paraphrasing

21   of Judge Leonard's protective order in your possession?

22             MR. BRINKMANN:  Your Honor, I object.  This is

23   getting into the Goldberg litigation.  It's a transcript

24   from that litigation, and it's not relevant to the issues

25   in the case.
```

1        THE COURT:  I don't know what it is yet, but --

2    Mr. Tague, is that what this is?  A transcript from a

3    hearing in the Goldberg matter?

4        MR. TAGUE:  That's the transcript from the

5    proceedings in which the record was sealed, or the

6    protective order was entered.  And it's on -- it's also

7    Joint Exhibit Number 2 and in the pretrial order was to

8    be admitted without objection.

9        THE COURT:  Mr. Brinkmann, it occurs to me this

10   has already been -- it's part of the stipulation that I

11   already read to the jury; is it not?

12       MR. BRINKMANN:  I was not familiar -- I did

13   not -- he named it something different than what we've

14   called it in the -- the joint stipulation, it's called

15   "the Court order" where it talks about the protective

16   order and the contents not being disseminated.  I didn't

17   understand that that's what this was.

18       THE COURT:  So you have no objection now?

19       MR. BRINKMANN:  I have no objection, Your

20   Honor.

21       THE COURT:  All right.  The objection is

22   withdrawn.  You may ask questions.

23   BY MR. TAGUE:

24       Q    I think I asked the question -- well, let me

25   ask you.  You don't remember receiving that document in

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    the course of the investigation?

2         A    It's -- I don't recall.  It's possible that I

3    received it, but I don't recall.

4         Q    What is Exhibit 17?

5         A    The first page is a, an email dated

6    September 23, 2010.  The subject is "Carmody letter."  It

7    would appear that it had an attachment.  It said, "Joe:

8    Attached is the scanned letter and attachments for Kevin

9    Carmody."

10        Q    The attachment was the September 23, 2010,

11   discharge letter; was it not?

12        A    That's what -- that's what's attached to this

13   exhibit.

14        Q    Well, you were sent, shown being a recipient of

15   the email; were you not?

16        A    Yes.

17        Q    And you received it; did you not?

18        A    It appears that I did.

19        Q    Did you read it?

20        A    I don't recall.  I would imagine that I would

21   have read it.

22        Q    Well, that would be your custom and practice to

23   read emails relative to an active investigation; would it

24   not?

25        A    It would be my custom and practice to read my

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    email messages.

2         Q    Okay.  And the -- did you read the attachment?

3         A    I remember -- I don't know when I read the

4    attachment.  I do remember reading this at some point.  I

5    don't know whether it was with, with this, or -- but it

6    would be typical for me to open my email and open the

7    attachments and read them.

8         Q    My specific question is:  The email says it was

9    sent Thursday, September 23, 2010, at 10:13 a.m.  Is that

10   on or about the time that you would have received it?

11        A    That's, that's the stamp on the email.  I don't

12   know when I would have had a chance to open it up.

13             MR. TAGUE:  I'd move to admit 17 into evidence,

14   Your Honor.

15             THE COURT:  Mr. Brinkmann?

16             MR. BRINKMANN:  Your Honor, I don't see any

17   relevance.  This is simply attaching a copy of the

18   termination letter, which is the Plaintiff's Exhibit 5

19   and Group Exhibit 8 -- I'm sorry, Joint Exhibit 8.  This

20   email and the time of the email is not relevant to the

21   questions that are before the Court.

22             THE COURT:  Can I, can I see the Exhibit, Mr.

23   Tague -- oh, never mind.

24             COURTROOM DEPUTY:  It's 17, right?

25             MR. TAGUE:  Right.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1              (Brief pause in proceedings.)

2              THE COURT:  Mr. Tague, as I look at this, it is

3    an email from Christine Pierson, who I'm not sure we've

4    heard testimony as to who she is or what role she plays,

5    with a copy of the termination letter and then a number

6    of what appear to be simply forms, the letter and the

7    forms totaling ten pages.

8              I'll let you ask a few more questions to

9    establish the relevance of this; but, again, we have

10   heard no testimony as to who Christine Pierson is, what

11   role she plays in any of the issues before this Court.

12   And as the witness has testified, there's no

13   indication -- well, he said it was -- it would be his

14   custom and practice to read it; but if you ask him about

15   the time, there's no indication about the time he opened

16   it either, so --

17             MR. TAGUE:  The time is what's relevant.  The

18   time that this email that contained the attachment was

19   10:13 a.m. on September 23, 2010.  And the emergency --

20   or the hearing on September 23rd that lifted the

21   protective order was in the afternoon.  So this letter

22   was already signed, ready to go in the morning before the

23   hearing.

24             One of the issues in the case that the

25   defendants have raised is that Mr. Carmody -- or one of

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    the issues is:  Did he have a reasonable opportunity to

2    respond?  And did he have a reasonable opportunity to

3    respond once the protective order was done?  And if the

4    termination was before the Court removed the order, I

5    think that's germane to that issue.

6              THE COURT:  Mr. Bohn, you believe that you did,

7    in fact, receive this email at some point in time?

8              THE WITNESS:  Yes.

9              THE COURT:  I will allow this to be admitted

10   over objection at this time.

11             Just so I understand, Mr. Bohn, you don't know

12   when you opened this letter, correct?

13             THE WITNESS:  That's correct.

14             THE COURT:  I used the word letter.  It's an

15   email, correct?

16             THE WITNESS:  Correct.

17             THE COURT:  Sorry.  I misspoke.

18   BY MR. TAGUE:

19        Q    The time that the university system says it was

20   sent to you was September 23, 2010, at 10:13 a.m.,

21   correct?

22        A    Correct.

23        Q    What is Exhibit 19?

24        A    It's an email from Julia Harper, dated

25   August 24, 2010, to Sharon Reynolds and myself.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      Q    And there's an attachment that came with that
2  email; was there not?
3      A    There is an attachment to this -- it says that
4  there's an attachment, and there is an attachment to this
5  exhibit.
6      Q    And what is the attachment?
7      A    It's a -- looks like a letter dated August 11,
8  2010, from Rhonda Perry to Robert Kirchner.
9      Q    And Ms. Perry sent you a copy of that in
10  August, correct?
11      A    It appears that she did.
12      Q    Did you or anyone in Academic Human Resources
13  take any action to have Judge Leonhard change or modify
14  the protective order before the September 7, 2010,
15  findings?
16      A    That, that wouldn't have been work that I would
17  have done.  That would have been left to our attorneys.
18      Q    Do you know whether your attorneys attempted to
19  do that?
20      A    I don't, I don't recall.
21      Q    At the time that Kevin Carmody came into
22  possession of the Group Exhibit A emails, his supervisor
23  was Jong-Shi Pang; was he not?
24      A    I don't, I don't recall when the timing was of
25  all the changes that occurred.  As I talked about

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   earlier, Jong-Shi Pang and Chuck Thompson were

2   supervisors for Mr. Carmody.

3            THE COURT:  What exhibit are we being shown,

4   Mr. Tague?

5            MR. TAGUE:  This is Exhibit 1, the second page.

6   BY MR. TAGUE:

7       Q    I want you to look at Exhibit 1, the second

8   page.  In that first bullet point, isn't it true that the

9   letter of July 19, the charging letter to Kevin Carmody,

10  specifically told him not to contact any University of

11  Illinois employees or students, or to engage in any other

12  official business?

13           MR. BRINKMANN:  Your Honor, that's a

14  mischaracterization of the statement in the letter.  We'd

15  ask --

16           MR. TAGUE:  I'm sorry.  I'll withdraw it.

17  BY MR. TAGUE:

18      Q    There's -- that first bullet point states in

19  part, "You are not to contact University of Illinois

20  employees," correct?

21           MR. BRINKMANN:  Your Honor, that's a partial

22  statement, and I object.

23           THE COURT:  Yeah.  Mr. Tague, we can all read

24  it.  It's in English.

25           MR. TAGUE:  Okay.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1          THE COURT:  I mean, if you want me to, I'll

2    read it into the record.  It's pretty clear what it says,

3    and you read just a portion of that.  So do you want to

4    read the whole thing in, or have the witness do it?

5          MR. TAGUE:  Everybody can read it, and they can

6    show it.

7          THE COURT:  All right.  Just so we're clear,

8    I'll make the record.  The second sentence reads, on the

9    first bullet point on page 2 of Exhibit 1, "While on

10   administrative leave, you are not to contact University

11   of Illinois employees or students regarding this matter,

12   or any other official business."  That's the full

13   sentence.

14         Do you agree, Mr. Brinkmann?

15         MR. BRINKMANN:  I do, Your Honor.

16         THE COURT:  Do you agree, Mr. Tague?

17         MR. TAGUE:  I do.

18         THE COURT:  Thank you.  Just making a record.

19   BY MR. TAGUE:

20   Q    How could Mr. Carmody prepare a defense if he's

21   not allowed to contact any potential witnesses?

22         MR. BRINKMANN:  Well, Your Honor, I'll object.

23   It's asking for an opinion by the witness.

24         THE COURT:  Yeah.  I'll sustain that.  I, I --

25         MR. TAGUE:  If I may have just one moment, Your

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    Honor.

2                 (Brief pause in proceedings.)

3                 MR. TAGUE:  I have no further questions of this

4    witness.

5                 THE COURT:  Just for housekeeping, Mr. Tague,

6    before you sit down, we had 12, which is Joint 10.  Are

7    you moving to admit those exhibits?

8                 MR. TAGUE:  Yes.

9                 THE COURT:  All right.  Then we had Plaintiff's

10   3 -- oh, any objection to that, Mr. Brinkmann?

11                MR. BRINKMANN:  No, Your Honor.

12                THE COURT:  Okay.  Then we had Plaintiff's 3 --

13   Plaintiff's 3.  Are you moving to admit -- actually, you

14   didn't move to admit that.  Do you want that in or not

15   in?

16                MR. TAGUE:  Yes.  I would move to admit.

17                THE COURT:  Mr. Brinkmann, you objected to

18   that; is that correct?

19                MR. BRINKMANN:  Your Honor, I -- could I see

20   that?

21                THE COURT:  It's somewhere up in the front.

22                (Brief pause in proceedings.)

23                MR. BRINKMANN:  I have no objection, Your

24   Honor.

25                THE COURT:  Okay.  So Plaintiff's 3 is

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   admitted.

2           And then we had Plaintiff's 17, which I

3   admitted over objection.

4           Have I missed any of your exhibits, Mr. Tague?

5           MR. TAGUE:  6, that's the Thompson memo.

6           THE COURT:  Oh, I did miss that one.  Does that

7   have a corresponding joint exhibit number?

8           MR. TAGUE:  Yes, 3.

9           THE COURT:  3, correct.  I admitted 3 and did

10  not note that it was also Plaintiff's 6.  I told you

11  double-labeling them would cause me to make errors.

12          There's no objection to those being admitted,

13  Mr. Brinkmann?

14          MR. BRINKMANN:  No, Your Honor.

15          COURTROOM DEPUTY:  Number 16.

16          THE COURT:  And then we had -- 16 was not

17  admitted.

18          COURTROOM DEPUTY:  Not?

19          THE COURT:  Mr. Tague, you did not intend to

20  admit Exhibit 16, did you?

21          MR. TAGUE:  I would move to admit 16.

22          MR. BRINKMANN:  Your Honor, I object to 16.

23          THE COURT:  Yeah, 16 is not admitted.

24          COURTROOM DEPUTY:  And 19.

25          THE COURT:  19 was the last one.  You did

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   not -- that's what I was just looking at, correct?  Were

2   you moving to admit 19?

3               MR. TAGUE:  Yes.

4               THE COURT:  Mr. Brinkmann, do you care?

5               MR. BRINKMANN:  I don't know what this is for,

6   Your Honor, but the -- certainly, the letter from Rhonda

7   Perry is, is relevant.  I don't see what the email has to

8   do with it.

9               THE COURT:  Right.  There's an email cover

10  page, but the letter to Rhonda Perry -- from Rhonda Perry

11  to Mr. Kirchner is attached as part of Exhibit 19.  I'll

12  admit that, so 19 is admitted.

13              So, Mr. Tague, have I covered all of your

14  exhibits now?

15              MR. TAGUE:  I believe so.

16              THE COURT:  More importantly, let me ask my

17  courtroom deputy if we're --

18              COURTROOM DEPUTY:  11?  I don't think we have

19  11.

20              THE COURT:  11 was not admitted.  Yeah, we did

21  not -- that was not admitted.

22              All right.  Mr. Brinkmann, to you.

23              MR. BRINKMANN:  Your Honor, I'm not going to

24  ask any questions at this time.  We may recall Mr. Bohn

25  if the defense puts on evidence in the case, Your Honor.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1          THE COURT:  That is your right.  That is

2     appropriate.  That is proper.

3               (Witness Bohn excused, 3:32 p.m.)

4          THE COURT:  All right.  Mr. Tague, I'm putting

5     you on the spot.  It is 3:32.  Do you wish to start

6     calling another witness?

7          MR. TAGUE:  Sharon Reynolds is my next witness.

8     I believe we would be more than a half hour with her.

9          THE COURT:  I'll tell you what.  Why don't we

10    start with her, and I'll make a promise to the jury at

11    ten minutes to 4:00 we're stopping.  All right?

12          So Mr. Tague, judge your questions accordingly.

13    Find a good break around ten minutes till 4:00.  We're

14    going to stop, and we'll come back tomorrow.

15          Ladies and gentlemen, I'll be checking the

16    weather forecast as things go.  The good news is they've

17    changed it for tomorrow.  There is no more rain in

18    tomorrow's forecast, nor wind; and it's going to go up to

19    a soaring 32 degrees, if you believe the forecast.  So I

20    don't mind stopping early today because we're going to

21    start a little earlier tomorrow.  But I'd rather have you

22    get home because the wind chill is still a negative, and

23    some of you have more than an hour to drive home, so I

24    want to make sure everybody is safe.

25          Mr. Tague, to you.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1              MR. TAGUE:  I'd like to call Sharon Reynolds.

 2              SHARON REYNOLDS, sworn, 3:33 p.m.,

 3              DIRECT EXAMINATION BY MR. TAGUE:

 4       Q     Would you please state your name?

 5       A     Sharon Reynolds.

 6       Q     And in June through September of 2010, you

 7  worked for the University of Illinois; did you not?

 8       A     I did.

 9       Q     What was your job?

10       A     I was associate director for Academic Labor and

11  Employee Relations.

12       Q     And who was your supervisor?

13       A     Deb Stone.

14       Q     And where was Joe Bohn in the reporting

15  hierarchy?

16       A     So Joe reported directly to me.

17       Q     When did you learn that there was going to be

18  an investigation involving Mr. Carmody?

19       A     I'm not exactly sure of the specific time, but

20  it would have been in the summer of 2010 when the

21  information came to AHR.

22       Q     And what information came to HR?

23       A     The information came from, that would have

24  informed us about potential misconduct; and then we would

25  review that information to see if it would give rise to
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    any kind of employment action.

2        Q    Did you receive a copy of the Group Exhibit A

3    documents?

4        A    At some point, I might have received it.

5        Q    Okay.  The -- who told you that there needed to

6    be an investigation of Mr. Carmody?

7        A    I don't remember exactly who informed me of

8    that, but it is -- it's likely that maybe Deb assigned it

9    to my area.

10       Q    I'm going to show you what's been marked as

11   Plaintiff's Exhibit Number 1.  What is that document?

12       A    This is the meeting notification that went to

13   Mr. Carmody.

14       Q    That document in the first paragraph says,

15   "This letter is to notify you that you are a subject of

16   an investigation into these concerns and that Academic

17   Human Resources, in conjunction with the College of

18   Engineering, will be conducting the investigation."

19            Who in the College of Engineering worked with

20   you in the investigation?

21       A    I can't recall exactly my own interactions.  I

22   believe that, as is customary in our office, there are

23   different people who take the lead on investigations; and

24   Joe took the lead on part of this, but it often comes

25   from an HR director in that college, or other

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    individuals.

2         Q    Okay.  So you can't tell me any individual or

3    individuals who worked in conjunction with you and Joe

4    Bohn on the investigation?

5         A    I can't recall directly who it would have been

6    from the college.

7         Q    Okay.  Had the investigation already started

8    prior to the July 19, 2010, letter?

9         A    I -- no.  The letter notifies the employee of

10   the pending investigation.

11        Q    Who actually drafted Exhibit Number 1?

12        A    I, I can't be certain who might have drafted

13   it.  Sometimes it's collaborative.  But it is, it is our

14   standard letter for notifying an employee of a charge.

15        Q    Were there any meetings to discuss what should

16   be included in Exhibit 1 prior to July 19, 2010?

17        A    It's customary that anytime information comes

18   to us that may be an allegation of misconduct that we

19   would have a meeting in our office with the unit and talk

20   about whether the misconduct would give rise to a serious

21   employment action.

22             And so while I can't remember the specifics

23   five years ago, I would imagine a meeting like that took

24   place.

25        Q    Who attended?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    A    Again, I couldn't tell you exactly who might

2 have attended.  It would most likely be a representative

3 from our office and then possibly somebody from the

4 College of Engineering.

5    Q    The third paragraph references two university

6 policies, correct?

7    A    Correct, yes.

8    Q    Who in Academic Human Resources identified the

9 policies that were applicable relating to Mr. Carmody's

10 investigation?

11    A    Again, because it was in my area and it was Joe

12 and I, it could very well be that we identified the

13 policies.

14    Q    But you can't say for sure?

15    A    I can't say for sure.

16    Q    Were there any other policies that were

17 considered to be applicable but not included?

18    A    I don't recall that there was a discussion of

19 other policies.

20    Q    I've shown you Exhibit Number 3.  What is that

21 document?

22    A    This is my -- well, an email exchange between

23 myself and Mr. Carmody with some others copied.

24    Q    Okay.  So the front page is your response, and

25 the following pages are his inquiry to you?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1        A    Correct.

 2        Q    He asked you to identify the portions of the

 3   policy that were to be applicable to his case; did he

 4   not?

 5        A    He did.

 6        Q    And you, your response to him was the third,

 7   fourth, and fifth paragraph of that front page?

 8        A    Yes.

 9        Q    And you didn't identify at that time specific

10   policy pages, paragraphs, or provisions, did you?

11        A    No.  It is our practice to identify the

12   policies, and any opportunity the employee might have to

13   talk further about the policies would most likely occur

14   in the dialogue that happens during the employment

15   meeting.

16        Q    Okay.  Now, the original meeting was scheduled

17   for when?  July 21st?

18        A    Yes.

19        Q    And Mr. Carmody's inquiry to you as to what

20   specific policy provisions were applicable was the next

21   day; was it not?  The 20th?  Page 2?

22        A    So he emailed me on July 20th, and I responded

23   the 21st.

24        Q    So he emailed you the afternoon of July 20th.

25   Do you know when he actually received the July 19th
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   letter?

2        A    I do not.

3        Q    Anyway, he emailed you at 1:30 on July 20th;

4   and you responded to him the next morning, correct?

5        A    It appears that I did.

6        Q    Okay.  That was July 21, 2010, about 9:33,

7   correct?

8        A    Yes.

9        Q    Now, the, did you -- well, ultimately, there

10  was a meeting that took place; was there not?

11       A    Yes.

12       Q    Do you remember when that was?

13       A    I believe it was on the 28th.

14       Q    Did you provide Mr. Carmody at the meeting of

15  the 28th with the specific policy references that were

16  involved in his case?

17       A    My recollection of the meeting on the 28th is

18  that we just began the meeting and started the

19  introductions, the allegations, and his opportunity to

20  speak to us when we were unable to proceed.

21       Q    So you started the meeting.  You had an

22  introduction.  What was told to Mr. Carmody and his

23  representative concerning the introduction?

24       A    I'm sorry.  I'm not sure I understand.

25       Q    Well, you said the meeting started.  What

1   happened next?

2       A    Well, the meeting started, and we often go

3   through just some -- the introductions of who's present;

4   that this is -- we're going to read the allegations.

5   We're going to ask Mr. Carmody to, in his own words, tell

6   us what happened in responding to the allegations.

7           It's typical for us to tell him that only he

8   can speak; that his attorney can advise him, but he

9   cannot speak directly -- the attorney can't speak

10  directly to us.

11      Q    Now, you say that is customarily what happened,

12  and that's what you expected to happen.

13          But my question is:  What, in fact, happened

14  the first thing at the meeting?  Was there introductions?

15      A    I believe there were introductions.

16      Q    Was there a tape recording or record made of

17  what happened?

18      A    We don't have a practice of taping or recording

19  the meetings.

20      Q    Did you take any notes?

21      A    I might have been prepared to take notes.

22      Q    Okay.  So you typically would take notes, but

23  did you take notes in this case?

24      A    I might, again, have been prepared to take

25  notes.  I don't recall getting to the portion where I

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   would have started taking notes.

2        Q    What did you get to?  Did you actually read or

3   delineate the charges?

4        A    To the best of my knowledge, we did.

5        Q    And at that time, did you provide him a

6   reference to the policy, specific policy provisions that

7   were applicable and to which he was allegedly in

8   violation of?

9        A    It's very typical for us to read right from

10  what we would call the allegation or charge letter, and

11  so it's possible it was both the narrative allegations as

12  well as the policy reference.  I couldn't be for certain;

13  it's just been so long.

14       Q    So you don't remember what you read to him

15  about the charges; is that correct?

16       A    Again, I -- it would be our practice to read

17  the charges, the allegations that are, that had been

18  provided to him in the letter.

19       Q    Whether -- and I'm not interested whether it

20  happened or not.  But my question is:  Other than

21  possibly reading him the charges, was anything else

22  provided to him concerning the details of the policies

23  that you thought were applicable?

24       A    That is not our practice.

25       Q    Even though he had specifically asked for it

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    right after the charge letter came?

2         A    Our practice would be to give him the policies,

3    and often they are made available.

4         Q    And then he would have to guess as to which

5    ones were applicable?

6         A    Well, there, again, usually during that

7    employee exchange, there is a natural dialogue about

8    those policies and the conduct and his responsibility for

9    it.

10              THE COURT:  Mr. Tague, do you want to stop now,

11   or -- you've got a little less than a minute to go.  I'm

12   keeping my promise to the jury.

13              MR. TAGUE:  I appreciate that.

14              THE COURT:  Would you like to stop now for the

15   night?

16              MR. TAGUE:  I would.

17              THE COURT:  All right.  Ladies and gentlemen,

18   it is 3:50.  We're going to stop for the day.

19              I'm going to read you what I've read you

20   before.  We are about to take our first evening break

21   during the trial.  I want to remind you of the

22   instructions I gave you earlier.  Until the trial is

23   over, you are not to discuss this case with anyone,

24   including your fellow jurors, members of your family,

25   people involved in the trial, or anyone else.  If anyone

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   approaches you and tries to talk to you about the case,

2   do not tell your fellow jurors but advise me about it

3   immediately.

4          Do not read or listen to any news reports of

5   the trial.  Remember to keep an open mind until all the

6   evidence has been received and you have heard the views

7   of your fellow jurors.

8          Bottom line is:  Don't talk to your family.

9   Don't talk to your friends.  No Facebooking.  You've got

10  to keep an open mind.  You have not heard all the

11  evidence.  You haven't heard my instructions.  Don't talk

12  to people.  It might impact you, and that wouldn't be

13  fair to anybody.

14         All right?

15         It's not going to be so cold tomorrow morning.

16  So I was going to ask you to come back at 10:00; we'll

17  start at 10:00 tomorrow.  I'm going to move it up a half

18  an hour because I want to keep things moving.  So if you

19  can plan on being in the jury room about 9:20 tomorrow

20  morning, I'll try to have you in here at 9:30, and we're

21  just going to plow straight on.

22         I really try to maximize your time.  I don't

23  like wasting your time at all.  So that's what we're

24  going to do tomorrow.  All right?  Be back here at 9:20

25  in the jury room.

```
 1                    (Jury dismissed for the day, 3:51 p.m.)

 2              THE COURT:  Please be seated.  The jury's left

 3    the courtroom.

 4              Anything further you wish to raise with me, Mr.

 5    Tague, before we're done for this evening?

 6              MR. TAGUE:  No.

 7              THE COURT:  Mr. Brinkmann, anything?

 8              MR. BRINKMANN:  No, Your Honor.

 9              THE COURT:  All right.

10              We're okay on jury instructions, so I'll see

11    you back here tomorrow morning about 9:20.

12              MR. TAGUE:  Thank you, Your Honor.

13              THE COURT:  Just be back here then.  We'll be

14    in recess.

15                    (Trial adjourned, 3:52 p.m.)

16                    *  *  *  *  *  *  *  *  *  *

17                    REPORTER'S CERTIFICATE

18         I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify

19    that the foregoing is a correct transcript from the

20    record of proceedings in the above-entitled matter.

21         Dated this 14th day of February, 2016.

22

23                    s/Lisa Knight Cosimini
                    _____
                    Lisa Knight Cosimini, RMR-CRR
24                    Illinois License # 084-002998

25
```