2:12-cv-02249-CSB-EIL   # 118   Page 1 of 153
Carmody v. Board of Trustees of the U... (1... et al., No. 12-2249
E-FILED
Tuesday, 08 March, 2016  04:29:22 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS


KEVIN RICHARD CARMODY,

                                    Docket No. 12-2249

               Plaintiff,

     vs.                            Urbana, Illinois
                                    January 13, 2016
                                    9:29 a.m.
BOARD OF TRUSTEES OF THE
UNIVERSITY OF ILLINOIS, et al.,

               Defendants.


               JURY TRIAL -- Day 2 of 3

     BEFORE THE HONORABLE COLIN STIRLING BRUCE
          UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S :

For the Plaintiff:        MICHAEL J. TAGUE, ESQUIRE
                          Flynn, Palmer & Tague
                          402 West Church Street
                          P.O. Box 1517
                          Champaign, Illinois 61824-1517
                          217-352-5181

For the Defendants:       WILLIAM J. BRINKMANN, ESQUIRE
                          Thomas, Mamer & Haughey, LLP
                          30 East Main Street, Suite 500
                          Champaign, Illinois 61820
                          217-351-1500




Court Reporter:           LISA KNIGHT COSIMINI, RMR-CRR
                          U.S. District Court
                          201 South Vine, Suite 344
                          Urbana, Illinois 61802


Proceedings recorded by mechanical stenography; transcript
produced by computer.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249     2

I  N  D  E  X

Page

PRELIMINARY MATTERS ..............................   3

SHARON REYNOLDS
    Continued Direct Examination by Mr. Tague .....   5
    Cross-Examination by Mr. Brinkmann ...........  13
    Redirect Examination by Mr. Tague ............  21
    Recross-Examination by Mr. Brinkmann .........  27

RHONDA PERRY
    Direct Examination by Mr. Tague ..............  28
    Cross-Examination by Mr. Brinkmann ...........  60

LAURA CLOWER (Offer of Proof)
    Direct Examination by Mr. Tague ..............  63

LAURA CLOWER
    Direct Examination by Mr. Tague ..............  85

CHARLES THOMPSON (Deposition) ....................  95

KEVIN CARMODY
    Direct Examination by Mr. Tague .............. 100
    Cross-Examination by Mr. Brinkmann ........... 137

```
1                   (In open court, 9:29 a.m.)

2               COURTROOM DEPUTY:  This is in Case Number

3    12-2249, Carmody versus the Board of Trustees of the

4    University of Illinois, et al.

5               THE COURT:  All right.  We have all counsel

6    present.  All parties are present.

7               Mrs. Reynolds, you need to come back up and

8    take the witness stand at this time.

9               Mr. Tague, anything you need to raise before we

10   call the jury back in?

11              MR. TAGUE:  No.

12              THE COURT:  Mr. Brinkmann?

13              MR. BRINKMANN:  Yes, Your Honor.

14              Mr. Tague is going to be calling Laura Clower

15   and Rhonda Perry, two University of Illinois legal

16   counsel witnesses this morning; and they were also on my

17   witness list.  I've discussed with Mr. Tague me

18   conducting my examination of them this morning as well

19   for purposes of efficiency and judicial economy.  He's

20   agreeable to that, and so I would ask the Court's

21   permission to do that.

22              THE COURT:  Absolutely, sure.

23              MR. BRINKMANN:  Thank you.

24              THE COURT:  It's -- let me make it clear to

25   both sides.  As we, you know, as we get into day two, and
```

1    I think we're hopefully heading to resolve this by --

2    send it to the jury by tomorrow.  If you need to call a

3    witness out of order, that's fine.

4            If you have witnesses that are on both lists, I

5    have no problem with counsel doing both of their

6    examination at the same time.  It is, in my mind, a waste

7    of time to have somebody testify, then get off the stand,

8    and then an hour or so later call them back up and ask

9    them the same set of basic questions again and burn up

10   time and then get to the meat of the matter a second time

11   with the same witness.

12           So I don't know if it will come up; but if it

13   does, plan with me saying yes to whatever you're going to

14   do to increase the efficiency.  Understood?

15           MR. BRINKMANN:  Yes.

16           MR. TAGUE:  Yes.

17           THE COURT:  All right.  We got all the jurors

18   here?

19           COURT SECURITY OFFICER:  Yes, sir.

20           THE COURT:  Let's bring them in.

21             (Jury present, 9:32 a.m.)

22           THE COURT:  All right.  Everybody's back.

23           I had to wait while my court reporter made sure

24   we were good to go.  We had a technical problem this

25   morning.  It's been resolved with the equipment.  It's

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  been taken care of.  I don't think it will happen again;

2  and now by saying that, I've now jinxed us.  But for some

3  reason, equipment that works perfectly fine the day

4  before -- and nobody is in here except us -- the next day

5  will stop working.  And I don't know why, but we're in

6  the habit of testing things before we bring you in here.

7  We tested it and guess what?  It worked yesterday; didn't

8  work this morning.  Now it works.

9           So with that being said, Mr. Tague, you were

10  continuing the examination of Sharon Reynolds.

11           Mrs. Reynolds, you understand you're still

12  under oath from yesterday, correct?

13           THE WITNESS:  I do.

14           THE COURT:  All right.  Mr. Tague, you may

15  continue.

16           (Brief pause in proceedings.)

17  SHARON REYNOLDS, previous sworn and remaining under oath,

18           resumes testimony, 9:33 a.m.,

19      CONTINUED DIRECT EXAMINATION BY MR. TAGUE:

20      Q    I think the first document in the stack that I

21  have there is Plaintiff's Exhibit Number 10.  Could you

22  look at that document, please.

23           After, after the September 7, 2010, report,

24  were you aware that there were communications going on

25  between Rhonda Perry, Laura Clower, and Robert Kirchner?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

6

```
 1        A     I do not believe I was aware.

 2        Q     Have you seen any of the documents that are put

 3   together as Exhibit Number 10?

 4              (Brief pause in proceedings.)

 5        A     My best recollection is that I have not seen

 6   these documents.

 7        Q     Were you asked to do anything after

 8   September 7, 2010, and before September 23, 2010,

 9   relative to accepting information from Mr. Carmody or

10   Mr. Kirchner?

11        A     Can you repeat that, please?

12        Q     Sure.

13              After September 7, 2010, your report and

14   findings, and September 30 -- I'm sorry, September 23,

15   2010, when the discharge letter went out, were you asked

16   by anyone to do anything further in the investigation?

17        A     To the best of my recollection, no.

18        Q     Okay.  Wasn't the investigation still open

19   until the discharge letter was issued?

20        A     Well, the investigation ended with the findings

21   and recommendation.

22        Q     Rhonda Perry and Laura Clower were serving as

23   your attorneys and advisors; were they not?

24        A     Yes.

25        Q     If you would put that document down and pick up
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    document number 14.  That document -- the first page is

2    an August 3, 2010, letter from Rhonda Perry to Robert

3    Kirchner regarding Kevin Carmody; and then the second

4    page is a letter from Rhonda Perry to Attorney Kirchner

5    dated August 11, 2010.

6            Had you seen these documents prior to your

7    creation of the September 7, 2010, report and findings?

8        A    I may have seen them.

9        Q    I'm sorry?  I didn't hear you.

10       A    I may have seen the August 3rd document, and

11   maybe the August 11th.  The August 3rd document seems to

12   refer to Rhonda -- or to Dr. -- I'm sorry, Mr. Kirchner's

13   response to the July 8th [sic] meeting that we had.  And

14   at the conclusion of that meeting, I do remember an

15   exchange between the attorneys that he could respond in

16   writing on behalf of his, of his client.

17       Q    So you told -- or it was your intent to

18   communicate to Mr. Carmody and his attorney that they

19   could respond to the charges in writing?

20       A    It's a customary practice.  And in that

21   meeting -- again, it was five years ago -- on the 28th, I

22   recall the discussion being such:  Because we couldn't

23   proceed with the meeting and Mr. Carmody wasn't answering

24   the questions, that he could have an opportunity to, if

25   he wanted to respond to the charges, to put those into

1    writing.  But there was also a discussion about sort of

2    the legal aspect around the court ruling; and I was an

3    observer in that, but I remember the discussion.

4         Q    But you never considered any written

5    submissions; is that a correct statement?

6         A    To the best of my recollection, we did not

7    receive a written statement from Mr. Carmody on his

8    behalf about what his perspective was regarding the

9    allegations.

10        Q    And, again, if you would pick up Number 10 just

11   so that I am certain on this.  I'm interested in the -- I

12   think it is -- the fourth page in starts a letter

13   September 15, 2010, to Laura Clower and Rhonda Perry from

14   Robert Kirchner.  It's a three-page letter.

15        A    And, I'm sorry?  It's from Laura or from --

16        Q    It's to Laura.

17        A    To Laura.  September 15th?

18        Q    I'm sorry?

19        A    September 15, 2010?

20        Q    Yes.

21        A    Yes.

22        Q    You never received and considered that letter

23   and submission by Mr. Carmody's attorney in the

24   investigation?

25        A    Again, my recollection of our decision letter,

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  our finding letter, was that it would precede this; that

2  it was earlier in September.  So, no, by this time my

3  part of it would have concluded.

4       Q    Could you put in front of you Plaintiff's

5  Exhibit Number 27.  What is that document?

6       A    It is the Academic Staff Handbook, Chapter 3.

7            MR. BRINKMANN:  Your Honor, I'm going to

8  object, that this handbook is not relevant to any of the

9  issues in the case and to questions regarding that.  It

10  has nothing to do with notice of charges or opportunity

11  to respond.  It deals with other matters.

12            THE COURT:  Mr. Tague, I'm going to overrule

13  the objection for the moment.  You better tie this up

14  fairly quickly.  We're not going to run afield of the

15  issues in this case.  So if you have some questions, you

16  better get to something relative to one of the issues

17  very quickly.

18            MR. TAGUE:  Okay.

19  BY MR. TAGUE:

20       Q    That document contains the protocols and the

21  parameters in which academic professionals might be

22  served a notice of non-reappointment; does it not?

23       A    It may do so.  There are more updated documents

24  that might give information about notification of

25  non-reappointments for academic professionals.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      Q    Okay.  The next document I want you to look at

2  is the, Number 28.

3           Did I hand you 28, University Statutes?

4      A    I don't believe you did.

5      Q    Pardon?

6      A    I don't believe that you did.  I don't see

7  something marked 28 in front of me.

8           (Brief pause in proceedings.)

9      Q    Okay.  I'll ask somebody else those questions.

10     A    Okay.

11     Q    I've shown you again your report of

12 September 7, 2010.  I'd like you to look at the third

13 page of that, and I'm interested in finding number 13.

14          You ultimately learned that that finding was

15 false; did you not?

16          MR. BRINKMANN:  Your Honor, I'm going to

17 object.  This gets into the post-termination aspect of

18 the case.

19          THE COURT:  Before I rule on that, what exhibit

20 are we talking about here now?

21          MR. TAGUE:  This is Exhibit Number 2, the

22 September 7th report.

23          THE COURT:  Repeat your question again.

24 BY MR. TAGUE:

25     Q    You ultimately learned that finding number 13

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  was false; did you not?

2          THE COURT:  Well, I don't have any time frame

3  in which I can make a ruling, so do you want to ask:  Is

4  this relative to something that happened after

5  September 23, 2010?

6          MR. TAGUE:  The -- I understand what you're

7  saying, and let me rephrase the question.

8  BY MR. TAGUE:

9      Q    Prior to September 23, 2010, did you learn that

10 finding number 13 was false?

11     A    No.

12          THE COURT:  All right.  With that rephrasing,

13 I'll overrule the objection, so that answer can stand.

14     Q    Number 19, the last sentence in number 19 which

15 states, "However, the attorney also stated that she used

16 documents from Group Exhibit A in Professor Thurston's

17 deposition in February 2010," you made that finding; did

18 you not?

19          MR. BRINKMANN:  Your Honor, I object.  This

20 gets into the Thurston litigation, which is not part of

21 the case.

22          THE COURT:  Well, I'll overrule the objection

23 for a moment.

24          I mean, Mr. Tague, you're dangerously close to

25 areas that are not supposed to be discussed; so if you

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    want to tie this up quickly, I'll let you proceed.

2              We're not here to talk about the Goldberg

3    litigation.

4              MR. TAGUE:  Correct.  Let me rephrase the

5    question.

6    BY MR. TAGUE:

7       Q    You found that the -- there were documents in

8    Group Exhibit A that were used in a February deposition

9    for Ms. Thurston; did you not?

10             MR. BRINKMANN:  Your Honor, I object.  That's a

11   misrepresentation of what's contained in the paragraph,

12   which refers to a representation made by one of the

13   attorneys.

14             THE COURT:  I'll sustain that objection.

15   That's not what that says.

16   BY MR. TAGUE:

17      Q    Okay.  So in any event, you made the finding in

18   number 19, correct?

19      A    We did make the finding in 19.

20             MR. TAGUE:  If I may have just a moment.

21             (Brief pause in proceedings.)

22             MR. TAGUE:  I have no further questions.

23             THE COURT:  Thank you, Mr. Tague.

24             Mr. Brinkmann.

25             MR. BRINKMANN:  Thank you, Your Honor.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1          CROSS-EXAMINATION BY MR. BRINKMANN:

2      Q    Ms. Reynolds, could you tell us:  What is your

3  educational training in the field of human resources?

4      A    Certainly.  I have a master's degree in labor

5  and employee relations from the University of Illinois,

6  and I have advanced certifications in management

7  development from Harvard University and certification in

8  mediation from Northwestern University.

9      Q    Could I ask you to keep your voice up so that

10  we can all hear you?

11      A    Certainly.

12      Q    Yes.

13          Have you also had on-the-job training within

14  the University of Illinois Academic Human Resources

15  Office?

16      A    Yes.

17      Q    Pardon me?

18      A    Yes.

19      Q    And did that training including the giving of

20  notice and opportunity to respond to charges to

21  employees?

22      A    Yes.

23      Q    How long have you been employed by the Academic

24  Human Resources Office at the university?

25      A    Since 2006.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1       Q     And over that period of time, approximately how

2   many investigations of employee disciplinary matters of

3   any kind have you been involved with?

4       A     Probably over 90.

5       Q     Okay.  In the case of Mr. Carmody, was the

6   purpose of providing him with a charge letter to inform

7   him of the meeting where he would have an opportunity to

8   respond to all of the concerns, to respond to all of the

9   allegations, and to respond to issues with respect to the

10  Code of Conduct and the Policy on Appropriate Use of

11  Computers?

12      A     Yes.

13            MR. TAGUE:  I'm going to object, Your Honor.

14  It's a compound question.

15            THE COURT:  I'll sustain that.

16            Mr. Brinkmann, you actually lost me part way

17  through there, --

18            MR. BRINKMANN:  Sorry.

19            THE COURT:  -- so maybe you could rephrase

20  that.

21  BY MR. BRINKMANN:

22      Q     Was the purpose of the charge letter that was

23  given to Mr. Carmody on July 19 of 2010 to inform him

24  about the opportunity to respond to the concerns that

25  were set forth in the charge letter?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1          MR. TAGUE:  Your Honor, I'm going to object

2    again.  This -- I take it he's asking her questions

3    either in clarification or in his case in chief, and he

4    shouldn't be leading this witness.

5          I think the proper question is:  What, what was

6    the purpose?

7          THE COURT:  All right.  It is a leading

8    question.  I am taking it as though you're asking to

9    clarify.  We've had a lot of discussion about this

10   charging letter.  The jury has heard about it multiple

11   times.  We've seen it on the screen.

12          Mr. Brinkmann, I presume you were clarifying.

13   Essentially the question you're asking is:  What was the

14   purpose of the charging letter?  Is that correct?

15          MR. BRINKMANN:  It is, Your Honor.

16          THE COURT:  Let's stick with something that

17   simple --

18          MR. BRINKMANN:  Okay.

19          THE COURT:  -- and try to get this thing

20   rolling.

21   BY MR. BRINKMANN:

22   Q    With respect to the concerns expressed in the

23   charge letter, what was the purpose of the charge letter?

24   A    The purpose of the charge letter is to give

25   employees notice of the charges, the applicable policies,

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    often to give them information about leave circumstances.

2        Q    Were Mr. Carmody's responses to the charge

3    letter to be used as part of the information that you

4    would be gathering during your investigation?

5        A    Yes.

6        Q    And is that a standard and customary practice

7    of the Academic Human Resources Office?

8        A    Yes.

9        Q    In addition to getting Mr. Carmody's responses,

10   was the purpose of the meeting that was described in the

11   charge letter to give Mr. Carmody an opportunity to ask

12   questions about the concerns expressed in the letter?

13       A    Yes.

14       Q    Was he also given the opportunity to ask

15   questions about the factual allegations?

16       A    Yes.

17       Q    Was Mr. Carmody also given the opportunity to

18   go over the Code of Conduct and the Policy on Use of

19   Computers at the charging meeting?

20       A    He -- we would have had that opportunity had we

21   proceeded; but, yes, that is part of our standard

22   practice.

23       Q    And then was the charge meeting also an

24   opportunity for you and Mr. Bohn to ask questions to Mr.

25   Carmody?

1      A    Yes.

2      Q    All right.  Now, when Mr. Carmody was given the

3  letter of July 19, 2010, did he request an extension of

4  time for the meeting to take place?

5      A    Yes.

6      Q    And was the meeting then scheduled for a week

7  later, September -- or, I'm sorry, July 28th of 2010?

8      A    Yes.

9      Q    In addition to Mr. Carmody asking for an

10  extension of time, did he in an email ask whether he was

11  charged with violating a particular part or section of

12  the Code of Conduct?

13      A    Yes, he did.

14      Q    And did he also ask if he was charged with

15  violating a particular part or section of the Policy on

16  Appropriate Use of Computers?

17      A    Yes, he did.

18      Q    Your response to him -- you referred him to the

19  charge letter, which listed the entire Policy on Use of

20  Computers and the entire Code of Conduct as being

21  potentially violated?

22      A    Yes.

23      Q    Was it your intention to limit the notice of

24  charges to one section of the Code of Conduct or one

25  section of the Policy and exclude other sections?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1     A     No.

2     Q     Would the parts, if any, of the Code of Conduct

3  and the Policy on Use of Computers that may have been

4  violated depend upon what facts were discovered in your

5  investigation?

6     A     Yes.

7     Q     And would that include the facts that you

8  expected to obtain from Mr. Carmody at the meeting where

9  he would have an opportunity to respond?

10    A     Yes.

11    Q     Now, before the meeting on July 28th of 2010,

12  did Mr. Carmody or his attorney give you advance notice

13  that there would be no written response or no verbal

14  response provided at the meeting?

15    A     No.  They did not.

16    Q     And before that meeting, did you get any

17  advance notice that Mr. Carmody would not be answering

18  questions because of a court order?

19    A     No.  We did not.

20    Q     Was a copy of the court order provided to you

21  by Mr. Carmody before the meeting?

22    A     No.

23    Q     Was a copy of the court order provided to you

24  during the meeting?

25    A     No.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    Q    If you had known in advance that interpretation

2  of a court order was going to be an issue at the meeting,

3  would you have requested the advice of the University

4  Legal Counsel Office?

5    A    Yes.

6    Q    During the meeting on July 28, did Mr. Carmody

7  provide any response to the charges, either written or

8  verbally?

9    A    No.

10    Q    Did he ask any questions?

11    A    No.

12    Q    When Mr. Bohn began asking questions, was that

13  the first time you were told by Mr. Kirchner, Mr.

14  Carmody's attorney, that because of the court order he

15  would not be answering any questions?

16    A    To the best of my knowledge, yes.

17    Q    In any of the other employee disciplinary cases

18  that you have been involved with over the years, has an

19  employee refused to answer questions on the basis of a

20  court order?

21    A    No.

22    Q    At that point when Mr. Kirchner informed you

23  that Mr. Carmody would not answer questions based upon

24  the court order, was Rhonda Perry called by you and Mr.

25  Bohn to come to the meeting?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      A    Yes, she was.

2      Q    And did Rhonda Perry -- well, who is Rhonda

3   Perry?

4      A    Rhonda Perry is an associate legal counsel with

5   the university who's assigned to our office to help us

6   with employment matters.

7      Q    Okay.  And did she then come to the meeting and

8   have a discussion with Mr. Kirchner?

9      A    She did.

10      Q    At the meeting and following that discussion,

11   did Mr. Carmody agree to provide a response to the

12   charges?

13      A    No.

14      Q    Did he agree to answer questions about the

15   charges?

16      A    No.

17      Q    Before the end of the meeting, was Mr. Carmody

18   specifically invited to provide a response in writing to

19   the charges?

20      A    Yes.

21      Q    Now, we heard yesterday from Mr. Bohn that the

22   door was left wide open for Mr. Carmody to respond after

23   the meeting.  Was Mr. Carmody given any deadline by which

24   he should respond to the charges?

25      A    Not that I recall.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      Q    At any time before your September 7 report of

2  findings and recommendation, did you receive any response

3  from Mr. Carmody?

4      A    I did not.

5      Q    A copy of your report and findings was sent by

6  you and Mr. Bohn to Mr. Carmody's attorney on

7  September 7th?

8      A    Correct.

9      Q    And did you receive any information after

10  September 7th with respect to the charges?

11      A    No.  I did not.

12           MR. BRINKMANN:  That's all, Your Honor.

13           THE COURT:  Mr. Tague.  Take your time.

14           REDIRECT EXAMINATION BY MR. TAGUE:

15      Q    I've shown you Exhibit 3.  You have that in

16  front of you; do you not?

17      A    Yes.

18      Q    I want you to look at the first page of that

19  exhibit.

20           You just told Mr. Brinkmann that you couldn't

21  identify the provisions of the policies referred to in

22  the third, fourth, and fifth paragraph of your email

23  response to Kevin because information in the meeting

24  might be necessary to do that, correct?

25           MR. BRINKMANN:  Objection.  That's a

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    mischaracterization of the witness's testimony, Your

2    Honor.

3              THE COURT:  I'm thinking.

4              MR. TAGUE:  I'm sorry?

5              THE COURT:  I'm thinking.

6              Mr. Tague, ask the question a different way.

7    BY MR. TAGUE:

8        Q    You didn't identify in your email response to

9    Kevin Carmody the specific policy provisions that you

10   thought were applicable to the charges, did you?

11       A    It is our practice to list the policy as it is

12   because at this time we may not know.  It could -- the

13   entire policy may apply.

14       Q    Okay.  So you wanted to know additional facts

15   before you would indicate which policies were applicable,

16   correct?

17       A    Again, it is our practice to cite the entire

18   policy.

19       Q    You didn't tell Mr. Carmody, did you, that you

20   would tell him later what policy provisions were

21   applicable after you interviewed him in that email, did

22   you?

23       A    I'm sorry.  Can you repeat that?

24       Q    Sure.

25              You didn't tell Mr. Carmody in that email that

1    you'd tell him what policies were applicable later

2    because you needed facts to consider before you would

3    know for sure which ones were applicable?  You never told

4    him that, did you?

5         A    No.  It's not our practice to do so.  We, we

6    simply give and make available the entire policies that

7    may be part of the discussion with the employee about the

8    misconduct that is alleged.

9         Q    At no time did you or anyone else in Academic

10   Human Resources tell Mr. Carmody, "Now that we have

11   facts, we'll now tell you what policies are applicable

12   for you to respond to," did you?

13           MR. BRINKMANN:  Your Honor, I'll object.  This

14   has been asked and answered.

15           THE COURT:  No.  Overruled.

16           You can answer that question.

17           THE WITNESS:  Can you -- I'm sorry.  Can you

18   repeat it one more time?

19           MR. TAGUE:  Could I have that one read back,

20   Your Honor.

21           THE COURT:  Go ahead and read it back.

22           COURT REPORTER:  Question:  At no time did you

23   or anyone else in Academic Human Resources tell Mr.

24   Carmody, "Now that we have facts, we'll now tell you what

25   policies are applicable for you to respond to," did you?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1        A      No.  And we simply don't -- I mean, again, in

2    my eight, nine years in Academic Human Resources, we do

3    not cite specific policies.  Although in discussions with

4    the employees, it becomes sort of an organic part of our

5    questioning, which is in our attempt to find out his

6    perspective, in his words, what occurred; but this is the

7    way that we construct our charge letters and our

8    recommendation letters.

9        Q    Was it your intent during the course of this

10   meeting on July 28th to identify what policies were

11   applicable in this discussion that you intended to have?

12       A    Again, it is a discussion where we ask

13   questions about the conduct that may apply to many

14   portions of the policy.

15            The, the Code of Conduct is a very short, very

16   plain language policy that just speaks to the duty of all

17   of us to be honest, to keep things confidential, to be

18   good stewards for the university.

19            The Appropriate Use Policy is an IT policy.

20   It's one where senior IT individuals probably know quite

21   well, and he could have used that knowledge to talk to us

22   about any portion of that policy.

23            But, again, that dialogue, in my experience as

24   someone who takes these matters very seriously in talking

25   to employees about their perspective, is one that comes

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   out of that discussion.  But the practice is that, when

2   we write the charge letter and the recommendation letter,

3   to simply cite the policy.

4        Q     When in the process is the employee told what

5   policies are applicable for which he needs to respond?

6        A     I don't know how I can explain this any better

7   to you, Mr. Tague.  The -- we have a discussion.  It's

8   informed by the employee response meeting.  It's

9   represented in the findings what, what portions of the

10  university policies, or what is within the university

11  policies that are violations.

12       Q     Well, you just looked at Exhibit Number 2, and

13  I can show it to you again if we need to; but in Exhibit

14  Number 2, which is the actual findings and

15  recommendations, you never identified any specific policy

16  provisions of the Computer Use Policy, did you?

17       A     Again, I don't have it in front of me.  But

18  in -- I'm sure it talks about trustworthiness,

19  confidential, privileged information, all things that are

20  part of our Code.

21       Q     But my question to you is:  How would Mr.

22  Carmody know that unless at some point in the procedure

23  you tell him, "These are the provisions, these are the

24  sections in these documents that are applicable, that

25  might result in you losing your job"?  It never happens,

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  does it?

2       A    I think it's unfair to say that it never

3  happens.  We have meetings with employees.  The policies

4  are made available.  The questions we ask are

5  specifically -- you know, often relate to those policies.

6  We depend on their answers also to help inform us about

7  the decision.

8       Q    You sent Exhibit Number 2 to Robert Kirchner;

9  did you not?

10      A    Let me look.

11           Mr. Kirchner is copied.  Yes.

12      Q    Did you send a copy directly to Kevin Carmody?

13      A    Yes.  Yes.  He's copied as well.

14      Q    Why did you send a copy to Mr. Carmody and to

15  Mr. Kirchner if the process did not contemplate their

16  ability to respond to it?

17      A    The September 7th letter, the recommendations

18  letter?

19      Q    Yes.

20      A    Well, it's addressed to Chuck Thompson and to

21  Deborah Stone.

22      Q    Okay.  But you sent a copy to Mr. Carmody and

23  Mr. Kirchner, correct?

24      A    Right.  But it doesn't suggest an action.  It

25  just was so that they would be informed of the process.

1      Q     Why?

2      A     It is our, it is our practice to keep the

3   employee informed of where we are.

4            MR. TAGUE:  May I have just a moment?

5            THE COURT:  Take your time.

6                (Brief pause in proceedings.)

7            MR. TAGUE:  I have no further questions.

8            THE COURT:  Mr. Brinkmann.

9            MR. BRINKMANN:  Yes, Your Honor.

10           RECROSS-EXAMINATION BY MR. BRINKMANN:

11     Q     Mr. Tague asked you:  When do you inform the

12  employee of the policy that he's charged with violating?

13           My question is:  In the charge letter of

14  July 19, 2010, is the employee in this case, Mr. Carmody,

15  informed of the policy that he's charged with violating?

16     A     Yes.

17     Q     Okay.  And the purpose of copying the employee,

18  and the employee's attorney in this case, of your

19  findings, was that so that they would be advised of the

20  results of your investigation?

21     A     Yes.

22           MR. BRINKMANN:  Okay.  That's all, Your Honor.

23           MR. TAGUE:  No further.

24           THE COURT:  Mr. Tague?  Nothing?

25           MR. TAGUE:  No.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1              THE COURT:  You may step down.

 2              THE WITNESS:  Thank you.

 3                  (Witness Reynolds excused, 10:10 a.m.)

 4              THE COURT:  Mr. Tague, you may call your next.

 5              MR. TAGUE:  I'd like to call Rhonda Perry.

 6     She's one of the witnesses we have under subpoena.

 7              MR. BRINKMANN:  Your Honor, she's waiting

 8     outside.  May I --

 9              THE COURT:  Please, please.  Thank you for

10     doing that.

11                  (Brief pause in proceedings.)

12              RHONDA PERRY, sworn, 10:11 a.m.,

13              DIRECT EXAMINATION BY MR. TAGUE:

14        Q    Would you please state your name?

15        A    Rhonda Perry.

16        Q    And where are you employed?

17        A    University of Illinois.

18        Q    In the summer of 2010, were you so employed?

19        A    Yes.

20        Q    What was your job at that time?

21        A    I was an associate university counsel.

22        Q    Okay.  And Laura Clower also worked in the

23     legal office with you; did she not?

24        A    Correct.

25        Q    Where was she at in relation to your job?  Were
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

29

1  you under her?  Lateral to her?  How was that related?

2      A    She was a colleague, lateral.

3      Q    Did you have any specific assigned area of

4  responsibility?

5      A    Yes.

6      Q    What was that?

7      A    I, I was a generalist for the office, but I

8  also handled student affairs and employee relations.

9      Q    Would you be the attorney assigned to assist

10  Academic Human Resources in employee investigations?

11      A    Correct.

12      Q    And in that capacity, did you ultimately

13  provide advice to Joseph Bohn?

14      A    Yes.

15      Q    Did you provide advice to Sharon Reynolds?

16      A    Yes.

17      Q    Did you provide advice to Deborah Stone?

18      A    Yes.

19      Q    And did you provide advice to Charles Thompson?

20      A    Yes.

21      Q    When did you first learn that there was an

22  issue with Kevin Carmody?

23      A    Sometime at the end of June of 2010.

24      Q    Okay.  And how were you alerted that there

25  were, was an issue?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      A    I was contacted by Steve Veazie and Laura

2   Clower about some, something that had happened in a State

3   Court case.

4      Q    And what were you asked to do?

5      A    I was asked to notify the appropriate

6   university campus officials so that they could

7   investigate.

8      Q    And who, then, was notified and began

9   investigation?

10     A    Well, I notified the Provost Office, HR; and at

11  some point, Joe, Joseph Bohn was assigned to investigate.

12     Q    So you notified HR.  That's not a person.  Was

13  there a person in HR that you actually provided notice

14  to?

15     A    I think Sharon Reynolds was the first person

16  that I spoke to in HR.

17     Q    Okay.  And then what was your next involvement

18  once you told Sharon Reynolds that there was this

19  problem?

20     A    What was my next involvement?  I -- at that

21  point, then I provided legal advice to them.

22     Q    Okay.  Was there any documents or information

23  provided to Ms. Reynolds when she was notified of the

24  issue?

25     A    Oh, yes.  There was an exhibit -- or there was

1   a document that had been filed in State Court that was a,

2   a pleading with exhibits attached; so those were provided

3   to HR.

4        Q    I want to back up and ask another question

5   that -- I had you identify Sharon Reynolds in HR.  Who in

6   the Provost Office was notified?

7        A    Katherine Galvin.

8        Q    Did she have any involvement in the

9   investigation?

10       A    I, I don't recall her having any.

11       Q    Okay.  Was anyone in the Provost Office ever

12   involved in the investigation?

13       A    I don't recall.

14       Q    I've handed you Plaintiff's Exhibit Number 9.

15   My question to you is:  That was the documents that were

16   attached to the State Court finding -- or State Court

17   filing that you referred to; are they not?

18       A    They appear to be.

19       Q    Okay.  And the -- was the entire State Court

20   filing provided to Ms. Reynolds or only those emails

21   which are Exhibit Number 9?

22       A    I don't recall, but I -- it seems like I would

23   have given her the entire pleading and the exhibits.

24       Q    So I understand what you're telling me, that

25   you don't know whether you gave her the whole document or

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    the emails; but you, in fact, gave her the emails or the

2    whole document, correct?

3         A    Correct.

4         Q    Now, I also showed you, or have in front of

5    you -- if you'd look at Number 11, that is the transcript

6    of a hearing that was had in those State Court

7    proceedings relating to that filing, correct?

8         A    Yes.  It's an Emergency Hearing Regarding

9    Discovery Materials transcript.

10        Q    And you gave that to Ms. Reynolds also?

11        A    I don't recall if I gave this to Ms. Reynolds

12   or Mr. Bohn, but I did provide it to HR.

13        Q    So you gave it to, to one of the two people

14   that were involved in the investigation with Academic

15   Human Resources, correct?

16        A    Correct.

17        Q    What is Exhibit Number 7?

18        A    Exhibit Number 7 is a copy of the Policy on

19   Appropriate Use of Computers and Network Systems.

20        Q    Okay.  And the other document that I pulled

21   out, Number 8, what is that?

22        A    Number 8 is the University Code of Conduct.

23        Q    Exhibit Number 1 ultimately was a charge letter

24   that was signed by the dean and delivered to Kevin

25   Carmody, correct?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
1        A    Correct.

2        Q    And did you see that document before it was

3   sent?

4        A    I believe so.

5        Q    It refers to a charge against him; does it not?

6        A    A charge against who?

7        Q    Kevin Carmody.

8        A    Yes.

9        Q    And that charge is in the second paragraph, the

10   numbered point 1, correct?

11        A    Those are the allegations?

12        Q    Right.

13        A    Yes.

14        Q    And then the third paragraph identifies those

15   two documents we just talked about, Number 7 and 8,

16   correct?

17        A    Correct.

18        Q    Now, that letter did not identify which

19   paragraphs or which sections of those policies were

20   applicable, did they?

21        A    No.

22        Q    Exhibit Number 3, if you'd look at that, do you

23   know what that document is?

24        A    It appears to be an email.

25        Q    Okay.  That is an email from Sharon Reynolds to
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
1   Kevin Carmody, correct?

2       A    Correct.

3       Q    That is in response to an email which I think

4   is the second page of that document that he sent to her,

5   correct?

6       A    Yes.

7       Q    Were you aware that Mr. Carmody specifically

8   asked Sharon Reynolds what sections of the policies he

9   needed to respond to?

10      A    The email says, "Please provide me in writing

11  and in advance of any rescheduled meeting precisely which

12  portions of any and all policies which are claimed in the

13  alleged misconduct."

14      Q    So he made that request.  Ms. Reynolds replied.

15  And were you copied with that reply, or did you see that

16  reply?

17      A    I saw the reply.  Yes.

18      Q    She did not supply him with specific sections,

19  did she?

20      A    In this email, it does not appear so.

21      Q    She never did, did she?

22      A    I don't know.

23      Q    Were policy provisions ever identified prior to

24  September 7 -- I'm sorry, policy sections ever identified

25  prior to September 7, 2010, in the investigation?
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      A      I'm sorry.  Can you repeat that question?

2      Q      Sure.

3             In the course of the investigation, did anyone

4   in Academic Human Resources actually identify the

5   applicable sections in those policies contained in

6   Exhibit 7 and 8?

7      A      Probably.

8      Q      After Mr. Carmody was sent the charging letter

9   on July 19, 2010, what is your next involvement in the

10  investigation or in support of Joseph Bohn, Sharon

11  Reynolds, or Deborah Stone?

12     A      I was called to join a meeting that Ms. Stone

13  and Mr. Bohn were having with Mr. Carmody and his

14  attorney, Bob Kirchner.

15     Q      Okay.  Was that July 28, 2010?

16     A      Yes.

17     Q      And when were you called?  Do you remember what

18  time of the day or -- time?

19     A      I have no idea.

20     Q      Were you able to go right over?

21     A      Yes.

22     Q      What happened when you arrived?

23     A      When I got to the meeting, I was told that

24  Mr. Kirchner was preventing Mr. Carmody from responding

25  to the questions HR had about how he came into possession

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   of the documents that were included in Exhibit A.

2       Q    And was there a discussion that you had?

3       A    Yes.  Bob and I had a conversation about

4   whether or not his client could answer questions about

5   the possession of the documents.  Bob insisted that he

6   couldn't.

7            I said that he could, that it was not a

8   violation of the Court's order to answer the questions

9   that we had for him, which was about how he obtained the

10  documents and how he was trying to use them.

11           And, ultimately, Bob disagreed.  He said he was

12  going to go to court -- excuse me -- go to court to

13  clarify, and I offered to join him in a motion to seek

14  clarification; but until that time, we were going to move

15  forward with the investigation.

16      Q    Did you reschedule another time to reconvene

17  the interview by Joseph Bohn and Sharon Stone -- I'm

18  sorry, Sharon Reynolds?

19      A    No.

20      Q    Did you do anything to have the protective

21  order vacated or modified?

22      A    The university wasn't a part of the litigation,

23  so I -- no.  There would have been no mechanism for me to

24  modify an order.

25      Q    James Kearns was the attorney who caused that

1    order to be entered; was he not?

2         A    What order?

3         Q    The protective order.

4         A    I'm sorry.  I don't understand.

5         Q    Well, James Kearns was the -- well, James

6    Kearns or Gary Lietz, who were university-assigned

7    attorneys and acting as counsel for the university, are

8    the ones that brought the Group Exhibit A documents to

9    the attention of Judge Leonhard in the emergency hearing

10   which resulted in the protective order being entered,

11   correct?

12        A    Yes.

13        Q    Were they ever asked or instructed to take

14   steps to modify that order or vacate it so that it would

15   not interfere with the Carmody investigation?

16        A    No.

17        Q    Was there correspondence --

18        A    Corr--

19        Q    Do you have 14?

20        A    No.

21        Q    I'm showing you what's been marked as Exhibit

22   Number 14.  Mr. Kirchner did write you that letter; did

23   he not?

24        A    Yes.

25        Q    And he in that letter summarized what the

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   dispute was that you discussed with him on July 28th,

2   correct?

3       A    He inaccurately summarized the meeting.  Yes.

4       Q    So you responded to him, correct?

5       A    Correct.

6       Q    And you responded to him essentially a week

7   later?

8       A    Yes.

9       Q    And that's your response, correct?

10      A    Correct.

11      Q    What's your next involvement in the

12  investigation?

13      A    I may have been consulted by HR as they

14  interviewed witnesses and collected information, but I

15  don't recall specifically.

16      Q    Ultimately, recommendations and findings were

17  made by Joseph Bohn and Sharon Reynolds, correct?

18      A    Yes.

19      Q    Were you involved in the creation of that

20  document?

21      A    I may have provided legal advice on the

22  document.

23      Q    How was it determined that Deborah Stone and

24  Charles Thompson should be sent that document?

25      A    Charles Thompson was his immediate supervisor

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   at the time the letter was issued; and because there was

2   a recommendation for immediate termination, Deb Stone had

3   to be involved with that determination.

4        Q    That document, which is Exhibit Number 2, Kevin

5   Carmody and Robert Kirchner were sent a copy of that,

6   correct?

7        A    Yes.

8        Q    Why were they sent a copy?

9        A    Because it was about Mr. Carmody's case, and he

10  was represented by Bob Kirchner.

11       Q    And was it contemplated that he would have an

12  opportunity to respond to those findings and

13  recommendations?

14       A    At the time the findings were issued -- well,

15  yes.  Yes, to answer your question.

16       Q    And, in fact, Mr. Kirchner did respond to the

17  findings and recommendations; did he not?

18       A    Correct.

19       Q    I think I put Exhibit Number 10 in the stack in

20  front of you so I didn't have to walk back and forth.

21  Did I do that, or do I need to get it?

22       A    Sorry.  You need to get it.

23            THE COURT:  Mr. Tague, is 14 -- is that a

24  one-page exhibit?

25            MR. TAGUE:  Two pages.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1            THE COURT:  May I see 14?

 2   BY MR. TAGUE:

 3       Q    Okay.  I've showed you Exhibit Number 10.  What

 4   is that exhibit?

 5       A    A series of letters.

 6       Q    The first one, the first page is a letter of

 7   September 9, 2010, to you and Ms. Clower from

 8   Mr. Kirchner, correct?

 9       A    Yes.

10       Q    And that's in response to the findings of

11   September 7, 2010, correct?

12       A    Correct.

13       Q    When was this provided to Sharon Reynolds and

14   Joseph Bohn?

15            MR. BRINKMANN:  Objection, Your Honor.  It

16   assumes that it, in fact, was supplied to them.

17            MR. TAGUE:  That's a fair objection, Your

18   Honor.  I'll rephrase.

19            THE COURT:  Thank you, because I'm going to

20   sustain it.

21            MR. TAGUE:  Right.

22   BY MR. TAGUE:

23       Q    Was that letter provided to Joseph Bohn and

24   Sharon Reynolds?

25       A    Probably.
```

1          MR. BRINKMANN:  Your Honor, I object and move

2     to strike.  The witness is not testifying on the basis of

3     personal knowledge.  The answer appears to be speculation

4     by the witness.

5          THE COURT:  I'll sustain that.

6          You're going to have to do more to get this in,

7     Mr. Tague.

8     BY MR. TAGUE:

9          Q    You received this document; did you not?

10         A    Yes.

11         Q    What did you do with it when you received it?

12         A    I would have reviewed it and discussed it with

13    HR, but I don't recall if I made a copy.

14         Q    And the second page is the, a reply to

15    Mr. Kirchner's letter, the second and third page?

16         A    Correct.

17         Q    Now, Ms. Clower signed that letter, but you

18    were involved jointly with her in creating it; were you

19    not?

20         A    Correct.

21         Q    And, again, that was in response to

22    Mr. Kirchner's letter of September 9, 2010, correct?

23         A    The letter and the phone call we had had with

24    him, yes.

25         Q    And as a result of that letter, Mr. Kirchner

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    was invited to particularize the response that he had

2    made on September 9, 2010; did he not?

3         A    I'm sorry.  I don't understand that question.

4         Q    The -- in that letter of September 10, 2010, by

5    Laura Clower, Mr. Kirchner was invited to particularize

6    the general response he had made on September 9, 2010,

7    correct?

8         A    The letter says that we were willing to receive

9    a response to the investigative report and recommendation

10   from his client on or before Wednesday, September 15th.

11        Q    And he did that by the next letter in this

12   email, which is the September 15, 2010, three-page letter

13   addressed to you and Ms. Clower, correct?

14        A    He did send a letter on the 15th.  Yes.

15        Q    Then the next letter is Ms. Clower's response

16   to the September 15th letter?

17        A    There's a September 17th letter from Ms. Clower

18   to Mr. Kirchner referencing the September 15th letter.

19        Q    Then there's a September 20 letter from

20   Mr. Kirchner in response to that?

21        A    Yes.

22        Q    Mr. Kirchner responded the same day -- I'm

23   sorry.  Ms. Clower responded the same day, which is the

24   next fax correspondence, correct?

25        A    Correct.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    Q    And then finally the last in this series of

2  exchanges, on September 21, Ms. Clower responds to

3  Mr. Kirchner, correct?

4    A    I'm sorry.  The last letter I have is --

5    Q    I'm sorry.  The last letter Mr. Kirchner

6  responds to Ms. Clower, correct?

7    A    Correct.

8    Q    These all related to an invitation by the

9  university to allow Mr. Carmody and his attorney to

10  respond to the findings and recommendations, correct?

11    A    To participate, yes.

12         MR. TAGUE:  Okay.  I'd move to admit Number 10,

13  Your Honor.

14         THE COURT:  Mr. Brinkmann, what do you think?

15  Objection?

16         MR. BRINKMANN:  Your Honor, insofar as they do

17  not provide any substantive response to the charges, I

18  would object to that, Your Honor.

19         THE COURT:  All right.  Mr. Tague, I'm going to

20  allow these to be admitted, but I want it understood:

21  The jury will not see these without significant redaction

22  contained within some of the letters.  They are rife with

23  material that I've ruled is inadmissible.

24         So I will admit them into the record, but the

25  jury is not going to review all of the letters, all of

1   the legal correspondence.  It goes into matters that are

2   not at all relevant.  It would be confusing; and, in

3   fact, some of them fly right in the face of some of my

4   previous rulings.

5         So it's admitted, but the jury -- it will not

6   be going back to the jury.  Admitted over objection.

7         MR. TAGUE:  There's one page of this document,

8   Your Honor, that I would like to ask the witness.  May I

9   show it to Mr. Brinkmann; and if he doesn't think it

10   falls within the parameters you just cautioned me on,

11   then I'll show it?  If not, I'll bring it to you, and you

12   can tell me whether I can show it and ask her.

13         THE COURT:  I'll tell you what -- no.  We're

14   going to do something different.

15         Ladies and gentlemen, it's about 10:40.  We're

16   going to take our morning break.  I'll work with the

17   attorneys on this matter.  Like I said, I try to maximize

18   your time.  I don't want to waste your time.  We'll take

19   a break for you to use the restroom.  That will be the

20   only break of the morning.

21         In the meantime, I'll keep the attorneys in

22   here hostage, and we'll work through this.

23         (Jury absent, 10:40 a.m.)

24         THE COURT:  The jury has left the courtroom.

25   Have a seat.

```
 1              Mr. Tague, I have the exhibit in front of me.
 2   What page are you talking about?
 3              MR. TAGUE:  The third page of this document.
 4              THE COURT:  The third page is the second
 5   page --
 6              MR. TAGUE:  Correct.
 7              THE COURT:  -- of a letter from Laura Clower,
 8   the associate university counsel.
 9              MR. TAGUE:  And I'm interested in point 6 and
10   the last paragraph.
11              THE COURT:  Mr. Brinkmann.
12              MR. BRINKMANN:  Your Honor, I'm concerned about
13   the same things that the Court has expressed.  I think
14   there's a lot of inflammatory information here.  What
15   we're going to get into if we start picking parts of
16   letters is speculation by the jury.
17              I think that Ms. Clower is going to be a
18   witness and can testify that she advised Mr. Kirchner
19   that he, he could respond.  And, in fact, I think
20   Ms. Perry has also already testified to that.  So I think
21   that this is not appropriate.
22              THE COURT:  Mr. Tague, is it your belief in
23   paragraph 5 that those are depositions related to the
24   Goldberg litigation?  Is that your understanding?
25              MR. TAGUE:  That's my understanding.  Yes.
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1              THE COURT:  I'm not going to allow this -- you

 2     to show this to the jury, and I'm going to make a record

 3     at this time.

 4              Mr. Kirchner -- actually, these are findings

 5     I'm making right now so the record is clear if this case

 6     is appealed.  Mr. Kirchner is familiar to this Court and

 7     to most practitioners in the Champaign-Urbana area.  He

 8     is deceased.  Mr. Kirchner was, perhaps, known as a

 9     fierce advocate, but also one who was no stranger to

10     vitriol, hyperbole, and oftentimes vicious

11     mischaracterizations of what was occurring.

12              Those of us who practiced with Mr. Kirchner --

13     and he was a very effective advocate -- were used to his

14     manner of communication.  This jury is not.

15              As I'm reviewing this letter, he brings up --

16     not, not -- these letters; there's more than one of them

17     in Exhibit 10 -- he brings up matters flying in the face

18     of several motions in limine for us which I've entered,

19     specifically motion in limine number 1.  Any argument or

20     evidence suggesting partiality during the pretermination

21     process will not be allowed.

22              Mr. Kirchner's letters on -- in several of

23     them, on multiple occasions he alleges definitely

24     partiality, indications of other matters involving the

25     university, other lawsuits going on.  All of that would
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    fly directly in the face of the motion in limine.  It

2    would confuse the jury.  It would cause us to be

3    distracted from the real issues in this case.

4          Likewise, he certainly implies and, in fact,

5    almost openly states in at least one letter that the

6    plaintiff is working in a hostile environment and/or that

7    the termination, or upcoming termination of the plaintiff

8    is being caused by the Goldberg lawsuit.  Again, that's

9    directly in the face of one of the motions in limine.

10          I can say with all candor:  I appreciate what

11    Mr. Kirchner was doing.  And, again, those of us who are

12    experienced practitioners down here -- and, frankly, I

13    would include you, Mr. Tague, and you, Mr. Brinkmann, who

14    worked with Bob Kirchner -- know that this was his

15    custom.  And oftentimes, even though he sounded

16    absolutely insulting in his letters, for example, we all

17    knew that with Mr. Kirchner he could be worked with in a

18    spirit of cooperation and oftentimes things were

19    resolved.

20          Gentlemen, we have the advantage of knowing Bob

21    Kirchner.  This jury does not.  And I think if we were to

22    give them the opportunity to review these letters, not

23    knowing Bob Kirchner -- and, in fact, that was one of the

24    questions that I asked during voir dire, and none of them

25    know him -- this, these letters could really cause

1   confusion, cause distraction, and cause the jury to be

2   misled as to the true issues in this case.

3           So, I allowed you some latitude, Mr. Tague.  As

4   I reviewed the letters, the exhibit, I allowed you some

5   latitude to talk to Ms. Perry about the correspondence.

6   I will let you have the same latitude in talking to

7   Ms. Clower.

8           But actually having them see the exhibits, the

9   letters I should say, that are part of Exhibit 10, for

10  the reasons I just stated would be confusing and

11  misleading to the jury and get us off the real issues in

12  this case.  So for that reason, I am admitting them into

13  evidence, but the jury will not see them.  That's the

14  record I've made.

15          With that being said, I don't mean to cut you

16  off from the more human parts of this trial.  I presume

17  everyone here would like to have a restroom break at some

18  point.

19          MR. TAGUE:  I would.  But perhaps this is --

20  you know, I don't want to violate your orders in limine.

21  The, and I understand based upon what you said the --

22  specifically, I wanted to ask this witness on this second

23  page of Ms. Clower's letter, I wanted to ask her about

24  the information that Ms. Clower put in number 6 and the

25  last paragraph, the last paragraph being that -- it

```
 1   states, "Notwithstanding the foregoing, the university is
 2   willing to receive" --
 3              COURT REPORTER:  I'm sorry; would you use the
 4   microphone?
 5              MR. TAGUE:  I'm sorry.
 6              COURT REPORTER:  You're fading out on me.
 7              MR. TAGUE:  The last sentence says, "The
 8   university is willing to receive a written response to
 9   the investigative report and recommendation from your
10   client on or before Wednesday, September 15th."
11              THE COURT:  I will allow you to ask that of
12   Ms. Clower.  Obviously, this is her letter, so you don't
13   need to ask this witness that.  You can ask Ms. Clower
14   that question.
15              If you want to ask her, "Did she provide
16   correspondence to Mr. Kirchner that stated" -- and then
17   read that, that's fine with me.  I would -- I think that
18   would be appropriate.
19              Do you agree, Mr. Brinkmann?
20              MR. BRINKMANN:  I do, Your Honor.
21              THE COURT:  So I think that there's nothing
22   wrong with that.
23              MR. TAGUE:  Would you say it again?
24              THE COURT:  If you would like to ask Ms. Clower
25   when she testifies, essentially read that last paragraph,
```

1   that statement to her.  Did she send that?  I, I think

2   that would be entirely proper.

3           MR. TAGUE:  And number 6.

4           THE COURT:  Number 6 is -- we're then going to

5   start backing our way and piecemealing our way back into

6   this letter because there's other parts of this letter --

7   you know, there's allegations about where he is and his

8   whereabouts and when he's unavailable.  It's a -- it

9   is -- we're going to get into a morass if we start

10  working our way through and piecemealing our letters.

11          That last sentence, though, I understand why

12  you're wanting to do it.  You're a very effective

13  attorney yourself, Mr. Tague.  I think that's a fine

14  question to ask, and I would have no objection if you --

15  I rule you can ask that question.  So go ahead and ask

16  Ms. Clower about that.  I don't see any need for you to

17  ask this witness that question, but --

18          MR. TAGUE:  And --

19          THE COURT:  For that matter, Mr. Tague, let me

20  tell you:  I don't think you were trying to get around

21  any of my orders.

22          Again, I know you're familiar with Bob

23  Kirchner.  You've probably known him longer than I have,

24  or he's deceased now, but -- so I don't think you were

25  doing anything to try to violate any of my orders.  I

1  think you're just trying to do a very good job of

2  representing Mr. Carmody.

3          MR. TAGUE:  Thank you.  And why I'm exploring

4  these is I don't want to do it inadvertently.

5          THE COURT:  Sure.

6          MR. TAGUE:  Although as you, I think, can

7  appreciate, I do intend to push the envelope to let you

8  allow me to go up to the point that I can't go.

9          Now, the other thing that, in this sequence

10  that I thought was important, the September 17th letter

11  of Ms. Clower, I'm interested in the last sentence of the

12  first paragraph.  And, again, I'll ask her.

13          THE COURT:  Okay.  The last letter, it's --

14  making a record here.  This is in Exhibit 10.  It's the

15  September 17th letter from Ms. Clower, and you wish to

16  read the last sentence, or inquire about the last

17  sentence of the first paragraph, which reads, "Your

18  communication has nonetheless been forwarded to the

19  proper university officials as they consider what

20  employment action is warranted in your client's case."

21  That's the sentence you'd like to ask about.

22          Mr. Brinkmann, any objection to that question

23  being asked?

24          MR. BRINKMANN:  Your Honor, it's totally out of

25  context.  I don't know how it can be meaningful to the

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
1   jury.  I think it would be confusing.  I'm not sure what
2   relevance it has, so I do have a problem with that.
3              THE COURT:  Well, now, see, we're doing just
4   what I didn't want to do.  Now we have to go back to the
5   previous letter from Mr. Kirchner, which is --
6              MR. TAGUE:  The September --
7              THE COURT:  No, no, no.  It's the
8   September 15th letter, and in typical Bob Kirchner
9   fashion, the very second paragraph begins with
10  Mr. Kirchner making allegations about "potentially
11  criminal misconduct engaged in by university personnel in
12  their longstanding efforts to effectuate a termination of
13  Mr. Carmody's employment."  That's a quote.
14             I recognize that as typical Bob Kirchner
15  language.  But, again, we're already getting into his
16  inflammatory vitriol.  And then he keeps going on.
17  That's just the first page.
18             I mean, as we go on, he's got more on the
19  second page.  He's got implications of a conspiracy with
20  the university.  I mean, this is just what we don't want
21  to get into because it's not relevant.
22             So --
23             MR. TAGUE:  The relevancy that I think here,
24  Judge, is that if you allow me to ask Ms. Clower about
25  the last sentence in her September 10th letter, she
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   indicates the university was willing to receive a written

2   response to the investigation report before Wednesday,

3   September 15th.

4           Mr. Kirchner responded.  And I understand your

5   rationale relative to the entire response.

6           But he responded and then Ms. Clower said,

7   "Your response was forwarded to the appropriate

8   university personnel."

9           THE COURT:  Well, to be fair, let me just say:

10  I'm not sure he responded.  He wrote a letter.  I'm not

11  sure how responsive it is.  But he did write a letter

12  back.

13          MR. TAGUE:  Correct, with his position.

14          THE COURT:  With his, his various positions.

15  So that's a true statement.

16          MR. TAGUE:  That's a true statement.

17          But the people involved in the decision -- Ms.

18  Stone, Ms. Reynolds, and Mr. Bohn -- indicated they

19  didn't receive anything subsequent, and this sequence of

20  just those little excerpts show that there was something

21  submitted, and presumably submitted to the appropriate

22  university officials, which would be the officials making

23  the decision.

24          So part of the defense is that "he never

25  responded even though we gave him an opportunity to

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    respond in writing," and these documents belie that

2    assertion.

3            And I understand that there's other portions

4    that you have to weigh the prejudicial effect of, but I

5    think that that is the relevancy.

6            MR. BRINKMANN:  If I may respond, Your Honor.

7            THE COURT:  You may, Mr. Brinkmann.

8            MR. BRINKMANN:  The defendants were not the

9    individuals making the decision on termination, so I

10   don't know what -- and the persons that are referred to

11   in this letter as "the proper university officials" are

12   not identified.

13           I think the thrust of Ms. Clower's involvement

14   in this matter was to inform Mr. Kirchner that he could

15   respond to the September 7th findings and I think later

16   on inquires about getting the Court order modified.

17           But beyond that -- in fact, the sentence that

18   precedes the sentence in the September 17th letter talks

19   about his September 15 letter focusing on attacking the

20   process and the people and raises irrelevant matters.

21           I don't really see the relevance of this as it

22   would be taken out of context with the jury.  I think the

23   jury might believe that there was, or speculate that

24   there was a substantive response that was being

25   forwarded.  She's forwarding the September 15 letter, but

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    it didn't have a substantive response to any of the facts

2    or evidence.

3              THE COURT:  Let me -- let's take a five-minute

4    break while I'm going to read every single -- reread; I

5    already read them once -- I'm going to reread every

6    single letter in Exhibit 10.  So let's take about a

7    five-minute break while -- if you need to use the

8    restroom, please do so while I review this.  Then I'll

9    come back and make a ruling.

10             (Recess, 10:56 a.m. to 11:04 a.m.)

11             THE COURT:  Have a seat.  We're missing a

12   couple parties.

13             (Brief pause in proceedings.)

14             THE COURT:  All right.  We're back on the

15   record.  The jury is not present.  All counsel and

16   parties are present.

17             During the break, I reviewed every single

18   letter in greater detail that is contained within

19   Exhibit 10.  My earlier findings stand.

20             As far as the September 10th letter from Laura

21   Clower, the Court will allow inquiry by Mr. Tague as to

22   the last sentence of that letter if he so elects.  That

23   is a question that should be asked, obviously, of

24   Ms. Clower, not of this witness.

25             And as far as the September 17th letter from

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   Ms. Clower, and the sentence, the last sentence of the

2   first paragraph, inquiry will not be allowed into that

3   area, and let me explain.

4           I have read -- frankly, this is exactly why I

5   did not want to get into this before the jury.

6           At the end of the September 10th letter from

7   Ms. Clower, she indicates that the university is willing

8   to receive a written response to the investigative report

9   and recommendation -- specifically, that, that

10  document -- from your client on or before Wednesday,

11  September 15th.

12          In the Court's review of the September 15th

13  correspondence from Mr. Kirchner, it does not respond to

14  that whatsoever.  It is a letter full of vitriol,

15  allegations, accusations, et cetera, that does not

16  discuss the investigative report to any great degree and,

17  in fact, spends 90 percent of it discussing matters not

18  related to this case.  Most of it talks about

19  conspiracies within the university related to the

20  Goldberg matter.

21          So when there is a response on September 17th

22  by Ms. Clower to that, any interpretation of that,

23  reasonable interpretation of that is that she simply

24  forwarded the letter on.

25          But as Mr. Brinkmann has stated, these

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  witnesses didn't receive it.  They weren't the decision

2  makers.  That would mislead the jury.

3        After my careful review of all of this, all of

4  these letters, that is the Court's ruling.  So I don't

5  know where that places you, Mr. Tague.  If you wish to

6  ask about the last sentence of the September 10th letter,

7  that's the extent to which I'm going to let you make

8  inquiry of this correspondence with Ms. Clower.  Beyond

9  that, I think any, anything further would be misleading

10 and confusing.  So that's my ruling.

11        Has everyone had a chance to take a break?

12        MR. TAGUE:  I did.

13        THE COURT:  Yes.  All right.

14        MR. TAGUE:  If I may, what -- I'll finish up

15 with this witness in light of your ruling, obviously.

16        Ultimately, the next witness will be Laura

17 Clower.  There's some questions I want to ask her that do

18 not touch upon this specific exhibit, but there are some

19 things I wanted to ask her about that exhibit that I'd

20 like to be in the record to supplement it by way of an

21 offer of proof.

22        So the -- as we plan once I finish with what

23 you're going to allow me to ask her, I would like to ask

24 her some questions in the nature of an offer of proof.

25        THE COURT:  Why don't you do that when we

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    finish with this witness -- well, let's see how we are

2    for time.  We might let the jury take an early lunch and

3    then you do your offer of proof, and then we'll break and

4    then bring her back after lunch if the time works.  We'll

5    play it by ear.

6            I certainly do not mean to prevent you from

7    making a record.  You're doing an excellent job so far.

8    Both of you are.  You, too, Mr. Brinkmann.  I obviously

9    don't mean to leave you out.  So I appreciate all the

10   cooperation you two are showing, and this has really

11   been, so far, a fairly smooth trial, so I appreciate

12   that.

13           All right.  With that being said, any reason

14   not to bring the jury in, Mr. Tague?

15           MR. TAGUE:  No.

16           THE COURT:  Mr. Brinkmann?

17           MR. BRINKMANN:  No.

18           THE COURT:  Let's bring them back.

19              (Brief pause in proceedings.)

20              (Jury present, 11:10 a.m.)

21           THE COURT:  Please be seated.

22           Mr. Tague, you may continue.

23   BY MR. TAGUE:

24       Q    Did I put Exhibit 26 in front of you?

25       A    Yes.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    Q    I put -- what is Exhibit 26?

2    A    It is an Excerpt of Report of Proceedings had

3    on September 23, 2010.

4    Q    You've seen that document before; have you not?

5    A    I don't believe I have.

6    Q    Were you aware that there were proceedings in

7    the State Court matter scheduled for September 23, 2010,

8    to have Judge Leonhard consider vacating or modifying the

9    protective order?

10   A    Yes.

11   Q    And when did you learn that?

12   A    On September 23rd.

13   Q    Okay.  And from whom did you learn it?

14   A    Ms. Clower, I believe.

15   Q    So that hearing happened that afternoon; did it

16   not?

17   A    According to this, at 12:02 p.m.

18   Q    I've handed you what's been marked as

19   Exhibit 17.  The, the attachment to the first page email

20   is the actual termination letter from Charles Thompson

21   and Deborah Stone; is it not?

22   A    Yes.

23   Q    That document had been drafted and signed prior

24   to the hearing on September 23, 2010, before Judge

25   Leonhard; isn't that correct?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      A    I don't know exactly what time the letter was

2  signed.

3      Q    You instructed HR to hold the letter to make

4  sure the judge didn't issue any orders or injunctions,

5  Judge Leonhard, correct?

6      A    Correct.

7      Q    And that didn't happen, so then you told them:

8  Send the letter out, correct?

9      A    Yes.

10     Q    And the -- who did you tell in HR?  Reynolds,

11  Sharon Reynolds, Joseph Bohn, or Deborah Stone?

12     A    I'm -- I don't recall.  I'm sorry.

13          MR. TAGUE:  If I may have just one --

14          THE COURT:  Take your time.

15              (Brief pause in proceedings.)

16          MR. TAGUE:  I have no further questions of this

17  witness, Your Honor.

18          THE COURT:  Mr. Brinkmann.

19           CROSS-EXAMINATION BY MR. BRINKMANN:

20     Q    Ms. Perry, you've told us that you had a

21  conversation with Mr. Kirchner on July 28, 2010, when you

22  were called to come to the meeting?

23     A    Correct.

24     Q    What, if anything, did you talk to Mr. Kirchner

25  about with respect to interpretation of the Court order?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      A    I disagreed with his interpretation that his

2  client couldn't testify how he came into possession of

3  the, the exhibits.  He, he basically said the Court

4  prohibited him from talking about anything regarding the

5  exhibits, and I said we don't really care about the

6  substance of the exhibits.  We care about how he got them

7  and how he planned to use them.

8      Q    What, if anything, did you tell Mr. Kirchner

9  with respect to getting clarification of the Court order?

10     A    I told him that I'd be happy to join him if he

11  decided to go to court to get clarification of the order.

12  I didn't feel clarification was necessary based on what I

13  had seen; but if he wanted to, I would not -- I was not

14  opposed to helping him get that clarification.

15     Q    And what, if anything, did you tell him with

16  regard to an ongoing opportunity to respond to the

17  charges?

18     A    I told him he was free to let me know if his

19  client changed his mind about participating, but the

20  investigation would go forward.

21          MR. BRINKMANN:  That's all, Your Honor.

22          THE COURT:  Mr. Tague, any redirect?  Or

23  recross, I should say.

24          MR. TAGUE:  No, Your Honor.

25          THE COURT:  You may step down.

1          THE WITNESS:  Thank you.

2              (Witness Perry excused, 11:16 a.m.)

3          THE COURT:  Mr. Tague, your next witness would

4    be Laura Clower; is that correct?

5          MR. TAGUE:  That is correct.

6          THE COURT:  And then after that, would it be

7    Mr. Thompson after that?

8          MR. TAGUE:  Yes.

9          THE COURT:  The video?

10          MR. TAGUE:  Right.

11          THE COURT:  Okay.

12          MR. TAGUE:  Well, I'm sorry, no.  Deborah

13    Thurston is under subpoena to come here after lunch.

14          THE COURT:  After lunch?

15          MR. TAGUE:  Correct.

16          THE COURT:  Okay.  It's 11:15.  All right.

17    Ladies and gentlemen, I think the safest course of action

18    is for you to take an early lunch.  I do not want to cut

19    your lunch short, and I don't want to waste your time

20    while we're waiting for witnesses.

21          I want to recheck the video deposition

22    equipment -- it's not deposition.  It's a DVD of a

23    deposition.  I want to make sure everything is working.

24    And if we have a witness who's not supposed to be here

25    until after lunch, I simply don't want you to sit here

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    doing nothing or sit in the jury room doing nothing.

2    Make sense?

3            So I'd rather have you go to an early lunch,

4    and I'll make it a longer lunch.  So it's 11:15.  Why

5    don't you come back to the jury room about 12:35 -- make

6    it 12:40 -- and I'll try to bring everybody back in here

7    at 12:45, and we'll start then.  All right?  So be back

8    in the jury room at 12:40.

9            (Jury absent, 11:17 a.m.)

10           THE COURT:  All right.  The jury has left the

11   courtroom.

12           At this time, Mr. Tague, why don't we get Laura

13   Clower on the stand and you can make a record of the

14   questions that you're going to ask that you believe would

15   be in violation of my order.

16           I might add that normally, an offer of proof,

17   I'd have you simply state to me what you believe the

18   evidence would be.  But in this case, since she's here

19   and since we have the time, this seems to be a more

20   effective way to handle this.

21           MR. TAGUE:  Yes, Your Honor.

22           (Brief pause in proceedings.)

23           LAURA CLOWER, sworn, 11:19 a.m.,

24           DIRECT EXAMINATION BY MR. TAGUE:

25   Q     Would you please state your name?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
1          A     Laura Clower.

2          Q     And what's your position with the University of

3   Illinois?

4          A     I am senior associate university counsel.

5          Q     And what was your position in the summer of

6   2010?

7          A     I was associate university counsel.

8                MR. TAGUE:  Your Honor, I'd like to start the

9   questioning on the offer of proof that we discussed

10  before this witness took the stand, if I may.

11               THE COURT:  Yes, please.

12  BY MR. TAGUE:

13         Q     Would you look, Ms. Clower at Exhibit 10 that I

14  have before you.  What is that document?

15         A     Just the first page or the entire packet?

16         Q     Well, why don't you go -- why don't you go

17  through the documents.  It's a series of correspondence

18  between you and Robert Kirchner relating to Kevin

19  Carmody, correct?

20         A     That appears to be true.  Yes.

21         Q     On September 2nd -- I'm sorry, September 7,

22  2010, a report of findings and recommendation came out of

23  Academic Human Resources authored by Joseph Bohn and

24  Sharon Reynolds; did it not?

25         A     Correct.
```

1      Q      You were aware of that happening on or about

2   the time it happened; were you not?

3      A      Yes.

4      Q      After that date, Mr. Kirchner wrote you and

5   Ms. Perry on September 9, 2010, relating to that report;

6   did he not?

7      A      In part, yes.

8      Q      Okay.  And the first page of Exhibit Number 10

9   is his September 9, 2010, letter to you and Ms. Perry,

10  correct?

11     A      Correct.

12     Q      Did you have any communication with

13  Mr. Kirchner before the second page of that document,

14  which is apparently your written response to him?

15     A      Yes.  According to his letter of September 9,

16  we had had a telephone conversation the day before.

17     Q      And what was discussed in that telephone

18  conversation?

19     A      Well, it was five and a half years ago, so I

20  don't know that I have a specific recollection of the

21  exact details, but it would have been generally about the

22  report that had come out and his interest in, perhaps,

23  filing something in writing.

24     Q      Okay.  They followed up with a written

25  communication, same subject matter, correct?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      A    I did, you mean?  Or he did?

2      Q    No.  He did --

3      A    Oh.

4      Q    -- on September 9th?

5      A    Yeah.  I interpret this to be that he sent a

6   letter on September 9th after we had had a telephone

7   conversation on September 8th.

8      Q    Okay.  And then you responded to that in

9   writing, correct?

10     A    Yes, on September 10th.

11     Q    Did you respond verbally before September 10th?

12     A    I don't recall having a conversation, other

13   than the one that seems to be referenced in his letter of

14   September 9.  I'm not saying that we didn't have an

15   additional conversation, but I'm not remembering one.

16     Q    And the September 10, 2010, letter is your

17   response to his September 9 letter, correct?

18     A    Yes.

19     Q    On the second page of that letter, number 6,

20   you state the, after the -- well, you state, "You are

21   welcome to point out with specificity any information you

22   claim to be false, but Mr. Carmody's opportunity to

23   respond to the allegations of wrongdoing, and have those

24   concerns incorporated into the recommendation regarding

25   his university employment, has passed."  You wrote that;

1  did you not?

2       A     Yes.  That's what it says.

3       Q     And the, but nevertheless, in the last

4  paragraph, you indicate, "Notwithstanding the foregoing,

5  the university is willing to receive a written response

6  to the investigative report and recommendation from your

7  client on or before Wednesday, September 15," correct?

8       A     That's what it says.  Yes.

9       Q     What's the next document in that exhibit?

10            THE COURT:  Go back.  Why did you say that in

11  the very last sentence of the September 10th letter?

12            THE WITNESS:  In the ordinary practice of

13  things at the university, when there is a report such as

14  that that was issued on September 7th, a decision will

15  ordinarily issue within a week after such a report is

16  available.  And we were allowing additional time to Mr.

17  Carmody and Mr. Kirchner if they wanted to provide

18  additional information.

19            He had not -- he had not taken advantage of the

20  opportunity, the meeting that had been set up that was to

21  meet in person; but he was being offered additional time

22  before the decision was made if he wanted to submit

23  anything further.

24            THE COURT:  I understand.

25            MR. TAGUE:  Okay.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1   BY MR. TAGUE:

 2        Q    And he did submit something; did he not?

 3        A    Mr. Kirchner sent a letter on September 15.

 4   Yes.

 5        Q    What did you do with that letter?

 6        A    I think I wrote a response to it on the 17th of

 7   September.

 8        Q    Okay.  And that's the next document in the

 9   chain?

10        A    Yes.

11        Q    In the last sentence of the first paragraph,

12   you indicate, "Your communication has nonetheless been

13   forwarded to the proper university officials as they

14   consider what employment action is warranted in your

15   client's case."

16             To whom was it forwarded?

17        A    Well, again, as I sit here I don't have a

18   specific recollection, Mr. Tague.  But reading the

19   sentence, since the people who would have been able to

20   make the decision at that point would have been Mr. Chuck

21   Thompson and Ms. Deb Stone, I presume that's who I was

22   referring to.

23        Q    Then the next document in that string is

24   Mr. Kirchner's September 20, 2010, letter to you and

25   Ms. Perry, correct?
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1        A     Yes.  That's the next item in this packet.

 2        Q     And you responded to that the, in the next

 3   document, which is your fax of September 20, 2010?

 4        A     I -- yes.  I -- that looks correct.  I mean, it

 5   is sequential, so --

 6        Q     Was the September 20, 2010, letter of

 7   Mr. Kirchner to you forwarded to Ms. Stone?

 8        A     Again, I don't recall.  It's --

 9        Q     On September 21, Mr. Kirchner wrote to you in

10   response to your September 20 fax and letter?

11        A     Yes.  There's a letter from him on

12   September 21.

13        Q     Was that sent to Mr. Bohn, Ms. Reynolds, or --

14        A     I don't recall, Mike.

15             MR. TAGUE:  May I have just a moment?

16                  (Brief pause in proceedings.)

17   BY MR. TAGUE:

18        Q     After September 15, 2010, you told me about

19   written responses in this sequence of communication.

20   What I want to know is:  After September 2010, were there

21   any verbal communications between you and Mr. Kirchner

22   concerning the September 7, 2010, report and

23   recommendation?

24        A     Again, Mr. Tague, I know that I probably had

25   two or three conversations on the phone with Mr. Kirchner
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   during this window of time, meaning in September of 2010;

2   but I don't have a recollection of exactly when those

3   conversations occurred.  So I, I don't know.  We might

4   have.  We might not have.

5        Q    So if I ask you if any particular details were

6   talked about, any specifics of the charges of the

7   procedures, you wouldn't be able to tell me, other than

8   what's documented in your written correspondence?

9        A    I'm not recalling as I sit here.  No.

10            MR. TAGUE:  Those are all the questions that I

11  have in the offer of proof, Your Honor.

12            THE COURT:  Mr. Brinkmann, not to leave you

13  out.

14            MR. BRINKMANN:  I have no questions, Your

15  Honor.

16            THE COURT:  All right.  It's 11:30.  I've got

17  the jury coming back in about an hour and ten minutes.

18  Why don't we all come back here in one hour.  We'll be in

19  recess.

20            (Recess, 11:30 a.m. to 12:34 p.m.)

21            THE COURT:  All right.  It's approximately

22  12:34.  We're back on the record.  We have both counsel

23  and all parties are present.

24            Before I bring the jury back in, I want to make

25  sure that I've -- I know which exhibits have been

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    admitted and not.

2            We had a discussion about -- we've already

3    admitted Exhibit 10, but it's over objection and not

4    going back to the jury.

5            Exhibit 14 was correspondence involving Rhonda

6    Perry.  I don't believe you intended to introduce that,

7    Mr. Tague, but I just wanted to make sure that that's

8    correct.  You didn't intend to introduce that, did you?

9            MR. TAGUE:  Yes.  I would like to have it moved

10   into evidence.

11           THE COURT:  You do?

12           Mr. Brinkmann?

13           MR. BRINKMANN:  I have no objection to that,

14   Your Honor.

15           THE COURT:  All right.  14 is admitted.

16           All right.  And then we had -- 26 was a

17   transcript of some, of the State Court proceedings in the

18   Goldberg matter.  Other than showing that to Ms. Perry, I

19   don't think we really got into that at all.  Are you

20   moving to admit that?

21           MR. TAGUE:  Yes.

22           THE COURT:  Mr. Brinkmann, Exhibit 26, the

23   proceedings on September 23rd.

24           MR. BRINKMANN:  I object, Your Honor.  I don't

25   see any relevance to reasonable notice of charges or

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    reasonable opportunity to respond.  This -- there has

2    been testimony that the Court lifted the protective

3    order; and beyond that, I don't see any purpose for this

4    exhibit.

5            THE COURT:  I'm not going to admit Exhibit 26.

6    It is a 14-, 15-page document, the last page being the

7    court reporter's certification, concerning matters in the

8    Goldberg case and the, the emergency motion to lift the

9    stay.

10           We've already had sufficient testimony that

11   there was at least an email with the termination letter

12   sometime around, in the morning -- my recollection is

13   10:30; I could look at my notes, but somewhere around

14   10:30 in the morning.  That's been testified to several

15   times.  That's an exhibit that's been admitted.

16           Likewise, there's already been quite a lot of

17   testimony from at least two or three witnesses about the

18   timing of the hearing before Judge Chase Leonhard of

19   Champaign County.  He's an associate judge.  The hearing

20   on that was in the afternoon shortly after 12:00.

21           So there's no reason to admit this exhibit.  It

22   does not serve any purpose, and it would only serve to

23   cause confusion, so 26 will not be admitted.

24           All right.  27 is the Academic Staff -- Mr.

25   Tague, is this the University Code of Conduct?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1          MR. TAGUE:  No.  That's the Academic Staff
2    Handbook.  What is in that handbook is the procedures
3    relating to the notice of non-renewal.
4          THE COURT:  Reappointing his contract.
5          MR. TAGUE:  That's correct.
6          THE COURT:  Correct.  Any objection to this
7    being admitted?
8          MR. BRINKMANN:  Yes, Your Honor.  If it's going
9    to go to the jury, I would.  It -- there's been no
10   specific testimony with regard to any of the contents.
11   It's, I would argue, not applicable in this case because
12   notice of reappointment does not apply when there is an
13   involuntary termination for cause, which was what we had
14   here.  So, you know, it's not a breach of contract case,
15   and so it's, it's not relevant in the due process issues.
16         THE COURT:  All right.  I'm going to admit this
17   over objection, and the reason is as follows.  Should the
18   jury find in favor of the plaintiff, damages is an issue
19   they have to consider.  Certainly, the testimony has been
20   that the academic professional contracts were renewed on
21   a yearly basis with the presumption they would be
22   renewed; and if they were not, there had to be -- I think
23   the testimony was -- up to a year's notice in advance.
24   The Academic Staff Handbook corroborates that.  So if the
25   jury was to find in Mr. Carmody's favor, damages would

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    become relevant, and this would support an argument that

2    he would be continued to be paid his salary.  So 27 will

3    be admitted over objection.

4            MR. BRINKMANN:  Thank you.  Just for the

5    record, Your Honor, could I add to my objection that

6    there is a lack of foundation.

7            THE COURT:  I thought authentication was

8    waived.  You indicated in the final pretrial order that

9    authentication was waived.

10            MR. BRINKMANN:  Yes.  It is what the document

11    purports to be.  Foundation with respect to it being a

12    source of the policy and foundation with respect to the

13    specific subject matter.

14            THE COURT:  All right.  I understand what your

15    objection is now.  I, I'm going to allow it over that

16    objection.  I think we've had sufficient testimony, I

17    believe, from Mrs. Stone that she explained how the

18    academic professional -- I hope I'm using the correct

19    term -- academic professional appointment terms were done

20    on a yearly basis, and I believe she said at one point

21    there was specific procedures involving that.

22            We had another witness who discussed the

23    Academic Staff Handbook.  I think it was -- I know it was

24    Mrs. Reynolds -- and that that would be where that would

25    arrive from.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1          So it's thin, but I think with authentication

2     being waived and testimony from those two witnesses

3     combined, there is sufficient foundation, both as to why

4     it's relevant; and it goes to damages should the jury

5     find in the plaintiff's favor.

6          And I think that's -- so, have we had the --

7     all right.  Things are being called different things on

8     the exhibit list and in the -- have we had the -- the

9     University Code of Conduct, is that Exhibit 8?  That's

10    Exhibit 8.  All right.

11          MR. TAGUE:  Yes.

12          THE COURT:  I've got it.  Okay.

13          MR. TAGUE:  There's two other exhibits that

14    maybe we can address while the jury's out, in the

15    efficiency of time, or we can do it later.

16          THE COURT:  Let's just do it later.  I'd like

17    to bring them back in.  I don't like them waiting.

18          How we doing for jurors?  All back?

19          All right.  Mr. Tague, any reason not to bring

20    the jury back in?

21          MR. TAGUE:  No.

22          MR. BRINKMANN:  Your Honor, I just wanted to

23    discuss the fact that Deb Thurston is being called as a

24    witness this afternoon by Plaintiff.  She had absolutely

25    nothing to do with the charges or opportunity to respond.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   Her deposition, I think, was essentially all ruled to be

2   irrelevant in the case.

3           THE COURT:  Correct.

4           MR. BRINKMANN:  And I have a concern that

5   putting her on the stand is just for the purpose of

6   making me, forcing me to make objections on a more

7   frequent basis than I already have.

8           THE COURT:  Mr. Tague, your response?

9           MR. TAGUE:  The point that I wanted to make --

10  I'm sorry.

11          The point that I wanted to make with

12  Ms. Thurston is that in her deposition I asked her when

13  she became aware that the Group Exhibit A documents had

14  come out.  And she said she became aware of it when Gary

15  Lietz told her about it; but then she testified that that

16  happened before the first deposition she gave in the

17  Goldberg case, which was in February of 2010.  So I think

18  that's a relevant temporal element, and that's the only

19  thing I was going to ask her about.

20          THE COURT:  You're going to have to explain

21  that to me again using different words.  I don't

22  understand what you're getting at.

23          MR. TAGUE:  Okay.  The -- Mr. Carmody received

24  the Group Exhibit A documents in his News-Gazette mailbox

25  in June of 2010, based upon testimony that we've heard.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1              In Ms. Thurston's deposition, I asked her,
 2    "When did you learn about the Group Exhibit A documents
 3    being in existence and their being in the hands of others
 4    than you?"
 5              And she said, "I learned that before my first
 6    deposition when Gary Lietz alerted me to it and gave me
 7    copies of it."
 8              So then I asked her, "When did that happen?"
 9              And she said, "Before my first deposition," and
10    her first deposition was in February of 2010, rather than
11    after the June date that these otherwise all came to
12    light.
13              THE COURT:  Mr. Brinkmann.
14              MR. BRINKMANN:  Your Honor, --
15              THE COURT:  Mr. Brinkmann, do you have a copy
16    of the transcript?
17              MR. BRINKMANN:  Yes, I do.
18              THE COURT:  Okay.
19              MR. BRINKMANN:  I'm looking at page 31 and
20    question:  "When did you learn that the university
21    initiated an investigation relating to Kevin Carmody and
22    documents that related to your email account?
23              "I'm sorry.  What?
24              "Ultimately somebody told you that some of your
25    emails, some of your emails were in possession of Kevin
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    Carmody's attorney; is that a correct statement?  Or how

2    did you learn about the documents?

3            "Somebody came to my office.  It might have

4    been Gary Lietz.  I can't remember who it was exactly,

5    but somebody came to my office and told me about it.

6            "Do you know when that was?

7            "Answer:  I can't remember.

8            "The first deposition had not occurred yet, had

9    it not, when you learned about these documents?

10           "No.  I'm pretty sure it was before the first

11   deposition.

12           "You believe Mr. Lietz came to your office,

13   right?  Would there be any log of your record?

14           "Not that I know of.

15           "So, some of your emails -- it --"

16           THE COURT:  Okay.

17           MR. BRINKMANN:  It's not clear, number one; but

18   number two, regardless, the contention here is that there

19   was -- when the university did become alerted to this and

20   took action, the questions are:  Did Mr. Carmody get

21   appropriate notice of the charges and an opportunity to

22   respond?

23           THE COURT:  All right.

24           MR. BRINKMANN:  This is getting into

25   information that is not clear from her deposition to

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
1   begin with, but --

2          THE COURT:  And you just read to me from her

3   deposition?

4          MR. BRINKMANN:  I did, Your Honor.  I have it.

5          THE COURT:  Could you let me take a look at

6   that real quick?

7          MR. BRINKMANN:  I was reading from page 31.

8              (Brief pause in proceedings.)

9          THE COURT:  Mr. Tague, what you related to me

10  would be your sole set of questions you intended to ask

11  Ms. Thurston?

12         MR. TAGUE:  My questions that I was going to

13  ask her about the Group Exhibit A documents:  When did

14  you first see them?

15             And if she follows the script of her deposition

16  from pages 31 through 40, she'll testify that she saw

17  the, the documents, or at least many of the documents,

18  before her first deposition, which was February of 2010.

19         THE COURT:  And, Mr. Brinkmann, you're

20  objecting to her testifying about that because of a lack

21  of foundation?

22         MR. BRINKMANN:  That's correct, Your Honor.

23  And I'm advised that she actually gave two depositions in

24  June of 2010.  One was a discovery deposition that

25  preceded the evidence deposition, both of, I believe, of
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  which were contemporaneous with the discovery of Group

2  Exhibit A.

3          So we know that, I think, Group Exhibit A was

4  not part of the February deposition; and what she refers

5  to as "some emails" is not clearly identified.

6          I, I think it's misleading and unclear.  I have

7  strong concerns, Your Honor.

8          THE COURT:  The Court has reviewed the

9  deposition of Deborah Thurston from August 19, 2015,

10  specifically pages 26 through 42 -- excuse me, through

11  page 45.

12          I join in the concerns of Mr. Brinkmann.  It's

13  clear to me from the answers of Ms. Thurston there is a

14  presumption in here by Mr. Tague who is conducting the

15  deposition that she knows what Exhibit A is, Group

16  Exhibit A.  But, again, she's talking about emails, but

17  she's not indicating at all what emails we're talking

18  about, whether it's Group Exhibit A.  At one point she

19  does talk about another deposition, so I presume that's

20  the one back in February.

21          In fact, at one point during the deposition, on

22  page 37 and 38, she's obviously indicating she, she's not

23  clear which questions are being asked.  And, in fact, Mr.

24  Brinkmann then objects to that.

25          So I think it would be improper to try to --

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    and misleading to the jury to indicate that somehow she

2    had, she had knowledge of Group Exhibit A back before her

3    February deposition and then try to impeach her with this

4    transcript from the deposition when, in fact, it's not

5    clear at all that she's talking about what's, has been

6    referred to as Group Exhibit A.  It's Plaintiff Exhibit 6

7    in this case.

8            So I'm not going to tell you not to call her;

9    but if that's your only line of questioning, I will

10   sustain that objection to that, and you may not impeach

11   her with this deposition to that purpose.  That would be

12   misleading.  That's my ruling on that.

13           Teresa, can you give this back to Mr.

14   Brinkmann.

15           COURTROOM DEPUTY:  Yes.

16           THE COURT:  You know, let me add something for

17   the record.  I know both of you are not doing it on

18   purpose, but you are both well familiar with this case.

19   The jury is not.  I am not.  And when you are bandying

20   around terms like "this letter" and "those emails," I am

21   doing my best not to wade into your case.  But both of

22   you need to clarify what you're talking about because

23   many times it's only later on that you clarify what it

24   is.

25           And that's all I'll say.  Just remember that

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  the jury and I do not know the evidence as well as both

2  of you do; and you're making a, presumptions about what

3  we know and what we don't know.

4           So with that being said, do you still intend to

5  call her or no?

6           MR. TAGUE:  Well, I don't think I would need to

7  call her.  I'd prefer not to inconvenience her if I may

8  do one thing -- and for some reason, I didn't bring it.

9  In her deposition, we actually showed her an exhibit.  I

10  don't believe that exhibit is dual-marked.  The, as an

11  exhibit.  I think it was Exhibit 2 in her deposition, but

12  I don't think it has a deposition listing for Thurston on

13  it.

14           I'd like to, I guess, supplement the discussion

15  relative to the, your ruling by actually putting that in

16  the record at some time.  But I --

17           THE COURT:  So your contention is that

18  discovery -- excuse me, that Deposition Exhibit 2 is

19  identical to Group Exhibit 6?

20           MR. TAGUE:  That's my recollection.  But for

21  some reason, that part of the file didn't get brought

22  today with the Thurston deposition exhibit.

23           THE COURT:  I can only rule on what's before

24  me; and what I can tell you now from reading that

25  deposition, it is not clear that she knows what you're

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    talking about.  And even more importantly, there's

2    nothing -- how am I to presume that Deposition Exhibit 2

3    is also Group Exhibit A?  I mean, I can't.  It's not in

4    the record.

5            So with that being said -- all right.  So then

6    you don't intend to call her; is that correct?

7            MR. TAGUE:  No.

8                (Brief pause in proceedings.)

9            THE COURT:  Yeah.

10           And let me add:  I'm not even sure why I see

11   the relevance of that.  I mean, whether or not somebody

12   who's -- that doesn't go to the two issues before us:

13   reasonable notice and reasonable opportunity to be heard.

14           If some -- if Deborah Thurston was confused in

15   a deposition about when Group Exhibit A existed or didn't

16   exist, I don't know how that is in the least bit relevant

17   to the reasonable notice or reasonable opportunity to be

18   heard.  It's just not.  So actually, I will deny it for

19   that reason as well.

20           MR. TAGUE:  Okay.  The -- I'm going to see if

21   she's out there, and then I will tell her --

22           THE COURT:  Excuse me.

23           MR. TAGUE:  -- she can go.

24           THE COURT:  Before you leave, my clerk and I --

25   just reminded me.  You've all seen the jury instructions

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    that were filed by the Court.  I would like to have a

2    jury instruction conference, depending on where we are,

3    either toward the close of today or first thing in the

4    morning.  But I am presuming, since they're basically the

5    instructions you provided me, just in Seventh Circuit

6    format, there are no objections.

7            But I want to make you aware of that because

8    it's actually a time-consuming process for us to make all

9    the copies and correct everything that needs to be

10   corrected if there is anything.  I kind of put the burden

11   on the two of you to check for typographical errors, too,

12   in case we miss something.  So it can be time-consuming.

13           All right.  That's where we are.  Why don't you

14   excuse Mrs. Thurston, then, Mr. Tague.  Thank you for

15   doing that.

16               (Brief pause in proceedings.)

17               THE COURT:  So your next witness would be?

18               MR. TAGUE:  Laura Clower.

19               THE COURT:  Laura Clower.

20           All right.  Any reason not to bring the jury

21   in, Mr. Tague?

22               MR. TAGUE:  No.

23               THE COURT:  Mr. Brinkmann?

24               MR. BRINKMANN:  Bring them in.

25               (Brief pause in proceedings.)

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1              (Jury present, 1:00 p.m.)

 2              THE COURT:  All right.  Please have a seat.

 3              Just so you know, the attorneys and I did not

 4    enjoy a long lunch.  We've been in here working; and even

 5    while you were back in the jury room, we were still

 6    working.  So if you hear some stomachs growling or

 7    things, that's the reason why.

 8              Just for the record, before the jury, we have

 9    admitted Exhibit 14; is that correct, Mr. Tague?

10              MR. TAGUE:  I'm sorry?

11              THE COURT:  Plaintiff's Exhibit 14, you moved

12    to admit that, correct?

13              MR. TAGUE:  Yes.

14              THE COURT:  That is admitted.

15              And Plaintiff's Exhibit 27, you moved to admit

16    also, correct?

17              MR. TAGUE:  Yes.

18              THE COURT:  That is admitted.

19              All right.  You may call your next witness.

20              MR. TAGUE:  I'd like to call Laura Clower to

21    the stand, please.

22                LAURA CLOWER, sworn, 1:01 p.m.,

23                DIRECT EXAMINATION BY MR. TAGUE:

24         Q    Would you please state your name?

25         A    My name is Laura Clower.
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    Q    And in the summer of 2010, you worked for the

2    University of Illinois?

3    A    I did.

4    Q    What was your position?

5    A    Associate university counsel.

6    Q    And did at some point in time you become

7    involved in an investigation relating to Kevin Carmody?

8    A    Yes.

9    Q    When did the university learn that something

10   had happened that would, or should result in an

11   investigation of Mr. Carmody?

12   A    Somewhere in the middle to later part of June

13   of 2010.

14   Q    And what did the university learn that caused

15   its initiation of an investigation?

16   A    Mr. Carmody's attorney had attached to a filing

17   in a case that was currently pending in Champaign County

18   Courthouse some documents that consisted primarily of

19   emails that he was neither the author or the recipient

20   of, and they had been filed in court on his behalf.

21   Q    And how did the university become aware of

22   that?

23   A    I would have been alerted to that by the

24   attorney that was representing the defendant in that

25   case.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1       Q     That was James Kearns?

2       A     Correct.

3       Q     Now, subsequently, did you have any other

4  involvement with the investigation?

5       A     Not while it was ongoing, at least not

6  extensively.

7       Q     Did you monitor the communications or how the

8  investigation was going?

9       A     I think probably Rhonda Perry kept me loosely

10 informed about what was going on, but I didn't monitor it

11 day in and day out.  No.

12      Q     Did you ever become aware that Kevin Carmody

13 had asked the investigators to provide him with specific

14 policy provisions that he was charged with violating?

15      A     I know that he received a statement of charges.

16 And I think there were some communications.  I don't know

17 if they were from him or his attorney.  But, yeah, I knew

18 there were communications involving the folks who were

19 handling the investigation.

20      Q     But my specific question is:  Can you identify

21 a date or a communication in which specific policy

22 provisions were provided to him relative to the charges?

23      A     Well, I -- again, I wasn't involved in the

24 investigation, but it's my understanding that the

25 statement of charges specified the policies that were

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    implicated by the misconduct that was in, understood to

2    have occurred.

3            And I think there was an additional

4    communication -- I'm not remembering from whom -- that I

5    think provided citations to the, where you could find

6    those policies online.

7        Q    Do you know who provided the citations to the

8    policies and when that was done?

9        A    Well, if I'm -- again, I don't have things in

10   front of me.  But the primary communication from, with

11   Mr. Carmody would have come through the office of

12   Academic Human Resources.

13       Q    Okay.  So we need to ask them what details were

14   provided, correct?

15       A    They, they certainly would know better exactly

16   what had been communicated than I would.

17       Q    I think I have in front of you there Exhibit

18   Number 28?

19       A    The University Statutes?

20       Q    Yes.

21            What is that?

22       A    I'm sorry.  Did you ask me a question, Mr.

23   Tague?  I was picking up the document.

24       Q    What is that document?

25       A    Oh, this is a copy of the University of

1    Illinois Statutes.

2         Q    And if you would turn to page 31.  The

3    University of Illinois Statutes speak to employment of

4    academic professionals; do they not?

5         A    Section 11, yes, is titled "Employment of

6    Academic Professional Staff."

7         Q    And that section would have been applicable to

8    Mr. Carmody but for termination proceedings for cause;

9    would they not?

10        A    They would have been applicable to him in his

11   employment as an academic professional.  Yes.  I, I

12   haven't read -- I would have to sit and read all of

13   Section 11 to know for sure if it had anything to do with

14   termination for cause or not.

15        Q    I put in front of you Number 46?

16        A    You did.

17        Q    What is that document?

18        A    This is an email from me to Judge Leonhard,

19   Mr. Kirchner, Mr. Kearns, and Mr. Lietz, copying Rhonda

20   Perry.

21        Q    When was that -- what was the date and time of

22   that email?

23        A    It says it's on -- Thursday, September 23,

24   2010, at 11:12 a.m. is the time stamp on the email.

25        Q    And the -- you were aware that there was going

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   to be a proceeding that afternoon in State Court

2   concerning vacating or modifying the order of protection

3   relative to the Group Exhibit A documents?

4        A    I don't, I don't recall now, and I don't know

5   if I knew then what time the hearing was going to happen.

6   But, yes, this is a letter I sent that was in connection

7   with that motion that had been filed that day.

8             MR. TAGUE:  I have no further questions.  Thank

9   you, Ms. Clower.

10            THE COURT:  Mr. Brinkmann.

11            MR. BRINKMANN:  Your Honor, I have no

12  questions.

13            THE COURT:  Are you moving to admit Exhibit 46?

14            MR. TAGUE:  28 and 46, correct, Your Honor.

15            THE COURT:  28, Mr. Brinkmann, the University

16  Statutes, do you have any objection?

17            MR. BRINKMANN:  Your Honor, I'll object on

18  grounds of relevance and also lack of foundation.

19            THE COURT:  That will be admitted over

20  objection.  I think it is relevant to some degree.

21            Plaintiff's Exhibit 46 you also are moving to

22  admit?

23            MR. TAGUE:  Yes.

24            THE COURT:  Mr. Brinkmann?

25            MR. BRINKMANN:  Same objection, Your Honor.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
1              THE COURT:  It will be admitted over objection.
2   We've already heard lots of testimony about, about the
3   matters contained within -- well, the essence of the
4   matters contained within Exhibit 46, so I'll allow the
5   admittance of 46 over objection.
6              And you said you had no questions, Mr.
7   Brinkmann?
8              MR. BRINKMANN:  That's correct, Your Honor.
9              THE COURT:  You may step down.  Thank you.
10             THE WITNESS:  Thank you.
11             (Witness Clower excused, 1:09 p.m.)
12             THE COURT:  Mr. Tague.
13             MR. TAGUE:  I think this would be the time to
14  play Mr. Thompson's DVD.
15             THE COURT:  All right.  Here's what we're going
16  to do, ladies and gentlemen.  If you'll step out of the
17  courtroom, I'm going to say, hopefully, for just a few
18  moments.  But I want to make sure everything is working.
19  I have to ask the attorneys a couple questions about the
20  DVD.  Then we'll bring you back in.  If it turns out to
21  be more than a few minutes, you might presume what worked
22  this morning is not working now.  But we'll see.
23             So just step outside for a few minutes.  It's a
24  good time for a stretch; and, hopefully, we'll bring you
25  right back in here.
```

```
 1            (Jury absent, 1:10 p.m.)

 2            THE COURT:  The jury has left the courtroom.  I

 3  have in my notes, Mr. Brinkmann, that prior to this being

 4  played you wished to discuss with me something about

 5  advising the jury; is that correct?

 6            MR. BRINKMANN:  Yes, Your Honor.  This is a

 7  witness being called out of order.  It was a deposition

 8  taken by the defendants in the case pursuant to notice,

 9  and just because I think that our -- most of the evidence

10  that we intended to present is already getting into the

11  case through the witnesses that have been called -- we

12  had the same witnesses on our list, essentially -- I

13  think that it's important that the jury understand that

14  this is a witness that was a defense witness who's called

15  out of order.  I did the direct exam.  He did the cross.

16            THE COURT:  That would be proper.  You have no

17  objection to that, Mr. Tague?

18            MR. TAGUE:  What exactly does he want you to

19  tell the jury?

20            THE COURT:  I would advise the jury that this

21  is a defense witness being taken out of order, and to

22  facilitate the speedy efficiency of the trial --

23            MR. TAGUE:  Well, I -- obviously, the order of

24  questioning was because Mr. Brinkmann wanted to do his

25  video deposition.  He -- there was a deposition that
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  existed.  I think it was -- was it right before the

2  pretrial, Bill, or right after the pretrial?  Bill

3  learned that the, Mr. Thompson had taken a job in

4  California.  Mr. Brinkmann said, "I want to take a

5  video," and that seemed reasonable to do.

6          But to call him a defense witness, he was our

7  witness who was going to be an adverse witness.  We would

8  have called him live but for leaving; and we, I guess,

9  could have read his deposition.  So I think saying that

10  the witness is taken out of order is okay to say.  He's a

11  defense witness -- I don't like that nomenclature; but if

12  there's something else like it.  Obviously, he was a

13  university employee.  We put him down as an adverse

14  witness.

15          THE COURT:  Let me just clarify then.  I

16  believe it's proper for me to tell them we're taking the

17  witness out of order and that he is a defense witness

18  only because it's a videotaped deposition.  I don't want

19  them to be confused as to why -- I'm presuming the first

20  person they're going to hear questioning Mr. -- I lost

21  his name -- Mr. Thurston [sic] would be -- Mr. Brinkmann,

22  you're the first person to start asking questions?

23          MR. BRINKMANN:  Yes.

24          THE COURT:  And the jury's seen you, Mr. Tague,

25  asking the questions first in every witness so far, so

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  that's the only reason why we'd clarify we're taking him

2  out of order.

3          MR. TAGUE:  And I think you need to do that.  I

4  just --

5          THE COURT:  If you can give me a different word

6  other than defense witness, or a different phrase.

7          MR. TAGUE:  He's a university witness.

8          THE COURT:  That's fine.

9          Mr. Brinkmann, you have a problem with that?

10         MR. BRINKMANN:  No.

11         THE COURT:  I mean, I think we're at the point

12  we're splitting hairs here.  Come on.

13         Before the jury comes back in, let's make sure

14  things are working.

15             (Brief pause in proceedings.)

16         THE COURT:  We're good.

17             (Brief pause in proceedings.)

18         THE COURT:  Are we good?

19         COURTROOM DEPUTY:  Yes.

20         THE COURT:  All right.  Let's bring the jury

21  back in.

22             (Brief pause in proceedings.)

23             (Jury present, 1:17 p.m.)

24         THE COURT:  All right.  Please be seated.

25         Ladies and gentlemen, you're going to now view

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  a videotaped deposition of a witness.  The witness is

2  being taken out of order.  He is a University of Illinois

3  employee.

4          And, Mr. Brinkmann, you can initiate the DVD.

5              (Charles Thompson deposition begins at

6              1:17 p.m. and ends at 2:32 p.m.)

7          THE COURT:  All right.  Ladies and gentlemen,

8  let's take a ten-minute break.

9              (Jury absent, 2:32 p.m.)

10          THE COURT:  We'll be in recess until 2:45.

11              (Recess, 2:33 p.m. to 2:45 p.m.)

12          THE COURT:  Mr. Brinkmann, we're going to need

13  the DVD.  We'll mark that as Court's Exhibit 1A.  That

14  will be Court's Exhibit 1B -- the transcript and the

15  exhibits will be Court's Exhibit 1B.

16          MR. TAGUE:  Your Honor, in Mr. Thompson's

17  deposition, he referred to four exhibits that have not

18  yet been addressed as to admissibility yet -- Number 20,

19  22, 24, and 41 -- and I would move for admission of all

20  of those.

21          THE COURT:  So what you're telling me here is

22  the references in the deposition were to the same numbers

23  as in your exhibit list?

24          MR. TAGUE:  That's correct.

25          THE COURT:  Well, they're attached and they're

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   made reference -- they're part of the written transcript

2   of the deposition, correct?  They should be incorporated

3   into what I've now indicated is Court's Exhibit 1B; so to

4   that extent, they're already in the record.

5             MR. TAGUE:  That's correct.

6             THE COURT:  Okay.

7             MR. TAGUE:  But I wanted them admitted so

8   ultimately they can go to the jury.

9             THE COURT:  Different question.

10            Mr. Brinkmann.

11            You'll have to tell me those numbers again.

12            MR. TAGUE:  Okay.  Number 20.

13            THE COURT:  Okay.

14            MR. TAGUE:  Want to do each one separately or

15  all of them?

16            THE COURT:  Let's just do them one at a time.

17  20, Mr. Brinkmann?

18            MR. BRINKMANN:  Your Honor, I object.  It's not

19  relevant to the issues in the case.

20            THE COURT:  I agree.  That is not admitted.

21            Next.

22            MR. TAGUE:  22.

23            MR. BRINKMANN:  Same objection, Your Honor.

24  It's a reference to a draft of the charging letter.  We

25  have the original charging letter that was used in

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1   evidence.  I'm not sure what is being suggested --
 2            THE COURT:  Right.
 3            MR. BRINKMANN:  -- by this.
 4            THE COURT:  Right.  I recall when the questions
 5   were asked of him about, "Did you see this?", and he
 6   didn't recall.  And that's correct; that will not be
 7   admitted.
 8            MR. TAGUE:  24.
 9            MR. BRINKMANN:  Objection to that, Your Honor.
10   This is an email from Lori Rairden that is talking about
11   a meeting to discuss the findings.  I don't see that that
12   is relevant to opportunity to respond or notice of
13   charges.
14            THE COURT:  Mr. Tague, this was in the context
15   in the deposition when, to paraphrase Mr. Thompson, "I
16   received a notice about a meeting, and I went to it, and
17   I don't recall who was there."  Was that basically what
18   he said, in essence?
19            MR. TAGUE:  Correct.  Correct.
20            THE COURT:  That will not be admitted.  I
21   think -- I'm rejecting all these exhibits, not admitting
22   them, because I think it would simply confuse the jury as
23   to the issues they are to decide.
24            What was the -- you had another one?
25            MR. TAGUE:  41.
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1            THE COURT:  Mr. Brinkmann.

 2            MR. BRINKMANN:  Same objection, Your Honor.

 3            THE COURT:  This is in the same context,

 4  correct, Mr. Tague?

 5            MR. TAGUE:  Yes.

 6            THE COURT:  Same ruling, not admitted.  It

 7  would confuse the jury, and it's not relevant.

 8            COURTROOM DEPUTY:  20, 22, 24 and 41 are

 9  emails, and those were attached to this.  This is the

10  videotape transcript of Mr. Thompson.  I don't see any

11  exhibits to this.

12            MR. BRINKMANN:  I don't think I have the

13  original.  I can bring that tomorrow, Your Honor.

14            THE COURT:  That's fine.  Submit it tomorrow

15  with the original exhibits.  We'll make it 1B.  Please

16  don't forget to bring that tomorrow, Mr. Brinkmann.

17            We have the DVD, correct?

18            COURTROOM DEPUTY:  Yes.

19            THE COURT:  All right.  Who would be your next

20  witness?

21            MR. TAGUE:  Kevin Carmody.

22            THE COURT:  All right.  Just for planning

23  purposes, again, we have people driving.  Luckily there's

24  no snow out there.  But it -- and it's warmer, but it's

25  still cold enough; I want to send people on their way
```

1  right around 4:00.  So we'll go as far as we can.  Then

2  we'll stop.  I will try not to interrupt you mid, mid

3  thought.

4            MR. TAGUE:  Okay.

5            THE COURT:  Let's bring them back in.

6                 (Brief pause in proceedings.)

7            THE COURT:  Hold on one second.

8            Mr. Tague, after Mr. Carmody, would you have

9  any other witnesses?

10            MR. TAGUE:  No live witnesses.  Mr. Brinkmann

11  and I need to discuss with you the depositions, the form

12  to actually read to the jury for Jong-Shi Pang and, and

13  Adesida.  And I believe that based upon some of your

14  rulings today Mr. Brinkmann would like to revisit some of

15  the stuff in Pang's deposition, and I think you probably

16  should consider what he has to say.

17            THE COURT:  All right.  Once the plaintiff

18  rests, do you have any witnesses to call, Mr. Brinkmann?

19            MR. BRINKMANN:  Your Honor, I may, I may have

20  one short witness.  And before putting on any evidence, I

21  will have a motion for directed verdict --

22            THE COURT:  Right.

23            MR. BRINKMANN:  -- that I'll file.

24            THE COURT:  I'm asking these questions in terms

25  of scheduling the jury instruction conference.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1          All right.  And I want to know when to tell the

2    jury to come back.  All right.  I'm just going to tell

3    them to come back at 9:30.  I'm presuming we're not going

4    to get done with Mr. Carmody today, and then we'll take

5    up the matter of the depositions after Mr. Carmody.

6          All right.  Now we're ready.  Thank you,

7    gentlemen.

8               (Brief pause in proceedings.)

9               (Jury present, 2:53 p.m.)

10          THE COURT:  Please have a seat.

11          I'm sorry for that.  We were working out

12    scheduling.  We're all ready.

13          Mr. Tague, you may call your next witness.

14          MR. TAGUE:  Kevin Carmody.

15               KEVIN CARMODY, sworn, 2:54 p.m.,

16               DIRECT EXAMINATION BY MR. TAGUE:

17    Q    Could you please state your name?

18    A    Kevin Carmody.

19    Q    And what is your month and year of birth?

20    A    I was born in August 1960.

21    Q    You're currently 55?

22    A    Yes.

23    Q    When did you start working for the University

24    of Illinois?

25    A    I think it was 1987.  What happened was I

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   worked at Sangamon State University in Springfield for

2   about three and a half, three and three-quarters years.

3   And then that eventually became incorporated into the

4   University of Illinois.

5           When I came to Champaign, I worked one year

6   through the Computer Science Department at the U.S. Army

7   CERL base here in town.  And then I worked from 1987 and

8   '88, I worked in administrative computing.  So I think I

9   started in 1987 for the official University of Illinois

10  on a full-time appointment.

11      Q    And could you tell the jury just briefly what

12  jobs you had with the University of Illinois here at the

13  Urbana and Champaign campus?

14      A    I started -- I think it was around 1987.  I

15  worked two years as a senior analyst for Administrative

16  Information Systems and Services.  I was part of the TC

17  Networking Group, and we did SNA/SDLC networks.

18          I was the primary contact for Board of Trustees

19  support.  I worked in the president's office.  I was the

20  primary contact and data guy there.

21          The president's wife -- the president's house

22  where his, the president's wife, Stan Ikenberry's wife,

23  had a database, I maintained that.

24          I also worked in the Swanlund Building as a

25  primary contact for Administrative Information Systems

1  and Services.  I put in the building network and led a

2  project team of about 20 people to put in administrative

3  computing in the Swanlund Building for the chancellor and

4  all the vice chancellors.

5         And then I did general support for all of our

6  campuses, including Chicago.

7     Q    At some point in time, did Jong-Shi Pang become

8  your supervisor?

9     A    Yeah.  I started in 19-- let's see, May 21,

10 1989 is when I started in the General Engineering

11 Department.  The department name has changed multiple

12 times.  It's been called General Engineering, Industrial

13 Enterprise and Systems Engineering.  And now it's called

14 ISE.  So sometimes we call it ISE or IESE.  But I think

15 when it was all IESE I started working for Jong-Shi Pang.

16 He was supervisor up until 2010, July 1st.

17    Q    And what were your responsibilities in the

18 department?

19    A    I took care of the IESE department, all their

20 computing needs.  I was the liaison to the central

21 computing organization on campus for most of my time

22 there.  I was the liaison with the Administrative

23 Computing Group on campus.  I took care of multiple

24 instructional labs, research labs.  I wrote grant

25 proposals.  I brought in about a million dollars of

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   grants into the department.  And I worked the entire

2   transportation building; and we had two, another building

3   in ceramics where we had rooms and also DCL, I think,

4   too.

5            But I was the primary network support person

6   and computer person for the department.  I was the only

7   person for -- I think I had another employee for many of

8   the years; but for the last several years, it was just

9   me.

10       Q    And were you an hourly employee, or how was

11  your employment segmented?

12       A    I had a full-time position, 100 percent

13  position, as manager of systems services for over

14  22 years.

15       Q    Did you have an annual appointment?

16       A    Yes, I did.  They changed the contract dates in

17  August.  It might have been August 21st before; but for

18  the last several years, I think August 16th was when the

19  new contract started.

20       Q    So your last -- when was the last contract

21  period, then, that you actually worked for the University

22  of Illinois?

23       A    Well, let's see, I think the new contract would

24  have started August 16, 2010, when I was on paid leave.

25            And then what happens is they give you a

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    contract on August 16th you -- the contract doesn't show

2    up until September, like the first week of September.

3    The Board of Trustees meets in September at some point to

4    approve the budget for the university and approve

5    contracts.

6              I believe my contract was technically approved

7    in the, on my termination day.  I believe my contract was

8    actually approved that day.

9        Q    So you actually received a, a contract for the

10   period August 16, 2010, to August 15, 2011?

11       A    That's correct.

12       Q    And you received that based upon a Board of

13   Trustees approval on September 23?

14       A    Yeah.  What happens is it's automatically

15   generated, I think, about the first week of September;

16   and then the Board technically approves it when they have

17   their board meeting in September.

18       Q    Were you ever provided with a notice of

19   non-reappointment?

20       A    No.  I'm supposed to -- under the, the Academic

21   Staff Handbook and under the Statutes, if they want to

22   take a long-term employee like me who's been there more

23   than five years or ten years, they have to give them a

24   one-year notice.  And I didn't -- I received no such

25   notice.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1       Q     You were involved in civil litigation with

2   David Goldberg; were you not?

3       A     Yes, I was.

4       Q     That was still pending in 2010?

5       A     Yes, it was.

6       Q     When did it end?

7       A     It ended the same day that my employment was

8   terminated, on September 23, 2010.

9       Q     Sometime in 2010, you received some documents

10  in your News-Gazette mailbox; did you not?

11      A     Yes, I did.

12      Q     When was that?

13      A     I -- it didn't become an issue until later, so

14  I don't know the exact date; but it was sometime in early

15  June of 2010.

16      Q     And exactly what did you find, and how did you

17  find it?

18      A     I just found -- I'm going to guess and say

19  there were, you know, 40, 40-some documents in my

20  News-Gazette box; and I brought those to my attorney.

21      Q     When did you take them to your attorney?

22      A     That I can't tell you.  As soon as I could

23  after, after I found them.  Probably several days later.

24      Q     Is that the first time that that happened?

25      A     No.  It had happened -- it had happened

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1    previously, both to me and Bob Kirchner.  We'd both

 2    received anonymous documents on more than one occasion,

 3    including -- in my case, at least in 2009 for sure.

 4         Q    Same method, same place?

 5         A    I think in 2009, they were put in my mailbox,

 6    my actual mailbox, not my News-Gazette box.

 7         Q    By posted mail or just --

 8         A    Just dropped off, just hand-delivered, I guess.

 9         Q    And what did you do on that prior occasion?

10         A    Same thing.  I gave them to, directly to Ruth

11    Wyman is my recollection; and, and then she, she took,

12    took care of notifying the other attorneys that were

13    involved.

14              MR. BRINKMANN:  Excuse me, Your Honor.  I'm

15    going to object to this line of questioning.  It's with

16    respect to the Goldberg litigation, and what happened

17    before June of 2010 is not relevant.

18              THE COURT:  I'll sustain that objection.

19    BY MR. TAGUE:

20         Q    So when you got the documents in June of 2010,

21    you gave them, I think you indicated, to your attorney?

22         A    Yes, I did.  I brought them in to Bob

23    Kirchner's office at some point.  Bob had them for a

24    minute or two, then gave them to me and said I should

25    give those to Ruth right away; and I gave them to Ruth
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    Wyman, my other attorney.

2        Q    And Ruth Wyman is -- how's she affiliated with

3    Mr. Kirchner or his office?

4        A    She's like a junior there.  Bob, Bob -- it was

5    Bob's law office, and she was a junior.  I don't think

6    she was a partner, just a junior associate or whatever

7    you call it.

8        Q    So she was an attorney working with him in his

9    office?

10       A    Yes.

11       Q    And she worked with you and Mr. Kirchner on the

12   Goldberg matter and the ultimate investigation by the

13   university?

14       A    Yes.

15       Q    Okay.  So what happened next with those

16   documents?

17       A    Ruth took the documents, and she filed them

18   with the Court.  I think it was a motion in limine

19   filing.  I believe the filing was done, maybe, June 22nd

20   or 23rd -- somewhere during that week.  And, and then

21   copies of that, of course, went to the other university

22   contract attorneys, Gary Lietz and -- oh, what's the

23   guy's name -- Jim Kearns and Gary Lietz.  Those are both

24   attorneys paid for by the university.

25       Q    Who made the decision to file the documents

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    with the Court?

2         A     Ruth.  Ruth Wyman did.

3         Q     I'm showing you Joint Exhibit Number 1.  That's

4    the documents that we've been talking about that you

5    received anonymously?

6         A     Yes.  This is the Group Exhibit A documents

7    that were filed from what I received.  Yes.

8         Q     Why did you give the documents to your

9    attorney?

10        A     I flipped through them.  You know, obviously

11   somebody was trying to give me information, and I flipped

12   through them and I saw Jim Kearns' name in there; and Jim

13   Kearns is the university attorney for David Goldberg who

14   was part of the assault case.

15        Q     Okay.  And that's the reason that you gave them

16   to your attorney?

17        A     Yeah.  I mean, I don't know what the intent in

18   giving them --

19             MR. BRINKMANN:  Your Honor, excuse me.  I

20   object.  This is not relevant to this case.

21             THE COURT:  I'm going to sustain.  Let's move

22   off things involving the Goldberg case.  That's not

23   material to why we're here.

24   BY MR. TAGUE:

25        Q     After the filing with the State Court of the

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   Group Exhibit A documents, what happened next relative to

2   the university?

3       A    I talked to Professor Pang about these.  I

4   think it was one day before.  There was a deposition

5   scheduled for that Friday, maybe June 25th, approximately

6   that day; and the -- at least one or two days before

7   that, I met with Professor Pang.  I think it was

8   concerning my performance evaluation, and I discussed

9   these with him.

10          MR. BRINKMANN:  Your Honor, this is a,

11  continuing testimony regarding now a deposition in the

12  Goldberg case.

13          THE WITNESS:  I'm sorry.  That was -- I

14  apologize.  I don't know how to reference it other

15  than --

16          THE COURT:  I'll sustain that.

17          We're moving away from the Goldberg matter,

18  please.

19  BY MR. TAGUE:

20      Q    Did you meet with Dr. Pang and discuss the

21  Group Exhibit A documents?

22      A    Yes, I did.

23      Q    When was that?

24      A    Approximately June 24th.  I think it was

25  related to a performance evaluation meeting and some

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    other meetings that we had.

2        Q    Okay.  And what did you tell him about the

3    documents?

4            MR. BRINKMANN:  Objection, relevance, Your

5    Honor.

6            THE COURT:  Sustained.  There was a

7    conversation about the documents.  Move on.

8    BY MR. TAGUE:

9        Q    When did you hear anything else about the

10   documents or an investigation concerning you relating to

11   the documents?

12       A    The next day there was a protective order put

13   in place by the university contract attorneys.  And then

14   I don't think I heard anything about the documents until

15   July 19th when I was given -- I was summoned.  I had been

16   contacted by email by Michael Bragg in the College of

17   Engineering and asked to come over.

18            I was actually on vacation, I think, when I got

19   this email.  And so when I came back, I believe it was on

20   a Monday.  But when I came back, I was summoned at a

21   certain time to meet with Michael Bragg, and I was handed

22   this charge letter that said I was fired.

23       Q    I've shown you Plaintiff's Exhibit Number 1.

24   That's the charge letter?

25       A    Yes, it is.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    Q    And that's the one you were provided by Dean

2   Bragg?

3    A    Yeah.  I was provided this by Dean Bragg,

4   Associate Dean Bragg on behalf of Ilesanmi Adesida, the

5   dean of the College of Engineering.

6    Q    Were you provided with anything else other than

7   that document you have in your hand?

8    A    I don't believe I was.

9    Q    And what, if anything else, were you told you

10   were supposed to do or required to do?

11    A    I was required to turn over keys; and, and I

12   was required to immediately go to my office and grab just

13   a quick -- some of my personal possessions but not all of

14   them.  I'd been in that office 22 years.  So I could take

15   some of my personal possessions.

16        I think the letter also instructed me that I

17   wasn't supposed to contact or talk to any employees at

18   the university.

19    Q    And once you received that letter, then, you

20   complied with their directives, removing you from the

21   university, correct?

22    A    Yes.  That's correct.

23        And my earlier answer should have included that

24   I was supposed to turn over a laptop, which I did not

25   have, and any other university equipment.  And I don't

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   think I had any.

2        Q    So everything you had was in your office, and

3   you turned it over?

4        A    Yes, I did.

5        Q    And did you -- were you asked by Charles

6   Thompson to provide information to him?

7        A    Yes, I was.  I provided Chuck with -- there was

8   some ongoing issues and projects that I was working on

9   that got interrupted, and I gave him information so that

10  that could be taken care of in my absence.

11            I gave him keys.  I gave him my -- I pointed

12  out various things that he needed to know to run our

13  building network and where our software licenses were and

14  everything I could provide him to run our department.

15       Q    I've shown you Exhibit 3.  What is Exhibit 3?

16       A    Exhibit 3 is -- well, it starts off with an

17  original message from me, on July 20th of 2010, where I'd

18  written to Joe Bohn and Sharon Reynolds and copied to my

19  attorney, Robert Kirchner, about the July 19th charge

20  letter from the dean where I got suspended.

21            And then it -- Sharon Reynolds replied on

22  July 21st, copying Joe Bohn and apparently herself in

23  response to my letter.

24       Q    Did you have any verbal communication with Joe

25  Bohn or Sharon Reynolds prior to your written email?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    A    I don't -- I don't believe I did.

2    Q    Did you have any verbal reply other than her

3 response that is contained in Exhibit Number 3?

4    A    No.  I did not.

5    Q    Ultimately, the meeting that was originally

6 going to happen, I think, on July 21st, was continued;

7 was it not?

8    A    That's correct.  It was because my attorney was

9 busy.  He had like more than 150 cases, active cases; and

10 so it had to be rescheduled, and I think it got

11 rescheduled on July 28th, or thereabouts.

12    Q    Were there any communications between, to your

13 knowl-- well, did you have any communications with anyone

14 at the university concerning the investigation between

15 July 21st and July 28th?

16    A    I don't believe I did.

17    Q    Okay.  So a meeting then happened on July 28th?

18    A    Yes.

19    Q    Where was that meeting at?

20    A    It's the Academic Human Resources suite of

21 offices.  It's on -- I think it's on Wright Street.

22 There's a university bookstore, and it's connected to the

23 same building somehow; but I think it's on the third or

24 fourth floor of that building.

25    Q    And who was present at that meeting?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      A      Should have been Sharon Reynolds, Joe Bohn; and

2   Robert Kirchner and I met with both of them.  Eventually,

3   Rhonda Perry was called in and brought in later.

4      Q      So the meeting is called.  Did you all sit

5   around a conference table?

6      A      Actually, we were seated.  That's correct.

7      Q      What, then, was the first thing that happened

8   in the meeting?  Who spoke and initiated dialog?

9      A      There was some minor dialogue going on, but it

10  wasn't really relevant to what was going on.  It was sort

11  of friendly.

12         And I started off trying to ask a question of

13  Sharon Reynolds; and I tried to ask the question twice,

14  but I got interrupted by her.

15     Q      So after pleasantries, the first thing that

16  happened was you posed questions to Sharon Reynolds?

17     A      Yes.

18     Q      What were the questions?

19     A      My question was that tenured professors have

20  transcripts when they have, you know, a dismissal

21  hearing.  Civil service employees have a transcript of

22  those proceedings and things when they're, when they have

23  the situation I have, which is a termination proceeding

24  or investigation.

25         I just wanted to know if academic professionals

1    were entitled to have a transcript made, or what were my

2    rights or what was the university policy for this kind of

3    investigation because it was very unclear.

4            But I never got to really completely ask the

5    question because I kept getting interrupted.

6        Q    Okay.  Who interrupted you?

7        A    Sharon Reynolds did.

8        Q    So she did not answer your question, but she

9    responded in some fashion?

10       A    Yeah.  She kept asking me -- as soon as I said

11   that when they have faculty dismissal hearings for

12   tenured faculty that they have transcripts, she would

13   interrupt me.  "Are you saying you're faculty?  Are you

14   saying you're faculty?"  She was kind of yelling at me.

15           And I, and I responded, "No.  I'm not claiming

16   that I'm faculty."

17       Q    Were you allowed to make a recording or have a

18   transcript of what happened at that July 28th meeting?

19       A    I -- from what I learned later, the university

20   policy is they don't allow recording, but it never really

21   got addressed at that meeting.

22       Q    So after you told us the questions you

23   attempted to ask and the response that Ms. Reynolds had,

24   what happened next?  Who spoke and what was the --

25       A    After I answered the two questions -- well, the

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  same question twice -- after I answered Ms. Reynolds'

2  question, then she, instead of asking me questions, she

3  was really -- her and Joe Bohn both were asking questions

4  of Bob.

5          They would say, "Well, we want to ask" -- Bob

6  Kirchner had already explained that there was an order

7  from the judge controlling my speech and limiting my

8  speech on certain topics.  And so Joe, Joe and Sharon

9  were asking Bob; they would say, "Well, we would want to

10 ask about the content of these Group Exhibit A documents,

11 and we would want to ask about certain things about these

12 Group Exhibit A documents."

13         And Bob would respond and say that I'm not

14 allowed, that my speech is restricted by the judge's

15 order.  That was his legal opinion, and I would not be

16 allowed until the university got that lifted -- got the

17 order lifted or until we -- you know, somebody got the

18 university order lifted.  The protective order, I'm

19 sorry.

20    Q    Were any other questions proposed to be asked

21 by Joseph Bohn or Sharon Reynolds?

22    A    No.  There was no questions asked of me, other

23 than the initial question from Sharon.

24    Q    What else do you remember about the dialogue

25 between Joe Bohn, Sharon Reynolds, and Mr. Kirchner?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      A    That, you know, Mr. Kirchner told them that,

2  you know -- obviously, I denied the charges.  I didn't

3  improperly access anything.

4          And he specifically addressed some of the

5  points in the July 19th charge.  But, but he just said,

6  "My client can't talk about any of this, this Group

7  Exhibit A stuff that you want to ask about, but you can

8  ask him other questions."

9          And rather than pursue that, they said that

10  they wanted to get Sharon Reynolds involved, and so Bob

11  agreed to that, and we just waited for -- I'm sorry.

12  That they wanted to get Rhonda Perry involved, and so

13  they made a call to Rhonda Perry, and we waited for her

14  to come over.

15      Q    Did Robert Kirchner specifically tell Joe Bohn

16  and Sharon Reynolds that, other than the contents of the

17  Group Exhibit A documents, you would answer their other

18  questions?

19      A    Yes.

20      Q    And they chose not to do that?

21      A    That's true.  Yes.

22      Q    They called Rhonda Perry?

23      A    Yes, they did.

24      Q    Who called?  Sharon or Joe?

25      A    I don't know.  I think Sharon called because I

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1   think they had to leave to get access to a phone.  They

 2   might have actually both gone.  But I think Sharon

 3   supposedly made the call because she came back and

 4   informed us.

 5       Q    Did they, one or both of them leave the room

 6   and make the call outside of the presence of you and

 7   Mr. Kirchner?

 8       A    I think we moved to the hallway, yeah, and so

 9   the phone call was not made in our presence.

10       Q    Okay.  So you were asked to excuse yourself

11   shortly so they would make the phone call?

12       A    It was just sort of agreed.  We all kind of

13   stood up and moved around, and they walked off for a

14   while; and then they came back, and we all waited

15   together.

16       Q    How long was it before Ms. Perry arrived?

17       A    I think it was about ten minutes.

18       Q    Was there any conversation between the time

19   that they decided they wanted to contact Ms. Perry and

20   her arrival?

21       A    I don't think we had any discussion without --

22   once they initiated Rhonda Perry's name, I don't think we

23   had any discussion with them.

24       Q    Were you provided with any documents prior to

25   the decision to call and wait for Rhonda Perry?
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    A    I don't believe I was.  No.

2    Q    Were you provided with the Computer Policy or

3  the Code of Ethics -- or Code of Conduct policies at that

4  meeting?

5    A    I don't have any recollection of that, of

6  receiving anything.

7    Q    So Ms. Perry arrived.  And what happened, then,

8  after she arrived?

9    A    Rhonda and Bob had a conversation where Bob,

10  you know, expanded on, you know, that the charges were

11  based on a false premise; and, and he had problems with

12  the charges.  And, basically, you know, he tried to state

13  his position that Judge Leonhard ordered -- Judge

14  Leonhard's order protected --

15         MR. BRINKMANN:  Excuse me, Your Honor.  I'm

16  going to object on hearsay grounds.  This has been

17  testified to by Rhonda Perry as far as the conversation.

18  This is offered for the truth of the matter.

19         THE COURT:  I'll sustain as to hearsay as to

20  what Mr. Kirchner said.

21         Ask another question.

22  BY MR. TAGUE:

23    Q    Did Ms. Perry ask you any questions, or ask you

24  to respond to any questions?

25    A    I don't believe she did.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1        Q     Did Ms. Perry instruct you that you needed to
 2    ask -- or answer questions posed?
 3        A     No.  She did not.  I don't think I had any
 4    interaction with Rhonda Perry.
 5        Q     Did Ms. Perry -- well, how long, then, did the
 6    conversation between Ms. Perry and Mr. Kirchner last?
 7        A     It went on for quite a while.  I'm going to
 8    guess and say between five to ten minutes.
 9        Q     And Joseph Bohn and Sharon Reynolds were both
10    present during this whole time?
11        A     Yes.
12        Q     After their conversation ended, did Ms.
13    Reynolds or Mr. Bohn attempt to ask you questions?
14        A     No.
15        Q     Did anyone, after Rhonda Perry and Robert
16    Kirchner had their conversation, indicate to you that you
17    would have an opportunity to ask questions?
18        A     Never.  No.
19        Q     The -- was anything said by Joseph Bohn or
20    Sharon Reynolds after the conversation between Ms. Perry
21    and Mr. Kirchner?
22        A     I don't -- do not recall any.
23        Q     Okay.  Were you invited to come back again to
24    tell your story?
25        A     No.
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      Q      Were you told that the investigation was going

2  to proceed in the absence of your answering questions or

3  asking questions?

4      A      Not at that meeting, but there was a paper

5  trail afterwards where the attorneys exchanged

6  communications between Rhonda and Bob and eventually

7  Laura Clower.

8      Q      After that July 28, 2010, meeting, was there

9  any direct communications between you and any of the --

10  well, Investigator Bohn or Investigator Reynolds?

11      A      I don't recollect any right now.

12      Q      Okay.  Did you contact any university employees

13  to provide information to supply to the investigators in

14  your defense?

15      A      I was not allowed to do that.  I think the

16  charge letter from the dean -- somewhere in the charge

17  letter, it indicated that I was not allowed to speak with

18  university personnel.

19      Q      So your answer is no; you did not attempt to do

20  that in light of that admonition?

21      A      That's correct.

22      Q      Do you know whether Mr. Kirchner did?

23      A      Mr. Kirchner had extensive meetings and

24  discussions and phone conversations and faxes and -- all

25  through August and September.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1            MR. BRINKMANN:  Objection, Your Honor, lack of

2      foundation.

3            THE COURT:  That's sustained.

4            If you want to ask that question a different

5      way, you can.

6            MR. TAGUE:  Yes.

7            THE COURT:  For now, that's sustained.

8      BY MR. TAGUE:

9      Q     After then, July 28, 2010, you were aware that

10     your attorney was communicating with university attorneys

11     relative to the investigation, correct?

12     A     Correct.

13     Q     And your belief was that there was substantial

14     communication back and forth after July 28th and until

15     September 7, 2010?

16     A     Yeah.

17           MR. BRINKMANN:  Your Honor, I'm going to

18     object.  This is not asking the witness for a fact within

19     his knowledge.  It's seeking speculation.

20           THE COURT:  I mean, I'll sustain.  I think

21     we've covered this, Mr. Tague.  Everybody's aware that

22     there was, from the testimony, there was communication

23     between Mr. Kirchner and university counsel.  So I'll

24     sustain the objection.  That does call for him to

25     speculate as to the amount and manner, et cetera.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1        So ask another question.

2             MR. TAGUE:  Right.

3    BY MR. TAGUE:

4        Q    Obviously, you've been in court as we've heard

5    communications that happened on your behalf relative to

6    the investigation.  Were there any communications that

7    you're aware of that were not identified by the witnesses

8    so far in the proceedings?

9        A    Yes.  I was present for some phone

10   conversations in, in Bob Kirchner's office when phone

11   conversations took place with Laura Clower and people I

12   knew to be at the university.  There's some reference to

13   some of this in court transcripts.  On the day of -- on

14   the day I was terminated, there was a court hearing that

15   day to lift the order, to lift the protective order, and

16   Bob makes reference to some of the meetings and

17   communications.

18       Q    On September -- well, let me -- I've shown you

19   Plaintiff's Exhibit Number 2.

20       A    Yes.  This is a report.

21       Q    Okay.  So that is the September 7, 2010, report

22   of Joseph Bohn and Sharon Reynolds.  Were you sent a copy

23   of that?

24       A    Yes, I was.

25       Q    And do you know whether or not Mr. Kirchner

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   was, received a copy of that?

2       A    Yes, he did.  And I believe we met and

3   discussed it on September 8th, the following day.

4       Q    The -- do you know why you were sent a copy of

5   that?

6       A    I believe they -- I believe Rhonda Perry had,

7   had, by letter, had told us they were going to continue

8   the investigation; but I'm not sure precisely why they

9   sent it to me.  No.

10      Q    Did you or Mr. Kirchner formulate a, a response

11  to those allegations?

12      A    Bob responded to some of the specifics in this

13  19 point summary of investigation in his September 15th

14  letter to Laura Clower and Rhonda Perry.  Yes.

15      Q    And the, the next -- what's the next thing

16  that -- well, you ultimately received another

17  communication from the university; did you not?

18      A    Yes, I did.  I received a termination letter.

19      Q    Plaintiff's Exhibit Number 5 is the termination

20  letter that you received?

21      A    Yes.  It's signed by Charles Thompson and

22  Deborah Stone.

23      Q    And you received that on September 23, 2010?

24      A    Yes.  That's correct.

25      Q    Did you ever access a university database to

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   print emails relating to the Goldberg litigation?

2          MR. BRINKMANN:  Objection, Your Honor.  That is

3   not an issue relevant in this case.

4          THE COURT:  No.  It could become an issue, so

5   I'm going to overrule that.  He can answer that question.

6      A    If the question was, did I improperly access

7   the Group Exhibit A documents -- is that what you're

8   saying?

9      Q    Well, I was more specific.  Did you access a --

10  well, let me strike that, and I'll ask the question

11  again.

12         Did you access a computer database at any time

13  and print any of the documents in Group Exhibit A?

14     A    No.  I did not.

15     Q    After you were terminated by the University of

16  Illinois, did you ultimately obtain other employment?

17     A    I was unemployed for about 18 months.  And

18  then, then I got a job at Department of Children and

19  Family Services as a, some kind of systems analyst.  I

20  forget the title.

21     Q    Did you look for work after your termination?

22     A    Yeah.  I had to.  I mean, we were out of money;

23  and, to stay on unemployment, you're required every

24  couple of weeks to fill out forms saying that you're

25  interviewing.  So, yeah, I was looking all over, as far

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   away, you know, within driving range as I could.

2        Q    So you applied for unemployment?

3        A    Yes, I did.

4        Q    And you received it?

5        A    Yeah, a small amount.

6        Q    And you began looking for a new job?

7        A    Yes.

8        Q    Could you tell the jury what your search

9   efforts were?

10       A    I applied to many local places in town,

11  including, like, Solo, Wolfram, places like that.  Just

12  anything advertised in the paper that would fit with my

13  credentials, I would try.

14            I just, I just kept expanding my reach and

15  applying at Rantoul.  I think I interviewed down at

16  Eastern Illinois University; and just anywhere within

17  driving range, I would try to apply and get a job, any

18  job.

19       Q    So you initially looked local and then expanded

20  geographically?

21       A    Yeah.  And most of my search -- some of it was

22  with private companies, but I was particularly interested

23  in getting a government job because I, I wanted -- I had,

24  some 29 years in the retirement system, State

25  Universities Retirement System.  So I wanted some kind of

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    state employment job that would plug into what I'd built

2    up over my entire career with the retirement system.

3         Q    So in the state retirement system, you had

4    29 years in?

5         A    Yes.

6         Q    And you needed one more for full retirement?

7         A    That would be -- no, not for full retirement.

8    The minimum eligibility under my conditions would have

9    been 30 years.  And so, yeah, I would have been one year

10   short of just getting the minimum to, to at least have,

11   to be able to touch my retirement money.

12        Q    Why didn't you simply leave town and look at

13   other universities?

14        A    My kids go -- I mean, my job was right next to

15   University High School.  Both of my kids had gone to

16   school there.  My daughter, I believe she might have been

17   graduated at that point, or just finishing up.  And my

18   son was -- actually, I'm sorry.  I think my son was in

19   school at that time.  And so the whole point of me

20   keeping the job which, you know, in the IESE department

21   was to be close to my kids, to get them through high

22   school.

23             I've also got a disabled sister in town that

24   I'm a caretaker for; and, you know, I take care of her

25   SSI check and take care of her home and stuff.  She's

```
1   bipolar.

2       Q    You ultimately expanded your search, and you

3   told us that you got a job.  Where was that at?

4       A    It was in Springfield, about two hours away.

5       Q    You had to drive every day?

6       A    In my old car, yes, four hours a day.

7       Q    And how long did you work in that job?

8       A    Almost exactly one year.  It was, like, May 1,

9   2012, to April 30, 2013, if I'm not mistaken.

10      Q    And then what happened?

11      A    And then I got the minimum number of years

12  where I could draw on my retirement money to free that up

13  because up until that point I'd been borrowing money and

14  spending, you know, all my 403(b) money and the other

15  money that I had available to me.

16          MR. BRINKMANN:  Your Honor, I object and move

17  to strike.  That's not competent evidence of damages.

18          THE COURT:  I'll overrule.  This could become

19  relevant, so overruled.  Answer will stand.

20          Ask another question.

21  BY MR. TAGUE:

22      Q    And after that time, have you looked for work

23  here locally?

24      A    No.  I've sort of given up.  I mean, there's a

25  six-year gap now with my technology skills; and in the IT
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    business, it's kind of difficult.

2            And this litigation pretty much -- you know,

3    with my sister's situation and the litigation here, I'm

4    pretty much stuck here in town.  So, no, I've just -- I

5    don't want the responsibility of, of IT work.  I would

6    like to do something else eventually, but not IT work.

7        Q    What were your employment plans prior to your

8    termination in September 2010?

9            MR. BRINKMANN:  Objection, relevance, Your

10   Honor.

11           THE COURT:  No.  I'll overrule that.  This --

12   the jury will be correctly instructed on the law.  This

13   could be interpreted in a way that is appropriate.  I'll

14   make sure that it's not argued inappropriately, so he may

15   answer this question.

16       A    I had -- the college was undergoing a shared

17   services reorganization.  As late as 2010, Professor Pang

18   and I had repeatedly discussed my position.  They were

19   going to try to move my position under shared services so

20   that I reported to the college.  It didn't change my

21   reporting line.  Professor Pang didn't want that to

22   happen.  I wanted to stay just like it was, and we had an

23   agreement that I would keep my same reporting position

24   and keep on working in the department.  I had no plans to

25   change, other than to maybe interview on campus and

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    pursue a better job that would help me personally once my
2    son graduated from high school.  That was my immediate
3    goal, was to get my son through school.
4         Q    So you were going to work past a one-year
5    period?
6         A    Yeah.  I was going to stay in the ISE -- IESE
7    department until my son graduated; and then, yeah, if I
8    could find something else on campus, I would stay or stay
9    in the department, whatever fit my lifestyle.
10        Q    Did you ever formulate an age or date that you
11   actually would retire?
12        A    At some point I was threatening retirement, or
13   using that as a tool to sort of protect my job situation;
14   but, no, I did not.
15        Q    Now, once you received the July 19, 2010,
16   letter from the dean initiating the investigation, did
17   that impact you emotionally?
18        A    Yeah.  It was a big shock because I -- I mean,
19   it just totally came out of left field.  I knew there was
20   pressure on changing my reporting line to Chuck Thompson,
21   and so my reporting line had changed July 1st.  There was
22   some tension with Professor Pang and other people in the
23   department.
24             But, yeah, I was not -- how it impacted me
25   emotionally, to be escorted off by the police department

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   and escorted to my car, and Chuck Thompson threatened me

2   with coming back on campus.  And the July 19th letter

3   indicated that I wasn't allowed -- I believe it was in

4   that letter that I wasn't allowed on the College of

5   Engineering campus that I'd worked on for more than

6   20 years.

7           The way it affected me emotionally, it just,

8   like, threw away my career.  It just -- it took all

9   meaning away from all the time I'd spent at the

10  university.  Excuse me.

11      Q    Ultimately, when you received the

12  September 23rd letter of termination, how did you react

13  to that emotionally?

14      A    I was really upset.  I had already been hiding

15  it from my wife.  I had not told her I'd been on paid

16  suspension.  And I -- this coincided with stuff that was

17  going on with my family because my -- both of my parents

18  had had -- had health problems, and so it was just

19  devastating.  I don't know how to describe it.

20      Q    How did it impact your daily activities?

21      A    I, I was so buried in bills, I had not had any

22  kind of preparation for this kind of life event.  So I

23  was making calls to borrow money from people, from

24  relatives, from my parents, and my sister.  And I'm not

25  sure what else I can say about it.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    MR. BRINKMANN:  Your Honor, I object.  This is

2 not a competent element of damages.  Move to strike.

3    THE COURT:  You have strayed away from what

4 would normally be appropriate, Mr. Tague.

5    MR. TAGUE:  Let me try to get us back on track.

6    THE COURT:  If you can get us back on track,

7 I'll sustain that objection.

8 BY MR. TAGUE:

9    Q    Did the decision to terminate you affect your

10 relationship with your wife?

11    MR. BRINKMANN:  Objection, relevance.

12    THE COURT:  No.  That's -- emotional impact is

13 relevant.  That's overruled.

14    A    My wife was not happy, and I wasn't sleeping.

15 I was -- you know, I'd been on edge ever since that

16 happened, and so there was tension.  We hardly speak now.

17 I mean, my wife and I didn't have, you know, the best

18 marriage in the first place; but we hardly speak now at

19 all, even to this day.

20    Q    And how does that impact you?

21    A    It just -- it's sort of all the social filters

22 that you have inside of you to keep you from blurting out

23 things that, the first thing that pops into your head --

24 I just act inappropriately in public situations.  I

25 have -- I suspect I'm paranoid.  I suspect people have

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    ulterior motives when they don't.  And I don't sleep

2    well.  I take medication to control anxiety.  And I have

3    a lot of migraines.

4         Q    You have children?

5         A    Yeah.  I have two children.  They're both very

6    successful academically.

7         Q    Has the termination decision impacted your

8    relationship with your children?

9         A    Yeah.  They've had very little interest at

10   certain things, so I try to get sympathy at home or bring

11   up some of the issues that have gone on in court now for

12   five and a half years.  You know, it's kind of fallen on

13   deaf ears now.  They don't really want to know more than

14   they know, and so there's just certain topics we have to

15   completely steer away from.

16             So it's just injected some uncomfortable, you

17   know, situations into our lives that we wouldn't have

18   otherwise had.

19        Q    And how has that impacted you?

20        A    It makes me feel horrible because they

21   deserve -- they deserve to go to the best colleges and

22   have better clothes that I'm not able to give them now.

23        Q    Are there any other family members that the,

24   the termination decision has affected your relationship

25   with?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1       A     Yeah.  Initially, I was talking to my brothers

2   and sisters, and I have very -- I just went to a wedding,

3   a family wedding.  It's the one event I've attended

4   recently.  But I have very little -- with the exception

5   of one brother, I have very little contact with my

6   family.  And even with my bipolar sister, I have to do

7   things behind her back.

8             But I have very little -- we've reached -- I

9   have a land line at home.  We receive almost no phone

10  calls.  I have a cell phone.  We receive very few

11  telephone calls from relatives.

12      Q     Now, the, this started in the, with the

13  investigation and termination?

14      A     Yes.

15      Q     And how has it progressed?  Did it start out

16  not as bad and has gotten worse?  Has it been worse and

17  gotten better?  Can you describe for the jury the

18  frequency of the impact that you've described to them?

19      A     Well, my relationship with everybody else in my

20  family?  Is that --

21      Q     Yes.

22      A     Yeah.  Well, for example, it's -- when I first

23  got the charge letter, I think that night I went to see

24  my father because he was the first person I wanted to

25  tell.  He ended up in the hospital the same night; and

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  he, he's had a history of heart and kidney trouble.  But

2  I spent like a whole week, you know, most of the next

3  week with him for his problems; and he's had ongoing

4  problems all the way through.

5        I was supposed to take time off from work that

6  fall to do family medical leave to take care of my mom's

7  knee surgery.  I had brothers and sisters that did it the

8  year before.  I had promised them that I would take care

9  of it in the fall of 2010.  I was not able to do that.

10        And I had -- the very first time I told my

11  brothers, my father had some kind of health event maybe a

12  year or so later, and we all got together.  We thought he

13  might die.  And I just remember coming home from the

14  hospital.  My dad pulled through, you know, whatever was

15  going on.  Actually, he actually died that day and was

16  brought back to life by some paramedics.

17        That night, about, you know, after midnight

18  when he got back from the hospital, I sat there with two

19  of my brothers -- three of my brothers.  And at some

20  point, the conversation turned to me and my situation.

21  And when I started to explain it, inside of just one or

22  two minutes, they just quit listening and said, "Well,

23  good luck with all that," and then kept on going.  And

24  from that point, I've hardly spoken to those three

25  brothers.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1     Q     You feel impact or, emotional impact which you

2    feel is related to the termination how frequently?  Daily

3    basis?  Weekly?  Can you describe for the jury how often

4    you believe this event has emotionally damaged you?

5     A     I'm emotionally damaged, you know, all the way

6    through.  But it's, it's quite different.  In the

7    beginning, I was really sensitive and losing sleep and

8    had a lot of, you know, anxiety attacks.  And at this

9    point, I have very few interactions with other people, so

10   it's -- as long as I don't think about it, you know, I

11   can get through the day just fine.

12          But I have very little interaction with, you

13   know -- I had friends for 20 years on campus that would

14   see me and start to wave and then stop, you know, stop

15   putting their hand up because, because they remembered,

16   you know, they're not supposed to talk to me; or I'm not

17   a desirable person to talk to, so --

18          MR. BRINKMANN:  Objection, Your Honor.  This

19   is -- no foundation.  It's speculation.  It's an improper

20   expression of opinion.

21          THE COURT:  You can, you can stop with any of

22   those.  I'll sustain that objection.  There is no

23   foundation.  It is speculation.  We're also getting into

24   cumulative.

25          I think we've covered this pretty thoroughly,

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    Mr. Tague; but if you want to ask some more questions, go

2    ahead.

3    BY MR. TAGUE:

4        Q    Were you ever provided with the specific -- or

5    let me strike that and ask it.

6            Prior to September 7, 2010, did anyone from

7    Academic Human Resources ever identify for you what

8    policy provisions you were charged with violating?

9        A    No.  We asked for -- I asked and my attorney

10   both asked for policy violations.  We were not provided

11   that information.

12           MR. TAGUE:  I have no further questions.

13           THE COURT:  Mr. Brinkmann, we've got about

14   15 minutes.  You can get a start.

15           Ladies and gentlemen, we're going to be

16   stopping at 4:00.  I keep my promises.  So at 4:00, we're

17   going to stop.

18            CROSS-EXAMINATION BY MR. BRINKMANN:

19       Q    Mr. Carmody, you indicated that the litigation

20   with Goldberg ended on September 23rd of 2010, the same

21   date that you were terminated?

22       A    Yes.

23       Q    Isn't it true that the litigation did not end

24   at that point and continued on for about another six or

25   eight months?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      A     I'm not sure what you're referring to.

2      Q     Was the -- was there a hung jury on

3  September 23rd of 2010?

4      A     No.  There was a decision on September 23,

5  2010.

6      Q     Wasn't there a second jury trial in March of

7  2011?

8      A     I do not believe so.  I'm not sure what you're

9  referring to.  There were two -- the Goldberg litigation

10  had two suits.  We, we -- the first time the jury did

11  something wrong.  They sent instructions back to the

12  judge, and it included the vote count which was in my

13  favor.  It was like, you know, 7 to 3.  And the fact that

14  they'd included the vote count in there was an issue, and

15  so both attorneys objected and asked for a mistrial.

16  And, and I had the option to say, yeah, go ahead and give

17  it a mistrial.

18          That was the first time.  That was well

19  before -- the September 23rd was the second filing of

20  the, the assault case.

21      Q     All right.  Now, with respect to your income

22  since you were terminated from the university, what was

23  your earnings when you worked for one year at DCFS in

24  Springfield?

25      A     It was approximately $70,000.  Because the,

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    the -- it's a union job and it's, and it's less hours.

2    It's like 37 and a half hours per week, whereas my job at

3    the university was full time.  It was 40-plus with no

4    overtime.

5         Q    Was -- the salary was approximately $3,000 less

6    than your salary at the university; is that correct?

7         A    It was -- it was more than that.  Yeah.  But --

8    there were less hours, and it was adjusted for the 37 and

9    a half hours, so --

10        Q    You were earning 73,000 plus at the university,

11   and you earned 70,000 with DCFS?

12        A    Approximately.

13        Q    All right.  And when you left the job at DCFS,

14   you -- that was in order to voluntarily retire?

15        A    You say voluntary.  It was my decision because

16   I couldn't keep going, driving an old car under those

17   conditions, so I voluntarily took what's called a

18   reciprocal retirement and --

19        Q    Right.  And so, but you weren't fired by DCFS?

20        A    No.  I was not fired by DCFS.

21        Q    You retired; that was your decision?

22        A    That's correct.

23        Q    And since you've retired, your earnings have

24   been -- or your retirement income has been $60,000 a

25   year?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1        A     Approximately, yeah.

 2        Q     All right.  And that's continued up to the

 3   present?

 4        A     Yes.  That's my money.  That's my retirement

 5   that I saved from my entire career.  Yes, sir.

 6        Q     Now, you received the letter of charges on

 7   July 19th of 2010, correct?

 8        A     That's correct.

 9        Q     Did you read that letter when it was given to

10   you?

11        A     Yes, I did.

12        Q     And do you agree that the letter in its first

13   sentence mentions the concerns that the university had

14   related to the improper use and/or improper access to

15   electronic communications?

16        A     It says, "The College of Engineering has been

17   alerted to serious concerns related to improper use of

18   and/or access to electronic communications."

19        Q     So from reading the letter, you were aware of

20   what the university's concerns were at that time?

21        A     To these concerns specified on that line, yes.

22        Q     All right.  And you were then given notice that

23   you were the subject of an investigation into those

24   concerns, correct?

25        A     It says, "This letter is to notify you that you
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    are a subject of an investigation into these concerns and

2    that Academic Human Resources, in conjunction with the

3    College of Engineering, will be conducting the

4    investigation."  So they're both; COE and AHR were.

5         Q    Those were clearly stated and you understood

6    them when you read the letter; is that correct?

7         A    I, I understood that these words were there,

8    and I read them, and I understand what the sentences

9    mean.  Yes.

10        Q    All right.  And we're talking about getting

11   notice in this letter; isn't that true?

12        A    We're talking about notice of charges.

13        Q    Correct.

14             And the next paragraph talks about those

15   charges more specifically?

16        A    It talks about one charge, Number 1.  There is

17   one charge.

18        Q    Right.  And it alleged that "On June 23rd, your

19   attorney filed a document called 'Exhibit A.'"  That was

20   one of the allegations, correct?

21        A    It says, "More specifically, these misconduct

22   allegations are based on the following."  The actual

23   filing was --

24             MR. BRINKMANN:  Excuse me.  Your Honor, I would

25   object and ask that the witness be directed to answer the

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    question that was asked.

2              THE COURT:  Mr. Carmody, I know you want to

3    talk, but it's important you listen to the question being

4    asked and simply answer the question.

5              THE WITNESS:  The sentence is incorrect because

6    it should say "Group Exhibit A."  I'm sorry.

7              THE COURT:  Let's try to answer only the

8    question asked.

9    BY MR. BRINKMANN:

10        Q    You understood from reading this document,

11   which we've identified as Joint Exhibit 4, that an

12   allegation against you, one of the allegations was that

13   on June 23, 2010, your attorney filed a document called

14   "Exhibit A."  That was one of the allegations?

15        A    You said against me.  The allegation was that

16   my attorney filed the document.  That's not an -- I don't

17   know if that's an allegation against me or not, but --

18        Q    You, you read this and you understood it,

19   correct?

20        A    I understood what the paragraph says.  Yes.

21        Q    All right.  And then next it said that "The

22   exhibit contained some emails from or to university

23   employee Deborah Thurston from 2005 and 2007"?

24        A    Yes.

25        Q    You were aware that that was one of the

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    allegations?

2         A     Yes.  I see that here.  I agree.

3         Q     All right.  And you were aware that the

4    allegation was that the materials in Exhibit A "included

5    attorney-client privileged communications, job-related

6    communications, and personal correspondence"?

7         A     I agree that was an allegation.  I don't agree

8    that that's correct.

9         Q     Yes.

10             Just getting notice of charges, you received

11   notice of that charge or allegation when you received the

12   letter?

13        A     Yes.

14        Q     All right.  You were "not listed as a recipient

15   or author of any of the email messages"; that was one of

16   the charges you had notice of?

17        A     I wouldn't refer to that as a charge.  But that

18   is in the, the misconduct allegations in this paragraph.

19        Q     And it's further alleged that you "attempted to

20   use the substance of the email messages for

21   non-university related purposes and without permission."

22   You understood that was one of the allegations?

23        A     I understood that's an allegation.  Yes.

24        Q     And then, lastly, in this paragraph, you

25   understood that, "Furthermore there are open questions

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   regarding how you came into possession of those

2   documents, specifically whether you obtained them through

3   improper access"?

4        A    Yes.  I understand that there are open

5   questions.  I wouldn't call that an allegation.  But I

6   understand there are open questions.

7        Q    But it's, it's in the paragraph notifying you

8   of the misconduct allegations?

9        A    Yeah.  That's one of the problems is you -- it

10  says these --

11       Q    Excuse me, Mr. Carmody.  Can you answer the

12  question that I've asked you?

13       A    The open question sentence that you're

14  referring to is in the context of the -- it's in the

15  paragraph of, of allegations.  Yes.

16       Q    All right.  And the next sentence informed you

17  that, "If substantiated," if the allegations above were

18  substantiated, "such acts of misconduct are a violation

19  of university policy, including, but not limited to, the

20  University Code of Conduct and the Policy on Appropriate

21  Use of Computers and Network Systems at the University of

22  Illinois at Urbana-Champaign"?

23       A    I do not understand that sentence, nor did my

24  attorney.

25       Q    Do you know as an information technology

1  specialist and manager in the College of Engineering that

2  the Policy on the Appropriate Use of Computers is the

3  primary policy governing people in your position?

4      A    That's not the primary policy governing people

5  in my -- all these policies apply to all university

6  employees.  I don't know why you would say that.

7      Q    So you understood that the policy applied to

8  you?

9      A    Yes, I did.

10     Q    Okay.  And you understood that the Code of

11  Ethics -- the University Code of Conduct applied to you?

12     A    Yes, I did.

13     Q    All right.  Now, when you received this letter,

14  did you look at the University Code of Conduct?

15     A    I reviewed it with my attorney.  Yes.

16          MR. BRINKMANN:  For the record, Your Honor,

17  this is Plaintiff's Exhibit 8, the University Code of

18  Conduct.

19          THE COURT:  Thank you.

20          You've got time for a few more questions, Mr.

21  Brinkmann; then we have to stop.

22  BY MR. BRINKMANN:

23     Q    This is a document that you reviewed with your

24  attorney?

25     A    I don't have it in front of me.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      Q     It's on your screen.

2            THE COURT:  It's to your left -- to your right.

3      A     It says it's the University Code of Conduct.  I

4  would have reviewed whatever the Code of Conduct was that

5  was applicable at the time.  Yeah.

6      Q     And this is a one-page document, correct?

7      A     It's a short document.  I think it's one page.

8      Q     And you reviewed the entire document with your

9  attorney at the time that you received the notice of the

10 charges?

11     A     Yes, I did.

12     Q     The Code of Conduct references, "With regard to

13 professional conduct, those acting on behalf of the

14 university should practice," and then there are several

15 bullet points?

16     A     Yes, sir.

17     Q     Do you see that?

18     A     Yes, sir.

19     Q     And one of the bullet points is "stewardship by

20 exercising custodial responsibility for university

21 property and resources"?

22     A     Yes, sir.  I see that.

23     Q     The last bullet point on this Code of Conduct

24 references practicing "confidentiality by protecting the

25 integrity and security of university information such as

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    student records, employee files, patient records, and

2    contract negotiation documents."  You see that?

3        A    Yes, I do.

4        Q    And when you received the notice on July 19,

5    2010, the entire Code of Conduct was referenced to you;

6    they did not pick or choose any particular section; is

7    that true?

8        A    That is true.  They didn't inform me of any

9    particular section, and they declined to tell me any

10   particular section that those allegations would apply to.

11       Q    But you had the, the Code of Conduct; and you

12   had the charges with respect to the use of university

13   property, university information, and confidentiality,

14   correct?

15       A    Yes, I did.

16            THE COURT:  Mr. Brinkmann, --

17            MR. BRINKMANN:  Yes.

18            THE COURT:  -- can we stop now?

19            MR. BRINKMANN:  Yes.

20            THE COURT:  Okay.  Ladies and gentlemen, it is

21   right at 4:01.  I'm not going to read you my admonition

22   again.  I presume you recall it.  No Facebooking,

23   Twittering, no talking to your family.  It's another day

24   when you can turn to your family or friends and say, "I

25   can't talk to you."

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1          Come back in here again as you did yesterday;

2   be here about 9:20, and I'll try to get you in here about

3   9:30.  All right?  Thank you.

4              (Jury dismissed for the day, 4:01 p.m.)

5          THE COURT:  The jury has left the courtroom.

6   Mr. Carmody, you can step down if you wish.

7          For scheduling purposes, my plan for tomorrow

8   is we'll continue with Mr. Carmody, obviously.

9          You two gentlemen would like to get together

10  with each other, it sounds like; and then tomorrow after

11  Mr. Carmody concludes his testimony, I'll excuse the

12  jury, and we can have a dialogue about the depositions

13  being read.

14         And then at some point, we'll have to obviously

15  have a jury instruction conference, but we'll play that

16  by ear.

17         Anything further you want to take up before

18  tomorrow, Mr. Tague?  Yes?  No?

19         MR. TAGUE:  The -- there were documents on my

20  list that I'll want to introduce into evidence.  29 is

21  the National Vital Statistical Life Expectancy Tables.

22  The -- I would ask that Plaintiff's 29 be admitted and

23  then the, based upon the testimony of the plaintiff's age

24  and his life expectancy, to be able to argue that to the

25  jury on longevity damages.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
1              THE COURT:  Mr. Brinkmann.

2              MR. BRINKMANN:  Your Honor, there's no evidence

3     of permanent injury or damage and --

4              THE COURT:  No witness --

5              MR. BRINKMANN:  -- that's not an element.

6              THE COURT:  No witness has testified to those

7     tables.  If you want to try to get those in through a

8     witness, you can.  But right now there would be no -- I

9     guess the short answer is no.  Those will not be -- I

10    can't just let you admit an exhibit without a witness

11    testifying and some relevance and that's not -- unless I

12    missed it, we haven't had a single witness mention

13    Exhibit 29, so that will not be accepted at this time.

14             MR. TAGUE:  It was on the witness list, and I

15    think foundation and authenticity were waived; so I think

16    you can take judicial notice of it.  Now, the relevancy

17    issue, obviously, is a different thing.

18             THE COURT:  Well, I have to have both -- you

19    know, I have to have both foundation and relevancy.  And

20    if, you know, you're telling me you two have agreed to

21    waive foundation, that's one thing; but relevancy is

22    another matter.  So that will not be admitted at this

23    time.  You're free to try and get it in -- you know, you

24    haven't rested yet, so we can continue.

25             Any other -- I have a note that says "Need 1B,
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    Court's 1B" -- oh, the transcript of the -- the original

2    that you're going to bring tomorrow, --

3              MR. BRINKMANN:  Yes.

4              THE COURT:  -- Mr. Brinkmann.  All right.

5    Sorry about that.

6              MR. TAGUE:  I had -- 47, 48, and 49 are the

7    Plaintiff's job evaluations for 2010, 2009, and 2008.

8    Again, those are on the witness list.  Authenticity and

9    the, I think, found--

10             THE COURT:  Mr. Brinkmann.

11             MR. BRINKMANN:  Your Honor, these are not

12   relevant to the damage issue here.  He is being

13   terminated for cause; and, you know, this -- this is

14   evidence that doesn't -- doesn't pertain to getting

15   raises or his job performance other than the issues that

16   are related to the charges.

17             THE COURT:  I'm not going to admit those at

18   this time.  I -- just so the record is clear, Mr. Tague,

19   I let you get into the damages because, number one, we've

20   already entered an order.  He can argue about damages

21   concerning his annual salary.  I don't think there's been

22   any argument, inference, or anything other than up until

23   this termination for cause that Mr. Carmody did anything

24   but an excellent job.  So, at this point, I think you

25   would be free to argue that he was going to continue to

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   work up until he could retire.

2           We've already got testimony as to his salary.

3   We've even seen documents as to that.  So I don't think

4   that's in dispute, and I think that would just simply

5   serve to confuse the jury because the issue here is about

6   this termination for cause.

7           You're free to argue about:  Do the math and

8   how much could he make getting paid salary year after

9   year.  I think we've all firmly established -- and I know

10  you've done an excellent job of doing it -- that as an

11  academic professional on a yearly contract he has to get

12  at least a year's notice, and there's no indication that

13  he would not have continued to be employed up until he

14  chose to retire.  So, certainly, it would be an

15  appropriate argument for you to do the math and add it up

16  and say this is the amount of damages he's missing from

17  salary.

18          Likewise, I gave you quite a lot of latitude

19  when it came to damages related to emotional pain and

20  suffering.  In retrospect, I probably gave you too much

21  latitude; but I'd rather err on the side of caution to

22  make sure everybody has a fair trial rather than cut you

23  off.

24          So, but as far as the job evaluations go, 47,

25  48, and 49, I will not admit those because I don't think

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    it's in dispute that he did a, that he did a more than

2    adequate job and that you're free to argue about that

3    without, without even those exhibits coming in.  I think

4    to bring them in would simply confuse the jury.

5             Anything further?

6             MR. TAGUE:  What else -- were we going to do

7    anything else this afternoon?

8             THE COURT:  No.  We're done until tomorrow

9    morning.  As I said, we'll finish with Mr. Carmody.  Then

10   you and Mr. Brinkmann can talk to me outside the presence

11   of the jury about how you want to handle the deposition

12   testimony.  You indicated you might -- one or both of you

13   might want me to revisit one of my earlier rulings, which

14   I'm more than happy to do.

15            And then we'll finish up with the Plaintiff's

16   case and just proceed on with the trial in normal

17   fashion.

18            MR. TAGUE:  You had mentioned we were going to

19   have a jury instruction conference.

20            THE COURT:  Yeah.  We'll do it sometime

21   tomorrow.  I don't know when.

22            MR. TAGUE:  Okay.

23            THE COURT:  But you've all had -- you have

24   copies of the instructions.  They were filed last week.

25   And as I said, you, you should not find any surprises.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    They are basically the instructions both sides provided;

2    but they're in Seventh Circuit format and in Seventh

3    Circuit standard order.  So I haven't slipped any sneaky

4    instructions in there for either side, the basic

5    instructions.  All right?

6              Anything else, Mr. Tague?

7              MR. TAGUE:  No.  I can't think of anything.

8              THE COURT:  Mr. Brinkmann?

9              MR. BRINKMANN:  No, Your Honor.

10             THE COURT:  All right.  I'll see both of you

11   back here -- everybody back here at 9:20 tomorrow.  We'll

12   be in recess.

13             (Hearing concluded, 4:09 p.m.)

14             *  *  *  *  *  *  *  *  *  *

15                 REPORTER'S CERTIFICATE

16        I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify

17   that the foregoing is a correct transcript from the

18   record of proceedings in the above-entitled matter.

19        Dated this 18th day of February, 2016.

20

21             s/Lisa Knight Cosimini
                _____
                Lisa Knight Cosimini, RMR-CRR
22              Illinois License # 084-002998

23

24

25