UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS


KEVIN RICHARD CARMODY,

                                Docket No. 12-2249

        Plaintiff,

    vs.                           Urbana, Illinois
                                  January 14, 2016
                                9:20 a.m.
BOARD OF TRUSTEES OF THE
UNIVERSITY OF ILLINOIS, et al.,

        Defendants.


JURY TRIAL -- Day 3 of 3

BEFORE THE HONORABLE COLIN STIRLING BRUCE
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S :

For the Plaintiff:      MICHAEL J. TAGUE, ESQUIRE
                        Flynn, Palmer & Tague
                        402 West Church Street
                        P.O. Box 1517
                        Champaign, Illinois 61824-1517
                        217-352-5181

For the Defendants:     WILLIAM J. BRINKMANN, ESQUIRE
                        Thomas, Mamer & Haughey, LLP
                        30 East Main Street, Suite 500
                        Champaign, Illinois 61820
                        217-351-1500

Court Reporter:        LISA KNIGHT COSIMINI, RMR-CRR
                        U.S. District Court
                        201 South Vine, Suite 344
                        Urbana, Illinois 61802

Proceedings recorded by mechanical stenography; transcript produced by computer.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

I N D E X

Page

PRELIMINARY MATTERS ..............................  3


KEVIN CARMODY
    Continued Cross-Examination by Mr. Brinkmann ..  5
    Redirect Examination by Mr. Tague ............  21


RULE 50 MOTION
    Mr. Brinkmann ................................  32
    Response by Mr. Tague ........................  36
    Court's Ruling ...............................  41


JOSEPH BOHN
    Direct Examination by Mr. Brinkmann ..........  50
    Cross-Examination by Mr. Tague ...............  60


RENEWED RULE 50 MOTION ...........................  66


INSTRUCTION CONFERENCE ...........................  67


JURY CHARGE By Judge Bruce .......................  98


CLOSING ARGUMENTS:
    By Mr. Tague ................................. 111
    By Mr. Brinkmann ............................. 129
    Rebuttal by Mr. Tague ........................ 142


VERDICT PUBLISHED/JURY POLLED .................... 148

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1                (In open court, 9:20 a.m.)

 2              THE COURT:  All right.  We're back on the

 3    record in Carmody versus University of Illinois, et al.

 4    All parties are present.  Both counsel are present.

 5              One housekeeping matter my courtroom deputy

 6    just raised:  Mr. Tague, Mr. Brinkmann, yesterday we had

 7    the DVD of the deposition we watched submitted as Court's

 8    Exhibit 1A.  The transcript was to be submitted today as

 9    Court's Exhibit 1B with the attached exhibits.

10              My courtroom deputy has pointed out that the

11    exhibits used during the deposition are the same exhibits

12    that we've already had admitted; and, more importantly,

13    they have the exact same number.  That is what she

14    believes.

15              Is that correct, Mr. Tague?

16              MR. TAGUE:  That is correct, Your Honor.

17              THE COURT:  Also correct, Mr. Brinkmann?

18              MR. BRINKMANN:  Well, I don't know.  I'm

19    looking at the -- I guess, let me see here.  It appears

20    so.  Yes.

21              THE COURT:  Yes?  All right.  We have 1A and

22    1B, so I think we are -- that's the transcript?

23              MR. BRINKMANN:  I was asked to bring --

24              THE COURT:  The original.

25              MR. BRINKMANN:  I think I filed --
```

```
1              THE COURT:  A copy?

2              MR. BRINKMANN:  The other was a mini.

3              THE COURT:  We'll need the full.

4                   (Discussion off the record between the

5                   courtroom deputy and Mr. Brinkmann.)

6              THE COURT:  All right.  So we have the original

7    of the transcript.  The record should reflect that the

8    exhibits referenced in the transcript are the same

9    exhibits that are referenced by the same number during

10   this trial, and they are attached to the back of the

11   original transcript in any event.

12             All right.  Thank both of you for making sure

13   that part of the record was clear.

14             Any reason -- when we left off, Mr. Carmody was

15   on the witness stand.  Any reason why we cannot bring the

16   jury back in, Mr. Tague?

17             MR. TAGUE:  No.

18             THE COURT:  Mr. Brinkmann?

19             MR. BRINKMANN:  [Shaking head from side to

20   side.]

21             THE COURT:  Mr. Carmody, if you want to come

22   back up to the witness stand, and let's bring the jury

23   in.

24                   (Brief pause in proceedings.)

25                   (Jury present, 9:25 a.m.)
```

```
 1              THE COURT:  Please be seated.

 2              All right.  We're continuing the examination of

 3  Mr. Carmody by Mr. Brinkmann.  You may continue at your

 4  leisure.

 5              MR. BRINKMANN:  Thank you, Your Honor.

 6  KEVIN CARMODY, having been previously sworn and remaining

 7          under oath, resumes testimony, 9:26 a.m.,

 8      CONTINUED CROSS-EXAMINATION BY MR. BRINKMANN:

 9      Q    Mr. Carmody, I believe we left off discussing

10  the notice of charges and the reference to the University

11  Code of Conduct in those charges; and we were looking at

12  the University Code of Conduct, which is Joint Exhibit 5.

13      A    May I have that on paper, too?  Is that

14  possible, instead of using the screen?  I'm having

15  difficulty reading the screen.

16              THE COURT:  We can zoom in more.

17              THE WITNESS:  It has to do with not holding the

18  whole document so I'm only looking at parts and not

19  looking at the whole thing, if that's allowable or not.

20              MR. BRINKMANN:  I'm not sure I have another

21  duplicate.

22              COURTROOM DEPUTY:  What's the

23  Plaintiff's Number?  8?

24              MR. TAGUE:  Plaintiff's 8.

25              THE WITNESS:  Thank you.
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1    BY MR. BRINKMANN:
 2         Q    And you told us that when you received the
 3    charge letter you read the Code of Conduct, correct?
 4         A    Yes.
 5         Q    And you also went over it with your attorney
 6    before the meeting of July 28, correct?
 7         A    I'm not sure if we did or not.
 8         Q    Okay.  But you did tell us that you went over
 9    it with your attorney?
10         A    At some point, I went over it with my attorney.
11    Yeah.
12         Q    You were aware at the time that you read the
13    policy that the code applied to you as a university
14    employee?
15         A    This code applies to, to me and all university
16    employees, as I understood it.
17         Q    And you were aware from reading and going over
18    the document that each of the items of professional
19    conduct that the code stated should be practiced by
20    university employees?
21         A    Yes.  But this does -- this document clearly
22    says this does not specifically tell -- this is not an
23    attempt to define specifically what one should and should
24    not do.  It's just to communicate the expectations of the
25    university.
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      Q      And you were aware that the expectations of the
2  university included that you should practice "integrity
3  by maintaining an ongoing dedication to honesty and
4  responsibility"?
5      A      Yes.
6      Q      You should practice "trustworthiness by acting
7  in a reliable and dependable manner"?
8      A      Yes.
9      Q      You should practice "evenhandedness by treating
10  others with impartiality"?
11      A      Yes.
12      Q      You should practice "respect by treating others
13  with civility and decency"?
14      A      Yes, sir.
15      Q      You should practice "stewardship by exercising
16  custodial responsibility for university property and
17  resources"?
18      A      Yes.
19      Q      You should practice "compliance by following
20  state and federal laws and regulations and university
21  policies related to duties -- their duties," meaning your
22  duties "and responsibilities"?
23      A      Yes.
24      Q      And, lastly, you should practice
25  "confidentiality by protecting the integrity and security

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    of university information, such as student records,

2    employee files, patient records, and contract negotiation

3    documents"?

4         A    Yes.

5         Q    The Code of Conduct goes on to inform you that

6    "Those acting on behalf of the university shall seek

7    appropriate guidance when faced with ethical dilemmas."

8    And it gives you a place to contact the University Ethics

9    Office if you have an ethical dilemma?

10        A    Correct.  That's one of the options is, yes, to

11   contact them.  But it just says those acting on behalf of

12   the university shall seek appropriate guidance when faced

13   with ethical questions.  So that would include if there's

14   a legal -- if you needed legal guidance, then you would

15   seek somebody with legal expertise.  Yes.

16        Q    Yesterday, you also told us that the Policy on

17   the Appropriate Use of Computers not only applied to you

18   as an IT professional, but it applied to all of the

19   employees of the university?

20        A    It applies to -- that policy is -- it's an

21   equipment policy.  It applies to the services of the

22   UIUCnet.  I think it's in the first paragraph of that

23   policy.  But it applies to everyone.  It, it's a policy

24   on UIUCnet, and people using that are underneath that

25   policy.  Yes.

1       Q     And when you received the notice of charges

2   that referenced the Policy on Appropriate Use of

3   Computers, did you also read and review that policy?

4       A     I'm sorry.  Could you repeat the question?

5       Q     Yes.

6             You received the notice of charges that told

7   you that those were very serious charges and that this

8   policy was implicated as potentially having been

9   violated.  When you received the notice of those charges,

10  did you look at the policy?

11      A     They didn't give me the policies, but I

12  eventually did look them up.  Yes.

13      Q     Okay.  They gave you a link to the policy on

14  the Internet, true?

15      A     Yeah.  They gave me a link.

16      Q     Okay.  And from reading and reviewing the

17  policy, were you aware that it included a section on

18  examination of the contents of electronic messages and

19  files?

20      A     That is in Section 6, if I'm not mistaken.  If

21  you'll give me a copy, I would be glad to respond.  But

22  that Section 6 is about electronic media.  It doesn't

23  apply to paper.  It's about computer files and hard disks

24  and computers and networks.  It's not about anonymously

25  delivered paper in a mailbox.  It's --

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1                (Brief pause in proceedings.)

 2        Q    Mr. --

 3        A    I'm sorry.  There's --

 4        Q    There's no question, sir.

 5        A    Well, you just referred to a section in here.

 6   Was it 6.2?

 7        Q    Let me ask my question, if I might.

 8        A    Okay.

 9        Q    Mr. Carmody, for purposes of identification, I

10   have placed on the screen the Policy on Appropriate Use

11   of Computers and Network Systems at the University of

12   Illinois at Urbana-Champaign, which is Joint Exhibit 6

13   and Plaintiff's Exhibit 7; is that correct?

14        A    Yes.

15        Q    Okay.  You were aware from your review of this

16   policy of Section 6, and specifically Section 6.2, being

17   contained in that policy?

18        A    Yes.  I was aware of Section 6, Protection of

19   Information in Electronic Media; and Section 6.2,

20   Examination of Contents of Electronic Messages and Files.

21        Q    All right.  And that Section 6.2 states that

22   "Unless required by law or authorized by administrative

23   approval to do otherwise, campus and unit-level system

24   administrators will not examine the contents of

25   electronic messages and files and will make every -- will
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    make every reasonable effort to protect them from

2    unauthorized inspection, subject to the following."

3            And then in Section (a), it says that the

4    contents may be seen in the course of routine

5    maintenance.  Section (b), it provides what action is to

6    be taken if there is a request to examine the contents in

7    order to secure the messages.  And then Section (c)

8    indicates the file names and directory names are treated

9    as public information.

10            Is that what the policy says?

11    A    Yes.

12    Q    All right.  Now, further, Policy 6.3 provides a

13    process for requesting disclosure of contents of messages

14    and files, and that provides in 6.3(a) that requests for

15    disclosure of the contents of messages must be made in

16    writing through regular reporting channels.

17            Is that what it says?

18    A    Yes.

19    Q    In Section 6.3(b), it states that while a

20    request is pending, the unit executive officer may ask

21    computer system administrators to take reasonable

22    necessary steps to maintain, store, or otherwise prevent

23    deletion or modification of the information being sought.

24            Is that what it says?

25    A    Yes.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      Q      And in Section 6(c), it states that the

2   individual whose messages are involved must be notified

3   in advance of that information being released.

4            Is that what the policy says?

5      A      Yes.

6      Q      All right.  Paragraph 6(d) then goes on to

7   state conditions for disclosure.  In the absence of

8   legally compelled access or disclosure, the, the unit

9   officer is authorized to grant access to file contents or

10  electronic mail messages only if certain guidelines are

11  met.

12            And the guidelines are, first, that the access

13  or disclosure is requested in writing.  The reason for

14  the requested disclosure serves a legitimate university

15  purpose.  The disclosure is not invasive of legitimate

16  privacy interests.  The nature and scope of the

17  disclosure is submitted in writing and approved by the

18  college office.  And affected individuals are notified in

19  a timely manner in writing of any access or disclosure,

20  consistent with Section 6.3(c) above.

21            Is that what the policy states?

22     A      Yes.

23     Q      On page 7 of the policy, there is a section on

24  network security?

25     A      I'm sorry.  Hang on.  Yes.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1       Q      And that talks about the security functions of

2  commonly used desktops, servers, and communication

3  technologies being vulnerable to unauthorized access or

4  viewing of the system resources?

5       A      Yes.

6       Q      Under that section, the policy then provides

7  for responsibilities of network administers and ensuring

8  integrity?

9       A      Administrators, yes.

10      Q      The policy in Section (b) provides, "In

11 addition, if an individual administrator of a multi-user

12 system determines that an account presents an immediate

13 security risk, he or she may inactivate the computer

14 account without prior notice."  And it provides that the

15 administrator must contact the CITIES Security Office?

16      A      CITES.

17      Q      CITES Security Office in a timely manner to

18 report and discuss the situation.

19             Is that what the policy states?

20      A      Yes.  Yes.

21      Q      Now, getting back to the notice of the charges,

22 which is Joint Exhibit Number 4, do you have that before

23 you, sir?

24      A      I don't have it.

25      Q      And for the record, that's also Plaintiff's

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    Exhibit Number 1.

2           Does the letter of July 19, 2010, reference

3    that a meeting would take place so that an informed

4    decision can be made?

5    A    Yes.  It says -- it says, "So that an informed

6    decision can be made, a meeting will be held on July 21,

7    2010, at 3:30 in Room 403B of the Illini Bookstore

8    Building."  Yes.

9    Q    And you were informed that at the meeting you

10   would have an opportunity to respond to all charges, --

11   A    Yes.

12   Q    -- correct?

13          I want to direct your attention to Joint

14   Exhibit Number 2, the report of proceedings and order of

15   Judge Leonhard of June 25, 2010.

16          Do you have a copy of that?

17   A    I do not.

18          (Brief pause in proceedings.)

19   Q    Joint Exhibit 2 is also Plaintiff's Exhibit

20   Number 11; is that correct?

21   A    Yes.

22   Q    And this is the transcript of the proceedings

23   on June 25, 2010?

24   A    Yes.

25   Q    And is it true that you were present in court

1    at the time of that proceeding?

2        A    Yes.

3        Q    And did Judge Leonhard enter a protective order

4    with regard to Group Exhibit A at that hearing?

5        A    Yes, sir, he did.

6            THE COURT:  Mr. Brinkmann, this exhibit was --

7    this is Group Exhibit 2?  Joint Exhibit 2?

8            MR. BRINKMANN:  Yeah.  It's Joint Exhibit 2.

9            THE COURT:  This was not admitted.  Do you wish

10   to have it admitted now?  If you're going to start

11   referencing materials inside, I believe it would be

12   appropriate.

13           MR. BRINKMANN:  Can I have the witness testify?

14   It's been identified; and I believe the order, which is

15   the part that we've been talking about throughout the

16   trial, is contained in this exhibit.

17           THE COURT:  Sure.  I mean, if you want to move

18   to admit it at this time, I don't think -- Mr. Tague, you

19   do not object, do you?

20           MR. TAGUE:  No.  I think I moved to admit it

21   and -- before.

22           THE COURT:  I thought so also.  I didn't know

23   we were going to come back to this.  If we are, then I

24   think it would be proper that it be admitted --

25           MR. BRINKMANN:  Yes.

```
 1            THE COURT:  -- so that both sides can use it.
 2            MR. BRINKMANN:  Then I move to admit, Your
 3   Honor.
 4            THE COURT:  All right.  Joint Exhibit 2, which
 5   is also Plaintiff's Exhibit 11, is now admitted.
 6                (Brief pause in proceedings.)
 7   BY MR. BRINKMANN:
 8       Q    The -- is it correct that the Court's order on
 9   page 26, beginning at line 4, states that "The Court is
10   further going to enter a protective order on the
11   parties --
12       A    I'm sorry.  Page 26 of 36 is 293 -- is that
13   what you're looking at?  This said 26 of 36 up here, and
14   it says 293.
15            Oh, you're using the page number down here?
16       Q    At the bottom.
17       A    Okay.  Page 26, yes, sir.
18       Q    Yes.
19            Is it true that the judge's order, beginning at
20   line 4 on page 26, states that "The Court is further
21   going to enter a protective order on the parties that
22   there be -- there is to be no secondary dissemination of
23   any of the contents of Group Exhibit A as the Court has
24   described them, beyond the respective litigation files of
25   the three lawyers here"?
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      A     Yes.

2      Q     You were aware, then, as of June 25, 2010, that

3  the Court's order prohibited dissemination or disclosure

4  of the contents of Group Exhibit A, correct?

5      A     No.  On June 25th, I did not understand

6  completely what was going on.  There was a big flurry of

7  four -- three attorneys and a judge --

8      Q     Okay.  So you didn't understand that, but

9  that's what the judge said?

10      A     I didn't fully understand it.  That's what the

11  judge said.  That's right.

12      Q     You don't deny that that's what the judge said?

13      A     I do not deny it.

14      Q     All right.  Was there any later order by the

15  judge that prohibited you from disclosing how you used

16  the emails?

17      A     Bob, Bob Kirchner read --

18      Q     Excuse me.

19           Was there an order by the Court that you're

20  aware of that prohibited you from disclosing how you used

21  the emails?

22      A     Everything that's in this document was said by

23  the judge.  You've read part of it --

24      Q     I'm sorry, Mr. Carmody.  If you would answer my

25  question.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1        A    I don't recall anything later from the judge
 2   after this date.
 3        Q    Was there any order at any time by the judge
 4   that prohibited you from answering questions about how
 5   you got access to the emails?
 6        A    According to my attorney, Robert Kirchner --
 7        Q    Excuse me.  Can you answer the question that's
 8   been asked, please?
 9        A    Please ask it again.
10        Q    Was there any later or previous, or order at
11   any time, by the judge that prohibited you from answering
12   questions about how you got access to the emails?
13        A    My attorney interpreted the meaning of this --
14        Q    Excuse me.
15             Are you aware of an order by the judge that
16   prohibited you from answering questions about how you got
17   access to the emails?  Are you aware?
18        A    I can't fully answer that because there's
19   some -- there's a term called subject matter, and only
20   Mr. Kirchner understood it, and that is in the record.
21   It's in the communications in September, and, and August
22   that he had with the other attorneys at the university.
23   There was a different legal opinion.  I do not understand
24   all that.  I had to rely on the advice of my attorney.
25   The last thing that we got from the judge was this thing
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    on June 25th until the order was lifted on

2    September 23rd.

3         Q    I have placed Joint Exhibit 4 back on the

4    screen, which is Plaintiff's Exhibit 1.  I believe you

5    have that before you.

6              You agree, Mr. Carmody, that the very first

7    sentence of the notice of charges informed you that the

8    concerns by the College of Engineering were about

9    improper use and improper access.  Is that correct?

10        A    Yes.

11        Q    That sentence says nothing about content as a

12   concern, does it?

13        A    I don't believe it does.

14        Q    At the meeting on July 28, 2010, where you had

15   the opportunity to respond, did you provide any

16   information about Group Exhibit A regarding use or access

17   to Mr. Bohn and Ms. Reynolds?

18        A    No.  Of course, I did not --

19        Q    All right.

20        A    -- because I couldn't --

21        Q    All right.  Thank you.

22             Were you present when Rhonda Perry arrived at

23   the meeting?

24        A    Yes, I was.

25        Q    And she talked with Mr. Kirchner?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1       A    Yes.

2       Q    And was there a discussion about differing

3  interpretations of the Court order by Judge Leonhard?

4       A    Yes.

5       Q    Was there a discussion about seeking to clarify

6  the Court's order?

7       A    Yes.

8       Q    And you were advised that the investigation

9  would continue to proceed after the meeting?

10      A    I was advised in writing about August 4th, I

11 think, by Rhonda Perry.  I believe so.

12      Q    Did you ever contact Mr. Bohn or Ms. Reynolds

13 after the July 28 meeting to discuss your response?

14      A    I was prohibited from contacting employees,

15 which I think it says in this letter, and my attorneys

16 had contact --

17      Q    I'm sorry.

18           My question is:  Did you contact them?

19      A    I was not allowed to.  No.  I did not.

20      Q    Okay.

21      A    I --

22           MR. BRINKMANN:  Thank you, Your Honor.  That's

23 all I have.

24           THE COURT:  Back to you, Mr. Tague.

25

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1              REDIRECT EXAMINATION BY MR. TAGUE:
 2        Q    Mr. Carmody, do you have Exhibit Number 8 there
 3   still in front of you, --
 4        A    Yes.
 5        Q    -- Plaintiff's Exhibit 8?
 6             Could you look at that, please?
 7        A    Okay.
 8        Q    Mr. Brinkmann asked you about that University
 9   Code of Conduct; did he not?
10        A    Yes.
11        Q    I have highlighted the second paragraph.  What
12   does that provision say?
13        A    "This is not an attempt to define specifically
14   what one should and should not do, but to communicate the
15   university's expectations of proper conduct and what
16   professional conduct the university values."
17        Q    Did you understand this provision of the
18   University Code of Conduct to advise you to use your best
19   judgment regarding the Group Exhibit A documents you had
20   received in paper form?
21        A    Yes.
22        Q    Did you use your best judgment when you turned
23   over the documents that eventually became Group Exhibit A
24   to your attorneys?
25        A    Yes.  I followed the law.
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1        Q    I've highlighted a second provision there,
 2   which states, "Those acting on behalf of the university
 3   shall seek appropriate guidance when faced with ethical
 4   dilemmas."  That's in that; is it not?
 5        A    Yes.
 6        Q    Did you believe that you had an ethical
 7   question when you received anonymously paper documents in
 8   your News-Gazette mailbox?
 9        A    Yeah.  When I received these documents
10   unsolicited at my home, not on UIUCnet, which like the
11   other policy, but, yes.
12        Q    What did you do to seek appropriate guidance?
13        A    I contacted my attorneys.
14        Q    Did you obtain advice from your attorney as to
15   what you should do with those documents?
16        A    Yes, I did.
17        Q    And what was that advice?
18        A    Robert Kirchner advised me to turn them over to
19   Ruth Wyman.
20        Q    And then --
21        A    My other attorney -- excuse me.
22        Q    And then did you believe that your actions were
23   in compliance with the University Code of Conduct?
24        A    Yes.
25             MR. BRINKMANN:  Your Honor, I'm going to object
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    as to what his belief was.  It's, it's not relevant to

2    notice that the university gave of the charges or

3    opportunity to respond.

4              THE COURT:  I'll overrule.  He can -- I'll let

5    this go for a little bit longer.

6              MR. TAGUE:  I think he answered the question.

7              THE WITNESS:  Yes.  I answered "yes."

8    BY MR. TAGUE:

9         Q    Do you have Exhibit Number 7 in front of you?

10        A    Yes.

11        Q    On the first page of that exhibit, in Section

12   1, it says the purpose.  I highlighted the last sentence

13   of the first paragraph that says, "Unless explicitly

14   noted, these policies apply to all computing and network

15   communications equipment in all units."

16             That's what it says; does it not?

17        A    Yes.

18        Q    And when you read it and were not given any

19   specifics by Sharon Reynolds or Joseph Bohn or Deborah

20   Stone as to what policy provisions were applicable in the

21   charge, did you believe that that sentence was pertinent

22   to anything?

23        A    Sure.

24             MR. BRINKMANN:  Objection to the leading form

25   of the question, Your Honor, and also to questions about

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    the witness' opinions.

2              THE COURT:  I'll sustain as to leading.  Ask

3    him a non-leading question, please.

4              MR. TAGUE:  Okay.

5    BY MR. TAGUE:

6        Q    What relevancy, if anything, did you believe

7    that that sentence had to the charge and the reference to

8    the policy in the charge letter of the dean of July 19,

9    2010?

10       A    I could not connect this policy to the dean's

11   charge because my -- I was at home.  I'm not at work.

12   This policy is about UIUCnet, which my News-Gazette box

13   at home is not computing and networking equipment.

14   That's my -- it's my News-Gazette box at home with paper

15   and not electronic media under Section 6.

16       Q    Now, I've highlighted another provision on that

17   first page, which is 2(b), that says "The use of

18   computing and network services provided by the campus is

19   subject to all applicable state and federal laws, as well

20   as general university and campus policies."

21             That's in there; is it not?

22       A    Yes.

23       Q    Did you believe that that provision had

24   applicability to the charge that you were given and the

25   nonspecific reference to that policy?

1          MR. BRINKMANN:  Objection to the form of the

2    question, also asking for an opinion by the witness.

3          THE COURT:  I will sustain as to leading.

4          Please stop asking Mr. Carmody leading

5    questions.

6          MR. TAGUE:  Okay.

7          THE COURT:  Ask him open-ended questions.

8    BY MR. TAGUE:

9      Q    After you received the charge, you read the

10   policy in its entirety, correct?

11     A    Yes.

12     Q    Did you read that provision?

13     A    Yes.

14     Q    Did it mean anything to you in conjunction with

15   the charge?

16     A    It did not connect to the charge, no, because

17   it's not -- my, my News-Gazette box isn't part of the

18   UIUCnet, and my private life at home is not a part of the

19   university or UIUCnet.

20     Q    Did you believe that turning over the documents

21   to Mr. Kirchner and Ms. Wyman was in compliance with

22   applicable laws?

23     A    Yes.

24          THE COURT:  Objection sustained.  Stop asking

25   leading questions.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    BY MR. TAGUE:

2         Q    I've highlighted Section 6, portions of Section

3    6, which states "Protection of Information in Electronic

4    Media."  I've highlighted a sentence.  The -- if you

5    could look -- well, the sentence is the second sentence

6    in 6.1.  It says, "Before storing or sending confidential

7    or personal information, campus users should understand

8    that most materials on University systems are, by

9    definition, public records.  As such, they are subject to

10   laws and policies that may compel the university to

11   disclose them."

12        Then it goes on, "The privacy of materials kept

13   in electronic storage and electronic mail is neither a

14   right nor is it guaranteed."

15        That's in the policy that you read; is it not?

16        A    Yes.

17        MR. TAGUE:  Those are all the questions I have.

18        THE COURT:  Mr. Brinkmann, back to you.

19        MR. BRINKMANN:  No questions, Your Honor.

20        THE COURT:  You may step down, Mr. Carmody.

21        (Witness Carmody excused, 10:03 a.m.)

22        THE COURT:  Mr. Tague, you may call your next

23   witness.

24        MR. TAGUE:  We're done.

25        THE COURT:  I recall you raised a matter with

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    me yesterday regarding an earlier order I entered.

2    Should we take that up now outside the presence of the

3    jury?

4            MR. TAGUE:  Yes.

5            THE COURT:  All right.  Ladies and gentlemen, I

6    have a matter to take up.

7            Let me tell you:  Today I, I anticipate it will

8    be what I call an "aerobics day."  You will be in and out

9    multiple times as I work with the attorneys.  We have a

10   number of evidentiary matters to handle, some legal

11   matters to handle involving some orders.  We have the

12   jury instructions to put together, the ones I'm going to

13   give you.

14           Incidentally, that's a tedious process.  We

15   have to make sure there's no typographical errors.  We

16   have to make multiple copies, et cetera.

17           So you'll be up and down a lot today.  Today's

18   sort of the aerobic day.  So get ready to move.  All

19   right?  I'll bring you back as soon as I can.

20               (Jury absent, 10:04 a.m.)

21           THE COURT:  All right.  The jury has left the

22   courtroom.  Please be seated.

23           Mr. Tague, was this when you were going to --

24   is it still your intention to read some depositions, or

25   has that changed?

1          MR. TAGUE:  That was when we had intended to do

2    that, but we have determined not to do that.

3          THE COURT:  All right.  So -- all right.  That

4    answers that question.

5          Would you be resting at this point then?

6          MR. TAGUE:  The -- I think I did tender the

7    employment evaluations that you refused.

8          THE COURT:  That's correct.

9          MR. TAGUE:  So I believe that I've discussed

10   all the exhibits to be admitted.  So if I may have just a

11   moment, --

12         THE COURT:  All right.

13         MR. TAGUE:  -- we would rest.

14         THE COURT:  I thought -- just so it's clear

15   from yesterday -- I know we covered a lot of ground -- I

16   did refuse the evaluations.  I think they are -- they're

17   not relevant to one of the issues.  But simply inserting

18   them into the record with no relevancy through any

19   witness would not be appropriate.

20         I would not, however -- based on what we've

21   heard so far, there's no indication that he was fired for

22   anything other than cause; that, in fact, Mr. Carmody had

23   20-plus years of very good service.  And if you want --

24   wanted to argue in the damages phase as to what his

25   salary would be over the number of years he had left

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   until he retired, I indicated that I thought that would

2   be an appropriate argument if you chose to make such.

3   And I stand by that ruling.

4          All right.  So with that, you rest?

5          MR. TAGUE:  Yes.

6          THE COURT:  All right.  We'll have to do that

7   in front of the jury.

8          Before I bring the jury back in so that the

9   plaintiff can rest, just for my scheduling purposes, Mr.

10  Brinkmann, who would be your first witness?

11         MR. BRINKMANN:  I have a motion for directed

12  verdict, Your Honor, that I --

13         THE COURT:  Right.

14         MR. BRINKMANN:  -- wanted to submit.  And

15  Joseph Bohn will be my first and only witness, Your

16  Honor.

17         THE COURT:  All right.  What we'll do is we'll

18  bring -- they're going to get their exercise.  We'll

19  bring the jury back in.  You need to rest, obviously, Mr.

20  Tague --

21         MR. TAGUE:  Yes.

22         THE COURT:  -- formally in front of the jury.

23  We'll take them back out, and then I'll hear your motion

24  at that time, Mr. Brinkmann.

25         Let's bring them back in.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1              (Brief pause in proceedings.)

2              (Jury present, 10:08 a.m.)

3         THE COURT:  All right.  Please be seated.

4         Mr. Tague, you may call your next witness.

5         MR. TAGUE:  Your Honor, we have called all the

6    witnesses we intend to present.  The plaintiff would rest

7    his case.  Thank you.

8         THE COURT:  All right.  Ladies and gentlemen,

9    the plaintiff has rested.  I'm going to verify the

10   exhibits that were admitted on behalf of the plaintiff.

11             They would be Plaintiff's Exhibits 1, 2, 3, 4,

12   5, 6, 7, 8, 9, 10, which is admitted but not going to the

13   jury, 11, 12, 13, 14, 16, 17, 19, 27, 28, 46.

14             Is that correct, Mr. Tague?

15        MR. TAGUE:  I believe so.

16        THE COURT:  Mr. Brinkmann, you concur?

17        MR. BRINKMANN:  I do, Your Honor.

18        THE COURT:  Then we had Joint Exhibits, Joint

19   Exhibit 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 is also Plaintiff's

20   12 -- 10, 11, and 12 is the -- would that be it for the

21   joint exhibits that were admitted?

22        MR. BRINKMANN:  Yes.  And, Your Honor, which of

23   those will not, or will go to the jury?

24        THE COURT:  We'll discuss those later.

25        MR. BRINKMANN:  Okay.

1          THE COURT:  But 10 is definitely not, but the

2    rest of them we'll talk about.

3          Mr. Tague, you concur those are the joint

4    exhibits?

5          MR. TAGUE:  Yes.

6          THE COURT:  All right.

7          COURTROOM DEPUTY:  I have a question.  Did you

8    say 16?  I show 16 admitted.

9          THE COURT:  16 I have not admitted.  Did I say

10   16?

11         MR. TAGUE:  I think you might have said 16,

12   Your Honor, and I had noted that you denied that.

13         THE COURT:  Yeah.  16 is not admitted.  If I

14   said that, I said that in error.

15         All right.  Ladies and gentlemen, that's the

16   exhibits admitted during the plaintiff's case, as well as

17   you've heard the witnesses for the plaintiff.  The

18   plaintiff has rested.

19         More legal stuff that has to be taken care of.

20   You have to go back out again.

21              (Jury absent, 10:10 a.m.)

22         THE COURT:  All right.  The jury has left the

23   courtroom.  Mr. Brinkmann, you have a motion under Rule

24   50 for a judgment as a matter of law?

25         MR. BRINKMANN:  I do, Your Honor.

```
 1              (Brief pause in proceedings.)

 2              THE COURT:  Whenever you're ready.

 3              MR. BRINKMANN:  Yes, Your Honor.  The first --

 4    there are two parts to this.  The first is that the

 5    plaintiff as a matter of law was provided with an

 6    opportunity to respond to the charges; and, therefore,

 7    the defendants did not violate a constitutional right.

 8    The two issues under this section are reasonable notice

 9    of the charges and reasonable opportunity to respond to

10    the charges.

11              We have in evidence the Plaintiff's Exhibit 1,

12    I think Joint Exhibit 4, which is the notice of charges

13    letter.  I think as a matter of law, Your Honor, this

14    goes beyond what is required to give notice under due

15    process.  The only thing that the plaintiff has raised

16    with respect to the notice of charges is whether or not

17    he was directed to a particular sentence in the one-page

18    Code of Conduct or whether he was directed to a

19    particular section of the code -- Policy on the Use of

20    Computers.

21              Plaintiff has testified that he read the Code

22    of Conduct.  He reviewed it with his attorney.  He read

23    and analyzed the policy in questioning by me and by his

24    own attorney.  I think that due process does not require

25    that the particular sentence in a policy or the
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   particular section of a policy needs to be pointed out.

2           Due process, as the Seventh Circuit has

3   indicated, requires that the notice of charges can be

4   given verbally.  It has to be simply a reasonable notice

5   of what the university or the employer in this case is

6   contending was the conduct that was the subject of the

7   investigation.  That was done, and I suggest as a matter

8   of law in this case it satisfies due process.

9           It's also undisputed from the evidence that the

10  charging letter referenced a meeting for the purpose of

11  giving the plaintiff an opportunity to respond.  What the

12  plaintiff has done is refused to engage in that process.

13  The plaintiff appeared, refused to answer questions on

14  the basis of his attorney's advice.

15          But answering questions was not the only thing

16  that the meeting was to accomplish.  The plaintiff was to

17  have an opportunity -- and it's stated in the charging

18  letter -- to respond to the charges.  In other words, his

19  own statement, without anybody asking him questions, was

20  to be provided if he chose to do that.  The plaintiff

21  chose not to do that.  The plaintiff chose not to engage

22  in that process afterwards.  Reasonable opportunity to

23  respond to charges was given as a matter of law, I

24  believe, under the evidence in this case.

25          The second part of the motion has to do with

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    qualified immunity.  The case law says that qualified

2    immunity protects officers performing discretionary

3    functions from civil liability so long as their conduct

4    does not violate clearly established statutory or

5    constitutional rights that a person would know about.

6            Once qualified immunity is raised, the

7    plaintiff has the burden of establishing that his or her

8    rights were violated and the law concerning the proffered

9    rights was clearly established at the time that the

10   challenged conduct occurred.

11           And then the Court must determine whether a

12   reasonably competent official would know that the conduct

13   was unlawful in the situation that he confronted.

14           The Seventh Circuit cases on this deal with an

15   individual being prevented from meaningful participation

16   in the process because of a physical disability or a

17   mental disability, some disability whereby he claimed he

18   could not respond.

19           In this case, we have a sort of a novel

20   situation where the plaintiff could respond but did not

21   respond, chose not to respond.  Here, the law -- the

22   question is whether a reasonably competent official would

23   know that the conduct was unlawful; in other words,

24   proceeding with the investigation, even after giving this

25   opportunity to respond, that that was unlawful.  There is

1 no precedent that would have made this clearly indicated

2 to the defendants in this case.  For that reason, we

3 think that qualified immunity applies.

4         Now, lastly, Your Honor, and this is not in the

5 written motion.  It's something that I believe arises

6 because of some of the testimony that came in yesterday.

7 And that is as a matter of law I don't think that the

8 plaintiff has established a causal connection between the

9 notice of charges and opportunity to respond to those

10 charges and his firing.  There's no evidence that if the

11 plaintiff had been given specific information about which

12 paragraph of the Code of Conduct and which section of the

13 Policy was applicable, there's no evidence that he would

14 have acted differently at the meeting where he had an

15 opportunity to respond.

16         There's no evidence that the decision by the

17 decision makers in this case -- Mr. Thompson and Ms.

18 Stone -- would have changed, that it would have been

19 different.

20         There's no evidence that he would have changed

21 his conduct in refusing to engage and refusing to provide

22 any response.

23         And so I don't think that the plaintiff has

24 carried the burden of proof as a matter of law in showing

25 a causal connection between the conduct of the defendants

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    and the termination and damages that he seeks.

2            For those reasons, we request a directed

3    verdict in this case.

4            THE COURT:  Thank you, Mr. Brinkmann.

5            Mr. Tague, do you wish to respond?

6            MR. TAGUE:  Yes.

7            I'm failing -- obviously, I just received this

8    written motion and heard the statements for the first

9    time by Mr. Brinkmann.

10           But I'm not seeing the difference in this

11   argument from the one that was presented in Defendants'

12   summary judgment motion as to these defendants that was

13   denied by the Court.

14           The Court of Appeals made a determination

15   relative to the pretermination entitlement of Kevin

16   Carmody.  That was the law of the case.  And the -- I

17   think you've already established, further law of the case

18   here, relative to the denial of our motion for

19   reconsideration in which you did not believe that you had

20   the authority to change what the Court of Appeals had put

21   in their decision.

22           So that Court of Appeals decision identified

23   two prongs of a pretermination due process violation.

24   One was that there was, in fact, a temporary impediment

25   to Mr. Carmody based upon the State Court protective

1  order; and the Appellate Court indicated that there was a

2  plausible cause of action and that a trier of fact would

3  have to hear evidence as to whether or not, in fact, this

4  was an impediment under all of the circumstances of the

5  case and whether or not there was either a lack of

6  diligence or some overriding reason that the university

7  or the investigators could not or should not grant Mr.

8  Carmody the opportunity to come in after the order was

9  lifted on September 23, 2010.

10        And there's been no evidence presented to this

11  point, and I am thinking even after the defendant, if

12  they have one witness left, I think quite likely there

13  will not be any evidence that the university would have

14  had an unreasonable burden if Mr. Carmody would have been

15  allowed to come in on the 23rd, 24th, within a matter of

16  hours or days, to finally be able to participate in the

17  process, hear the story, and have this supplementation

18  orally during the meeting that the investigators had

19  talked about.

20        So, a jury certainly can conclude, based upon

21  the evidence, that there was no meaningful, or reasonable

22  opportunity to respond.  Given the imposition of the

23  Court order and the refusal of the university to allow a

24  participation upon a -- immediate participation, as far

25  as that goes -- within a short period of time after

1 | September 23, 2010.

2 |         Mr. Brinkmann didn't speak to the second prong

3 | of what the Court of Appeals said that could be a due

4 | process violation.  That was the allegation that the

5 | charging letter made charges to him that were in the

6 | nature of accessing the information but that the

7 | supervisor reporting the allegation appeared in the

8 | findings in Mr. Thompson and Ms. Stone's ultimate letter

9 | of discharge.

10 |         So for those reasons, the case should go to the

11 | jury as to, in fact, whether there was a due process

12 | violation.

13 |         On the causation element of it, the --

14 | Mr. Thompson testified to it in more detail.  But in the

15 | ultimate letter of September 23, 2010, reference to the

16 | findings and conclusions on September 7, 2010, the whole

17 | gist of Mr. Thompson's testimony was, "well, I didn't

18 | have firsthand knowledge of most of this.  I was relying

19 | upon the investigators."

20 |         There were statements in that report to the

21 | effect that you didn't answer questions.  That might be

22 | used against you.

23 |         There were statements in, on September 7, 2010,

24 | that you didn't report it to your supervisor.  We've

25 | heard testimony from Mr. Carmody, "I reported it to my

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    supervisor." So that had he known if the charge was, you

2    failed to report under this policy provision, under this

3    Code of Conduct provision, that you came into possession

4    of these paper documents and did not tell your

5    supervisor, he would have had an opportunity to tell the

6    investigators that in some fashion, either orally or in

7    writing.

8           On the issue of qualified immunity, I think

9    that that one was also addressed with the exact same

10   facts presented in arguments in the motion for summary

11   judgment, and you made a decision on that. The --

12   there's nothing different here that would show anything

13   other than these, the group of the three remaining

14   defendants -- this was their job -- to provide these

15   matters.

16          And in spite of that, in spite of knowing that

17   they needed to have a fair process, they give the

18   charging letter. They get a very reasonable request, you

19   know, "You told me about these policies. What section

20   should I look at?"

21          And rather than saying that, "Well, these are

22   the sections," or even saying, "All of them. You need to

23   respond to all of them," they just said, "Look at the

24   charge." And the charge, of course, didn't say "all of

25   them." It didn't say "some of them." Nor did they say

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    that "at the meeting we'll tell you."

2            And I think that, in fact, the testimony of the

3    defendants is more -- reprehensible is the word that

4    comes to my mind; maybe that's a strong statement.  But

5    rather than tell him at any time, we'll tell you later,

6    or if you engage in a dialogue we'll tell you, they

7    simply said we're not going to tell you.  Just look at

8    the charge, and the charge will tell you what specifics

9    are actually provided.

10           I think we cited a case that perhaps was part

11   of your ruling on your denial of their motion for summary

12   judgment relative to qualified immunity, that it isn't

13   necessary that there be a case on all four corners to put

14   people that are charged with this job.  It's part of

15   their job.  They work in academic resources.  This isn't

16   the, a case where there is a foreman of a county road

17   crew that is trying to do an employee hearing for the

18   first time.

19           These people had policies.  They talked about

20   practices and procedures that were, in our opinion,

21   clearly deficient in providing details for a fair and

22   meaningful opportunity to respond.

23           Accordingly, the, there is no basis for

24   absolute qualified immunity.

25           Be happy to answer any questions, Your Honor.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1              THE COURT:  No.
 2              I'm looking for a case, if I can find it, and I
 3    cannot.
 4                   (Brief pause in proceedings.)
 5              THE COURT:  Well, I believe I know what the law
 6    is, so we'll proceed.
 7              Were it not for the appropriate standard, or
 8    burden, this motion might succeed.  It does not.  I view
 9    the evidence at this stage in the light most favorable to
10    the nonmoving party; that being the plaintiff.  So I view
11    the evidence in the light most favorable to Mr. Carmody
12    when considering this motion.
13              The two issues that are before the Court with
14    two ancillary issues, qualified immunity and causation --
15    but the two primary issues are:  Did Mr. Carmody receive
16    a reasonable notice of the charges against him?  And was
17    he given a reasonable opportunity to respond?
18              First, reasonable notice of the charges against
19    him.  I find based on the evidence so far that the jury
20    could conclude that he was unclear or that his
21    interpretation -- whether it was a reasonable
22    interpretation or not is up to the jury -- but the jury
23    could conclude that his belief in how the University Code
24    of Conduct and the Policy on Appropriate Use of Computer
25    and Network Services, his interpretation of how those
```

1   policies were written, combined with the charging letter

2   together, did not give him reasonable notice.

3           The jury could accept his interpretation, could

4   accept his reliance to some degree about his counsel,

5   Mr. Kirchner and/or Mrs. Ruth Wyman.  And they could

6   conclude that he did not have reasonable notice.

7           And I view the evidence in the light most

8   favorable to Mr. Carmody.  So perhaps the jury will find

9   that he did not get reasonable notice.

10           Likewise, as far as reasonable opportunity to

11  be heard to contest the reasons for the, ultimately his

12  discharge, again, the jury could interpret all of the

13  evidence in the way that Mr. Carmody wants them to

14  interpret it.  And if they did that, they could find that

15  all of that time period from when he first had the

16  rescheduled meeting at the end of July all the way up to

17  September 23rd, even though he did not respond at all

18  during that time period, nor does his attorney make any

19  effort to lift the stay, the protective order, the jury

20  could still find that he didn't have a reasonable

21  opportunity to respond based upon what his attorney was

22  telling him and perhaps the time just slipped away, or

23  they conclude that that was a reasonable action for him

24  to take.  They could do that.

25           So it is possible for the jury -- a reasonable

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    jury would then have a legally sufficient evidentiary

2    basis to find for the plaintiff.  There has been enough

3    evidence in this record to support the plaintiff's

4    claims.

5           I will -- I am not the trier of fact.  I will

6    say:  My observation, it is very thin evidence.  I'm not

7    sure if I was a trier of fact I would find for the

8    plaintiff.  But I'm not.  That is for the jury to decide

9    at this stage.

10          As far as the causal connection -- well, we've

11   already discussed the qualified immunity issue.  It's

12   been discussed in some pleadings.  I didn't find it

13   specifically in the latest summary judgment motion, but I

14   know it's been raised and discussed in this case.  I find

15   that the, qualified immunity does not apply.  I'm not

16   going to reiterate all the reasons.  Suffice to say that

17   I believe it's not necessary that there be a case exactly

18   identical to put the parties on notice that their conduct

19   would violate a constitutional right.  So I'll leave it

20   at that.

21          As far as the causal connection is concerned,

22   that's actually one of my notes from the first day; but

23   in my mind, there was some very weak evidence, but

24   sufficient, when Rhonda Perry testified.  There was

25   commentary that she was keeping Human Resources apprised

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  of what she was doing, including the three defendants.

2  They knew what was going on.  They continued with their

3  investigation.  True, they told the plaintiff, "Look,

4  we're going to continue with our investigation."  But

5  they also knew at the same time that, especially as they

6  drafted the report, that he was likely to be fired; and

7  they knew at the same time, thanks to Rhonda Perry's

8  testimony, they were there initially.  They knew

9  Mr. Kirchner's position.  And they knew that there was

10  some ongoing correspondence back and forth.

11          The other university counsel testified that she

12  was also periodically keeping them apprised, although

13  typically through Rhonda Perry.  Likewise, she was being

14  apprised what was going on through Rhonda Perry.

15          I find that when I combine all those things

16  together, there is a sufficient causal connection that,

17  again, a reasonable jury could find that there's a

18  legally sufficient evidentiary basis to find for the

19  plaintiff, based on me examining the evidence in light of

20  the nonmoving party.

21          So with that being said, the motion is denied

22  at this time.

23          All right.  Let's take about a five-minute

24  break.  We can come back.  You intend to call Mr. Bohn,

25  Mr. Brinkmann?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1           MR. BRINKMANN:  I do, Your Honor.  But I would

2     also need to know.  You've indicated that Joint

3     Exhibit 10, 11, and 12 are admitted into evidence, but

4     that Number 10 would not be going back to the jury.  I

5     assume that I'm not able, then, to put that on the screen

6     and question him.  Is that your ruling?  Or may I use

7     that on the screen to question him?

8           THE COURT:  10 -- let me take a look at

9     Exhibit 10.

10           By the way, don't, don't presume all the

11     exhibits are going back.  I just know at this stage there

12     is no way Exhibit 10 is going back to the jury, for all

13     the reasons I stated previously.  We can discuss which

14     exhibits go back after we're done.

15           MR. BRINKMANN:  I was talking about Joint

16     Exhibit 10, I'm sorry.

17           THE COURT:  Oh, Joint Exhibit 10.

18           MR. BRINKMANN:  Yeah, which is the Carmody

19     talking points.

20           THE COURT:  Oh, you can put that on the screen.

21           (Discussion off the record; the Court is

22           conferring with the courtroom deputy.)

23           THE COURT:  Yeah.  It's the other 10 -- It's

24     Plaintiff's Exhibit 10 that's not going to the jury.

25     This is what happens when you use the same numbers.

```
 1          Okay.  Let me make it really clear.
 2   Plaintiff's Exhibit 10, which is correspondence involving
 3   Mr. Kirchner, that is not going back to the jury.
 4          Joint Exhibit 10, which is also Plaintiff's 12,
 5   you can be free to use that.  As a matter of fact, I
 6   believe -- Mr. Tague, you actually already put that on
 7   the screen and showed it to the jury.  So that -- you can
 8   certainly use that with Mr. --
 9          MR. BRINKMANN:  And I will do that with Number
10   11 as well, Your Honor, Joint Exhibit 11.
11          THE COURT:  Yeah.  Please let me know if you're
12   talking about Joint or Plaintiff's.
13          Joint 11, which is Plaintiff's 4, yes.  And,
14   again, Mr. Tague has already shown that to the jury.
15          MR. BRINKMANN:  Thank you.
16          THE COURT:  Oh.
17          MR. TAGUE:  Your Honor, I do have one matter
18   since he indicated Joe Bohn is going to testify.
19          When Mr. -- I'm sorry.  I didn't think I was a
20   wanderer, but apparently I am.
21          When Joe -- when Mr. Bohn was testifying, he
22   referred, I believe, to when we were talking to him about
23   talking points, he indicated that there was a document
24   that he had signed.  And, of course, I go back to the
25   office; I scratched my head; I didn't remember that.
```

1 Well, he's, he's right, and I pulled it out from the

2 documents.

3           And maybe --

4               (Brief pause in proceedings, Court

5               conferring with courtroom deputy.)

6           MR. TAGUE:  May I proceed?

7           THE COURT:  Yes.  Sorry about that.

8           MR. TAGUE:  The -- so we discovered in a

9 deposition exhibit that I think was over 600 pages that

10 when we did the pretrial order, pulled out the talking

11 points, that was the, I think, deposition exhibit we were

12 just talking about.

13          But there also was this two-page document that

14 was in Mr. Bohn's files that also relate to his interview

15 of Jong-Shi Pang.  This is not an exhibit on the pretrial

16 list, and I would like leave to make this Exhibit

17 Number 50.

18          And it may be that if nothing's asked about

19 Jong-Shi Pang, it just goes in the pile.  But if they ask

20 him about talking points and Jong-Shi Pang, I'd like to

21 show him this exhibit.  So I would move -- and I think

22 there's good cause given; it's a short document.  He

23 talked about it in his direct.  And because of the volume

24 of paperwork, it wasn't pulled back or held for any

25 reason.  It's one that, you know, in the ebb and flow of

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    things that we received.

2              MR. BRINKMANN:  First of all, Your Honor, he

3    did not talk about this document in his direct being

4    signed.  What he, what he said in his direct examination

5    was that the talking points for the Carmody meeting that

6    he used had his writing on it.  And the talking points

7    that Mr. Tague was using in the questioning, and I will

8    be using, are the ones that are the agreed exhibit here,

9    that we've been referring to.

10             The plaintiff has rested, and so I object to

11   this request.

12             THE COURT:  Well, I'm not going to give you a

13   preliminary ruling.  We'll see where the questioning of

14   Mr. Bohn goes and see if it strays into matters that

15   makes this exhibit relevant.  It is an exhibit that I

16   presume -- you had possession of these documents before,

17   correct, Mr. Brinkmann?

18             MR. BRINKMANN:  Yes.

19             THE COURT:  So you're not -- you know, this

20   isn't the first time directly that you've seen these

21   documents, but I'm not going to give an advisory opinion.

22   I'll see where the testimony of Mr. Bohn goes.  If it

23   strays in an area that makes it relevant, then I'll rule

24   at that time.

25             All right.  It's 10:40.  Let's take a

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    five-minute break.  Be back at 10:45, and we'll call up

2    Mr. Bohn to take the stand.

3                    (Recess, 10:40 a.m. to 10:50 a.m.)

4            THE COURT:  Mr. Tague, any reason not to bring

5    the jury back in?

6            MR. TAGUE:  No, sir.

7            THE COURT:  Mr. Brinkmann?

8            MR. BRINKMANN:  No, Your Honor.

9            THE COURT:  By the way, we're working on the

10   jury instructions.  It just was brought to my attention

11   that the punitive damage instruction the two of you

12   submitted is not the Seventh Circuit pattern instruction.

13   Other than -- so I want to make sure that you know -- I

14   said yesterday I'm using all the instructions you

15   submitted, just using the ones -- either putting them in

16   Seventh Circuit format or in the Seventh Circuit order or

17   using the Seventh Circuit's latest version.  That's one

18   where I'm going to change the instruction to the Seventh

19   Circuit instruction.

20           All right.  Let's bring the jury back in.

21                    (Brief pause in proceedings.)

22                    (Jury present, 10:51 a.m.)

23           THE COURT:  All right.  Please be seated.

24           On behalf of the defendants, Mr. Brinkmann.

25           MR. BRINKMANN:  Your Honor, we will call

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    Mr. Joseph Bohn to the stand.

2                  JOSEPH BOHN, sworn, 10:52 a.m.,

3                  DIRECT EXAMINATION BY BRINKMANN:

4        Q    Would you state your name again for the record,

5    please?

6        A    Joseph Bohn.

7        Q    And you are a defendant in this case?

8        A    Yes.

9        Q    Mr. Bohn, I'll try not to be repetitious of

10   what you have testified to already with respect to this

11   case.

12                  I want to ask you about the meeting that was

13   held on July 28th with Mr. Carmody and his attorney.  At

14   that meeting, who, as between yourself and Sharon

15   Reynolds, was taking the lead in conducting that meeting?

16       A    I, I was taking the lead for that meeting.

17       Q    Mr. Bohn, I have placed on the screen Joint

18   Exhibit 10, which is also Plaintiff's Exhibit 12 and has

19   been previously admitted.  Is this a copy of the outline

20   for the meeting that you prepared?

21       A    Yes.

22       Q    And at the meeting, to the best of your

23   recollection, were you able to go through the bullet

24   points with Mr. Carmody and his attorney?

25       A    The -- I believe I -- I do remember getting

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    through the initial bullet points.  I'm talking about

2    we're here to discuss the charge letter.  I'm talking --

3    go through an instruction, informal process -- so those

4    first -- one, two, three, four -- seven bullet points,

5    ending with we "can take a break if needed."

6         Q    So those would include introducing yourself and

7    Sharon Reynolds, informing that it was an informal

8    process, not a legal hearing, part of the

9    employer/employee relationship.

10            The next bullet point being that it's a meeting

11   that's part of an investigation to help us better

12   understand the situation.

13            Kevin will be the only one providing

14   information to us.

15            His attorney can advise.

16            And we can take a break if needed.

17            Those things were stated at the beginning of

18   the meeting?

19        A    Correct.

20            MR. TAGUE:  I want to interpose an objection.

21   It's compound and leading.

22            THE COURT:  Overruled.  I'll let that answer

23   stand.

24   BY MR. BRINKMANN:

25        Q    In accordance with this exhibit, did you next

1    then read the charges?

2         A    I did.

3         Q    And were those the same charges that were

4    contained in the charging letter of July 19, 2010?

5         A    That's correct.

6         Q    Did you then state the next sentence, which

7    says, "To begin, please provide us any information that

8    you feel would be helpful for us to understand about the

9    concerns outlined in the charge letter dated" -- it says

10   July 14 -- "the charge letter dated July 19, 2010"?

11        A    Yes.

12        Q    What happened after you made that statement?

13        A    I believe at this point there was --

14   Mr. Kirchner started to object and talk about his

15   concerns related to the protective order, and so there

16   was not -- that was the information that was provided to

17   me.

18        Q    Did you have any discussion with Mr. Kirchner

19   about the questions that are set forth under the part of

20   this exhibit that says "ask the following questions"?

21        A    Yes.

22        Q    Were you able to ask any of the questions

23   contained in paragraphs 1 and 2?

24        A    Yes.

25        Q    How far did you get into those questions?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      A    I recall three distinct volleys back and forth,

2    asking the first question -- at a minimum, three distinct

3    volleys back and forth, asking the first question, then

4    getting to number two and, at a minimum, getting to (a)

5    and (b).

6      Q    All right.  So the first question that you

7    asked was, "Were the following documents presented in

8    Exhibit A by your attorney?"  And then it says, "note

9    they may be numbered to help."

10          Was that question asked?

11     A    Yes.

12     Q    Did you receive an answer?

13     A    They would not answer that response.

14     Q    Did you ask the next question?

15     A    Yes, I did.  The next one kind of outlines the,

16   what the next questions are going to focus on.

17     Q    It says, "There are open questions regarding

18   how you came into possession of these documents,

19   specifically whether you obtained them through improper

20   access."  And then it says, "A.  Please describe how you

21   obtained the documents contained in Group Exhibit A."

22          Is that what that question was?

23     A    Correct.

24     Q    Did you state that question at the meeting?

25     A    I did.

1    Q    Was there an answer?

2    A    No.

3    Q    Did you state the next question, 2(b), "Did you

4  receive the documents in Group Exhibit A electronically

5  or in paper format?"

6    A    Yes.

7    Q    Did you get an answer to that?

8    A    No.

9    Q    Were you able to ask any further questions

10  during the meeting?

11    A    It's, it's my understanding that I did, but I

12  can't recall more than three volleys back and forth.

13    Q    Now, the questions on Group -- Joint Exhibit 10

14  go into the second page.

15         Do you recall if you made it, during the

16  meeting, to any of the questions on the second page?

17    A    I, I -- as my practice, I, I do recall having a

18  summary of next steps that I, that I shared with

19  Mr. Kirchner and Mr. Carmody.  And so I, I did read that

20  bottom part, starting with "You will remain on

21  administrative leave until told differently."

22    Q    All right.  So the part that's entitled "Next

23  Step" was covered during this meeting?

24    A    Correct.

25    Q    And those five bullet points, all of which were

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    stated during the meeting?

2        A    Right.  And throughout --

3        Q    Was it --

4        A    Throughout the conver-- through the

5    conversation, the attorney and Mr. Carmody were, were

6    asked questions and offered their input throughout the

7    conversation.

8        Q    Did you get any answers from Mr. Carmody to any

9    of these questions during the meeting?

10       A    No.  I did not.

11       Q    Was it your intention to ask all of the

12   questions on this outline at that meeting?

13       A    Yes.

14       Q    Did any of those questions ask about the

15   content of the emails in Group Exhibit A?

16       A    My recollection is no.

17       Q    And in reviewing this exhibit, the outline of

18   the questions that you did, in fact, use, do any of these

19   questions relate to asking about the content of the

20   emails in Group Exhibit A?

21       A    What I, what I reviewed, these questions, I did

22   not see anything related to content.

23       Q    Did those questions cover the subject matters

24   that were set forth in the charging letter regarding use

25   of the emails and access to the emails?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1       A     Yes.

2       Q     Now, Mr. Bohn, at the beginning of the meeting,

3   you told us that you were taking the lead with

4   introductions and getting started; is that correct?

5       A     Correct.

6       Q     Did you observe Sharon Reynolds yelling at Mr.

7   Carmody at the beginning of the meeting?

8       A     Ms. Reynolds did not yell or raise her voice

9   with Mr. Carmody.

10      Q     At any time during the meeting, did she yell?

11      A     No.

12      Q     Mr. Bohn, I've placed on the screen the joint

13  Exhibit Number 11.  Is that a document that reflects an

14  interview with Jong-Shi Pang?

15      A     Yes.

16      Q     And who asked the questions during that

17  interview?

18      A     I asked the questions.

19      Q     And was Sharon Reynolds present?

20      A     She was.

21      Q     And did she take notes?

22      A     In, in these calls, I remember Sharon and I

23  both taking notes.  Likely, Sharon was the lead note

24  taker; and I would, as I normally do, I would take notes

25  as I asked questions.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1      Q     Does Exhibit 11 reflect the questions that were

2   asked to Jong-Shi Pang and the answers that he gave to

3   those questions?

4      A     Correct.

5      Q     During your interview with Jong-Shi Pang -- and

6   I'm specifically referring to paragraph 2 on Exhibit,

7   Joint Exhibit 11 -- did you ask Jong-Shi Pang that

8   question; and did he give that response, the question

9   being, "Did Kevin Carmody ever tell you that he was in

10  possession of confidential email messages dated 2005 and

11  2007 from or to university employee Deborah Thurston and

12  that he was not listed as a recipient or author of any of

13  the email messages"?

14     A     He -- I did ask that question.

15     Q     And is his response set forth below to that

16  question?  Did he respond no; he, Jong-Shi Pang, first

17  heard about the possibility of an email matter from Laura

18  Clower.  Definitely Kevin himself did not mention

19  anything about these email messages to him?

20     A     That's correct.

21     Q     Was the question in paragraph 3 asked to

22  Jong-Shi Pang, "Are you aware of any instances when Kevin

23  Carmody told anyone he was in possession of confidential

24  email messages dated 2005 and 2007 from or to university

25  employee Deborah Thurston and that he was not listed as a

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    recipient or author of any of the email messages"?  Was

2    that question asked?

3         A    Yes.

4         Q    And was his response he's not aware Kevin told

5    anyone about the messages?

6         A    Correct.

7         Q    Number 4, did you ask Jong-Shi Pang, "Are you

8    aware of Kevin Carmody alerting you or others that there

9    may have been a security breach related to confidential

10   email messages dated 2005 and 2007 from or to university

11   employee Deborah Thurston?"  Did you ask that question?

12        A    Yes.

13        Q    And did Jong-Shi Pang respond no; he was not

14   aware?  Kevin had not informed him of any security leaks?

15        A    That's correct.

16        Q    And number 5, did you ask the question to

17   Jong-Shi Pang, "Did you ever authorize Kevin Carmody to

18   use the substance of confidential email messages dated

19   2005 and 2007 from or to university employee Deb Thurston

20   for non-university related purposes?"

21             And was that question asked?

22        A    Yes.

23        Q    And was his response, "No.  I did not"?

24        A    His response was, "No.  I have not."

25        Q    Thank you.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1        A      I'm sorry.
 2        Q      Mr. Bohn, was this a record that was made
 3   contemporaneous, or at the same time, as your interview
 4   with Jong-Shi Pang?
 5        A      This, this -- there would have been notes taken
 6   from those conversations; and at some point, Ms. Reynolds
 7   and I would have come together sometime after that to
 8   compile our notes and pull it all together.
 9        Q      And was that done before your report of
10   findings and recommendations?
11        A      Correct.
12        Q      Now, during this entire period of time from
13   July 19th of 2010 until September 23 of 2010, was Kevin
14   Carmody on paid leave?
15        A      Yes.
16        Q      The work that he had been doing as the only
17   administrator for IT to the department, was that -- did
18   that have to be reassigned to other people?
19        A      It did.
20        Q      And were those other people paid interim
21   employees?
22        A      There were other employees paid to, to do his
23   work.
24        Q      And during the pendency of this matter, was
25   there any uncertainty with respect to support personnel
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    in the department?

2         A    Yes.

3         Q    As of September 23, 2010, which would have been

4    almost two months after the meeting where Mr. Carmody was

5    to have an opportunity to respond, had there been any

6    notice communicated to you that you're -- or to anyone

7    that you're aware of, that Mr. Carmody's attorney

8    intended to seek clarification of the court order?

9         A    No.

10             MR. BRINKMANN:  That's all, Your Honor.

11             THE COURT:  Mr. Tague.

12             CROSS-EXAMINATION BY MR. TAGUE:

13        Q    The exhibit that Mr. Brinkmann showed you had a

14   second page, too; did it not?

15        A    I believe it did.

16        Q    That is the second page; is it not?

17        A    [No response.]

18        Q    Is that correct, a correct statement?  That's

19   the second page of that exhibit that you were just

20   talking about the first page?

21        A    Does this have my signature at the bottom?

22        Q    No.  You -- let me show you the full exhibit.

23        A    I don't recall whether he showed me the one

24   with my signature at the bottom or not, but that would be

25   the second page.  Yes.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1              THE COURT:  This is Joint Exhibit 11, correct?
 2              MR. BRINKMANN:  Correct.
 3   BY MR. TAGUE:
 4       Q    Are you telling us you're really not sure that
 5   this was the document since your signature's not on it?
 6       A    No.
 7       Q    Okay.  So this is the second page of it,
 8   correct?
 9       A    Correct.
10       Q    And number 9, it says, "Please provide any
11   information that you feel would be valuable during this
12   investigation."  You asked that question?
13       A    Correct.
14       Q    And Dr. Pang provided a response; did he not?
15       A    Correct.
16       Q    And in his response, A2, he says, "I was aware
17   Deborah Thurston was being subpoenaed."  He told you
18   that; did he not?
19       A    Correct.
20       Q    He told you that Deborah Thurston came to his
21   office, correct?
22       A    Correct.
23       Q    He told you -- it says, number 2, "told me she
24   was being subpoenaed relating to these email messages and
25   an ongoing lawsuit."  She told you that; did she not?
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1       A       Correct.

2       Q       Number 3, she told you that the emails had

3   personal things, and they were related to the Goldberg

4   lawsuit, correct?

5       A       The one thing I do want to say is that there is

6   a version of this document that I signed, and I'm not

7   able to see -- I'm presuming that these are the same

8   exact responses that are on that version.  If that's not

9   the case, I would need to know that now.

10      Q       Well, your attorney showed you the document.

11      A       Right.

12      Q       You don't trust him that he's showing you the

13  right one?

14      A       I, I believe that it's the right --

15              MR. BRINKMANN:  Your Honor, I'll object to that

16  argumentative statement by counsel.

17              THE COURT:  Yeah.  Don't argue with the

18  witness.

19              But at the same time this is Joint Exhibit 11;

20  is it not, Mr. Tague?

21              MR. TAGUE:  That's correct.

22              THE COURT:  It's the joint exhibit.  It's

23  agreed to by Mr. Brinkmann as well, so that should answer

24  your question perhaps.

25              THE WITNESS:  Then I'm comfortable that it's

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    accurate.

2    BY MR. TAGUE:

3         Q    And then number 4, when Deborah -- you

4    stated -- you asked that question, or at least Jong-Shi

5    told you that, too, correct?

6         A    Correct.

7              THE COURT:  Wait, I want to clarify something.

8    So this -- just so I understand, this isn't what Deborah

9    Thurston is telling you, Mr. Bohn; this is what Jong-Shi

10   Pang is telling you Deborah Thurston told him?

11             THE WITNESS:  Correct.

12             THE COURT:  It's basically hearsay.  Okay.

13             (Brief pause in proceedings.)

14   BY MR. TAGUE:

15        Q    You testified to, about Exhibit 12, and

16   portions of it.  And what I'm --

17             THE COURT:  Just so the record is clear, since

18   you are using -- both you gentlemen are using the same

19   numbers, this is Plaintiff's Exhibit 12, correct?

20             MR. TAGUE:  That's correct.

21             THE COURT:  Not to be confused with Joint

22   Exhibit 12.

23   BY MR. TAGUE:

24        Q    This is Plaintiff's Exhibit 12, and it went

25   down there and says, "Ask the following questions.  1:

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   Were the following documents presented as Group Exhibit A

2   by your attorney?"  And then, paren, you put notations on

3   them.

4           So you had in your possession the Group Exhibit

5   A documents, correct?

6       A    If that note is in there, I would have had

7   that, those documents in my possession.

8       Q    And I think you testified you asked that

9   question of Mr. Carmody?

10      A    Correct.

11      Q    And you handed him a document that had been

12  sealed by the protective order by Judge Leonhard; did you

13  not?

14      A    I don't know if I -- if at that point I was

15  allowed to hand him the document.  I don't know if we got

16  to that point.

17      Q    Okay.  And his response was that "I, I can't

18  talk about Exhibit A because of the court order"?

19      A    I don't recall Mr. Carmody making a response.

20  As I recall, Mr. Kirchner made the responses.

21          MR. TAGUE:  If I may have a moment.

22              (Brief pause in proceedings.)

23  BY MR. TAGUE:

24      Q    And that document, it -- right before it says

25  "ask the following questions," it says, "To begin, please

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    provide us any information that you feel might be helpful

2    for us to understand about the concerns outlined in the

3    charge letter dated July 14, 2010."

4             That appears that way; does it not?

5        A    It does.

6             MR. TAGUE:  I have no further questions.  Thank

7    you.

8             THE COURT:  Mr. Brinkmann.

9             MR. BRINKMANN:  No further questions, Your

10   Honor.

11            THE COURT:  You may step down.

12                 (Witness Bohn excused, 11:16 a.m.)

13            THE COURT:  Mr. Brinkmann, you may call your

14   next witness.

15            MR. BRINKMANN:  Your Honor, the defendants

16   rest.

17            THE COURT:  All right.  The defendants have now

18   rested, ladies and gentlemen.  It's 11:16.  I have some

19   legal matters to take up.  We have to formulate the jury

20   instructions.  We have to copy the jury instructions.

21   This all takes time.

22            Like I said, this is your aerobic day.  So it's

23   11:15 now.  I'm thinking about timing because I want

24   everybody to get lunch, including the attorneys and the

25   parties.

```
1              Please come back about 1:10, and I will do my
2    best to get you in here at 1:15.  I'm not going to
3    guarantee that, but I'm really going to try.  If you
4    haven't figured out yet, I really try to not waste your
5    time.  So please come back at 1:10, and I'll try to get
6    you in here at 1:15.  All right?
7              (Jury absent, 11:17 a.m.)
8              THE COURT:  Please be seated.
9              Motion at the close of the case, Mr. Brinkmann.
10             MR. BRINKMANN:  Your Honor.  I renew the motion
11   for directed verdict.  I would rely on my previous
12   arguments.
13             THE COURT:  Mr. Tague, will you rely on your
14   previous response?
15             MR. TAGUE:  No.  I'd rely on the other -- what
16   I had said before.
17             THE COURT:  Rely on your previous response, all
18   right.
19             I will take that under advisement at this time.
20   I'll need to review my notes.  I'll take that under
21   advisement at this time.
22             All right.
23             Teresa, can you ask Diane where we are with the
24   initial jury instructions?
25             I'm going to get the jury instructions, the
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1    revised version, out so you can look at them.
 2                 (Brief pause in proceedings.)
 3                 THE COURT:  Do you gentlemen have the original
 4    set of instructions that were filed?
 5                 MR. TAGUE:  I do.
 6                 THE COURT:  Mr. Brinkmann, do you have a copy
 7    also?
 8                 MR. BRINKMANN:  I do, Your Honor.
 9                 THE COURT:  All right.
10                 Mr. Tague, ready to proceed?
11                 MR. TAGUE:  Yes.
12                 THE COURT:  Mr. Brinkmann?
13                 MR. BRINKMANN:  Yes.
14                 THE COURT:  All right.  Court's Instruction 1,
15    any objection, Mr. Tague?
16                 MR. TAGUE:  No.
17                 THE COURT:  Mr. Brinkmann?
18                 MR. BRINKMANN:  No.
19                 THE COURT:  Court's Instruction 2, any
20    objection, Mr. Tague?
21                 MR. TAGUE:  No.
22                 THE COURT:  Mr. Brinkmann?
23                 MR. BRINKMANN:  No.
24                 THE COURT:  Court's Instruction Number 3, we've
25    substituted a new one.  The new instruction reads as
```

1  follows.  "The evidence consists of the testimony of the

2  witnesses, the exhibits admitted in evidence, and

3  stipulations.  A stipulation is an agreement between both

4  sides that certain facts are true."

5          I added -- or that was added because I did read

6  a lengthy stipulation at the commencement of the trial.

7          Any objection as, as changed, Mr. Tague?

8          MR. TAGUE:  No.

9          THE COURT:  Mr. Brinkmann?

10          MR. BRINKMANN:  No.

11          THE COURT:  Court's Instruction 4, any

12  objection, Mr. Tague?

13          MR. TAGUE:  No.

14          THE COURT:  Mr. Brinkmann?

15          MR. BRINKMANN:  No.

16          THE COURT:  5, Mr. Tague?

17          MR. TAGUE:  No.

18          THE COURT:  Mr. Brinkmann?

19          MR. BRINKMANN:  No.

20          THE COURT:  We will modify Instruction 5 so

21  that it reads as follows.  "During the trial certain

22  testimony was presented to you by video."  We did not

23  read any depositions.  "You should give this testimony

24  the same consideration you would give it had the

25  witness" -- just one -- "appeared and testified here in

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
1   court."
2           With that change, do you concur, Mr. Tague?
3           MR. TAGUE:  Yes.
4           THE COURT:  Mr. Brinkmann?
5           MR. BRINKMANN:  I do.
6           THE COURT:  Court's 6, any objection, Mr.
7   Tague?
8           MR. TAGUE:  No.
9           THE COURT:  Mr. Brinkmann?
10          MR. BRINKMANN:  No.
11          THE COURT:  Court's 7.
12          MR. TAGUE:  No objection.
13          THE COURT:  Mr. Brinkmann?
14          MR. BRINKMANN:  No objection.
15          THE COURT:  Court's 8.  Did I -- I don't recall
16  doing any instruction for a limited purpose.  Did I?
17          MR. BRINKMANN:  No.
18          MR. TAGUE:  I don't recall any either.
19          THE COURT:  All right.  Court's 8 will be
20  withdrawn.
21          Court's 9, Mr. Tague?
22          MR. TAGUE:  No objection.
23          THE COURT:  Mr. Brinkmann?
24          MR. BRINKMANN:  No objection.
25          THE COURT:  Court's 10.
```

```
 1          MR. TAGUE:  No objection.

 2          MR. BRINKMANN:  No objection.

 3          THE COURT:  Court's 11.

 4          MR. TAGUE:  No objection.

 5          MR. BRINKMANN:  No objection.

 6          THE COURT:  Court's 12.  This has not come up.

 7  I don't believe this issue has arisen, unless I'm

 8  mistaken.

 9          MR. BRINKMANN:  I agree, Your Honor.

10          MR. TAGUE:  I agree.

11          THE COURT:  I will withdraw Court's 12.  Any

12  objection to the withdrawal, Mr. Tague?

13          MR. TAGUE:  No.

14          THE COURT:  Mr. Brinkmann?

15          MR. BRINKMANN:  No.

16          THE COURT:  Court's 12 is withdrawn.

17          Court's 13.

18          MR. TAGUE:  I don't think that issue came up

19  either.

20          THE COURT:  That's a standard Seventh Circuit

21  that they like us to give.  It hasn't been an issue in

22  this case, but I always err on the side of what the

23  Seventh Circuit tells us, what my betters say I should

24  do, so -- that doesn't do any harm by giving it and it

25  makes them happy.
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1              MR. TAGUE:  I don't object to it.

 2              THE COURT:  Mr. Brinkmann?

 3              MR. BRINKMANN:  No objection.

 4              THE COURT:  Court's 14.

 5              MR. TAGUE:  No objection.

 6              MR. BRINKMANN:  No objection.

 7              THE COURT:  Court's 15.

 8              MR. TAGUE:  No objection.

 9              MR. BRINKMANN:  No objection.

10              THE COURT:  Court's 16.

11              MR. TAGUE:  No objection.

12              MR. BRINKMANN:  No objection.

13              THE COURT:  Court's 17.

14              MR. TAGUE:  No objection.

15              MR. BRINKMANN:  No objection.

16              THE COURT:  Why are we calling her Deborah

17   S. Stone?

18              LAW CLERK KLOCK:  I don't know.  I can take the

19   "S" out.

20              THE COURT:  Mr. Brinkmann, you're Ms. Stone's

21   attorney.  Do you care if it's Deborah S. Stone?  I don't

22   think it matters.

23              MR. BRINKMANN:  It does not matter, Your Honor.

24   We're fine.

25              THE COURT:  All right.  Mr. Tague, you don't
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   care, I presume.  It's not as though we have a multitude

2   of Deborah Stones in this case.

3           LAW CLERK KLOCK:  Take it out?

4           THE COURT:  No, just leave it in there.  Nobody

5   cares.

6           MR. TAGUE:  I'm sorry, this is Number 17.  What

7   was the question?

8           THE COURT:  17, it's Deborah S. Stone.  The "S"

9   somehow slipped in there.  She doesn't -- Mr. Brinkmann

10  obviously doesn't object.  He just said he didn't.  I

11  don't think it makes a difference.  "We don't have a

12  multitude of Deborah Stones" is my comment.

13          MR. TAGUE:  I don't care.

14          THE COURT:  All right.  We'll leave that as it

15  is.

16          Court's 18.

17          MR. TAGUE:  No objection.

18          MR. BRINKMANN:  No objection.

19          LAW CLERK KLOCK:  I think the last sentence

20  needs to come out.

21             (Brief pause in proceedings.)

22          THE COURT:  That's correct.

23          Paragraph 18, the last sentence reads, "In

24  considering a claim against a defendant, you must not

25  consider evidence submitted only against other

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    defendants."

2            That would not be appropriate in this case,

3    based on the committee comments.  Would you agree, Mr.

4    Tague?

5            MR. TAGUE:  I would agree.

6            THE COURT:  Mr. Brinkmann?

7            MR. BRINKMANN:  Yes.

8            THE COURT:  We'll strike out that last sentence

9    that I just read into the record.

10           Court's 19.

11           MR. TAGUE:  No objection.

12           MR. BRINKMANN:  No objection.

13           THE COURT:  Court's 20.

14           MR. TAGUE:  No objection.

15           MR. BRINKMANN:  No objection.

16           THE COURT:  Court's 21.

17           MR. TAGUE:  No objection.

18           MR. BRINKMANN:  No objection.

19           THE COURT:  Okay.  Count 22 -- Count 22 --

20    Court's Instruction 22.

21           MR. TAGUE:  I don't believe that there was any

22    evidence presented that there was allegedly something Mr.

23    Carmody could have done that he failed to do to lessen

24    the injury, so I would object to that.

25           THE COURT:  Mr. Brinkmann.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1              MR. BRINKMANN:  I think there's quite a bit of
 2    evidence that he could have engaged in the process.  He
 3    could have cooperated in the process.  This gets into
 4    mitigation.  And there's talk about him being unemployed
 5    for 18 months so --
 6              THE COURT:  Yeah.  I, I agree.  I'll give this
 7    over Mr. Tague's objection.  I think we had sufficient
 8    evidence -- I think actually, Mr. Tague, you brought it
 9    in in questioning Mr. Carmody about unemployment, looking
10    for a job, driving in a very old -- was it a Honda
11    Civic? -- Honda Civic, old car back and forth to a job in
12    Springfield, two hours each way, and just long enough so
13    he could collect his -- qualify for state retirement.
14              I think that instruction is properly given, so
15    it will be given over the objection of the plaintiff.
16              Court's 23, standard instruction.  No
17    objection, Mr. Tague?
18              MR. TAGUE:  I'm sorry, 23?
19              THE COURT:  Yeah, standard instruction.
20              MR. TAGUE:  Yeah.
21              MR. BRINKMANN:  No objection.
22              MR. TAGUE:  No objection.
23              THE COURT:  Court's -- now, I wanted to change
24    Court's 24.  Just a second.  Right.  We're changing
25    Court's 24.  You have -- this is the Seventh Circuit
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    Pattern Instruction 7.24.  So the previous Court's

2    Instruction 24, the Court is withdrawing on its own

3    motion and substituting what is now new Court's 24 based

4    upon Seventh Circuit Pattern Instruction 7.24.

5              Any objection, Mr. Tague, to 7-- Court's 24,

6    Seventh Circuit Pattern Instruction 7.24?

7              MR. TAGUE:  No.

8              THE COURT:  Mr. Brinkmann?

9              MR. BRINKMANN:  Yes, Your Honor.  I object.  I

10   do not believe that this instruction is supported by any

11   evidence in the case of malicious conduct or reckless

12   disregard.  There's no evidence of ill will or spite or

13   that any of the conduct was done by the defendants in

14   this case for the purpose of injuring the plaintiff.

15             THE COURT:  Well, Mr. Brinkmann, you're free to

16   argue that.  The jury could -- I mean a reasonable jury

17   could conclude, based on what they've heard about the

18   meetings and correspondence with the attorneys, et

19   cetera, that there was some maliciousness or reckless

20   disregard involved.  I mean, a reasonable jury could

21   conclude that based on what they've heard.  You're, of

22   course, free to argue that there's not any evidence of

23   that.  So this will be given over the objections of

24   defense counsel.

25             Court's 25.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1            MR. TAGUE:  No objection.

 2            MR. BRINKMANN:  No objection.

 3            THE COURT:  Court's 26.

 4            MR. TAGUE:  No objection.

 5            MR. BRINKMANN:  No objection.

 6            THE COURT:  Court's 27, they've already heard

 7   me talk about this several times.  Any objection, Mr.

 8   Tague?

 9            MR. TAGUE:  No.

10            THE COURT:  Mr. Brinkmann?

11            MR. BRINKMANN:  No.

12            THE COURT:  Court's 28.

13            MR. TAGUE:  No objection.

14            MR. BRINKMANN:  No objection.

15            THE COURT:  And then the verdict form.

16            MR. TAGUE:  I have no objection to the one you

17   tendered.

18            MR. BRINKMANN:  I will object just to be

19   consistent, Your Honor, with the verdict form including

20   punitive damages.

21            THE COURT:  Right.  Okay.  I'm not going to

22   modify it for the -- I'm going to leave punitive damages

23   in for the reasons I previously stated.  Your objection

24   is noted as to the form, including punitive damages, Mr.

25   Brinkmann.
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1              Other than that, any objection, Mr. Brinkmann?
 2    Other than that, any objection to the form?
 3              MR. BRINKMANN:  No.  No, Your Honor.
 4              Oh, we have too many lines.
 5              LAW CLERK KLOCK:  Yeah.  I've already got the
 6    change made.
 7              THE COURT:  Yeah.  We only have eight jurors.
 8    We don't need ten lines.
 9              LAW CLERK KLOCK:  Okay.
10              THE COURT:  All right.  We will make those
11    changes.  Before we start closing, I'll make sure you
12    have a clean copy.  I ask both counsel to read through
13    the clean copies for any typographical errors.  They do
14    happen.  So I'm serious.  I want you to look through
15    there.  There's nothing more troubling than reading
16    through there and suddenly we figure out that we've left
17    out the word "not" or "shall" or something like that and
18    suddenly one of the two of you interrupts and says,
19    "Judge, that's not the right instruction."  So really
20    read those closely when you get the clean copies before
21    closings.
22              All right.  Let's talk about time limits for
23    closings.  Mr. Tague, how long do you want for your
24    closing?
25              MR. TAGUE:  I won't need more than an hour.
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1          THE COURT:  An hour?

2          MR. TAGUE:  I won't need more than that.  I'm

3    thinking 45 minutes.

4          THE COURT:  Yeah.  How about 45 minutes?  Okay.

5          MR. TAGUE:  And I'd like to reserve ten of

6    those for rebuttal.

7          THE COURT:  All right.  So you want 35 for your

8    initial and ten for rebuttal?

9          MR. TAGUE:  Or how do you do it?  Do I get 45;

10   and if I use too much, it just comes off my rebuttal?

11         THE COURT:  I'll give you the balance of your

12   time.

13         MR. TAGUE:  Okay.

14         THE COURT:  But it's been -- in my experience,

15   whatever time I give an attorney to talk, they'll talk.

16   So you can prove me wrong.

17         MR. TAGUE:  I think I usually talk fast and am

18   pretty efficient.  Maybe you can --

19         THE COURT:  All right.  So 45 -- so, Mr. Tague,

20   that's 45.  If you do use up 35 minutes, I will give you

21   a warning as you approach the 35.

22         MR. TAGUE:  Okay.

23         THE COURT:  So, Mr. Brinkmann, 45 will be

24   sufficient for you as well?

25         MR. BRINKMANN:  It will.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
1              THE COURT:  Okay.  I'll keep track of that.
2              All right.  Anything further on behalf of the
3    plaintiff, Mr. Tague?
4              MR. TAGUE:  No.
5              THE COURT:  Mr. Brinkmann?
6              MR. BRINKMANN:  No.
7              THE COURT:  All right.  They're coming back at
8    1:10.  We'll have the jury instructions copied.  I'd like
9    you all to be back by 1:00 so you can review those; and
10   if we have to make any changes, let somebody in the
11   courtroom know and they'll come and get me.
12             COURTROOM DEPUTY:  Do you want to talk about
13   exhibits now, what's going back?
14             THE COURT:  Yeah, we could.
15             COURTROOM DEPUTY:  We've got plenty of time.
16             (Discussion off the record between the
17             Court and courtroom deputy.)
18             MR. TAGUE:  I guess I should say, Your Honor, I
19   talked about leave to have another Exhibit Number 50.  I
20   would withdraw that request.
21             THE COURT:  All right.  Let's talk about what's
22   going back to the jury since my courtroom deputy is
23   extremely efficient and already has everything ready to
24   go.
25             COURTROOM DEPUTY:  Hold on for just one second.
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1              (Brief pause in proceedings.)

 2              THE COURT:  All right, Joint Exhibit 1 would go

 3     back, correct?  Mr. Tague?

 4              MR. TAGUE:  Okay, let's see.  Joint Exhibits,

 5     yes.

 6              THE COURT:  Joint Exhibit 2, which actually got

 7     admitted today.  Mr. Brinkmann, I'm sorry.  I didn't mean

 8     to skip you, Joint Exhibit 1?

 9              MR. BRINKMANN:  Yes.

10              THE COURT:  Joint Exhibit 2, any objection to

11     that going back?  Mr. Tague?

12              MR. TAGUE:  No.

13              THE COURT:  Mr. Brinkmann?

14              MR. BRINKMANN:  No.

15              THE COURT:  Joint Exhibit 3, Mr. Tague?

16              MR. TAGUE:  No.

17              THE COURT:  Mr. Brinkmann?

18              MR. BRINKMANN:  No.

19              THE COURT:  Joint Exhibit 4?

20              MR. TAGUE:  No.

21              MR. BRINKMANN:  No.

22              THE COURT:  Joint Exhibit 5?

23              MR. TAGUE:  No.

24              MR. BRINKMANN:  No.

25              THE COURT:  Joint Exhibit 6?
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1              MR. TAGUE:  No.

2              MR. BRINKMANN:  No.

3              THE COURT:  Joint Exhibit 7?

4              MR. TAGUE:  No.

5              MR. BRINKMANN:  No.

6              THE COURT:  Joint Exhibit 8?

7              MR. TAGUE:  No.

8              THE COURT:  Joint Exhibit 9?

9              MR. TAGUE:  No.

10             THE COURT:  Joint Exhibit 10?

11             MR. TAGUE:  No.

12             THE COURT:  Joint Exhibit 11?

13             MR. TAGUE:  No.

14             MR. BRINKMANN:  My answers are the same, Your

15   Honor, for all that.

16             THE COURT:  Didn't mean to skip you.

17             Joint Exhibit 12?

18             MR. TAGUE:  No.

19             MR. BRINKMANN:  No.

20             THE COURT:  All right.  Those will all go back.

21             We're going to send the joint exhibits back.

22   If there's a duplicate with the plaintiff's exhibit,

23   we'll send the joint exhibit back, not the plaintiff's

24   exhibit.

25             So, Teresa, you've got to tell me -- walk me

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1    through this here.  All right.  Plaintiff's 1 is Joint --
 2              COURTROOM DEPUTY:  4.
 3              THE COURT:  -- 4.  So that doesn't need to go
 4    back.
 5              2 was admitted.
 6              COURTROOM DEPUTY:  It's 7.
 7              THE COURT:  It's 7.  All right.
 8              COURTROOM DEPUTY:  3 is 6.
 9              THE COURT:  3 is 6.
10              COURTROOM DEPUTY:  4 is --
11              MR. TAGUE:  I'm sorry; what did you say?  You
12    said 4 was Number 6?
13              COURTROOM DEPUTY:  Yes.
14              MR. TAGUE:  I don't believe that's the case.
15              THE COURT:  Plaintiff's 3.
16              MR. TAGUE:  Was not a joint exhibit, I don't
17    think.
18              COURTROOM DEPUTY:  I show it is.  I'm sorry.
19              THE COURT:  Plaintiff's 3 is not a joint
20    exhibit.  That's correct.  Do you wish that to go back,
21    Mr. Tague?
22              MR. TAGUE:  Yes.
23              THE COURT:  Any objection, Mr. Brinkmann?
24              MR. BRINKMANN:  No.
25              THE COURT:  All right.  So Plaintiff's 3 will
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    go back.

2            COURTROOM DEPUTY:  And let me back up.  I'm

3    sorry.

4            THE COURT:  We're fixing some things.

5            COURTROOM DEPUTY:  Let me look at 2 again.

6            THE COURT:  Plaintiff's 2 is Joint 7.

7            COURTROOM DEPUTY:  Okay.

8            THE COURT:  All right.

9            COURTROOM DEPUTY:  So 4 is --

10           THE COURT:  Plaintiff's 4 is actually Joint 11

11   and 12.

12           COURTROOM DEPUTY:  Okay.

13           THE COURT:  Is that correct, Mr. Tague, Mr.

14   Brinkmann?

15           MR. TAGUE:  Yes.

16           MR. BRINKMANN:  Yes.

17           THE COURT:  Okay.  So that's already going

18   back; 4 is already going to back as Joint 11 and 12.

19           Plaintiff's 5.

20           COURTROOM DEPUTY:  8, is Joint Exhibit 8.

21           MR. TAGUE:  Correct.

22           MR. BRINKMANN:  Yes.

23           THE COURT:  Okay.  So it's already going back.

24           Plaintiff's 6, I think, was Joint 3.

25           MR. TAGUE:  Correct.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1           COURTROOM DEPUTY:  Yes.

2           THE COURT:  Is that correct, Mr. Brinkmann?

3           MR. BRINKMANN:  It is.

4           THE COURT:  Okay.

5           COURTROOM DEPUTY:  7 is 6.

6           THE COURT:  Plaintiff's 7 is Joint 6.

7           MR. TAGUE:  Correct.

8           MR. BRINKMANN:  Yes.

9           THE COURT:  That's going back.

10          Plaintiff's 8 --

11          COURTROOM DEPUTY:  Is 5.

12          THE COURT:  -- is Joint 5.  That's already

13  going back.

14          MR. BRINKMANN:  Yes.

15          MR. TAGUE:  Correct.

16          COURTROOM DEPUTY:  9 is Joint 1.

17          THE COURT:  Plaintiff's 9 is Joint 1.  That's

18  going back.

19          MR. TAGUE:  Correct.

20          MR. BRINKMANN:  Yes.

21          THE COURT:  Okay.  Plaintiff's 10 is not going

22  back.

23          COURTROOM DEPUTY:  Right.

24          11 is 2.

25          THE COURT:  Plaintiff's 11 is Joint 2.  It is

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   already going back.

2           MR. TAGUE:  I'm sorry.  Did you say it is Joint

3   2 and it's going back?

4           THE COURT:  Yes.  All the joint exhibits are

5   going back.  No one objected to those going back.

6           Plaintiff's 12 --

7           COURTROOM DEPUTY:  Is 10.

8           THE COURT:  -- is Joint 10.  It's going back.

9           Plaintiff's 13 is not joint anything.

10          COURTROOM DEPUTY:  Yeah.  It's Joint 9.

11          THE COURT:  Plaintiff's 13 is Joint 9?

12          COURTROOM DEPUTY:  Uh-huh.

13          THE COURT:  Wow, you guys have me confused.

14          COURTROOM DEPUTY:  Right?

15          THE COURT:  Is that correct?  Yes, it is

16  correct.

17          MR. TAGUE:  Yes.

18          THE COURT:  So that's going back.

19          Plaintiff's 17 --

20          COURTROOM DEPUTY:  Wait.  You skipped 14.

21          THE COURT:  Was 14 admitted?

22          COURTROOM DEPUTY:  Yes.

23          THE COURT:  I'm looking at the wrong list

24  again.

25          Plaintiff's 14, exchange of correspondence

1  regarding protection order.

2          MR. TAGUE:  That was the August correspondence,

3  I think one letter from Mr. Kirchner, one letter from

4  Ms. Perry, subsequent to the July 28 meeting.

5          THE COURT:  Correct.

6          MR. TAGUE:  We would ask that it go back.

7          THE COURT:  Any objection to that going back?

8          MR. BRINKMANN:  No, Your Honor.

9          THE COURT:  All right.  Plaintiff's 14 will go

10 back.  That's not a joint exhibit, correct?

11         MR. TAGUE:  That is correct.

12         THE COURT:  All right.  Now we're up to

13 Plaintiff's 17.

14         COURTROOM DEPUTY:  Yes.

15         MR. TAGUE:  That is the termination letter, but

16 it also has the email dating -- in the morning before the

17 emergency hearing.  We'd ask that it go back.

18         THE COURT:  Right.  I know what that is now.

19         MR. BRINKMANN:  17?

20         THE COURT:  Plaintiff's 17.

21         MR. BRINKMANN:  That's fine.  No objection.

22         THE COURT:  Okay.  That will go back.

23         We did not admit 18.

24         Plaintiff's 19.  Plaintiff's 19, any -- do you

25 wish that to go back, Mr. Tague?

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1          MR. TAGUE:  Yes.

2          THE COURT:  Any objection, Mr. Brinkmann?

3          MR. BRINKMANN:  Yes, Your Honor.  This, this

4  was admitted into evidence, but it's first of all --

5          THE COURT:  Can I see 19?

6          COURTROOM DEPUTY:  Yep.

7          MR. BRINKMANN:  -- an email cover page, and

8  then it has a copy of the same exhibit --

9          THE COURT:  Oh, right, right, right.

10          MR. BRINKMANN:  -- in the August exchange, and

11  it doesn't have the university headings.

12          THE COURT:  It's not the correct final form.

13          MR. BRINKMANN:  Right.

14          THE COURT:  Right.

15          MR. BRINKMANN:  It's unsigned.

16          THE COURT:  And, Mr. Tague, you agree with

17  that, correct?

18          MR. TAGUE:  Yes.

19          THE COURT:  All right.  20 will not go back.

20  We've already got a copy.

21          COURTROOM DEPUTY:  19.  We're talking about 19.

22          THE COURT:  19 will not go back.  Excuse me.

23  19 will not go back.  We already have a true copy, so to

24  speak -- or the final copy, I should say.

25          Twenty -- Plaintiff's 27, any -- you wish that

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    to go back, Mr. Tague?

2              MR. TAGUE:  That's the Academic Staff Handbook.

3    The specific answer to your question is:  Yes.  But I

4    believe you actually commented upon that, because it was

5    a lengthy document, and I don't think any of the

6    witnesses identified the specific sections that set forth

7    the non-renewal protocols for an academic professional.

8              THE COURT:  I'm thinking.  I have to get my

9    notes out.  Wasn't there discussion -- oh, the other

10   document we had was the Policy on Appropriate Use

11   of Comp-- I got it.  I confused them.  You're right.  I

12   don't believe that should go back.  Do you agree, Mr.

13   Tague?

14             MR. TAGUE:  Well, I --

15             THE COURT:  I don't think the jury's going to

16   peruse the entire Academic Handbook.

17             MR. TAGUE:  Yeah.  I don't agree, but that was

18   what you commented upon --

19             THE COURT:  Okay.

20             MR. TAGUE:  -- and I'm not going to reargue or

21   quarrel with you.

22             THE COURT:  Mr. Brinkmann, do you want that to

23   go back?

24             MR. BRINKMANN:  I do not.

25             THE COURT:  Yeah.  I -- that will not go back,

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  even if Mr. Tague so wishes.  That -- now that I know

2  what that is.  Thank you for helping me remember what,

3  which exhibit Plaintiff's 27 was.

4          Plaintiff's 28, do you wish that to go back?

5          MR. TAGUE:  Yes.

6          THE COURT:  Mr. Brinkmann, what's --

7          MR. BRINKMANN:  I don't -- yeah.  I don't have

8  an objection, Your Honor, if you want to send it back.

9  You know, this -- I don't believe that the section that

10  is applicable was pointed out either there.  It might

11  serve to waste time, but it's --

12          THE COURT:  Which one -- you know, one of the

13  difficulties is you were using -- both of you were using

14  one set of terms during the trial, and there's a

15  different set of terms on the witness -- on the exhibit

16  list.  So tell me what -- let me see 28.  What's 28?

17          Okay.  28 is not going back.

18          MR. TAGUE:  May I speak to that, Your Honor?

19          THE COURT:  Sure.

20          MR. TAGUE:  I don't believe Mr. Brinkmann's

21  correct.  I believe that I asked a witness if page 31 was

22  applicable.  And if you look at page 31, Section 11 deals

23  with employment of academic professionals.  So 31 and 32

24  set forth in the University Statutes the non-renewal

25  requirement for the one year before there can be a

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  discharge of an employee -- an employee who's an academic

2  professional and being discharged for something other

3  than cause.

4          THE COURT:  Well, I recall that testimony, and

5  he had to be given a one-year notice.  But just so we're

6  clear, this is a 51-page document.

7          MR. TAGUE:  I --

8          THE COURT:  And I think it would only serve to

9  confuse the jury.  They're not going to burrow through

10  here and try to find that.

11          MR. TAGUE:  What I suggest going back to the

12  jury would be the cover page, pages 31 and 32.

13          MR. BRINKMANN:  Your Honor, this is a document

14  that's dated three years after the occurrence.

15          THE COURT:  Right.

16          MR. BRINKMANN:  I don't know that that page is

17  the same in 2010.

18          THE COURT:  Yeah.  I don't want -- I don't want

19  to confuse the jury.  The cover page, in fact, does say

20  "as amended January 24, 2013."  We know from the

21  testimony that all incidents took place in 2010.  I don't

22  want them to begin to try to guess why we gave them a

23  2013 statute book, start looking through here.  That's

24  going to take them off the issues and will simply confuse

25  the jury, or at least has a strong likelihood.  So

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1    Plaintiff's 28 will not go back to the jury.
 2              Plaintiff's 46, do you wish that to go back,
 3    Mr. Tague?
 4              MR. TAGUE:  Yes.
 5              THE COURT:  Any objection to that, Mr.
 6    Brinkmann?
 7              MR. BRINKMANN:  Your Honor, I did object to
 8    this exhibit coming into evidence, so I would object to
 9    that.
10              THE COURT:  Let me take a look at 46.
11              (Brief pause in proceedings.)
12              THE COURT:  I think this will not go back.
13    This would also confuse the jury.  There's references in
14    here to another letter from Ms. Perry to Mr. Kirchner
15    dated August 11th.  It is not attached to the exhibit.
16    So the first thing if I was a juror I'd say, "Well,
17    where's that other letter?"
18              MR. TAGUE:  Well, that was one of the ones we
19    just talked about.  I think that August 11th document
20    was --
21              THE COURT:  I'm not going to have the jury
22    start scurrying through trying to figure out which goes
23    with which.  And, frankly, all these -- everything in
24    this letter there's already been, not just a limited
25    amount of testimony, a lot of testimony about it.  And
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    unless the jurors were sleeping, which they were not,

2    they've already heard all of this, or at least enough

3    related -- enough that is relevant and related to the

4    issues in this case.  So, and they already have Rhonda

5    Perry's letter, you said, which would be my -- would be

6    more relevant.  So I don't want to confuse them, so that

7    will not go back.

8              MR. TAGUE:  If I understand, Your Honor, it is

9    admitted; I can refer to it in my closing argument?

10             THE COURT:  Absolutely.  Just because an

11   exhibit isn't going back doesn't mean you can't refer to

12   it.  You can refer to any of them.

13             COURTROOM DEPUTY:  Court's Exhibit 1A and 1B.

14             THE COURT:  Those aren't going back.

15             Court's Exhibits 1A and 1B were the deposition

16   and the transcript, and those would not go back.  All

17   right.

18             MR. TAGUE:  Will the stipulation in the

19   pretrial order that you read go back?

20             THE COURT:  Normally, I would not send it back.

21   It was rather lengthy.  I read it straight from the

22   pretrial order.  You would have to modify it in some

23   fashion if the two of you agreed it would go back.

24   Normally I would not send it back.

25             MR. TAGUE:  I think in the pretrial order that

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
1   we had it also as a signed stipulation.
2           THE COURT:  It's a signed stipulation, and it
3   reads -- unfortunately, it reads "Exhibit A."  And we've
4   already had all sorts of testimony about a different
5   Exhibit A.  So like I said, if I was going to send it
6   back, I would remove the "Exhibit A" from the top.  It
7   does bear your signature, Mr. Tague, as well as your
8   signature, Mr. Brinkmann.  It is four pages in length --
9   well, three plus the signature section.
10          As I said, normally, I would not send it back,
11  stipulations back.  But I'm amenable if that's what -- do
12  you want that, Mr. Brinkmann?
13          MR. BRINKMANN:  No, I don't, Your Honor.  I
14  think that, number one, the jury's heard it.  But, number
15  two, everything in there has been in evidence in the
16  case.  And the jury is likely to be overwhelmed as it is
17  with all of the documents.  This is duplicative of the
18  evidence in the case and having heard it in the first
19  place.
20          THE COURT:  Mr. Tague, is there some
21  overwhelming reason you want this back?  This -- I have
22  slightly different reasons than Mr. Brinkmann, but they
23  overlap a little bit.  If you're going to hit the jury
24  with all the documents, all the testimony that they've
25  already heard, and then you're going to give them a
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   three-page stipulation that, frankly, has quotes and

2   legal terms all throughout it -- you can try to persuade

3   me, but I think this would be a mistake.

4           MR. TAGUE:  If I can, the stipulation of

5   undisputed facts, I believe Mr. Brinkmann and I -- I

6   think his version won out.  But what we did, we took your

7   undisputed facts that you found in the motion for summary

8   judgment, and we figured that was a pretty good starting

9   point to put down as uncontested facts because the -- we

10  couldn't argue about it, and we figured that since you

11  already were the genesis of it that that would be

12  appropriate to do.

13          What I think about this document, the way I

14  look at it is, you're right.  There's a lot of documents

15  that will go back to the jury in a raw form that we have

16  highlighted to help them in the testimonies of the

17  witnesses.  But they're going to need to put it in a

18  temporal perspective, which I believe this three-page

19  document does better than the, the recollections of the

20  jurors.

21          So if they have this three-page stipulation

22  that we all agree to are the core facts to which then the

23  jury would need to assess the disputed facts and the

24  inferences and credibility of the witnesses, that this

25  would, in fact, be helpful to them rather than a

1    hindrance to them in doing that.

2             Now, I agree that -- fully agree that we would

3    need to redact the Exhibit A on it, and I don't think we

4    would need to do anything other than just redact it.  But

5    I think it would be helpful to the jury.

6             THE COURT:  Mr. Brinkmann, you want to respond?

7             MR. BRINKMANN:  I don't think it would be

8    helpful.  I think that it's redundant.  And I still

9    object.

10            THE COURT:  I'm not going to send it back.  I

11   think it would just simply be too, too high of a chance

12   it's going to cause more confusion.  They have the

13   exhibits.  They've heard the testimony.  I read them the

14   stipulation.  And as you said, Mr. Tague, all these

15   things are undisputed.  I don't want to interject this in

16   so they think there are other issues in some way

17   surrounding these matters.

18            On top of that, this strays slightly into areas

19   involving the Goldberg case, and I don't want them to get

20   diverted into that matter.

21            So this isn't going to go back.  They've

22   already heard me read it to them at the start of the case

23   when they were -- before your opening statements, so

24   they, they should remember what I said.  Again, none of

25   these things are disputed.  So I think it would be a bad

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    idea.

2                All right.  Teresa, anything else?

3                COURTROOM DEPUTY:  No.

4                THE COURT:  You got all the exhibits, correct?

5                COURTROOM DEPUTY:  Uh-huh.

6                THE COURT:  You have all the exhibits.

7    Excellent.

8                Let's still get back here by 1:00.  Between now

9    and then, we'll have the jury instructions copied, and

10   that will give you ten minutes to read them and identify

11   any grammatical or typographical errors that have snuck

12   in.  And we'll try to start at 1:15 with closings.

13               That's all for the record.  We'll be in recess.

14                   (Recess, 12:01 p.m. to 1:03 p.m.)

15               THE COURT:  We're back on the record.  All

16   parties and counsel are present.

17               You should have a copy -- you should have

18   received a copy of the corrected jury instructions after

19   our jury instruction conference, and I hope you've had a

20   chance to look through them.

21               Mr. Tague, did you notice any errors or

22   anything else in there that needs to be corrected?

23               MR. TAGUE:  I just started reading them.  I

24   haven't noticed anything yet.

25               THE COURT:  Oh.  All right.  I'll tell you

1   what.  I'll come back in five minutes.  I do want you and

2   Mr. Brinkmann to have a chance to read through these

3   before I read them.  So we'll just take a break for about

4   five minutes.  Thanks.

5               (Recess, 1:03 p.m. to 1:11 p.m.)

6               THE COURT:  Mr. Tague, have you had a chance to

7   review the Court's instructions?

8               MR. TAGUE:  I have.

9               THE COURT:  Any errors or, typographical errors

10  or anything you saw that needs to be corrected?

11              MR. TAGUE:  I didn't see any.

12              MR. BRINKMANN:  I did not see any either, Your

13  Honor.

14              THE COURT:  All right.  Do we have all the --

15  we have the podium set up correctly.  Do we have all the

16  jurors back?

17              COURT SECURITY OFFICER:  Yes, sir.

18              THE COURT:  Any reason not to bring them in,

19  Mr. Tague?

20              MR. TAGUE:  No.

21              THE COURT:  Mr. Brinkmann?

22              MR. BRINKMANN:  No.

23              THE COURT:  Let's bring them in.

24              (Brief pause in proceedings.)

25              (Jury present, 1:12 p.m.)

```
 1              THE COURT:  All right.  Please be seated.

 2              We are at the final stages of the trial, so I

 3    will now -- I'm missing my clerk with the copies of the

 4    instructions.  Where did she go?

 5              COURTROOM DEPUTY:  They're here.

 6              THE COURT:  All right.  Can you hand those out

 7    to the jury?

 8                   (Brief pause in proceedings.)

 9              THE COURT:  All right.  All jurors have copies

10    of the instructions now.

11              Ladies and gentlemen, I'll read these to you.

12    You do not have to read along with me if you don't want

13    to.  You can simply listen to me read them, but it's

14    important for you to listen to the instructions.  If you

15    want to read along with me, you can.  There should be no

16    deviation from what is in the instructions that you have

17    and what I'm going to read.

18              Members of the jury, you have seen and heard

19    all the evidence and will hear the arguments of the

20    attorneys.  Now I will instruct you on the law.

21              You have two duties as a jury.  Your first duty

22    is to decide the facts from the evidence in the case.

23    This is your job and yours alone.

24              Your second duty is to apply the law that I

25    give you to the facts.  You must follow these
```

1  instructions, even if you disagree with them.  Each of

2  the instructions is important, and you must follow all of

3  them.

4         Perform these duties fairly and impartially.

5  Do not allow prejudice to influence you.

6         Nothing I say now, and nothing I said or did

7  during the trial, is meant to indicate any opinion on my

8  part about what the facts are or about what your verdict

9  should be.

10        During this trial I have asked a witness a

11  question myself.  Do not assume that because I asked

12  questions I hold any opinion on the matters I asked about

13  or on what the outcome of the case should be.

14        The evidence consists of the testimony of the

15  witnesses, the exhibits admitted in evidence, and

16  stipulations.  A stipulation is an agreement between both

17  sides that certain facts are true.

18        Certain things are not to be considered as

19  evidence.  I will list them for you.

20        First, if I told you to disregard any testimony

21  or exhibits or struck any testimony or exhibits from the

22  record, such testimony or exhibits are not evidence and

23  must not be considered.

24        Second, anything that you may have seen or

25  heard outside the courtroom is not evidence and must be

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    entirely disregarded.

2           Third, questions and objections or comments by

3    the lawyers are not evidence.

4           Four-- or excuse me.  Lawyers have a duty to

5    object when they believe a question is improper.  You

6    should not be influenced by any objection, and you should

7    not infer from my rulings that I have any view as to how

8    you should decide the case.

9           Fourth, the lawyers' opening statements and

10   closing arguments to you are not evidence.  Their purpose

11   is to discuss the issues and the evidence.  If the

12   evidence as you remember it differs from what the lawyers

13   said, your memory is what counts.

14          During the trial, certain testimony was

15   presented to you by video.  You should give this

16   testimony the same consideration you would give it had

17   the witnesses appeared and testified here in court.

18          Any notes you have taken during this trial are

19   only aids to your memory.  The notes are not evidence.

20   If you have not taken notes, you should rely on your

21   independent recollection of the evidence and not be

22   unduly influenced by the notes of other jurors.  Notes

23   are not entitled to any greater weight than the

24   recollections or impressions of each juror about the

25   testimony.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1           In determining whether any fact has been
2     proved, you should consider all of the evidence bearing
3     on the question, regardless of who introduced it.
4           You should use common sense in weighing the
5     evidence and consider the evidence in light of your own
6     observations in life.
7           In our lives, we often look at one fact and
8     conclude from it that another fact exists.  In law we
9     call this "inference."  A jury is allowed to make
10    reasonable inferences.  Any inference you make must be
11    reasonable and must be based on the evidence in the case.
12          You may have heard the phrases "direct
13    evidence" and "circumstantial evidence."  Direct evidence
14    is proof that does not require an inference, such as the
15    testimony of someone who claims to have personal
16    knowledge of a fact.  Circumstantial evidence is proof of
17    a fact, or a series of facts, that tends to show that
18    some other fact is true.
19          As an example, direct evidence that it is
20    raining is testimony from a witness who says, "I was
21    outside a minute ago, and I saw it raining."
22    Circumstantial evidence that it is raining is the
23    observation of someone entering a room carrying a wet
24    umbrella.  The law makes no distinction between the
25    weight to be given to either direct or circumstantial

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    evidence.  You should decide how much weight to give to

2    any evidence.  In reaching your verdict, you should

3    consider all the evidence in the case, including the

4    circumstantial evidence.

5            You must decide whether the testimony of each

6    of the witnesses is truthful and accurate, in part, in

7    whole, or not at all.  You also must decide what weight,

8    if any, you give to the testimony of each witness.

9            In evaluating the testimony of any witness,

10   including any party to the case, you may consider, among

11   other things:  the ability and opportunity the witness

12   had to see, hear, or know the things the witness

13   testified about; the witness's memory; any interest,

14   bias, or prejudice the witness may have; the witness's

15   intelligence; the manner of the witness while testifying;

16   and the reasonableness of the witness's testimony in

17   light of all the evidence in the case.

18           It is proper for a lawyer to meet with any

19   witness in preparation for trial.

20           You may find the testimony of one witness or a

21   few witnesses more persuasive than the testimony of a

22   larger number.  You need not accept the testimony of the

23   larger number of witnesses.

24           The law does not require any party to call as a

25   witness every person who might have knowledge of the

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   facts related to this trial.  Similarly, the law does not

2   require any party to present as exhibits all papers and

3   things mentioned during this trial.

4          When I say that a party must prove something by

5   a "preponderance of the evidence," or when I use the

6   expression, "if you find," or "if you decide," this is

7   what I mean:  When you have considered all the evidence

8   in the case, you must be persuaded that it is more

9   probably true than not true.

10         Plaintiff claims that Defendants Sharon

11  Reynolds, Joseph Bohn, and Deborah Stone violated his

12  constitutional right to procedural due process prior to

13  the termination of his employment.  Specifically,

14  Plaintiff claims that, while employed by the University

15  of Illinois, he was discharged without first having been

16  given a reasonable notice of the charges against him and

17  a reasonable opportunity to respond.

18         Defendants deny that Plaintiff was discharged

19  without first having been given notice of the charges and

20  an opportunity to respond.

21         You must give separate consideration to the

22  claim against each defendant in this case.  Although

23  there are three defendants, it does not follow that if

24  one is liable, any of the others is also liable.

25         To succeed on this claim, Plaintiff must prove

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1     several things by a preponderance of the evidence.

2          One:  Plaintiff was an employee of the

3     University of Illinois with a reasonable expectation of

4     continued employment.

5          Two:  Plaintiff was discharged from that

6     employment.

7          Three:  Before Plaintiff's discharge, Plaintiff

8     was not given an adequate pre-termination hearing;

9     specifically, he was not given reasonable notice of the

10    charges and/or given a reasonable opportunity to contest

11    the reasons for his discharge.

12         And four:  As a result of Defendants' failure

13    to give him an adequate pre-termination hearing,

14    Plaintiff suffered damage.

15         Plaintiff has the burden of proving each and

16    every element of his claim by a preponderance of the

17    evidence.  If you find Plaintiff has proven each of the

18    things required of him, then you must return a verdict

19    for Plaintiff.  However, if you find that Plaintiff has

20    not proved any one of the elements by a preponderance of

21    the evidence, you must return a verdict for Defendants.

22         If you decide for Defendants on the question of

23    liability, then you should not consider the question of

24    damages.

25         If you find the Plaintiff was not given the

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  notice of charges and opportunity to respond to which he

2  was entitled, then you must decide whether Plaintiff

3  suffered any damage as a direct result.  A damage award

4  to Plaintiff must provide such amounts as would make

5  Plaintiff whole and also compensate Plaintiff for any

6  mental or emotional distress Plaintiff suffered.

7          To award any element of damages, you must find

8  Plaintiff has proved a basis for such damages in the

9  evidence.  You may not award damages based on speculation

10  or guesswork.

11          If you find Plaintiff suffered mental or

12  emotional distress, loss of reputation, or other damage

13  based on the denial of an opportunity to contest the

14  charges against Plaintiff, then you may award such

15  damages that flow naturally from the Defendants' actions,

16  regardless of whether there may have been good grounds to

17  discharge Plaintiff.

18          Where mental or emotional distress or loss of

19  reputation are proven, I cannot give you any rule by

20  which to measure the specific amount of damages resulting

21  from such an injury.  This is a matter that is left to

22  your conscience, good sense, and sound judgment.

23          You should not act unreasonably through bias,

24  passion, or sympathy.  You should exercise common sense

25  and fix an amount of damages that, in accordance with the

1    evidence and the law, will fairly compensate Plaintiff

2    for all the injuries, if any, you find Plaintiff

3    suffered.

4            If you find Plaintiff was injured as a result

5    of conduct by Defendants, you must determine whether

6    Plaintiff could have done something to lessen the harm

7    suffered.  Defendants have the burden to prove by a

8    preponderance of the evidence that Plaintiff could have

9    lessened or reduced the harm done to Plaintiff and that

10   Plaintiff failed to do so.

11           If you find in favor of Plaintiff but you find

12   Plaintiff's damages have no monetary value, then you must

13   return a verdict for Plaintiff in the nominal amount of

14   $1.

15           If you find for Plaintiff, you may, but are not

16   required to, assess punitive damages against one or more

17   of the defendants.  The purpose of -- purposes of

18   punitive damages are to punish a defendant for his or her

19   conduct and to serve as an example or warning to

20   Defendants and others not to engage in similar conduct in

21   the future.

22           Plaintiff must prove by a preponderance of the

23   evidence that punitive damages should be assessed against

24   one or more of the defendants.  You may assess punitive

25   damages only if you find that the conduct of one or more

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    of the defendants was malicious or in reckless disregard

2    of the plaintiff's rights.  Conduct is malicious if it is

3    accompanied by ill will and spite, or it is done for

4    purposes of injuring Plaintiff.  Conduct is in reckless

5    disregard of Plaintiff's rights if, under the

6    circumstances, it reflects complete indifference to

7    Plaintiff's safety or rights.

8         If you find that punitive damages are

9    appropriate, then you must use sound reason in setting

10   the amount of those damages.  Punitive damages, if any,

11   should be in an amount sufficient to fulfill the purposes

12   that I have described to you, but should not reflect

13   bias, prejudice, or sympathy toward any party.

14        In determining the amount of punitive damages,

15   you should consider the following factors:  the

16   reprehensibility of the defendant's conduct; the impact

17   of the defendant's conduct on Plaintiff; the relationship

18   between Plaintiff and the defendant; the likelihood that

19   the defendant would repeat the conduct if an award of

20   punitive damages is not made; and the relationship of any

21   award of punitive damages to the amount of actual harm

22   the plaintiff suffered.

23        Upon retiring to the jury room, you must select

24   a presiding juror.  The presiding juror will preside over

25   your deliberations and will be your representative here

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   in court.

2           A verdict form has been prepared for you.  Take

3   this verdict form to the jury room; and when you have

4   reached unanimous agreement on the verdict, your

5   presiding juror will fill in and date the form, and all

6   of you will sign it.

7           I do not anticipate that you will need to

8   communicate with me.  If you do need to communicate with

9   me, the only proper way is in writing.  The writing must

10  be signed by the presiding juror or, if he or she is

11  unwilling to do so, by some other juror.

12          The writing should be given to the marshal, who

13  will give it to me.  I will respond either in writing or

14  by having you return to the courtroom so that I can

15  respond orally.

16          During your deliberations, you must not

17  communicate with or provide information to anyone by any

18  means about this case.  You may not use any electronic

19  device or media, such as a telephone, cell phone,

20  smartphone, iPhone, Blackberry, or computer; the

21  Internet, any Internet service, or any text or instant

22  messaging service; or any Internet chat room, blog, or

23  website such as Facebook, MySpace, LinkedIn, YouTube, or

24  Twitter to communicate to anyone any information about

25  this case or to conduct any research about this case

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    until I accept your verdict.

2            The verdict must represent the considered

3    judgment of each juror.  Your verdict, whether for or

4    against the parties, must be unanimous.

5            You should make every reasonable effort to

6    reach a verdict.  In doing so, you should consult with

7    one another, express your own views, and listen to the

8    opinions of your fellow jurors.  Discuss your differences

9    with an open mind.  Do not hesitate to reexamine your own

10   view and change your opinion if you come to believe it is

11   wrong.  But you should not surrender your honest beliefs

12   about the weight or effect of evidence solely because of

13   the opinions of other jurors or for the purpose of

14   returning a unanimous verdict.

15           All of you should give fair and equal

16   consideration to all the evidence and deliberate with the

17   goal of reaching an agreement that is consistent with the

18   individual judgment of each juror.  You are impartial

19   judges of the facts.

20           The verdict form reads as follows.  It has the

21   caption of the case at the top.  Underneath that, there's

22   a line that says "Jury Verdict."  Then it reads, "On

23   Plaintiff's procedural due process claim against

24   Defendant Sharon Reynolds, we, the jury, find in favor

25   of:  (check one) Plaintiff," with a line, "Defendant," a

1  line.  So you'll put an X next to one of those two.

2  "On Plaintiff's procedural due process claim

3  against Defendant Joseph Bohn, we, the jury, find in

4  favor of:  (check one), Plaintiff," with a line,

5  "Defendant," with a line.  Again, you check the box

6  beside one of those two.

7  "On Plaintiff's procedural due process claim

8  against Defendant Deborah S. Stone, we, the jury, find in

9  favor of:  (check one), Plaintiff," with a line,

10  "Defendant," with a line.  You will check one of those

11  two.

12  "If you found in favor of Plaintiff and against

13  any one of the defendants, complete the following

14  section.  If you found in favor of all three defendants,

15  please sign and date this form because you will not award

16  any damages."

17  The next page has damages if you need to go to

18  that section.  It reads, "Plaintiff's wage loss," with a

19  line for you to fill in the dollar amount; "Plaintiff's

20  mental or emotional distress and loss of reputation,"

21  dollar sign with a line for the amount; "nominal

22  damages," dollar sign for the amount, which would be $1.

23  "If you have awarded damages to Plaintiff, you

24  may also award punitive damages."  And it has a line for

25  "punitive damages against Reynolds," with a dollar sign

1    and a line; "punitive damages against Bohn," dollar sign

2    and a line; and "punitive damages against Stone," with a

3    dollar sign and a line.

4            "Fill in the date, and each juror must sign the

5    form."  There is a line for the date, and there are eight

6    signature blocks with the one for the presiding juror

7    identified with the words "presiding juror."

8            One more important thing.  I do not need eight

9    signed copies of this.  I one time forgot to say that,

10   and I got eight copies back.  You don't have to be human

11   Xerox machines.  Whoever is the presiding juror, use

12   their copy; and that's the one everybody fills in and

13   signs.  Understood?

14           All right.

15           So with that, on to closing arguments.  Mr.

16   Tague.

17           MR. TAGUE:  Thank you.  May it please the

18   Court.

19           THE COURT:  It does.

20           MR. TAGUE:  Kevin Carmody and I would like to

21   thank you for your service.

22           As the judge has instructed you, the law is,

23   and should be, a codification of common sense.  That's

24   why we need you to decide this case, so that you can

25   weigh the credibility of conflicting witness testimony

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    and determine what is more probably true than not true

2    from all of the exhibits, circumstantial evidence.  And

3    we have more than one of you so you can collectively talk

4    about what you have heard in the evidence and put all the

5    pieces of the puzzle together that was presented in

6    different segments from the different witnesses.

7            So what happened in this case?  The background

8    is that there was litigation between two University of

9    Illinois employees for years.  The university was

10   involved due to numerous witnesses who were employed by

11   the university.  The two people involved were employed by

12   the university.  The incident happened on campus, and the

13   U of I ended up assigning attorneys in the underlying

14   litigation, James Kearns as attorney for Dr. Goldberg,

15   and Gary Lietz, relating to involvement of the other

16   university witnesses.

17           In June of 2010, Kevin Carmody received paper

18   documents anonymously in his News-Gazette mailbox.  He

19   gave them to his attorney.

20           You've seen this, which is the University

21   Ethics Office Code of Conduct.  I've highlighted and

22   asked about that particular section.  That conduct says

23   that it's not an attempt to define specifically what one

24   should do or not to do, but communicates the university's

25   expectation of proper conduct and what professional

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    conduct the university values.

2            It goes on to state that if you've got a

3    problem that is unusual, which I would say this receipt

4    of these paper documents are, seek appropriate guidance

5    when you're faced with the dilemma.

6            The other policy, that all applicable state and

7    federal laws and general university campus policy should

8    be involved, this is in the Computer Use Policy.  That

9    information is presumed public information; and based

10   upon those general guidelines, which I think your common

11   sense would tell you, until confronted with a misconduct

12   investigation, those would be things that you should know

13   and apply.

14           I believe that Kevin Carmody did a very

15   reasonable thing, given those general guidelines, without

16   specific direction or specific reference to a policy.  He

17   gave those documents to his attorney; and his attorney

18   would then provide him with the guidance as to what

19   should happen so that he could comply with the law in

20   light of years of litigation, including involvement by

21   University of Illinois attorneys.

22           The attorney doesn't surreptitiously take the

23   documents, try to extort somebody, try to use the

24   documents outside of a process.  He puts them into the

25   sunshine, files them in court, knowing that, as soon as

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  he files them, the university-affiliated attorneys,

2  Kearns and Lietz, are going to see them.

3          During this time, Kevin Carmody tells Jong-Shi

4  Pang he had received the documents prior to the court

5  hearing on June 25, 2010.  And then toward the end of the

6  presentation of all the testimony, you saw that Joseph

7  Bohn had noted additional information that, when he spoke

8  with Dr. Pang, Dr. Pang told him Deborah Thurston came

9  in, said she was subpoenaed relating to the Group Exhibit

10  A documents.

11          So this isn't a situation where the documents

12  came into Mr. Carmody's possession, and he secreted them.

13  They were used in compliance with what should have

14  happened in the underlying litigations.

15          The U of I attorneys go into court.  They want

16  to suppress the use of the Group Exhibit A documents in

17  the court proceedings; and the result of that was the

18  issuance of a protective order.

19          Now, you're going to actually see Joint Exhibit

20  Number 2.  It was also referred to as Plaintiff's Exhibit

21  Number 11.  The judge read for you the pertinent part.

22  But you'll look at that, and you'll see that that is the

23  portion that talked about the no secondary dissemination

24  of the documents, that the documents were sealed.

25          And that became quite important because, as

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    things evolved later, the plaintiff made good faith

2    decisions relative to whether or not he would do certain

3    things that may be violative of that order.

4            So in spite of the fact that the Group Exhibit

5    A documents were under seal and it seems pretty clear

6    that they aren't supposed to go beyond the respective

7    litigations of the three lawyers here -- it didn't say

8    however many attorneys you have, however many attorneys

9    the university has, you can give copies to them -- but in

10   spite of the fact that the judge did that, the document

11   ended up in the hands of Laura Clower; and, oh, maybe

12   that's just something that could be overlooked, one

13   attorney to another attorney.

14           But Laura Clower then, the evidence is

15   undisputed, gives the documents to one of the

16   investigators, either Joseph Bohn, Sharon Stone, or

17   Deborah -- I'm sorry -- Deborah Stone, Sharon Reynolds,

18   or Joseph Bohn.  And then they use that document in

19   formulating charges and ultimately doing the, whatever

20   happened on the, July 28th.

21           University employees and the defendants

22   apparently determined that there is a serious malfeasance

23   involved with this paper document coming into the

24   possession of Mr. Carmody, and they start an

25   investigation.  We believe the investigation was one in

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    which the defendants knew from the very start it was on

2    extremely thin ice.

3            If documents were accessed from a device or

4    database years ago, 2005, 2007, they wouldn't be able to

5    forensically or scientifically show a source.  So they

6    couldn't prove there was a security breach.  They

7    couldn't prove that Kevin Carmody was involved in it.

8            If they looked at the equipment of Thurston and

9    Carmody for recent activity and they found nothing, you

10   could say common sense would tell you they've got a big

11   problem here with trying to fire Mr. Carmody based upon

12   access to information if they had contrary scientific

13   proof.

14           So the, what they did, instead, they developed

15   something different.  Ultimately, I think they knew Kevin

16   Carmody was going to respond, "I didn't hack the

17   computers."  And if there was no evidence that the

18   computer system was hacked, again, common sense would

19   dictate to you:  They'd have a real problem with their

20   investigation.

21           If they claim, "Well, he might have hacked this

22   computer between 2005 and 2009," that just doesn't square

23   with common sense.  With this litigation going on, Robert

24   Kirchner, I believe, would have argued -- and I think

25   they knew he would have argued -- "Well, if he had these

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    documents in 2005 or 2009, he would have given them to me

2    years ago, and we would have used them at that time

3    relative to this litigation."

4         So what was the conclusion?  I think the answer

5    again -- common sense gives that to you.  They didn't

6    bother to look, and that fact is undisputed because they

7    were afraid of what they'd find.  They'd find nothing

8    scientifically that would implicate Carmody, and he was

9    never given an opportunity to look himself.

10        So, they opted for charges that were incomplete

11   and vague; and they freely admitted that they would be

12   subject to evolution, that when you come in and we talk

13   to you about what you're charged with, we might change

14   the charges.  At that time, you might have an opportunity

15   to learn of the specific policies that you are being

16   charged with.

17        They developed charges that were signed by the

18   dean of the college, who knew nothing firsthand; and they

19   ultimately developed this charge letter that you've seen

20   that has one bullet point for the charge.  It has

21   "improper use" in the first paragraph.  But why wasn't

22   "improper use" in the preamble rather than part of the

23   charges?  Why wasn't it number 2?

24        Why were there multiple sentences in one bullet

25   point charge rather than multiple bullet points?

2:12-cv-02249-CSB-EIL  # 119  Page 118 of 152
Carmody v. Board of Trustees of the U of I, et al., No. 12-2249
118

1          Why wasn't there specifically a charge of

2     "failure to report" as either item number 2 or one of the

3     bullet point items?

4          Why weren't there specific policy provisions or

5     an explanation of the U of I interpretation of the policy

6     that they thought was applicable put in there?  Or given

7     to him sometime during the process, either at this

8     meeting or anything else?

9          And, again, I think common sense gives you the

10    explanation for that.  The investigators, Bohn and

11    Reynolds, could make findings supporting a decision

12    without the inconvenience of Kevin Carmody and his

13    attorney presenting contradictory facts or explanations.

14         So, Kevin Carmody, when he gets charges, makes

15    a very reasonable thing, I think, common sense tells you

16    one would do; and, in Exhibit 3, he says, "What

17    provisions of these identified policies did I allegedly

18    break?"

19         And they didn't tell him anything.  They didn't

20    tell him anything before the meeting.  Didn't tell him

21    anything at the meeting.  Didn't tell him anything at any

22    time until he was actually fired on September 23, 2010.

23         I think an example would score this.  If you're

24    pulled over by the State Police on the interstate and you

25    look at your ticket and it says you violated the Motor

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   Vehicle Code and you ask, "What provision did I violate?"

2   and the officer tells you, "Come to court.  You'll find

3   out," that isn't a reasonable notice of the charge so

4   that you would have a reasonable opportunity to respond

5   to it.

6          So, what's the conclusion that the evidence

7   shows?  That investigators Joseph Bohn and Sharon

8   Reynolds, one, either didn't know what the applicable

9   policies were and nevertheless started an investigation

10  and intended Mr. Carmody's one and only chance to respond

11  to be in that meeting of July 28, 2010, in which the

12  charges could evolve based upon his presenting the best

13  defense he could.  That would be reckless conduct in my

14  opinion.

15         Or, they knew one or more were applicable and

16  didn't tell him.  That would be either reckless or

17  malicious conduct.

18         They knew none were applicable, which would

19  definitely be malicious conduct.

20         Or they didn't care which ones were applicable,

21  as it was Kevin Carmody's problem if he didn't figure it

22  out, and it would be Kevin Carmody's problem if he said

23  something that led to another charge.  And I think that

24  is reckless and malicious.

25         Kevin Carmody attended the hearing.  There's

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    conflicting evidence that you heard as to what happened.

2    The investigators, Joseph Bohn mainly and Sharon

3    Reynolds, also state, "We tried to ask questions, and Mr.

4    Carmody didn't respond.  We offered to allow questions to

5    be asked, but Kevin Carmody didn't have any questions to

6    tell us.  Therefore, we concluded he didn't want to

7    participate in the process."

8           Now, Mr. Carmody gives a different version.  I

9    think some of the documents suggest a different version;

10   and we believe it's more credible what his version was.

11   That he goes in there, having previously asked what

12   policies are applicable and being referred right back to

13   that one bullet point charge, and his attorney explains

14   in the process early on, "We can't talk about the Group

15   Exhibit A documents."  They hand him the Group Exhibit A

16   documents that are supposed to only be in three

17   litigation files that are under the protective order and,

18   again, begin the interrogation.

19          Mr. Carmody indicates that he asked questions,

20   but they were not answered.  And we believe that the

21   evidence is more credible that the two investigators only

22   asked questions in which his attorneys had articulated

23   would be a subject matter of the protective order that he

24   couldn't do.

25          So they say he did not ask questions about

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  the -- or Mr. Carmody indicates they did not ask him

2  about the conduct or reporting.  Mr. Carmody indicated

3  that he couldn't answer questions about the contents of

4  the documents themselves.

5          But one thing, I think, is undisputed is that

6  they did not identify in that meeting, or for that matter

7  any other time, what specific policy provisions were

8  applicable.  And their only explanation was, when I asked

9  that question, "That's not our practice."  So the

10  conclusion, we believe from the evidence, is Kevin

11  Carmody was prevented from a reasonable opportunity to

12  respond to what the investigators wanted to ask relative

13  to the documents until the State Court order was removed.

14          The university seems to suggest that, well,

15  Kevin Carmody could have got the protective order lifted

16  and participated.

17          It was the U of I affiliated attorneys that

18  caused the creation of the protective order in the first

19  instance.  They took no action to modify it.  The --

20  their purported reason was "we're not a party to that

21  litigation," in spite of the fact that they had two

22  assigned attorneys that were involved with it who brought

23  the existence of the protective order into play the first

24  time.  That certainly didn't prevent Laura Clower from

25  writing the judge the day of the emergency hearing on

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  September 23, 2010, to purportedly correct the record

2  relative to what was in the motion at that time.

3          So the argument the university wasn't a party

4  to the litigation so "that's why we didn't do anything to

5  lift the protective order," I think common sense would

6  tell you is, borders on specious.

7          Why didn't they write the judge, or why didn't

8  the defendants ask one of their attorneys, Mr. Kearns or

9  Mr. Lietz, to write the judge on July 29, 2010, so that

10  everything could be aired out?  And I think common sense

11  gives you the answer for that.

12          It would be easier for the investigators to

13  make findings and recommendations for termination, again,

14  without the inconvenience of Kevin Carmody or Robert

15  Kirchner providing conflicting evidence or arguments that

16  policy provisions cited were not applicable.

17          What would have obviously been presented, Kevin

18  Carmody would have said, "I didn't steal data from

19  anybody's computer."  Robert Kirchner would have argued,

20  "If Kevin Carmody had done it recently, the U of I brain

21  trust of Corn and -- Mike Corn and Charles Thompson would

22  have developed scientific guidelines that would have put

23  this issue to rest quickly and unequivocally.

24          It was not likely that Kevin would have stole

25  data years ago and held it for use at a later point in

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   time.

2           The second thing Kevin Carmody would have said

3   is, "I, I don't know the source of the documents."  In

4   fact, they already knew that.  He received the documents

5   anonymously in his mailbox.

6           His attorney would argue:  Without knowing the

7   source, how on earth could you know if there was a breach

8   of security or if the documents actually came from a

9   University of Illinois database?

10          Kevin Carmody, based upon what we've seen,

11  reasonably concluded, could have concluded that it was my

12  lawful obligation to give the documents about the

13  Goldberg litigation to my attorneys to do whatever they

14  needed to do in supplementation of pretrial discovery or

15  whatever the court proceedings would be.

16          And the -- ultimately, the -- that happened,

17  and they're -- like I say, Robert Kirchner would have

18  argued there's no ulterior motive in using these

19  documents for personal gain because we're going to take

20  them and file them, and everybody will have them so that

21  Judge Leonhard can determine what the allowable use

22  should be.

23          And Kevin Carmody would specifically have

24  stated, as he did on the stand, he told Dr. Pang, his

25  immediate supervisor at the time, about the documents.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1          After July 28, 2010, Defendants Bohn and

2   Reynolds continued their investigation.  No action was

3   taken on their part; no request was made on their part to

4   lift the protective order.  They developed draft findings

5   in the absence of the Carmody participation.  And in

6   light of their findings and a meeting relating to the

7   findings, before they were actually completed and

8   finalized, they never came out and said:  Okay, let's

9   just do a charting -- amended charging letter.

10          Now let's add number two:  You failed to report

11  your receipt of the paper documents to Jong-Shi Pang in

12  violation of university policy, whatever they thought the

13  policy was at that point in time, even though we heard

14  from Charles Thompson in his video deposition that he

15  identified Policy 6.2 and 6.3 of the Computer Use Policy.

16          Nevertheless, the September 7, 2010, findings

17  come out.  Kevin Carmody and his attorney want to

18  challenge those findings that were made in the absence of

19  his reasonable opportunity to respond and participate in

20  the process.  But, regrettably, the protective order

21  still exists, and the U of I unilaterally determined

22  we're going to make a decision on September 23rd.  And

23  the emergency -- or a hearing before Judge Leonhard was

24  scheduled that same day to deal with vacating or changing

25  the order.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1              Now, why did they pick September 23, 2010?
 2   Well, there's an explanation for that, I think common
 3   sense tells you, based upon the testimony of Mr. Carmody.
 4   There was a, going to be a trial that week; and when the
 5   trial was over, then the university wouldn't need to try
 6   to take advantage of the protective order relative to
 7   that litigation anymore, and so that would be a good day
 8   to lift the order when they already had the termination
 9   letter in hand and they could tell everybody, "Well, we
10   didn't terminate him until the protective order was
11   lifted," even though, of course, they already had
12   intended to do it and the document was in hand to do it.
13   In other words, they could say, "He wasn't fired until
14   after the protective order was lifted."
15              But they didn't give him an opportunity to do
16   anything else; and the actual number five, which is the
17   termination letter, the -- in that third paragraph is
18   what the university found.  And, obviously, when you
19   compare the bullet point one to that one, it's different;
20   and it includes this failure to report argument.  The
21   university and the defendants' explanation for that is:
22   Well, that isn't an additional charge.  It isn't an
23   additional charge.  It's just information.
24              Well, I think there's an old saying.  If you
25   can't say it isn't so, change the subject.  I guess the
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   new way of putting it is:  Spin it different.

2           But it's undisputed that those things are

3   different, and -- they're different subject matter, and

4   it required them to amend the charge or delineate a

5   charge if they wanted to make a failure to report a

6   problem that would result in termination.  Or if it was

7   going to be elevated to something that tied into a

8   policy, it needed to be tied into the policy also.

9           No defendant ever bothered to amend the charge,

10  to provide Kevin Carmody that.  No defendant ever

11  identified a policy provision or a breach of an

12  interpretation of a policy to, to the dignity of an

13  allegation of a dischargeable cause.

14          And, again, I think maybe traffic analogies are

15  good.  You're pulled over.  You're charged with driving

16  too fast.  You go to court.  You present your evidence.

17  The judge says, "I convict you for failure to give a turn

18  signal and making an improper lane usage."  We don't

19  allow that.  You should have an opportunity to know what

20  is the charge, what is the crime, and then you can

21  respond to it.

22          Now, we believe that -- the judge told you

23  about the jury verdict form.  We think you can put the

24  boxes that -- the Xs in favor of the plaintiff, and

25  you'll need to look at damages.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1        You have an undisputed document that Mr.

2   Carmody made $73,695 a year.  He was a long-time

3   employee, worked for almost 30 years.  There's no

4   evidence that they would have let such a seasoned person

5   go for any reason.  Academic professionals would at least

6   have to be given a one-year notice of non-renewal anyway.

7   So we believe he would have continued at the University

8   of Illinois.

9        Common sense tells you that would have

10  happened.  He would not have given that job up, given he

11  needed to stay here because of family obligations.  So

12  that for 18 months, or a year and a half, he lost that

13  $73,695.

14       He worked for a year at less money.  The

15  difference is $3,695.  Then between then and now --

16  that's approximately another three years -- that 73,695.

17  And whether you want to look at it as five and a

18  half years of 73,695 less 70,000 or look at it as one and

19  a half years of 73,695, one year at 3,695, three years at

20  73,695, those numbers come up to be $335,322.50.  And I'm

21  sure you can all check my arithmetic if you think you

22  need to do that.

23       Now, would he still be working?  I think the

24  evidence would show, again, why would he quit?  He had a

25  career.  He had a job.  It paid good.  So would he have

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    worked in the future?  You'll need to decide how many

2    years he would have worked in the future.  My suggestion

3    is there's no basis in the evidence he wouldn't work --

4    wouldn't have worked until he was age 65.  So ten years

5    of 73,695 is 736,950.  If you add both those up, I think

6    it comes to $1,072,272.50.  And you'll need to check my

7    arithmetic on all of that.

8            Now, you heard him testify that he was

9    devastated when this happened.  Common sense would tell

10   you that would be what you would expect.  He confirmed

11   that it permeated every aspect of his life, his

12   relationship with his wife, his children, his peers, his

13   colleagues, his fixation on it, the stress caused by

14   financial difficulties caused by it.  And you'll need to

15   figure out, or provide, based upon your collective

16   judgment, what number should be provided in that slot for

17   the five and a half years he suffered and any suffering

18   that you think will continue into the future based upon

19   the same factors being present now as they've been

20   involved since he hasn't had a revenue.

21           I think a guideline would be you'll have to

22   look at some ratio of that million dollar figure, a

23   fraction of it, an equal amount of it, a multiple of it.

24   You'll have to decide that based upon what you are going

25   to look at and, as you looked at him testifying and heard

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    his testimony, as to the impact on his life.

2          And I talked about actions of either not caring

3    about the policies, not caring about his ability to

4    respond, or lifting the protective order.  It's either

5    reckless or malicious conduct or both.  So you also need

6    to look at those lines for punitive damages and look at

7    those based upon what the judge told you.

8          And, again, I think your guideline would be you

9    go back to the compensatory damages, however you figure

10   that out, and you look at the compensatory damages and

11   apply some ratio to that.  Again, maybe a fraction of

12   that.  You might divide an amount you feel appropriate

13   between the three defendants, or you might multiply it.

14   But any of those would be within your discretion and

15   guidelines, and we thank -- you know, we ask you to

16   consider that and do it.

17          So with that, again, I thank you.

18          THE COURT:  Thank you, Mr. Tague.

19          Mr. Brinkmann.

20          MR. BRINKMANN:  Thank you, Your Honor.  May it

21   please the Court, --

22          THE COURT:  It does.

23          MR. BRINKMANN:  -- Mr. Tague.

24          Ladies and gentlemen of the jury, on behalf of

25   Deborah Stone, Sharon Reynolds, and Joseph Bohn, I want

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   to thank you for your attention during the course of this

2   trial.

3          This trial is the only opportunity that my

4   clients have to respond to the claims by Mr. Carmody that

5   they violated his constitutional rights; and for that

6   reason, your attention has been important to us during

7   this case, and we thank you for that.

8          Mr. Tague has just asked you for a, quite a

9   large amount of money.  It's, from the wage standpoint,

10  he's asked for over a million dollars.  He's asked for

11  damages for emotional distress.  He's asked for damages

12  for punitive conduct -- punitive damages.

13         Our position in this case is that Mr. Carmody's

14  not entitled to any damages; that your award should be

15  zero damages.  But because this is an element of the case

16  that the judge will be instructing you on, I'm required

17  to discuss this with you.

18         Now, Mr. Carmody is essentially claiming that

19  he's entitled to be reimbursed for his salary in the

20  indefinite future.  And he assumes that he's entitled to

21  continued employment with the University of Illinois

22  where he had a one-year contract from year to year; it

23  would be renewed.  And he's claiming that he is entitled

24  to expect that he would continue to work indefinitely

25  into the future because he didn't get a one-year notice

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    of termination of that employment.

2              In this case, Mr. Carmody did get a notice of

3    termination of employment.  This is not a case where he

4    was terminated without cause.  It's a case where he was

5    terminated with cause.  And he received notice of

6    termination in the termination letter of September 23,

7    2010, and he is not entitled to expect to continue to

8    have employment with the university indefinitely after

9    getting notice of the fact that he's been terminated.

10             He lost wages for 18 months and then was

11   employed at $70,000 a year.  That's an amount that he's

12   not entitled to be paid for twice.  He can't say, "I'm

13   entitled to the university's salary" and, and not deduct

14   the amount that he was earning in Springfield.  He worked

15   at that job in Springfield for one year, and then he

16   voluntarily decided that he would retire, and he's been

17   retired since then.

18             He has not sought employment, and he has been

19   getting 80 percent -- a little more than that actually --

20   of his former salary in the pension moneys that he's

21   collecting from the state.  So I submit to you that he

22   was not entitled to the wages that he's claiming; and

23   he's not, in fact, lost the income that he's claiming

24   based upon the employment that he had and the pension

25   funds that he gets even up to now.

1          He claims emotional distress.  He testified

2     about the impact on his life of this proceeding where he

3     got notice of charges and was terminated.  He wants to

4     blame all of his personal problems on Deborah Stone,

5     Sharon Reynolds, and Joseph Bohn for doing their job,

6     doing the job that the university assigned to them, and

7     for doing it in the way that they were trained to do it

8     and the way that their office standard practices required

9     them to do it.

10          Mr. Carmody tells us that he has no

11     relationship anymore with his family, his colleagues, his

12     friends, his neighbors; and it's all the fault of the

13     defendants.  Now, he does admit that his marital problems

14     were pre-existing; but Mr. Carmody takes no personal

15     responsibility for any of his personal problems.

16          And in this type of a situation, one would

17     expect that Mr. Carmody would have a former colleague,

18     the brother that he still talks with, a child -- someone

19     come in and corroborate what he was like before, what he

20     was like since.  No such witness has been called by Mr.

21     Carmody to corroborate, and this is all his claim, his

22     word.

23          Mr. Carmody also wants you to award punitive

24     damages.  These are damages to punish the defendants for

25     doing their job.  Now the judge is going to instruct

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1  you -- and he has instructed you -- about punitive

2  damages.  Mr. Carmody has to prove that there was

3  maliciousness, that there was an intent to injure him to

4  award punitive damages.

5         As, as I said, the defendants here were

6  performing the job that they were responsible to perform

7  at the university.  Deborah Stone was the director of

8  Academic Human Resources when legal counsel advised her

9  of Mr. Carmody's use of these confidential email messages

10  where he was not a recipient, not a sender, not copied.

11  Clearly confidential, clearly a breach of security.  She

12  assigned it to Sharon Reynolds and to Joseph Bohn.  She

13  had no involvement in anything until September when she

14  received the recommendation letter, the findings and

15  recommendation letter.  There is no evidence that she was

16  guilty of any malicious conduct or intent to injure Mr.

17  Carmody.

18         Sharon Reynolds and Joseph Bohn, they were

19  assigned this case.  This was their job.  They do many --

20  I think Sharon Reynolds said she's done over 90

21  investigations similar to this.  These investigations go

22  on frequently at the University of Illinois.  They have

23  standard practices that they follow.  They have training

24  in how to do it.  And that's what they followed in this

25  case.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1       There's no evidence that Sharon Reynolds or

2  Joseph Bohn in carrying out their responsibilities did so

3  with any malice, did so with any intent to injure Mr.

4  Carmody.  They were following the procedures that they

5  were supposed to follow.

6       This was a breach of security, and I think

7  that's pretty clear from the evidence in this case.

8  Attorney-client privileged communications, business

9  communications, personal correspondence of Deb

10  Thurston -- this was a breach of security.

11       Judge Bruce has instructed you that if you find

12  for the defendants on liability, you have no need to

13  consider damages, and I suggest to you that that's the

14  case that we have here.  If you find -- and you should

15  find -- for the defendants on liability, therefore, you

16  have no need to consider damages.  Now, with respect to

17  liability, I think the strongest evidence, the best

18  evidence is that there was a reasonable notice of

19  charges, and there was a reasonable opportunity to

20  respond.

21       In my opening statement to you, I used the word

22  "relevant" issues during this case.  And I tried to

23  stress that word "relevant" because that's a key word in

24  this case.  The instruction by Judge Bruce is that Mr.

25  Carmody is claiming that he did not get reasonable notice

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   of charges.  He did not get reasonable opportunity to

2   respond.  That's what this case is about.

3           Exhibit, Joint Exhibit 4 -- and, you know, I

4   don't want to beat a dead horse.  Joint Exhibit 4 is in

5   black and white what the charges are, and this is what

6   you need to look at when you're deliberating in this case

7   to decide for yourself:  Is this reasonable notice?  I

8   think that it's very specific.  It tells what the

9   concerns are.  It gives him the Policy, the Code of

10  Conduct.

11          Mr. Tague is arguing to you that the university

12  shouldn't have even had possession of it.  These were

13  messages on university servers.  It was from university

14  databases.  If Mr. Kirchner or Mr. Carmody thought that

15  having possession of these documents violated the judge's

16  order, they would have gone in to Judge Leonhard and

17  said, "Judge Leonhard, the university attorneys for

18  Mr. Goldberg and for university witnesses in the Goldberg

19  litigation, they have violated your order."  They didn't

20  do that.

21          This, this is information that was in the

22  possession of the university system.  They were

23  university email addresses.  If they thought this was a

24  violation of the Court's order, they would have raised

25  it.

1          Now, Mr. Carmody is trying to avoid the fact

2     that he got reasonable notice of the charges by saying he

3     was not told what section of the Policy, and he was not

4     told what sentence in the one-page Code of Conduct that

5     he was supposed to have violated.

6          Mr. Carmody looked at these documents.  They're

7     not complicated.  You will have them as part of the

8     exhibits that you can look at in your deliberations.  He

9     reviewed them with his attorney.  He even went over each

10    section of the Policy on Appropriate Use of Computers.

11    So he knew very well what was in there, what was

12    prohibited, that he was supposed to get permission, that

13    he was supposed to give notice to Deb Thurston if he got

14    ahold of confidential information.  He knew that very

15    well.

16         This is a false issue in this case, and the

17    reason that it's raised is -- the real reason that it's

18    raised is that Mr. Carmody did not want to engage in the

19    process.  Mr. Carmody is not taking any personal

20    responsibility for having gotten the notice of charges

21    which he read and reviewed with his attorney.

22         Now, I think that the best evidence that Mr.

23    Carmody did not want to engage in the process comes from

24    his behavior at the meeting where he had an opportunity

25    to respond.  He came to that meeting knowing what the

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   purpose of the meeting was.  He came to that meeting

2   knowing that this was his opportunity to respond.  He was

3   well aware that the issues at that meeting were use and

4   access of the emails of Professor Thurston.  The issue

5   was not about discovering what was the content of those

6   emails, which is what he's trying to say.  The content of

7   those emails is described in the charge letter; so at the

8   meeting, they weren't trying to discover what was the

9   content of the emails.

10          We looked at Joint Exhibit Number 2, which is

11  the proceedings before Judge Leonhard on June 25 of 2010,

12  and you'll have that to look at when you do your

13  deliberations.  The language in Judge Leonhard's order,

14  page 26, is quite clear.  And it says that he is

15  prohibiting the parties from disseminating the contents

16  of the email.  That says nothing prohibiting Mr. Carmody

17  from talking about use of the emails, access to the

18  emails.

19          Mr. Carmody told us that he obtained these in

20  his mailbox.  We don't know if that's true or not.  He

21  did have access to this information as the information

22  technology manager of this department.  He had access to

23  the servers.  He had access to the work stations.  Those

24  were all removed from his control when he was suspended

25  with pay.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1          But he kept these documents for about two weeks

2     before his attorneys filed them with the Court.  We don't

3     know if he made copies.  We don't know what he did

4     because he didn't engage in the, in the information

5     gathering process.

6          But we do know that the court order did not

7     prevent him from answering questions about how he used

8     the documents and how he accessed the documents.

9          Now, part of the charging letter reference is

10    Mr. Carmody not getting permission; and at that meeting

11    on July 28th, Mr. Carmody was going to be asked

12    questions.  And I hope you will look at Joint Exhibit

13    Number 10 when you do your deliberations.  These are the

14    questions that Joseph Bohn intended to ask.  He got

15    partially through them.

16         But if you look at these questions, none of

17    them are questions about the contents of the email.

18    Mr. Kirchner, according to Mr. Carmody, was objecting

19    because he was saying Mr. Carmody could not talk about

20    the contents of the email.  All of the questions that Mr.

21    Bohn attempted to ask, and intended to ask, which are set

22    out in this exhibit, refer to the use, the access, and

23    permission to use the emails.

24         Joint Exhibit 11, which we talked about this

25    morning, is the notes of the recorded -- the answers by

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   Jong-Shi Pang.  Mr. Tague repeated to you in his closing

2   argument that Mr. Carmody told Dr. Pang that he had these

3   packages of emails of Deborah Thurston.  This is a

4   document that was created at the time of the interview

5   with Dr. Pang.  It was created before anyone knew there

6   was going to be a lawsuit.  It was created before there

7   was a decision made on what to recommend as far as

8   discipline for Mr. Carmody.  It was created before Mr.

9   Carmody was terminated from employment.

10          I suggest to you that this is the best evidence

11   of what Dr. Pang was told and what he was not told.  And

12   when you look at the questions and answers to Dr. Pang,

13   you will see that he clearly says that Mr. Carmody never

14   reported to him that he had these emails.

15          The other questions are also of interest in

16   the, in the case because they go to what, whether or not

17   Mr. Carmody had permission to use emails.  Did he get

18   permission from somebody else?  Did they know about what

19   he was doing?  These are all of the questions that Joseph

20   Bohn was attempting to ask Mr. Carmody so that they could

21   gather information for their investigation so that they

22   could give him his constitutional right to respond.  This

23   was his opportunity.

24          The answers by Dr. Pang are important, and I

25   hope you will look at them when you do your

1    deliberations.

2           Joint Exhibit 12 is the recorded answers of Deb

3    Thurston.  This was briefly discussed during the trial.

4    You will have this to look at in your deliberations as

5    well.  In her answers that were given -- again, at the

6    time of the investigation before anyone knew there was

7    going to be a lawsuit -- she confirms that she did not

8    give permission to Kevin Carmody to have these.  He

9    didn't tell her that he had them.  She doesn't know how

10   he got them.  They came from her computer.  They were not

11   copied to Mr. Carmody.  And she talks about the impact of

12   this episode to her.

13          But the reason that these are important and I

14   point them out to you is because this is what my clients,

15   Sharon Reynolds and Joe Bohn, relied upon in good faith

16   in conducting their investigation in trying to discover

17   what the facts are.  And this information was

18   uncontradicted by Mr. Carmody.  He had a period of six

19   weeks after June 28.  It's undisputed that they left the

20   door open for him to respond after June 28th.  He was

21   told he could respond in writing.  He was told that the

22   investigation was continuing, and I think those are

23   undisputed.

24          So Mr. Carmody refused to engage in the

25   process, and this was the information that was relied

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   upon in good faith.  I think if you put this all

2   together, you will find that the charge letter did give

3   Mr. Carmody reasonable notice.  He had multiple

4   opportunities to give some kind of a response.  He

5   continued to drag out the process.

6          His attorney was aware that there was a dispute

7   over the interpretation of the court order.  This is from

8   Plaintiff's Exhibit 14.  This is a letter from Rhonda

9   Perry dated August 11.  It informs Mr. Kirchner in no

10  uncertain terms that she disagrees with him on the

11  interpretation of the judge's ruling, and she also

12  offers -- she says, "I would be happy to join you in a

13  motion for clarification if you feel that's necessary."

14         Mr. Tague is trying to imply that it was the

15  university's burden to go into court and to have the

16  order clarified.  We think the order was clear.  It only

17  says, "Don't disseminate the contents."  Mr. Kirchner was

18  aware that the burden was on him, and he did nothing.

19         I think, again, if you put this all together,

20  it demonstrates that the defendants did not violate the

21  constitutional rights of Mr. Carmody; and for that

22  reason, I ask you to bring a verdict at the close of your

23  deliberations in favor of the defendants and against Mr.

24  Carmody.

25         Now, Mr. Tague will have an opportunity to talk

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   to you again in rebuttal.  I will not get the opportunity

2   to respond to what he says to you.  And what I ask you to

3   do when you deliberate is to trust your own memories,

4   trust your own common sense, and we will be waiting for

5   your verdict.

6          Thank you.

7          THE COURT:  Thank you, Mr. Brinkmann.

8          Mr. Tague.

9          MR. TAGUE:  I'll attempt to be brief.

10          There's no question that we asked for a lot of

11   money in the award because the numbers, the arithmetic

12   would suggest it.  Ultimately, you will need to decide

13   whether or not you should subtract the retirement Mr.

14   Carmody worked for and took early; that but for this,

15   what we believe the improper termination, he wouldn't be

16   tapping that $60,000 a year.  But you can decide whether

17   or not you should adjust the numbers based upon his

18   retirement that he's earned since he's taken it.

19          And I think you have to decide whether or not

20   he would have taken the retirement when he did but for

21   the turmoil he was placed in based upon this early

22   termination and forced termination that was against his

23   will.

24          Again, I think you can use your common sense to

25   determine whether or not Mr. Carmody, having received a

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    renewal of his contract for 29, 30 years, if it was

2    reasonable to believe that he would have received a

3    renewal from the time he was involuntarily terminated

4    until today and even at points past today to a typical

5    retirement age, which we would suggest is somewhere

6    around 65 years of age.

7            Mr. Brinkmann suggested, well, his emotional

8    distress, he didn't have any; or it was all his

9    responsibility.  You heard testimony that he had

10   emotional distress.  It disrupted his life.  He was

11   candid with you that he had some marital difficulties

12   before this termination, and it simply got worse and

13   aggravated.  To suggest that there was no emotional

14   distress, I just think, just belies common sense.

15           The nature and degree, duration and extent of

16   it, and whether he could have done anything to prevent it

17   based upon the evidence you heard, obviously, you will

18   take that into consideration as to what you put in for

19   that particular number.

20           Mr. Brinkmann suggests that the defendants were

21   only doing their job.  I would suggest to you it was the

22   defendants' job, based upon their experience, their

23   training, and the Constitution of the United States, to

24   give Mr. Carmody a fair investigation, to give him a fair

25   hearing, to tell him:  These are the laws, policies,

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    specific provisions that you violated.  These are all the

2    charges, either in the initial charge or in an amended

3    charge, and rather than this, well, it's our practice

4    that when you come to the hearing there's this fluid

5    exchange; and you can learn what you're charged with,

6    what policies are implicated, based upon us asking you

7    questions.

8            Rhonda Perry testified in this case.  Her

9    testimony was brief, but she said she kept all the

10   defendants apprised of the interaction that Mr. Carmody

11   maintained, what we believe is a good faith

12   interpretation of the judge's order, based upon the

13   document I showed you that these records, if they were

14   ever in the university database -- which there's

15   certainly evidence that they were -- are presumed by

16   definition to be public documents and not this other

17   confidential information that is out there.

18           So the other important thing, I think, that Mr.

19   Brinkmann did not discuss with you is:  Why weren't the

20   computers examined?  If it was a claim that Mr. Carmody

21   accessed one of the university's computers --

22           MR. BRINKMANN:  Excuse me, Your Honor.  This is

23   improper rebuttal.  But, also, we have had many rulings

24   by the Court that whether or not the investigation could

25   have or should have been done differently is not a proper

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1    issue before the jury.

2              THE COURT:  That is correct.  I will sustain

3    that.

4              Move on to a different area of argument.

5              MR. TAGUE:  I'm done.  Thank you.

6              THE COURT:  All right.  With that, ladies and

7    gentlemen, at this time, please retire to the jury room

8    to begin your deliberations.

9              And we have to -- we have to swear in the

10   bailiff.

11                  (Court security officer sworn, 2:30 p.m.)

12                  (Deliberations begin, 2:30 p.m.)

13             THE COURT:  The jury has left the courtroom.

14   Please be seated.

15             All right.  Mr. Tague, Mr. Brinkmann, we know

16   the exhibits that are going back to the jury.  My

17   courtroom deputy will make sure those are sent back there

18   fairly promptly.

19             If the jury has any questions during

20   deliberations, we'll need to be able to get in touch with

21   you reasonably quickly.  Make sure my courtroom deputy

22   has your cell phone numbers so if we need to call you we

23   can.

24             I will tell you that I will wait a reasonable

25   time.  I'm not sure what "a reasonable time" is.  But

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1   I'll wait a reasonable time for you to return before I
 2   answer any questions, if there are questions.  If you are
 3   not to be found, I will -- and not back within a
 4   reasonable time, I will answer without your input.  I do
 5   not let you hold the jury hostage.
 6              That's it.
 7              Anything further you'd like to raise, Mr.
 8   Tague?
 9              MR. TAGUE:  Where do you expect us -- so we can
10   go wherever we want to go so long as we're back here at a
11   reasonable time?  Do you expect the jury to be done today
12   or --
13              THE COURT:  Well, you know, I'll talk to them
14   sometime around 4:30 to ask if they want to stay.  But,
15   you know, just be available and make sure my courtroom
16   deputy can get ahold of you.  If we get a verdict, I'll
17   call you and tell you we have a verdict.
18              MR. TAGUE:  Okay.
19              THE COURT:  Just -- I mean, if you're saying,
20   "I'm thinking about driving to Chicago," my suggestion
21   would be no.
22              MR. TAGUE:  Well, that is where the Appellate
23   Court is; but, hopefully, we're not going to have to
24   predict that at this point in time.
25              THE COURT:  No.  I mean, you know, if you -- if
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

```
 1   you want to stay here in the building, that's fine.  I

 2   mean, no one's ever asked me.  People are just around.

 3   We can find people usually.

 4              MR. TAGUE:  Okay.

 5              THE COURT:  Mr. Brinkmann.

 6              MR. BRINKMANN:  We can get in and out at 4:30

 7   and 5:00 if that's --

 8              THE COURT:  Yep.

 9              MR. BRINKMANN:  Okay.

10              THE COURT:  Not a problem.

11              All right.  Anything further you wish to raise,

12   Mr. Brinkmann?

13              MR. BRINKMANN:  No.

14              THE COURT:  All right.  We'll be in recess.

15                 (Recess, 2:33 p.m. to 3:09 p.m.)

16              THE COURT:  All right.  We're back on the

17   record in Carmody versus University of Illinois, et al.

18              Both counsel are here.  All parties are here.

19   We received a verdict at 3:02?

20              COURT SECURITY OFFICER:  Yes.

21              THE COURT:  Any reason not to bring the jury in

22   and get the verdict?  Mr. Tague?  Mr. Brinkmann?

23              MR. TAGUE:  [Shaking head from side to side.]

24              MR. BRINKMANN:  No, Your Honor.

25              THE COURT:  All right.  Let's bring them in.
```

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1          (Brief pause in proceedings.)

2          THE COURT:  All right.  Please be seated.

3          I am looking -- a-ha, Xxxxx Xxxxxxx, Juror

4    Number 63, are you the foreperson?

5          JUROR NUMBER 63:  Yes.

6          THE COURT:  Has the jury reached a unanimous

7    verdict?

8          JUROR NUMBER 63:  I'm sorry?

9          THE COURT:  Has the jury reached a unanimous

10   verdict?

11         JUROR NUMBER 63:  Yes, we have.

12         THE COURT:  Would you pass it to the court

13   security officer or to my -- whichever one -- my

14   courtroom deputy is very fast.

15         All right.  The verdict reads as follows.  "On

16   Plaintiff's procedural due process claims against

17   Defendant Sharon Reynolds, we, the jury, find in favor

18   of" the box is checked for the defendant, Sharon

19   Reynolds.

20         "On Plaintiff's procedural due process claims

21   against Defendant Joseph Bohn, we, the jury, find in

22   favor of" and the space is checked for the spot next to

23   Defendant Joseph Bohn.

24         "On Plaintiff's procedural due process claim

25   against Defendant Deborah S. Stone, we, the jury, find in

1    favor of" and the X is placed next to the space for

2    Defendant Deborah Stone.

3            The rest of the verdict form is blank, as is

4    proper.  It is dated and appears to have the signature of

5    all members of the jury.

6            At this time, I would ask that my courtroom

7    deputy poll the jury.

8            COURTROOM DEPUTY:  Juror Number 90, were these

9    and are these now your verdicts?

10           JUROR NUMBER 90:  Yes, it is.

11           COURTROOM DEPUTY:  Juror Number 27, were these

12   and are these now your verdicts?

13           JUROR NUMBER 27:  Yes.

14           COURTROOM DEPUTY:  Juror Number 110, were these

15   and are these now your verdicts?

16           JUROR NUMBER 110:  Yes.

17           COURTROOM DEPUTY:  Juror Number 1, were these

18   and are these now your verdicts?

19           JUROR NUMBER 1:  Yes.

20           COURTROOM DEPUTY:  Juror Number 51, were these

21   and are these now your verdicts?

22           JUROR NUMBER 51:  Yes.

23           COURTROOM DEPUTY:  Juror Number 82, were these

24   and are these now your verdicts?

25           JUROR NUMBER 82:  Yes.

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1              COURTROOM DEPUTY:  Juror Number 67, were these

2    and are these now your verdicts?

3              JUROR NUMBER 67:  Yes.

4              COURTROOM DEPUTY:  Juror Number 63, were these

5    and are these now your verdicts?

6              JUROR NUMBER 63:  Yes.

7              THE COURT:  All right.  Ladies and gentlemen,

8    on behalf of the judges and the citizens of the Central

9    District of Illinois, thank you for being jurors.  I told

10   you it would be about a three-day trial.  It's about

11   3:15-ish, so just a little bit short of a three-day

12   trial.  I hope you enjoyed yourself.

13             I want to tell you -- and I want to thank the

14   attorneys in front of you -- both of the attorneys, both

15   Mr. Tague and Mr. Brinkmann, did an excellent job of

16   cooperating.  They sped things along substantially so we

17   weren't here for a lot longer.  They were very

18   professional and very gentlemanly in dealing with me.  So

19   I thank both of you gentlemen for your appearances in

20   front of me.

21             All right.  At this time, ladies and

22   gentlemen, --

23             COURTROOM DEPUTY:  They're done.

24             THE COURT:  They don't have any further --

25             COURTROOM DEPUTY:  No.  They don't have to call

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1   back.

2           THE COURT:  My courtroom deputy, who knows

3   things like this, tells me that you are done for good.

4   So once you're done today, we will not need your service

5   again.  Thank you again on behalf of -- well, everybody.

6   Thank you.

7              (Jury dismissed, 3:14 p.m.)

8           THE COURT:  All right.  The jury has left the

9   courtroom.  They've now been discharged.

10          I'll direct the, my courtroom deputy to enter

11  judgment on the verdict.

12          The renewed motion by Mr. Brinkmann under Rule

13  50 at the close of the case is denied as moot.

14          Anything further, Mr. Tague, on behalf of the

15  plaintiff?

16          MR. TAGUE:  Not at this time, Your Honor.

17          THE COURT:  Mr. Brinkmann, anything on behalf

18  of the defendants?

19          MR. BRINKMANN:  No, Your Honor.

20          THE COURT:  All right.  Thank you both,

21  gentlemen.  I really appreciate the professionalism, very

22  nice.  Thank you.  We'll be in recess.

23             (Trial concluded, 3:15 p.m.)

24

25              * * * * * * * * * *

Carmody v. Board of Trustees of the U of I, et al., No. 12-2249

1

2

3

4                    REPORTER'S CERTIFICATE

5

6          I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify

7    that the foregoing is a correct transcript from the

8    record of proceedings in the above-entitled matter.

9          Dated this 23rd day of February, 2016.

10

11

12              s/Lisa Knight Cosimini
                Lisa Knight Cosimini, RMR-CRR
13              Illinois License # 084-002998

14

15

16

17

18

19

20

21

22

23

24

25